UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:19-cv-20073-CMA

SHEHAN WIJESINHA,
individually and on behalf of all
others similarly situated,

        CLASS ACTION

    Plaintiff,

        JURY TRIAL DEMANDED

v.

BLUEGREEN VACATIONS, INC.

    Defendant.
_____/

**PLAINTIFF'S MOTION TO EXCLUDE THE EXPERT WITNESS TESTIMONY
OF JAN KOSTYUN AND INCORPORATED MEMORANDUM OF LAW**

    Plaintiff Shehan Wijesinha, individually and on behalf of all others similarly situated, moves to exclude the testimony of Defendant Bluegreen Vacations Unlimited, Inc.'s putative expert witness, Jan Kostyun ("Kostyun"), on the grounds that: (1) Kostyun is not qualified to testify about the matters for which Defendant presents him as an expert; (2) Kostyun's methodology is unreliable; (3) Kostyun's report and findings do not require expertise and can be adequately duplicated by any layperson; and (4) Kostyun's report does not assist the trier of fact. In support thereof, Plaintiff states as follows.

**BACKGROUND**

    On February 5, 2019, Plaintiff filed his First Amended Class Action Complaint [ECF No. 13] against Defendant, asserting claims for violations of the TCPA based on the telephone call that Defendant sent to Plaintiff's cellular telephone using an automatic telephone dialing system

("ATDS"). On May 16, 2019[1], Plaintiff filed his Motion for Class Certification seeking to certify the following putative class of similarly situated individuals (the "Class"):

> All individuals within the United States (i) who were sent an outbound call; (ii) which call was connected; (iii) to a cellular telephone number obtained by Defendant as a lead from Choice Hotels International, Inc., which was designated as a "Choice Inact CP Wireless" campaign lead; (iv) promoting Defendant's vacation packages; (v) placed by Gold Mountain Communications, LLC on behalf of Defendant using the TCN "Manual Dial Only" system; (vi) from October 9, 2018 through January 28, 2019.

[D.E. No. 58], at pg. 2.

Defendant filed its Opposition to Plaintiff's Motion for Class Certification on May 24, 2019 and introduced Kostyun as its purported expert—a software engineer and consultant who was engaged to opine on, among other things, the feasibility of identifying members of the proposed Class. [ECF No. 63-1], Expert Report of Jan Kostyun, dated May 24, 2019. Defendant later produced an Amended and Supplemental Report ("Report") by Jan Kostyun which is dated June 3, 2019. A copy of the Report is attached as **Exhibit A**. In his Report, Kostyun concludes that a class is not ascertainable:

> it is my opinion that there is no class-wide solution available to accurately identify subscribers and users of cell phone numbers as of the historic date(s) of alleged message(s), and at best, an individualized, account-by-account investigation will be necessary to achieve that identification.

*Id.* at ¶130. Defendant has relied almost exclusively on Kostyun's opinion to argue that the class should not be certified in this matter. As discussed below, Kostyun is not qualified to offer opinions on ascertainability, his methodology is unreliable and replicated by a layperson, and his opinions are misleading and of dubious value to the trier fact.

---

[1] Plaintiff also filed a redacted version of the Motion for Class Certification on May 10, 2019. [ECF No. 52].

2

**LEGAL STANDARD**

Explaining the standard for determining whether an expert's opinion is admissible, Judge Cohn wrote:

> Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony. *See* Fed. R. Evid. 702.[2] In applying Rule 702, "district courts must act as 'gatekeepers' which admit expert testimony only if it is both reliable and relevant." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). "District courts are charged with this gatekeeping function to ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert testimony.'" *Id.* To meet this obligation, courts "must engage in a rigorous inquiry to determine whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable ...; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Id.* at 1291-92. "The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence." *Id.* at 1292.

*Legg v. Voice Media Grp., Inc.*, No. 13-cv-62044, 2014 WL 1767097, at *1 (S.D. Fla. May 2, 2014).[3]

"In a district court's analysis under *Daubert*, the court must take on the role of a gatekeeper, but this role 'is not intended to supplant the adversary system or the role of the jury. Under this function, the district court must ensure that speculative, unreliable expert testimony does not reach the jury.'" *R & R Int'l, Inc. v. Manzen, LLC*, No. 09-cv-60545, 2010 WL 3605234, at *7 (S.D. Fla. Sept. 12, 2010). This is, in part, because "[t]he testimony of an expert may be assigned talismanic

---

[2] The text of Rule 702 states: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
   (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
   (b) the testimony is based on sufficient facts or data;
   (c) the testimony is the product of reliable principles and methods; and
   (d) the expert has reliably applied the principles and methods to the facts of the case."

[3] Unless otherwise noted, all internal citations and references are omitted.

significance in the eyes of lay jurors' and thus, the Court must exercise its gate-keeping function carefully to make certain that expert opinions are reliable." *Ramirez v. E.I. Dupont de Nemours & Co.*, No. 09-cv-321, 2010 WL 3490237, at *1 (M.D. Fla. Sept. 1, 2010) (citing *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004)).

Further, expert testimony is only admissible if it "is meant to help the factfinder interpret evidence or issues that can only be understood through the application of specialized expertise." *Legg*, 2014 WL 1767097, at *3. "Accordingly, expert testimony is admissible only if it 'concerns matters that are beyond the understanding of the average lay person.'" *Id.*

## ARGUMENT

### I. Kostyun is not Qualified to Testify About the Matters for Which Defendant Presents him as an Expert.

As a threshold matter, an expert must be "qualified to testify competently regarding the matters he intends to address." *Id.* at *1. The Eleventh Circuit has recognized that, "[w]hile scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status." *Frazier*, 387 F.3d at 1261. "Practical experience may serve as a basis for the qualification of an expert witness." *Welsh v. Newman Int'l Transp., Inc.*, No. 10-cv-582, 2011 WL 3958452, at *3 (M.D. Fla. Sept. 8, 2011). "[M]erely demonstrating that an expert has experience, however, does not automatically render every opinion and statement by that expert reliable." *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1201 (11th Cir. 2010). If a "witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id.* Further, if an expert's experience is "insufficiently related to the subject of his opinions, [it] does not provide a sufficient basis for those opinions to qualify him as an expert." *Pleasant Valley Biofuels, LLC v. Sanchez- Medina*, No. 13-

4

cv-23046, 2014 WL 2855062, at *3 (S.D. Fla. June 23, 2014); *see also Shirley v. Mitsubishi Motors Corp.*, No. 03-cv-2883, 2005 WL 5988668, at *6 (N.D. Ala. Oct. 25, 2005) ("tangentially related" experience is insufficient to qualify an expert to testify under *Daubert*).

Critically, "*Daubert's* general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Ultimately, the trial court's inquiry is "whether this particular expert had sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case." *Id.*

Here, Kostyun attempts to opine on the ascertainability of the class, and clims that any methodology that relies on data vendors to identify proposed class members is unreliable. *See* Report at ¶130 ("[T]here is no way to reliably and accurately attempt to identify the historic user(s) of a given cell phone number as of a particular date without, at a minimum, first obtaining information from the subscriber(s) and user(s) of that number as of the date of the alleged call(s)"). In short, Kostyun argues that any methodology that attempts to identify class members by using a list of telephone numbers in conjunction with various data vendors is flawed because the available data from the various vendors is unreliable. This process is colloquially known as a "reverse-append".[4] Kostyun is not qualified to opine on the "reverse-append" process because Kostyun lacks any significant level of education or training in performing, reviewing, testing, or otherwise working with data vendors in this regard. *Mohamed v. Am. Motor Co., Ltd. Liab. Co.*, No. 15-cv-

---

[4] The reverse append method involves "partner[ing] with reputable data vendors, such as LexisNexis, Experian, Microbilt, TransUnion, and others, to utilize reverse-append processes or skip-tracing services or information from public and proprietary records to match telephone numbers to particular names and addresses and cellular services." *Reyes v. BCA Fin. Servs.*, No. 16-24077-CIV, 2018 U.S. Dist. LEXIS 106449, at *33 (S.D. Fla. June 26, 2018) (citations and quotation marks omitted).

23352-MGC, 2017 U.S. Dist. LEXIS 159766, at *11 (S.D. Fla. Sep. 28, 2017) (TCPA case striking an expert because he failed to "test or use the software" in question); *see also* Transcript of Deposition of Jan Kostyun, dated June 3, 2019 ("T. Kostyun"), attached as **Exhibit B**, at 106:13-107:6 (Kostyun testifying that, with regard to TransUnion he received no formal training outside of "a bit of a discussion with their sales personnel, and also their technical personnel"); and *id*. at 110:11-13 (Kostyun testifying that he has never received any training on the LexisNexis platform).

In fact, Kostyun has barely even attempted to gain experience with the reputable data vendors in the field to opine on their accuracy and is therefore not qualified to testify on the accuracy of the "reverse-append" process. *See, e.g.*, *id*. at 107:7-108:21 (Kostyun admitting that he has only used TransUnion *two* to *three* times to perform batch upload analysis, the first time being approximately two months ago); *id*. at 110:8-17; 112:11-13 (Kostyun admitting that he has *never* used LexisNexis for a batch user/subscriber process but has used it approximately *two-times* to retrieve a full-file disclosure); *id*. at 133:12-15 (Kostyun admitting that he has never conducted any analysis or testing of the Experian reverse-append product); and *id*. at 133:12-15 (Kostyun admitting that he has never conducted any analysis or testing of the Microbilt platform).

In similar fashion, Kostyun opines on the ability and willingness of mobile carriers to comply with subpoena demands in regards to subscriber information. Specially, his Report states that "[s]ending thousands of telephone numbers to smaller carriers would prove overly *burdensome* for them, and could very well result in no data being provided by such carriers." Report at ¶115 (emphasis added). But, when asked about the basis for his opinion, Kostyun was unable to provide any corroboration:

> **Q. Are you aware of any instance where any carrier has provided no data in response to a subpoena of thousands of telephone numbers?**
>
> A. Yes.

> **Q. Okay. When did that occur?**
>
> A. Again, previous cases that I've been involved with. I know specifically that I've seen at least two subpoenas that went to Frontier telecommunications, and their response was they do not maintain that data in their regular course of business and did not provide anything.
>
> **Q. So in those instances, it wasn't an issue where the response was burdensome for them, but rather that they did not have the data, correct?**
>
> A. From my recollection, the response did not say -- did not mention burdensome.
>
> *****
>
> **Q. Are you aware of any instance where any major carrier has provided no data in response to a subpoena identifying thousands of telephone numbers and asking for subscriber information for those numbers?**
>
> A. I'm not aware of a large subscriber failing to reply to subpoenas[.]

T. Kostyun, 122:10-25; 123:5-10.

Kostyun also claims that "if all telephone numbers are sent to all carriers, Verizon and Sprint might both respond with historic customer records for that same telephone number." Report at ¶115. But when questioned about his statement, Kostyun admitted he had never directly observed the issue:

> **Q. That scenario that you just described to me, have you ever personally observed that?**
>
> A. I haven't personally observed it with respect to a subpoena, but I'm familiar with some of the data that is available for carriers like Verizon, and understand that that certainly would be one possible outcome of a subpoena request.
>
> **Q. Okay. You've never -- you're saying it's one possible outcome, but you never personally observed such an outcome, correct?**
>
> A. I don't know that I have actually seen in the cases that I've been involved with, a scenario that had a generalized date as opposed to specific dates.

T. Kostyun, 126:4-16.

Kostyun also opines on the ability of carriers to retain records, stating that "most carriers do not retain data long enough to cover records dating back to December 2013." Report at ¶123. However, the proposed class here only goes back to October 2018. When reminded of this fact, Kostyun was unable to comment on whether those records would be available from the carriers:

> **Q. Would you expect at least the five major carriers to have subscriber data dating back to October of 2018? As of today?**
>
> A.  I really can't comment one way or the other. I would not say that I could say with certainty that every one of the large carriers would have that data.
>
> **Q. Do you know one way or the other?**
>
> A. I do not know one way or the other.

T. Kostyun, 130:6-13.

Ultimately, Kostyun's Report is a collection of claims regarding the reverse append and subpoena process that have little to no support. Kostyun was educated in computer science and years ago had training and work experience in telecommunications software, but he has no education, training, or experience—either professionally or personally—involving any of the vendors, data sources, or methods outlined his report. Simply put, Kostyun has no specific experience in this realm of class member identification and location. Thus, Kostyun's tangentially related experience working for telecommunications companies over a decade ago, "does not provide a sufficient basis for those opinions to qualify him as an expert" and his report should be stricken. *See Pleasant Valley*, 2014 WL 2855062, at *3.

## II.  *Kostyun's Methodology is Unreliable.*

Even if this Court were to deem Kostyun a qualified expert witness—which he is not—his testimony must still be based on reliable methodology to be admissible. *Whelan v. Royal Caribbean Cruises Ltd.*, 976 F. Supp. 2d 1322, 1326 (S.D. Fla. 2013) ("Even if a witness is

qualified as an expert regarding a particular issue, the process used by the witness in forming his expert opinion must be sufficiently reliable under *Daubert* and its progeny."). Explicit within Rule 702 is the requirement that an expert's methodology be "the product of reliable principles and methods." Fed. R. Evid. 702(c). Although there is no definitive list of factors that determine reliability of methodology, the Supreme Court has identified the following factors as highly pertinent: "whether the theory or technique in question can be (and has been) tested, whether it has been subjected to peer review and publication, its known or potential error rate and the existence and maintenance of standards controlling its operation, and whether it has attracted widespread acceptance within a relevant scientific community." *Daubert*, 113 S. Ct. at 2796-97. However, a "'nonscientific expert' may be qualified based on his 'personal knowledge or experience' without the necessity of establishing '[s]tandards of scientific reliability, such as testability and peer review.'" *Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC*, 555 F.3d 1331, 1338 (11th Cir. 2009). "For nonscientific expert testimony, the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.*

Regardless, an expert's methodology and underlying basis for his opinions must be adequately documented and explained, and the "court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, No. 07-cv-61542, 2010 WL 6397501, at *2 (S.D. Fla. Aug. 23, 2010). Thus, "it remains a basic foundation for admissibility that '[p]roposed [expert] testimony must be supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known." *Frazier*, 387 F.3d at 1261; *see also McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1255 (11th Cir. 2005) (for nonscientific experts, the main purpose of the reliability inquiry is to determine whether the expert who is "basing testimony upon professional studies or personal experience, employs in the courtroom the same

level of intellectual rigor that characterizes the practice of an expert in the relevant field.").

Kostyun's testimony and report fail to propose a methodology to qualify him as an expert for his conclusions regarding the data files in this matter. First, Kostyun claims that 10.5 percent of Plaintiff's proposed class of 24,969 call records have no matching lead name or address. Report at ¶68. But when asked for his work product to support his claims, Kostyun was unable to provide any support other than to say that the results "were documented in the report." T. Kostyun, 59:12-22; *see id.* at 61:10-13 ("Again, I'm not sure if I saved the actual individual telephone numbers, but the result was documented in here as the 10.5 percent"). When questioned on the methods he used to obtain the 10.5 percent number, Kostyun testified that he compared the telephone numbers in the lead records in the csv files. *Id.* at 60:1-61-9. When pressed on which files he specifically reviewed to reach his conclusion, Kostyun was unable to elaborate:

> **Q. I understand that. But we are talking about the missing lead information for now. When you conducted your analysis to determine the number of missing lead files, what lead files did you use?**
>
> A. First of all, it wasn't an opinion of missing lead files; it was an opinion of missing lead records.
>
> **Q. Missing lead information.**
>
> A. Okay. And the lead files that I used were those 230 that we have received that I understood came through production.
>
> \*\*\*\*\*
>
> **Q. Okay. I'll represent to you that we did not send 230 CSV lead files to Bluegreen's counsel. So did you get those lead files from Choice Hotels or Gold Mountain?**
>
> A. Neither. I received a set of files from our counsel. And they were -- all of the clicker files, the lead files, and the disposition files were combined together in a single directory. And my understanding is that that was the way that they had received them from you.
>
> \*\*\*\*\*
>
> **Q. Okay. Gold Mountain did not produce to us 230 CSVfiles. So that's why it's unclear to us where these additional CSV files came from, and what you looked at in order to perform your analysis.**

> A. All I can tell you is that the data that I used was provided to me by counsel, and my understanding was that counsel received it from you as part of the Gold Mountain subpoena.
>
> **Q. Okay. Did you ever ask if you had been provided all of the lead information?**
>
> A. It was understood as part of the exchange of information that that was all there was.
>
> \*\*\*\*\*
>
> **Q. When you came up with 2,600 lead files missing, did you ever go back to counsel and say, we have 2,600 lead information missing from the class data, are you sure you gave me everything.**
>
> A. No, I had no reason to suspect that the data was incomplete. So I simply reported on the results that I found.
>
> \*\*\*\*\*
>
> **Q. And you didn't have any questions about why 2,600 lead files were missing?**
>
> A. No.

T. Kostyun, 59:1-11; 61:25-62:11:62:19-63:1;64:5-7. Kostyun's inability to produce his work-product and subsequent inability to testify competently about what documents he reviewed demonstrate a lack in methodology on his part.

Further, Kostyun's methodology failures are not limited to the above. Kostyun also testified several other times that he had failed to save his work product. *See id*. at 59:16-22 ("Q. Okay. Where is the documentation supporting the results outlined in your report? A. I gave some examples of missing lead files – lead information, and I may have saved the results of that analysis. It might be necessary for me to reproduce those database queries in order to produce the supporting evidence"); *id*. at 61:11-13 (A. "Again, I'm not sure if I saved the actual individual telephone numbers, but the resulted was documented in here as the 10.5 percent"). This issue was most notably discussed in regards to Kostyun's claim that nearly 16% of the lead records have an "unknown" entry in the address field:

11

> **Q. Where is the actual result of this analysis that you conducted?**
>
> A. Well, it's built into those databases that I analyzed. I don't believe I saved the specific records, but it's something that could be reproduced just as you can easily check your own files.
>
> **Q. Okay. If I wanted to test your methodology, I would be unable to do so today because that record does not exist, correct?**
>
> A. No. Again, you could look at your own data and perform the same analysis very simply. You can even do that in Excel.
>
> **Q. I'm not talking about performing my own analysis; I'm talking about checking your work product, and how would I do that.**
>
> A. You can check my work product by performing your own analysis, and seeing if you got the same results.

T. Kostyun, 69:1-18. Kostyun cannot have it both ways. He cannot claim to be an expert when it suits him and then minimize the necessity of his work-product by claiming that his analysis can be easily replicated.

Kostyun also describes commercial databases like LexisNexis, TransUnion, Microbilt and Experian as unreliable data centers. *See* Report at Pg. 43-45. But Kostyun admits that he never used Microbilt or Experian to perform a reverse-append and has used LexisNexis and TransUnion to perform a reverse-append no more than five times in total (only three of which were for a batch upload analysis). T. Kostyun, 107:7-108:21; 115:2-11. When asked how he knows that the data in these platforms are inaccurate, Kostyun stated "I don't know for certain whether they have inaccuracies and I don't know for certain whether they are accurate." T. Kostyun, 136:5-10. Thus, Kostyun relies on little more than blind faith to conclude that the data collection and analysis capabilities of data vendors such as TransUnion would be inaccurate. This conclusion is not supported by the intellectual rigor necessary to be admitted as an expert under *Daubert*. *See In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prod. Liab. Litig.*, 174 F. Supp. 3d 911, 935 (D.S.C. 2016) ("Because Dr. Roberts had no methodology for determining what studies to

consider and which to disregard, apparently just choosing those that she remembered or found supportive of her opinion. . . the Court excludes Dr. Roberts' causation opinions as unreliable under Rule 702.").

Of course, such unfounded speculation is inappropriate for an expert witness, since "[u]nder Rule 702 and *Daubert*, district courts must act as 'gatekeepers' which admit expert testimony only if it is both reliable and relevant. . . . District courts are charged with this gatekeeping function 'to ensure that speculative, unreliable expert testimony does not reach the jury' under the mantle of reliability that accompanies the appellation 'expert testimony.'" *Rink*, 400 F.3d at 1291; *see also McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002) ("*Daubert* requires that trial courts act as 'gatekeepers' to ensure that speculative, unreliable testimony does not reach the jury.").

In sum, Kostyun's testimony and Report simply do not reach the level of intellectual rigor necessary to be admitted as an expert under *Daubert* and its progeny.

### III. Kostyun's Report and Findings do not Require Expertise and can be Adequately Duplicated by any Layperson.

The final requirement for admissibility of expert testimony is that it "assist the trier of fact." *Frazier*, 387 F.3d at 1244. Even if Kostyun were recognized as an expert in certain aspects of telecommunications *and* his methodology was deemed sound, it does not inherently follow that his expert opinions *here* are within his expertise and useful to a trier of fact. In fact, Kostyun's opinions are little more than lay opinions based on rudimentary analysis, which further compels that his report be excluded. *See id.* ("[E]xpert testimony is admissible if it concerns matters that are *beyond* the understanding of the average lay person."); *but see United States v. Figueredo*, No. 06-cr-20255, 2006 WL 6888720, at *1 (S.D. Fla. Oct. 20, 2006) (granting motion to exclude expert testimony where "this is not a financially complex case and Defendant has not shown that the

13

proposed testimony 'concerns matters that are beyond the understanding of the average lay person.'"); *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1367 (S.D. Fla. 2009) (noting that "the Court cannot conclude that the opinion in question would assist the trier of fact, as it is a conclusion at which jurors could arrive on their own and requires no scientific or specialized knowledge.").

"[T]he distinction between lay and expert witness testimony is that lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.'" *Lincoln Adventures, L.L.C. v. Certain Underwriters at Lloyds of London*, No. 05-cv-60554, 2006 WL 5249739, at *1 (S.D. Fla. May 9, 2006). If an expert's opinion is not within his expertise, or he presents the opinions of a mere layperson, the opinion must be struck, or evaluated as a lay opinion under Rule 701 of the Federal Rules of Evidence.

Perhaps the most egregious example here is Kostyun's testimony in support of his claim that Plaintiff lacks nearly 16% of its class members addresses. Report at ¶73. When pressed for the actual data that he relied on Kostyun admitted that his test analysis required no specialized skill and encouraged Plaintiff's counsel – an admitted non expert- to do the test on his own:

> **Q. Okay. If I wanted to test your methodology, I would be unable to do so today because that record does not exist, correct?**
>
> A. No. Again, you could look at your own data and perform the same analysis very simply. You can even do that in Excel.
>
> **Q. I'm not talking about performing my own analysis; I'm talking about checking your work product, and how would I do that.**
>
> A. You can check my work product by performing your own analysis, and seeing if you got the same results.
>
> **Q. And that's an interesting point. Because the analysis that you performed in evaluating this class data, it doesn't require any kind of specialized skill, correct?**

> A. Well, it required the skill to know to look for inconsistencies like this, based on my experience with the fact that a lot of times customer records are corrupted Bad address information wasn't the only data that I looked for. I looked for problems with customer names, and inconsistencies between addresses and zip codes, and various factors like that.
>
> **Q. Right. But you're telling me that in order to check your work, I can just perform my own analysis correct?**
>
> A. In order to check this specific instance, you can do the analysis yourself.
>
> *****
>
> **Q. Okay. And then in terms of performing the analysis, no specialized skill is required, correct?**
>
> A. For this particular instance, yes.

T. Kostyun, 69:1-70:10; 70:24-71:1.

Kostyun's testimony in this instance undermines the entirety of his Report and is not the only time that Kostyun testified that his results could be replicated by a layperson in the place of his work-product. *See* id. 61:14-18 ("Q. Okay. If I wanted to test your methodology to make sure that you didn't make any mistakes, what would I be looking at? A. Well, you have all the data so you certainly would have all of the information that I used to do it").

Kostyun's opinions do not rely on expertise to assist a layperson with understanding complicated facts—it is the same work a layperson would perform with rudimentary computer skills—and thus Kostyun's report and testimony should be excluded.

### IV.     *Kostyun's Opinions are not Helpful to the Trier of Fact*.

"If an expert opinion does not have a 'valid scientific connection to the pertinent inquiry' it should be excluded because there is no 'fit.'" *Seamon v. Remington Arms Co., LLC (In re Estate of Seamon)*, 813 F.3d 983, 988 (11th Cir. 2016) (citing *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009)). "Stated another way, expert testimony is considered relevant when 'it logically advances a material aspect of the proposing party's case.'"

*Lebron v. Royal Caribbean Cruises, Ltd.*, No. 16-cv-24687, 2018 U.S. Dist. LEXIS 124820, at *23 (S.D. Fla. July 26, 2018) (citing *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999)); *see also Connectus LLC v. Ampush Media, Inc.*, No. 15-cv-2778, 2017 U.S. Dist. LEXIS 19829, at *13-14 (M.D. Fla. Feb. 13, 2017).

Kostyun cannot help the trier of fact here because his conclusions are designed to be misleading. For example, Kostyun claims that there are conflicts between the Clicker Reports and the Disposition Reports, but bases this conclusion on an intentionally misleading analysis. Specifically, the Report states that the number 304-614-4925 was reported in a Clicker Record on October 29, 2018 with result value of "Failed Refused," and thus should have not appeared in a Disposition Report. Report at ¶ 85. What he fails to mention is that this number was called twice on that date, with the second call resulting in a "Answered Linkcall" designation in the Clicker Record (indicating the call was connected). *See* T. Kostyun at 82:23-83:3. The same is true for all of the numbers listed as examples of this issue in Kostyun's Report: each of these numbers were called multiple times, one of which was connected, display a "Answered Linkcall" value in the Clicker Report, and thus appear in the Disposition Report. Report at ¶¶ 86-88; T. Kostyun at 79:9-89:23. However, Kostyun's Report only speaks of the attempts which did not result in a connection so that he can then claim that they should not appear on the Disposition Reports. Kostyun knew that the information he was providing was intentionally misleading, but he provided it anyway:

> **Q. But you never – did you ever perform the function that we just did, of looking to see if a telephone number had been called more than one time?**
>
> A. Absolutely.
>
> **Q. So why didn't you include that in your report?**
>
> A. Because that was not a discrepancy. This is the discrepancy.

\*\*\*\*\*

16

> Q. You don't think there are any flaws in your opinions?
>
> A. No.
>
> Q. Did you know if the same instance of multiple calls is the case for these other telephone numbers that you've identified in this chart?
>
> A. I believe each one of them had multiple occurrences in the clicker records.
>
> Q. And you did not find -- you didn't believe that to be important to include in your report?
>
> A. Well, the report, that section that I'm addressing here, involves discrepancies that were found and questions about the reliability of the data.

T. Kostyun, 84:9-15:10; 85:14-86:1.

Similarly, Kostyun attacks the proposed class because the Disposition files on which the class data is predicated, contain calls with a disposition of "No Answer," and characterizes them as not "connected" because no conversation took place. Report at ¶ 81; T. Kostyun at 76:14-78:23. However, these calls were "connected" in the sense that they were successfully placed—and the phone rang—and nothing more is required to establish a violation of the TCPA. *See Mohamed v. Off Lease Only, Inc.*, 320 F.R.D. 301, 312 (S.D. Fla. 2017) ("In light of this guidance, we find that violation of the TCPA occurs at the moment the text messages were allegedly sent.") (citations omitted); see also *M.A. v. NRA Grp., LLC*, No. 17-cv-7483 (NG)(RLM), 2019 U.S. Dist. LEXIS 93444, at *6 (E.D.N.Y. June 3, 2019). Kostyun ignored the legal definition of a call under the TCPA and chose to rely instead on how the TCN platform defines a call:

> Q. Okay. Your definition of connected does include voicemails, calls where a call is forwarded to a voicemail, correct?
>
> A. That is generally understood to be a connected call, yes.
>
> Q. So why do you say in here, there are also thousands of calls with dispositions of voicemail that could possibly represent calls that were connected, which never had been transferred to an agent for handling.

17

> A. Because as I understand it, the TCN system was configured such that calls that were determined to be voicemail should not have been transferred over to a live agent. But there was evidence that there were calls in the disposition file, and in the proposed class, that had a result of an answering machine had been detected.
>
> **Q. But I thought your testimony is an answering machine or a voicemail is a connected call?**
>
> A. It's a connected call, but it's still not a call that should have been transferred to a live agent.
>
> **Q. Okay. But our class definition is connected calls; do you agree?**
>
> A. I believe that was the distinction...

T. Kostyun, 78:3- 79:1.

Similarly, Kostyun's claim that many leads contain an "unknown" address is misleading, as he omits the fact that these leads contain other identifying information, including in some cases name, city, and zip code. Kostyun Depo. at 74:9-75:1. His conclusion that there are numbers that should have been on the Disposition Report, Kostyun Report at ¶¶ 95-96, is based on a single instance of this having occurred:

> **Q.** How many examples did you identify of this instance?
>
> A. This was the only one.

Kostyun Depo. at 99:11-13. Further, his conclusion that there are "duplicate" records, Kotsyun Report at ¶ 97, simply ignores that Gold Mountain was placing multiple calls to the same number. Kotsyun Depo. at 101:16-102:2.

For these reasons, Kostyun's opinions are not based on "good grounds" and should be excluded.

## CONCLUSION

Because Kostyun's work experience and training are in a different area of expertise and his report and testimony were largely premised on research a layperson would perform, Kostyun's

methodology and testimony are unfounded and unreliable. Accordingly, Plaintiff respectfully requests that this Court exclude Kostyun's expert report and testimony.

**CERTIFICATE OF GOOD-FAITH CONFERRAL**

I hereby certify that, pursuant to Local Rule 7.1(a)(3), I conferred with counsel for Defendant, and Defendant opposes the relief requested herein.

Dated:  June 7, 2019

Respectfully submitted,

/s/ Michael Eisenband
**EISENBAND LAW, P.A.**
515 E. Las Olas Boulevard, Suite 120
Ft. Lauderdale, Florida 33301
Michael Eisenband
Florida Bar No. 94235
MEisenband@Eisenbandlaw.com
Telephone: 954.533.4092
*Counsel for Plaintiff and the Class*

**IJH LAW**
Ignacio J. Hiraldo, Esq.
Florida Bar No. 0056031
1200 Brickell Ave Suite 1950
Miami, FL 33131
Email: ijhiraldo@ijhlaw.com
Telephone: 786.496.4469
*Counsel for Plaintiff and the Class*

**HIRALDO P.A.**
Manuel S. Hiraldo, Esq.
Florida Bar No. 030380
401 E. Las Olas Boulevard
Suite 1400
Ft. Lauderdale, Florida 33301
Email: mhiraldo@hiraldolaw.com
Telephone: 954.400.4713
*Counsel for Plaintiff and the Class*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 7, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

/s/ Michael Eisenband
**EISENBAND LAW, P.A.**
515 E. Las Olas Boulevard, Suite 120
Ft. Lauderdale, Florida 33301
Michael Eisenband
Florida Bar No. 94235
MEisenband@Eisenbandlaw.com
Telephone: 954.533.4092
*Counsel for Plaintiff and the Class*