UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:19-cv-20073

SHEHAN WIJESINHA, individually and on
behalf of all others similarly situated

      Plaintiff,

v.

BLUEGREEN VACATIONS, INC.,

        Defendant.

# Amended and Supplemental Report by Jan Kostyun dated June 3, 2019

## TABLE OF CONTENTS

INTRODUCTION AND SCOPE OF OPINION ..........................................................................1

RELEVANT EXPERIENCE ...................................................................................................... 2

COMPENSATION ..................................................................................................................... 6

DOCUMENTS REVIEWED ..................................................................................................... 6

METHODOLOGY ...................................................................................................................... 7

RESERVATION OF RIGHT TO AMEND ................................................................................ 8

SUMMARY OF OPINIONS ...................................................................................................... 8

DISCUSSION OF OPINIONS ................................................................................................... 9

    I.    The TCN Manually Approved Calling System ............................................................. 9

        A.    The TCN System Cannot Produce Numbers to Be Called Using a Random or Sequential Number Generator and Requires Human Intervention .................. 9

        B.    The TCN Manually Approved Calling System Lacks the Technical Internals Required for Predictive Dialing ........................................................ 18

        C.    The TCN System's Manual Limits Are Consistent with the Call Volume in the Discovery Record ............................................................................... 20

        D.    A Live Demonstration of TCN's Dialing Platform Confirmed All of the Manual Characteristics that have Been Discussed ............................................ 23

        E.    Classifying the TCN Manually Approved Calling System as an ATDS Would Make all Modern Smartphones ATDSs ................................................ 25

    II.    Documents Produced in the Litigation Cannot Be Used to Reliably Identify Call Recipients ................................................................................................................... 27

        A.    The Choice Lead Files ....................................................................................... 27

            1.    Missing Lead Data .................................................................................. 28

            2.    Staledated Lead Data .............................................................................. 29

        B.    Clicker Records .................................................................................................. 30

        C.    Disposition Records ........................................................................................... 31

            1.    Source of the Disposition Records and Values ....................................... 31

2.      Conflicts between Clicker Records' Results Values and
        Disposition Records' Disposition Values ................................................. 32

3.      Barriers to Resolving these Conflicts on a Class-Wide Basis ................. 34

4.      Additional Conflicts between the Clicker Records and Disposition
        Records .......................................................................................................... 36

5.      Duplicate records.......................................................................................... 37

III.  Barriers to Identifying Historical Users or Subscribers ................................................. 38

    A.  TransUnion .............................................................................................................. 39

    B.  Other Public Identification Services and Skip Tracing ......................................... 42

    C.  Name Directories .................................................................................................... 49

    D.  Reliability of Subscriber Information from Carriers ............................................. 50

        1.      Barriers to Identifying Numbers Assigned to Particular Carriers ............ 50

        2.      Carriers' Retention of Records.................................................................... 54

        3.      Prepaid Cell Phone Services ...................................................................... 56

        4.      Cell Phone Number Reassignment ............................................................. 56

        5.      Authorized User Identification................................................................... 58

    E.  Confirmation of My Opinions from Other Sources ............................................... 59

EXHIBIT A – JAN KOSTYUN CV ........................................................................................... 62

EXHIBIT B – LEXISNEXIS DISCLAIMER ............................................................................. 73

EXHIBIT C – MICROBILT DISCLAIMER .............................................................................. 74

EXHIBIT D – PARTIAL LIST OF OCCURRENCES OF LEXISNEXIS DISCLAIMER ......... 75

## INTRODUCTION AND SCOPE OF OPINION

1.      In this case, Plaintiff Shehan Wijesinha has brought a putative class action against Defendant Bluegreen Vacations ("Defendant" or "Bluegreen") under the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"). First Amended Class Action Complaint ("FAC"), Docket Entry 13, at ¶ 1.

2.      Plaintiff Wijesinha alleges that "[o]n or about December 11, 2018, Defendant called Plaintiff's cellular telephone number ending in 7557 ('7557 Number')." FAC at ¶ 24.

3.      Plaintiff has moved to certify a class defined as "All individuals within the United States (i) who were sent an outbound call; (ii) which call was connected; (iii) to a cellular telephone number obtained by Defendant as a lead from Choice Hotels International, Inc., which was designated as a 'Choice Inact CP Wireless' campaign lead; (iv) promoting Defendant's vacation packages; (v) placed by Gold Mountain Communications, LLC on behalf of Defendant using the TCN 'Manual Dial Only' system; (vi) from October 9, 2018 through January 28, 2019."

4.      I understand the following based on Plaintiff's assertions and the discovery record: Defendant received lists of marketing *leads* from Choice Hotels International, Inc., including names and contact information for members of Choice Hotels' loyalty program (Ryan Dep. 43:6-10). Defendant employed Gold Mountain Communications LLC ("Gold Mountain"), to perform marketing campaigns using a manual dialer, including placing calls to prospective customers based on the leads from Choice Hotels (Ryan Dep. 43:1-14). The marketing campaign in this case was known as the "Choice Inact CP Wireless" campaign.[1] Gold Mountain placed the calls for the Choice Inact CP Wireless campaign using a subset of the TCN Manual Dial Only

---

[1] Declaration of Ignacio J. Hiraldo Regarding Class Data at ¶¶ 11-12; also Motion for Class Certification p. 2

system referred to as the Manually Approved Calling System. And Gold Mountain has produced records relevant to the calls placed in the Choice Inact CP Wireless campaign, including Disposition files that purportedly identify calls handled by Gold Mountain's agents ("Disposition Reports")[2], and activity files referred to in Plaintiff's Motion for Class Certification as "Calls Attempted Reports" that reflect calls attempted by the TCN dialing system ("Clicker Records").[3]

5.     I have been engaged by Bluegreen through its counsel to provide opinions on the TCN Manually Approved Calling System, the accuracy and value of the call data and associated lead records, the feasibility of accurately determining the cellular telephone numbers that were called, and the users or subscribers associated with those numbers when called.

6.     I had previously submitted an expert report on these subjects dated May 24, 2019. Based on additional discovery and evidence that has surfaced since that time, I submit this amended and supplemental report.

<strong>RELEVANT EXPERIENCE</strong>

7.     I am an independent technology consultant with more than 35 years of experience in telecommunications, enterprise architecture, and information technologies. I received a Bachelor of Science degree *magna cum laude* in Mathematics and a Master of Science degree in Computer Science from Union College in 1976. I have been employed by major telecommunications companies, including Bell Telephone Laboratories, GTE, Verizon, and Syniverse Technologies. I also have been engaged as a consultant on various telecommunications issues by telecommunications companies and regulatory authorities, including Rogers Wireless (the largest wireless carrier in Canada), CRC (the national telecommunications regulatory agency of Colombia), and Syniverse Technologies (a worldwide

---

[2] Declaration of Ignacio J. Hiraldo Regarding Class Data at ¶ 6

[3] Declaration of Ignacio J. Hiraldo Regarding Class Data at ¶ 5

leader in telecommunications services). I have worked in software development, database technology, and enterprise architecture. I have worked for more than 15 years providing consulting services, software development, and data analysis in the field of telephone number portability. This experience covers landline, wireless, and intermodal (landline-to-wireless or wireless-to-landline) number portability, as well as telephone number pooling. I have played lead roles in the technical and organizational processes of porting landline numbers in the U.S. as well as wireless numbers in the U.S., Canada, and Colombia.

8.      As a software architect for Bell Telephone Labs, GTE, Verizon, and Syniverse, I developed expertise in areas such as landline and wireless number provisioning, including the end-to-end process of establishing service for an initial subscriber; landline and wireless order-entry, including the collection of subscriber contact information; initial implementation of the National Do Not Call registry; technical experience with telecom features such as voice calling, SMS messaging, fax transmissions, voicemail, auto dialer and Interactive Voice Response Unit (IVRU) technology, and switching implementations; and a wide variety of telecommunications industry standards.

9.      I also have extensive experience in database methodologies, data analysis, and data mining. My experience with database technologies includes hierarchical, network, and relational database models and implementations. I have instructed working professionals on the use of database programming, support, and internal architecture, and have developed database training courses. I am proficient with advanced database modeling, optimization and query techniques, as well as the development of database software applications. I have personally performed database queries and data analysis against hundreds of data stores, including but not limited to Internal and National Do Not Call lists, Wireless Block identifiers, Number Portability

transaction lists and telephone call records produced by both wireless carriers and businesses involved in dialing campaigns.

10.    I have extensive experience with call center operations and various dialing systems, including those used for inbound and outbound calling campaigns. In my tenure with GTE/Verizon, I performed early research with Intel-based Computer Telephony Interfaces (CTI), including text-to-speech translation and automated dialing interfaces. I have worked closely with IVRU engineers and application architects to develop programmatic interfaces used for inbound and outbound calling. I have worked closely with call center personnel at telecom businesses such as GTE, Verizon, Syniverse and Rogers Wireless while supporting Customer Relations Management (CRM) applications that include interfaces to inbound and outbound dialing systems. I have analyzed dialing systems and features from vendors such as Avaya, LiveVox, CallFire, RingCentral, Cisco, Five9, GTE, Txtwire Technologies, iVision, Stratics Networks and InfoLink Technologies. I have been retained to provide opinions regarding Automatic Telephone Dialing System (ATDS) capabilities in various litigated cases, including *Lutman v. Harvard Collection Services*, *Couser v. Cucamonga Valley Medical*, *Williams v. Bluestem*, *Schaevitz v. Braman Hyundai*, *Garcia v. Target*, *Diaz-Lebel v. Target*, *Eisenband v. Schumacher Automotive*, *Green-Mobley v. Capital One Auto Finance*, *Thomas v. Peterson's Harley Davidson*, *Carpenter v. World Omni Financial*, and *Scherkanowski v. Bluegreen Vacations*, among others.

11.    For the past ten years I have worked as a consultant and expert witness on cases covering TCPA issues, state-specific consumer issues such as the Washington Automatic Dialing and Announcing Device statute, and issues including patents, software copyrights, trade secrets, software value determination, vandalism, and sabotage of application programs. I have testified

in deposition and in court. My opinions have never been stricken or rejected, and have been cited in support of denial of class certification in two TCPA cases.

12.     A copy of my curriculum vitae is attached hereto as Exhibit A.

13.     I have not authored any publications in the past 10 years.

14.     In the past eight years, I have been qualified as an expert in federal courts and Florida state courts. I have been retained to provide deposition testimony as an expert for both Defendants and Plaintiffs in the following matters: *Shamblin v. Obama for Am.*, No. 8:13-cv-2428 (M.D. Fla.); *Cunningham v. Health Insurance Innovations*, No. 8:18-cv-00919 (M.D. Fla.); *Schaevitz v. Braman Hyundai*, No. 1:17-cv-23890 (S.D. Fla.); *Thomas v. Peterson's Harley Davidson*, No. 0:18-cv-61723 (S.D. Fla.); *Eisenband v. Schumacher Auto.*, No. 9:18-cv-80911 (S.D. Fla.); *Berman v. Freedom Fin.*, No. 4:18-cv-01060 (N.D. Cal.); *Diaz-Lebel v. Target*, No. 0:17-cv-05110 (D. Minn.); *Garcia v. Target*, No. 1:16-cv-2574 (D. Minn.); *Jackson v. Palm Beach Credit Adjusters*, No. 9:18-cv-80124 (S.D. Fla.); *Williams v. Bluestem*, No. 8:17-cv-1971 (M.D. Fla.); *Wilson v. Badcock*, No. 8:17-cv-02739 (M.D. Fla.); *Scherkanowski v. Bluegreen Vacations*, No. 1:18-cv-00301 (D. N.H.); *Green-Mobley v. Capital One Auto Finance*, No. 3:17-cv-764 (S.D. Fla.); *Carpenter v. World Omni Fin.*, No. 01-18-0000-6972 (A.A.A.); *Buja v. Novation Capital, LLC.*, No. 9:15-cv-81002 (S.D. Fla.); *Kalmbach v. Nat. Rifle Ass'n of Am. and InfoCision, Inc.* No. 2:17-cv-00399 (W.D. Wash.); *Goins v. Walmart and Palmer Recovery Attorneys*, No. 6:17-cv-00654 (M.D. Fla.); *Reyes v. BCA Fin. Servs.*, No. 1:16-cv-24077 (S.D. Fla.); *Jacobs v. Quicken Loans Inc.*, No. 15-cv-81386 (S.D. Fla.); *Cook v. Palmer Reifler & Assocs.*, No. 3:16-cv-00673 (M.D. Fla.); *Ameranth v. Six Continents Hotels*, No. 09-CV-3819 (Ga. Super. Ct. Dekalb Cnty.); *Couser v. Cucamonga Valley Med. Grp.*, No. 5:14-cv-01528 (C.D. Cal.); *Couser v. Dish One Satellite*, No. 5:15-cv-02218 (C.D. Cal.); *Datamaxx Applied*

*Techs. v. Comp. Projects of Ill.*, No. 4:09-cv-435 (N.D. Fla.); *Comprehensive Health Care Sys. of the Palm Beaches v. M3 USA Corp.*, No. 16-cv-80967 (S.D. Fla.); *Lutman v. Harvard Collection Servs.*, No. 2:15-cv- 257 (M.D. Fla.); *Moricz v. Google*, No. 10-CV-01240-RSL (W.D. Wash.); *Nece v. Quicken Loans Inc.*, No. 8:16-cv-02605 (M.D. Fla.); *PCS4Less v. Go Mobile*, No. 09-380-CZ (Mich. Cir. Ct. Washtenaw Cnty.); *Preman v. Pollo Operations*, No. 6:16-cv-00443 (M.D. Fla.); *Resource Acquisition & Mgmt. Servs. v. Mathews*, No. 09-CA 14536 (Fla. Cir. Ct. Hillsborough Cnty.); and *Florida v. Poole*, No. 09-CF-016786 (Fla. Cir. Ct. Hillsborough Cnty.).

## COMPENSATION

15.     I am being compensated at the rate of $350 per hour for my study and analysis in this case, as well as $300 per hour for travel and $400 per hour for testimony. My compensation is not dependent on the outcome of this matter.

## DOCUMENTS REVIEWED

16.     In forming my opinions, I have reviewed various documents; Class Action Complaint, *Shehan Wijesinha v. Bluegreen Vacations*, D.E. 1; the First Amended Complaint, D.E. 13; Order Granting Renewed Joint Motion to Enter Confidentiality Stipulation, D.E. 35; wav file of call recording to Plaintiff; Order for Partial Summary Judgment in *Marshall v. CBE Group*; *Glasser v. Grand Vacations*, 341 F. Supp.3d 1305; TCN TCPA-Manual Dial Only System product description; TCN Compliance Suite brochure; Default Call result Map for TCN dialer; Plaintiff's Motion for Class Certification and its exhibits; Choice Inactive CP Wireless.xlsx; Deposition Transcript of Louis James Russo and exhibits; Deposition Transcript of Sherry Ryan and exhibits; Deposition Transcript of Henry Seevers and exhibits; Deposition Transcript of Shehan Wijesinha and exhibits; 41 csv files from TCN's dialing system, represented as "Calls Attempted Reports"; 64 disposition csv files from Gold Mountain, represented as "Disposition Reports"; 230 csv files containing lead records, originating from

Choice; TCN Confidential Docs, received from I. Hiraldo, 5/15/2019; Vacation Package Marketing Agreement between Gold Mountain Communications and Bluegreen Vacations Unlimited, 12/28/2017; Subpoena for Deposition issued to TCN and Subpoena Rider; Objection to 30(b)(6) Deposition Subpoena & Designation Under Same (from TCN); Supplemental Objection & Response to Narrowed Subpoena (From TCN); Deposition Transcript of Jesse Bird.

17.    I also regularly research and follow developments in the telecommunications industry. I review significant FCC orders; review TCPA cases and rulings; communicate with former telecommunications associates; review opinions set forth by other TCPA experts; communicate with vendors who provide TCPA-related data services; review of industry blogs and user groups; and research statistics and trends related to the telecommunications industry. This ongoing review and research has also informed and supported my opinions.

## METHODOLOGY

18.    My methodology in producing my opinions is based on my business and technical experience in telecommunications, my experience as an expert in other TCPA-related cases, my education and training, and my review of documents relevant to this case, as cited throughout this report. Based on my experience and that review, I developed hypotheses regarding the manual vs. automatic nature of the TCN dialing system, the value and accuracy of the lead files and call records, the challenges with identifying the historic wireless status of telephone numbers called, and the challenges with identifying their associated users and subscribers. I have tested my hypotheses and reached conclusions using a combination of related documentation, training, research, and experience. My methodology and techniques were similar to the techniques that I used during my career as a telecommunications system architect. I have analyzed the results to form the opinions in this report.

## RESERVATION OF RIGHT TO AMEND

19.     I understand discovery is still ongoing and Plaintiff has not yet disclosed any expert. I therefore reserve the right to offer additional opinions and to amend this report based on information received after its date.

## SUMMARY OF OPINIONS

20.     Based on my methodology, including analysis and review of case-related materials, it is my opinion that:

A.      All calls at issue were placed with the TCN Manually Approved Calling System, which is equipment that does not have the capacity to produce telephone numbers to be called, using a random or sequential number generator, to store such numbers, or to dial such numbers. The TCN Manually Approved Calling System also requires distinct human intervention to dial each and every telephone number.

B.      Any interpretation that characterizes the TCN Manually Approved Calling System as an ATDS would make all smartphones ATDSs.

C.      The Choice Lead Files provided to Bluegreen are inaccurate, incomplete, and cannot be used to reliably identify call recipients.

D.      The Clicker Records produced by the TCN dialing system, and Disposition Records produced through Gold Mountain's agents cannot provide an accurate representation of the calls placed during Defendant's marketing campaign.

E.      If a set of telephone numbers could be itemized to which alleged calls were placed, there are tremendous barriers to accurately identifying the users or subscribers associated with those numbers at the date of said calls.

## DISCUSSION OF OPINIONS

### I.    The TCN Manually Approved Calling System

21.    All calls at issue were placed with the TCN Manually Approved Calling System, which is equipment that does not have the capacity to produce telephone numbers to be called using a random or sequential number generator, to store such numbers, or to dial such numbers. The TCN Manually Approved Calling System also requires human  intervention to dial each and every telephone number.

### A.    The TCN System Cannot Produce Numbers to Be Called Using a Random or Sequential Number Generator and Requires Human Intervention

22.    The discovery record thus far establishes that the TCN Manually Approved Calling System cannot generate numbers, that manual intervention is required to make each call, and that a Gold Mountain "clicker agent" manually selected each telephone number to be dialed.

23.    TCN's Chief Technology Officer Jesse Bird testified at deposition:

> Q.    Just going to ask you some general questions about the MAC system. I know we've talked about it a lot today. Does it have the capacity to dial any telephone numbers that have not been manually clicked by the agent?
>
> A.    It does not. (Bird Dep. 110:23 – 111:3)
>
> Q.    Does the MAC system have the capacity to produce telephone numbers to be called in any way randomly or sequentially?
>
> A.    It does not. (Bird Dep. 111:19 – 22)
>
> Q.    What are the methods by which the telephone numbers to be dialed can be provided to the TCN, the MAC system? I know we talked about a list that needs to be uploaded. Are there any other ways that the telephone numbers can be provided to the system?
>
> A.    Only via client-provided ways. So the client will either upload the number and/or the client -- or the agent can manually enter the number to dial via the input box.
>
> Q.    So does the MAC system have the capacity to dial a phone number that has not been provided to it by the user or administrator?

A.     It does not. (Bird Dep. 111:5 – 18)

24.     The manual nature of the system was also made clear when Mr. Bird discussed

the mechanics of the Manually Approved Calling (MAC) System versus other TCN products:

Q.     Mr. Bird, I want to talk a little bit more about the MAC system and how it differs from the other products that are offered by TCN. So first off, how is the MAC system different than preview dialing?

A.     The MAC system presents calls to agents and they are manually approved, but that call may go to a different agent than the one that approved it.

Q.     When you say, "manually approved," what do you mean by that?

A.     An agent has to literally approve every call.

Q.     How does that happen?

A.     The call record is presented to the agent and the agent can review it and then they can approve the call or they can cancel the call.

Q.     I guess I'm asking at a more basic level. Do they click a button that says, "Approve"?

A.     Generally speaking, yes. (Bird Dep. 32:21-34:16)

25.     Bluegreen's Senior Marketing Manager of Vendor relations and Special Projects

Sherry Ryan similarly testified:

Q.     Does Bluegreen have an understanding with respect to how the technology—

A.     Yes.

Q.     —that was used by—

A.     I know—

Q.     Yeah. Just, yeah, bear with me. How the technology that was used by Gold Mountain to make the calls that are at issue in this case works?

A.     A minor understanding, yes.

Q.     Okay. What is Bluegreen's understanding?

A.     That's a human initiated click con—clicker contact.

Q.      What does that mean?

A.      It's that somebody's actually physically dialing a phone and then connecting it to an agent.

Q.      When you say physically dialing a phone, what do you mean by that?

A.      They're dialing a number and then they connect that to the agent.

Q.      So somebody's sitting there punching the numbers and then when the call is connected, they're connecting it to an agent; is that correct?

A.      Correct.

Q.      Okay. Did you, Ms. Ryan, ever personally observe the process that you've just described to me during any of your visits?

A.      I believe I saw the initiator once in May.

Q.      In May of 2018?

A.      Uh-huh.

Q.      The e-mail communications that we've received indicate that the—well, strike that. Do you know the name of the platform that was used to place the call at issue in the case?

A.      I do.

Q.      Is it TCN?

A.      It is.

Q.      Okay. When did Gold Mountain first start using the TCN platform to make outbound calls on behalf of Bluegreen?

A.      January 2018.

Ryan Dep. 39:6-40:20.

        26.     Ryan also testified that Bluegreen required Gold Mountain to use a manual dial platform:

Q.      All right, but as far as Bluegreen knows, pursuant to their—the agreement between the companies, Gold Mountain was supposed to be placing outbound calls using the TCN platform for Bluegreen?

> A.   Bluegreen requires Gold Mountain to manual—use a manual dial platform—
>
> Q.   Uh-huh.
>
> A.   —in which to dial customers.

Ryan Dep. 42:17-24.

27.   Ryan also testified that Bluegreen understood that Gold Mountain used a manual dialer and human intervention was required for every call made:

> Q.   Okay. Do you see there in the second paragraph, last sentence, it says, "The vendor uses a manual dial only system which has no present or potential capacity to autodial, for random or sequential number generation, or for predictive dialing. Human intervention is required on every call made"; do you see that?
>
> A.   Yes.
>
> Q.   Okay. Is that true?
>
> A.   That is our understanding from Gold Mountain.
>
> Q.   That's based on what Gold Mountain told Bluegreen?
>
> A.   Correct.
>
> Q.   Okay. "Human intervention is required on every call made", what does that mean?

MS. NATHAN:      Objection to form.

THE WITNESS:      Am I supposed to say something?

BY MR. HIRALDO:

> Q.   Yes. What does human—
>
> A.   It means that a person is dialing the phone and then a different person is actually selling or making the offer to the customer.
>
> Q.   Okay, and when you say a person is dialing the phone, you're saying that—
>
> A.   Manually dialing.
>
> Q.   —somebody is punching in the phone numbers?

> A.     Somebody else is manually dialing the phone, yes.

Ryan Dep. 91:17 – 92:17.

28.     Ryan also testified that Bluegreen's marketing agreement with Gold Mountain required the use of "a phone in which they dial manually":

> Q.     "Independent Contractor agrees to make manually dialed outbound telemarketing calls from a manual dialer", and then in parentheses it says, "(as defined by applicable law)." What is a manual dialer?

MS. NATHAN:        Objection to form.

THE WITNESS:       It's that they have to manually dial a phone call.

BY MR. HIRALDO:

> Q.     Okay. Why did Bluegreen use the term manual dialer and not just telephone in this contract?
>
> A.     That would be a question for counsel.
>
> Q.     Do you know what the difference is between a manual dialer and just a regular telephone?
>
> A.     Well, I know what a manual dial is. It means dial manually.
>
> Q.     Okay. I guess what I'm trying to understand is what's -- if the purpose of this was to have Gold Mountain use—well, strike that. As you sit here today, do you know what a manual dialer is as defined in this contract?
>
> A.     It's a manual dial platform. It's a phone in which they dial manually.
>
> Q.     Okay. So is it just a regular telephone?
>
> A.     It's a phone that does not have any auto dial features.

Ryan Dep. 94:11-95:11.

29.     The President of Gold Mountain, Henry Seevers, testified that he had observed that the TCN platform requires a human person to review a record of a name and phone number and then click to dial:

> Q.     Have you personally observed someone using the TCN platform for the placement of an outbound call?
>
> A.     Yes.

13

Q.      Okay. How many times?

A.      I don't know. Maybe a few times.

Q.      You described earlier when describing the LiveVox platform a clicker agent. Do you recall that?

A.      Yes.

Q.      Does the TCN platform have a similar setup where a clicker agent is used?

A.      Yes.

Q.      So in terms of the outbound calls that were being made on behalf of Bluegreen in 2018, describe to me how those calls would occur using a TCN platform.

A.      Okay. The clicker agent station would be presented a record with the customer's name and phone number and any other information provided by Bluegreen and the clicker agent would click approved to dial.

Seevers Dep. 41:11-42:3.

30.     Seevers also testified that Gold Mountain never even discussed a predictive

dialing function with TCN, only a manual campaign:

Q.      Does the TCN product that Gold Mountain used in 2018 have a predictive dialing function?

A.      I don't know that for certain. We only talked to TCN about the manual only campaign.

Seevers Dep. 47:22-25.

31.     Seevers testified that Gold Mountain has never used any function other than the

human clicking function that he described with the TCN platform:

Q.      Has Gold Mountain ever used any other function besides the clicking function that you described when using the TCN platform?

A.      We have not.

Seevers Dep. 48:1-3.

32.     Seevers testified that Gold Mountain has never used or had access to any form of

predictive dialer from TCN:

14

> Q.    Has Gold Mountain ever used the TCN standard predictive dialer system for any purpose?
>
> A.    We have never.
>
> Q.    Does it have access to the TCN standard predictive dialer system in any way?

MR. KEMP-GERSTEL:        Objection to form.

THE WITNESS:        Not that I'm aware of, no, we do not or did not.

Seevers Dep. 83:23-84:5.

33.    Seevers testified that Gold Mountain complied with the Bluegreen marketing agreement that required it to use a manual dialer:

> Q.    That states, "Independent contractor shall only contact consumers on Bluegreen lead lists in performing the telemarketing program; exclusively use a manual dialer in all its outbound telephonic contacts with consumers and not engage in any text messaging in connection with this agreement." Do you see that?
>
> A.    I do.
>
> Q.    Did Gold Mountain comply with its obligations in that paragraph?
>
> A.    We did.
>
> Q.    And was there any portion of this paragraph that authorized Gold Mountain to use an auto dialer?
>
> A.    No.
>
> Q.    And did Gold Mountain use an auto dialer to place any calls pursuant to this contract?
>
> A.    No.

Seevers Dep. 94:11-95:1.

34.    Seevers further testified that under the Bluegreen marketing agreement, Gold Mountain was never authorized to use an autodialer:

> Q.    And under subsection 2(a) on the first page 15 of the document it states, "Independent contractor agrees to make manually dialed outbound

telemarketing calls from a manual dialer to consumers on the Bluegreen lead list, defined below, to make a ChoiceHotel International offer and to solicit the sale of the Bluegreen's discount vacation packages described on Schedule 1 annexed hereto." Do you see that?

A.   I do.

Q.   Was Gold Mountain authorized to use an auto dialer pursuant to this provision of the contract?

A.   No.

Seevers Dep. 93:14-25.

35.   Plaintiff's own Motion for Class Certification, when defining the class that he wishes the court to certify, even describes the calls at issue as those "placed by Gold Mountain Communications, LLC on behalf of Defendant using the *TCN 'Manual Dial Only' system*" (Plaintiff's Motion for Class Certification, p. 2, emphasis added).

36.   Several documents produced by TCN also confirm that the Manual Dial Only system (of which the Manually Approved Calling System is a subset) is, in fact, a manual dialing system, that it does not have any number generation capabilities, and that it has no predictive dialing capabilities. For instance:

a.   *FccRulesLetterJuly152015.pdf—included as part of TCN's subpoena response*: This letter, addressed to TCN's customers, states that in September, 2013, TCN implemented a Manual Dial Only Account System, with the following specifications: (1) "When using the Manual Dial Only Account, there is no present or potential capacity to auto-dial. Customers do not have ability to program auto-dialing because there is no application program interface (API) or development environment available to customers for this purpose. Auto-dialing is therefore not a programmable feature. Customers cannot add new functionality to TCN's

16

Manual Dial Only Account platform at all as an API enabling new functionality is not available. This includes, but is not limited to, the ability to make a manual system an auto dialer."; (2) "When using the Manual Dial Only Account, human intervention is required on every call via either a click or by pressing ten digits."; (3) "When using the Manual Dial Only Account, there is no present or potential capacity for random or sequential number generation."; and (4) "When using the Manual Dial Only Account, there is no present or potential capacity for predictive dialing".

b.    *KB-TCPA-ManualDialOnlySystem-110319-1029-26.pdf—included as part of TCN's subpoena response*. This document describes the Permissions Scheme Separation technique used by TCN that prevents users of its "Manual Dial Only System" from using any features or capabilities of its "Standard Predictive Dialer System." This document also provides screen shots of the "Manual Dial Only System," depicting the "Dial" button that system users must manually click in order to dial each individual telephone number.

c.    *TCPA_Summary_SLICK.pdf—included as part of TCN's subpoena response*. This document provides a TCPA summary, including the following specifications: (1) "There is no present or potential capacity to auto-dial. Customers do not have ability to program auto-dialing because there is no application program interface (API) or development environment available to customers. Auto-dialing is therefore not a

programmable feature. Customers cannot add new functionality to TCN's platform at all as an API enabling new functionality is not available. This includes, but is not limited to, the ability to make a manual system an auto dialer"; (2) "Human intervention is required on every call via either a click or by pressing ten digits."; (3) "There is no present or potential capacity for random or sequential number generation."; and (4) "There is no present or potential capacity for predictive dialing".

**B.**     **The TCN Manually Approved Calling System Lacks the Technical Internals Required for Predictive Dialing**

37.     Predictive dialing abilities are not sufficient for a system to qualify as an ATDS, but plaintiffs in cases involving disputes about whether a system qualifies as an ATDS often point to predictive dialing features to argue that they qualify as ATDSs. For example, many popular systems with predictive dialing features do not have the capacity to produce numbers to be called using a random or sequential number generator. And many dialers with predictive capabilities also require human intervention.

38.     But not only does TCN's Manually Approved Calling System lack the ability to produce numbers to be called using a random or sequential number generator and require human intervention, but it also does not even provide predictive dialing functionality. Indeed, TCN's Chief Technology Officer, Jesse Bird stated the following in his deposition:

Q.     Is the manual approved calling platform a type of predictive dialing platform?

A.     No.

Q.     Does it combine any aspect of predictive dialing in order to achieve the outbound process that we've been discussing?

A.     No.

Bird Dep. 58:12-18.

39.     Based on my experience with various dialing systems, TCN's Manually Approved Calling System possesses none of the technical internals that are required for predictive dialing.

40.     The following definition of predictive dialing appears on techopedia, an independent online IT Education site that is not affiliated with any specific dialing vendors: "Predictive callers are programmed to predict when human callers can pick up calls by measuring the number of available agents, lines, average handle time and certain other factors to adjust the outbound calls. They use statistical algorithms to reduce the time that agents spend waiting between conversations, also reducing the occurrence of someone answering when no agents are available."[4]

41.     One of the key characteristics of predictive dialing is the use of *call pacing*, a technique that dynamically adjusts the speed and frequency at which calls are placed, based on a number of factors including agent availability, the number of available telephone lines, the length of each phone conversation. The TCN Manually Approved Calling System provides none of this functionality: there is no automated call pacing—the speed and cadence of placing calls is based solely on the clicking action used by the clicker agent as each number is manually dialed; there is no feature that can be used to predict when agents are available—agents simply receive calls from the TCN dialer once they are answered, without any prediction of when they will be available. Instead, with the TCN Manually Approved Calling System, the dialing speed is completely controlled by the clicker agents, as they manually select each number to dial. The absence of predictive functionality in the TCN Manually Approved Calling System has been

---

[4] See *Definition – What does Predictive Dialer mean?*, at https://www.techopedia.com/definition/4328/predictive-dialer (last visited 5/23/2019)

confirmed by my review of TCN's product documentation, as well as the testimony of TCN's Chief Technology Officer, Jesse Bird.

42.     When questioned about the Manually Approved Calling System's capability to pace the timing of calls – in ways similar to those used in predictive dialing - TCN's Bird testified:

> Q.     Does the MAC system have the capacity to pace the timing of calls based on the availability of the agents, the average list of calls or any other way?
>
> A.     The MAC system only generates calls when agents click them.
>
> Q.     So the answer to that would be no?
>
> A.     No. I mean, not -- so it paces in that it provides a queue for the agents to approve. It does not control how quickly or slowly the agents approve those calls. (Bird Dep. 111:23 – 112:7)

**C.     The TCN System's Manual Limits Are Consistent with the Call Volume in the Discovery Record**

43.     Plaintiff implies that TCN's Manual Dial Only System has the characteristics of an ATDS, apparently based on the volume of calls processed through Gold Mountain's call center.

44.     Plaintiff questioned Gold Mountain's Seevers regarding the volume of calls that were processed by Gold Mountain's call center, implying that somehow Gold Mountain's staff could not have handled that volume, and that some level of automation must have been present:

> Q.     Based on the call log that we've been provided, we analyzed a week in December of 2018 and came up with an average of about 17,321 total outbound calls per day. Does that sound accurate to you?
>
> A.     I can't say if it sounds accurate. It sounds possible.
>
> Q.     So it's possible that in December of 2018, on average 17,000 plus calls were being made per day; is that correct?
>
> A.     That's possible, yes.
>
> Q.     Okay. And that was being done by approximately 60 agents?

A.   Approximately, yes.

Q.   That was being done by 60 agents during a ten- to 11-hour workday; is that correct?

A.   Yes.

Q.   Do you know roughly how many calls that works out to per agent per day, I'm sorry, per shift?

A.   No, I don't. I could do the math but, no.

Q.   Do you know—do you have any idea of on average how many outbound calls each of these agents were placing per day?

A.   Uh, no, I don't.

Q.   Is there any record of that number of outbound calls that was occurring during that time frame?

A.   Yes, I'm sure there is.

Seevers Dep. 39:14-40:15.

45.   Seevers later testified as follows about the staffing of each shift:

Q.   All right. Mr. Seever, the shifts, I may not -- I think I'm unclear on this. The two six-and-a-half-hour shifts, six- or six-and-a-half-hour shifts, how many agents were working per shift?

A.   Again, estimated maybe as many as 40 on the early shift and 20 or 25 on the afternoon shift.

Seevers Dep. 40:25-41:5.

46.   A key question seems to be whether Gold Mountain's staff could have processed over 17,000 calls in a single day without automated dialing.

47.   From the Seevers testimony, Gold Mountain operated two shifts of 6 1/2 hours per shift, per day, with approximately 40 agents on the early shift, and 20-25 agents on the second shift.

48.   Plaintiff's counsel represented that over 17,000 calls per day were placed during a given week in December, 2018. In fact, on December 11, 2018—the date that Plaintiff received

his alleged call—there were 18,915 calls reported in the Clicker Records. Even with only one available clicker agent, over a period of 13 hours across both shifts, it would require clicking on 1,455 calls per hour. That corresponds to manually clicking just over 24 calls per minute, or roughly one call every 2.5 seconds—a feat that seems to be inarguably attainable.

49.     The next issue would be whether Gold Mountain's agents had the available bandwidth to handle all the calls for that day. Keep in mind that the 18,915 calls reported on 12/11/2018 represent the total calls that were clicked and dialed—not the calls that were presented to Gold Mountain's agents for processing.

50.     Out of the 18,915 calls that were clicked and dialed, 3,110 of those calls had a Result value of "Answered Linkcall"—indicating the calls that TCN analyzed as answered, and transferred to a live Gold Mountain agent for processing. The remaining calls included Result values of "Answered Hangup", "Answered Linkcall Abandoned", "Failed Refused", "Busy", "Invalid", "No Answer", or "Machine Hangup" – none of which included calls that were completed, or calls that would be transferred to a Gold Mountain agent. It was also confirmed in the Bird deposition testimony that only calls with a result value of "Answered Linkcall" should be transferred to an agent for handling.

51.     The 3,110 calls that were transferred to a Gold Mountain agent average out to 260 calls per hour, using a conservative estimate of 12 productive hours in a workday. With 60 agents on first shift, and 20-25 agents on second shift, the average coverage over the course of the day was at least 40 agents. For 40 agents to cover 260 calls per hour, each agent would need to handle 6.5 calls per hour.

52.     And if 6.5 calls per hour (or more than nine minutes per call) seems like too much of a load for Gold Mountain's agents to handle, it should be noted that roughly 80 percent of all

calls are recorded with a Disposition of "No Sale – Not Interested", indicating that at least 4 out of 5 calls did not require discussion of the entire marketing script.

53.     Clearly, based on the volumes explained here, there would have been no need for any automated dialing for Gold Mountain to handle the volume of calls that was reported.

### D.     A Live Demonstration of TCN's Dialing Platform Confirmed All of the Manual Characteristics that have Been Discussed

54.     On May 29, 2019, I participated in a live demonstration of TCN's dialing platform, performed by TCN's Chief Technology Officer Jesse Bird. During that demonstration, Mr. Bird walked through sample dialing processes, and I was able to view his operation of various TCN screens that were required to set up and initiate, and complete various calling campaigns. The calling campaigns that were demonstrated included the Manually Approved Calling System, in which an approval agent (aka *clicker agent*) is presented with a telephone number along with related customer data, manually reviews the telephone number and related data, and then chooses to call or skip that number by manually pressing an *approve* or *reject* button. If *approve* was selected, the number is dialed, and when the TCN system determines that the call was answered, it is transferred to another agent who takes the call and handles it accordingly.

55.     It is my understanding, based on explanations from Mr. Bird, as well as evidence discussed earlier, that the calls at issue in this case were placed using the Manually Approved Calling System.

56.     By observing the sample dialing processes of the Manually Approved Calling System in the demonstration, I was able to confirm the following points that have been discussed regarding the dialing system used to place the calls at issue in this case:

A.    The Manually Approved Calling System is equipment that does not have the capacity to produce telephone numbers to be called, using a random or sequential number generator, to store such numbers, or to dial such numbers. During the demonstration, it was shown that the only telephone numbers that could be dialed using this system were those that were either manually entered into a calling list, or provided within a calling list that had been uploaded into the system. There was no evidence of the system's capability to generate random or sequential lists of numbers to be dialed.

B.    As each telephone number was presented to the approval agent, the Manually Approved Calling System required the *approve* button to be pressed to place a call, or the *reject* button to reject dialing of the current number.

C.    As the approval agent chose *approve* or *reject* for each telephone number presented, the next number from the customer's calling list was presented for the agent to review. The agent's action of reviewing the current number, and clicking the *approve/reject* button for each number represents the manual pacing of the calls placed in the dialing campaign. This manual pacing in no way resembles the programmed, algorithmic pacing used in predictive dialing, which determines the speed and frequency that calls are dialed, based on the prediction of agent availability.

D.    Several required manual actions were observed, including: creating or uploading calling lists; initiating the calling campaign; selecting the *approve* button for each call to be placed; or selecting the *reject* button for each call to be rejected.

### E.    Classifying the TCN Manually Approved Calling System as an ATDS Would Make all Modern Smartphones ATDSs

57.    Any interpretation that characterizes the TCN Manually Approved Calling System as an ATDS would make all modern smartphones ATDSs.

58.    During the early 1980s, "brick" cell phone models were just emerging on the marketplace and could do no more than place and receive calls, with talk times limited to 30 minutes or less and price tags as high as four thousand dollars.[5] Also during the 1980s, one of the world's most powerful computers was the Cray-2 Supercomputer. The Cray-2 could perform an estimated 1.9 Gigaflops of processing, and cost approximately $16 million.[6] The Cray-2 also occupied sixteen square feet of floor space, plus room for cooling equipment, power generators and other equipment.[7] By comparison, the Samsung Galaxy S6, already since upgraded several times to newer models, can perform an estimated 34.8 Gigaflops of processing,[8] sold new for a few hundred dollars, and occupies approximately fifteen square inches of desk space. Of course, today's smartphones have features that were barely a blip on the radar in the age of 1980s computers and cell phones, including high-definition photography and video, wireless uploading and downloading of a myriad of data content, GPS-based applications such as navigation, access to email—the list goes on. And, it is currently estimated that there are well over 200 million smartphone users in the U.S.[9]

---

[5] Looking back on 40 years of the cell phone at https://newatlas.com/mobile-pnone-40-year-anniversary-photos/25677/ last visited May 29, 2018.

[6] *Supercomputer vs. your computer in bang-for-buck battle* at https://www.theregister.co.uk/2012/03/08/supercomputing_vs_home_usage/ last visited Mar. 1, 2019.

[7] The Cray-2 Series of Computer Systems at http://www.craysupercomputers.com/downloads/Cray2/Cray2_Brochure001.pdf last visited Mar. 1, 2019.

[8] *Processing Power Compared* at https://pages.experts-exchange.com/processing-power-compared last visited Mar. 1, 2019.

[9] Number of smartphone users in the United States from 2010 to 2022 at https://www.statista.com/statistics/201182/forecast-of-smartphone-users-in-the-us/ last visited Mar. 1, 2019.

59.     If Plaintiff's contention—that the calls at issue were placed by an ATDS—is accepted, then the same argument would sweep all modern smartphones under the category of an ATDS.

60.     The TCN Manually Approved Calling System requires a human to view each individual telephone number, and click a "Call" icon/button to place each call. This manual dialing method is identical to the method used by hundreds of millions of smartphone users in the U.S. each day, in order to place billions of wireless calls.

61.     A smartphone user routinely views a list of telephone numbers, which are collected as *recent* inbound or outbound calls, in his or her call log. With a simple touch of an entry in the call log, the Android smartphone user can view the contact information, and click the call icon to place a call—just as Gold Mountain's clicker agent clicked a "Call" button for each call placed in Defendant's campaign. And if it is argued that the Android user's calling requires two clicks, Android provides a "Swipe to call feature" (which is enabled by default) that allows the Android user to view a list of telephone numbers or contact data, and call that number by simply swiping their finger across the entry – performing the same single selection of the "Call" button used by one of Gold Mountain's clicker agents.

62.     Similarly, iPhone users can view a list of telephone numbers or contact data on their "Recents" call log. By tapping the info icon on the right side of an entry, the details of the call can be displayed. Or by simply tapping the telephone number itself, the iPhone users can place a call to that number—in the same manner that the Gold Mountain clicker agent views a telephone number and clicks a "Call" button to manually place a call.

63.     And when discussing the possibility of including smartphones under the ATDS umbrella, the *ACA International v. FCC* Decision stated that "Those sorts of anomalous

outcomes are bottomed in an unreasonable, and impermissible, interpretation of the statute's reach. The TCPA cannot reasonably be read to render every smartphone an ATDS subject to the Act's restrictions, such that every smartphone user violates federal law whenever she makes a call or sends a text message without advance consent." (885 F.3d 687).

## II.   Documents Produced in the Litigation Cannot Be Used to Reliably Identify Call Recipients

64.   There are three major files at play in this case:

a.   *Choice Lead Files*: The "Choice Lead Files" are records of telephone numbers and associated names and addresses of Choice customers that were provided to Bluegreen. The data from these files, including the telephone numbers, was transmitted to Bluegreen and, in turn, Gold Mountain, to place the alleged calls here.

b.   *Clicker Records*: These are records of the calls attempted by the TCN Manually Approved Calling System for Gold Mountain's marketing campaign. The Clicker Records include the telephone number dialed and the result of the attempted call produced by TCN, but no other lead information.

c.   *Disposition Record*: These are a subset of the Clicker Records, and include those calls deemed answered by TCN and passed to a live Gold Mountain agent for processing. The Disposition Records include the telephone number dialed, and the disposition of the call as recorded by the human agent. Plaintiff has selected a subset of the Disposition Records to define his proposed class.

### A.   The Choice Lead Files

27

65.     The Choice Lead files are inaccurate, incomplete, and cannot be used to reliably identify call recipients for two principal reasons: first, many have no lead data; and, second, many may be staledated.

66.     Gold Mountain produced Choice Lead files as contacts used in the calls it placed regarding Bluegreen. The calls that Plaintiff has included in his proposed class were made to the leads for the "GMT_CHOICE_CPWireless_WinBack_manual" Choice Lead file prefix, which consist of 11 files and a total of 81,092 lead records.

67.     Plaintiff's proposed class is comprised 24,969 call records ("24,969 call records"), which is a subset of the Disposition Records. Plaintiff chose this subset of records based on a specific set of telephone numbers—those that appeared as leads in the "GMT_CHOICE_CPWireless_WinBack_manual" files, which were all designated as part of the "Choice Inact CP Wireless" campaign. This set of lead files, and its associated campaign, included Plaintiff's lead record.

### 1.    Missing Lead Data

68.     When I compared the telephone numbers that appear in Plaintiff's proposed class of 24,969 call records with the Choice Lead files, there are more than 2,600—or roughly 10.5 percent—of Plaintiff's 24,969 call records that have no matching lead name or address for the telephone number called.

69.     The table below provides just a few examples of calls found in Plaintiff's 24,969 call records, to telephone numbers for which no lead data exists:

| Phone Number | CEH Campaign Name | CEH AM ID | CEH Unique Record ID | Call Date | Disposition |
|---|---|---|---|---|---|
| 3168825662 | Choice Inact CP Wireless | 36460962 | 49221498 | 10/18/2018 | Not Qualified - Age |
| 3168825662 | Choice Inact CP Wireless | 36460962 | 49221498 | 10/19/2019 | Not Qualified – Age |
| | | | | | |
| 4102185721 | Choice Inact CP Wireless | 37240869 | 49223540 | 10/18/2018 | No Answer |
| | | | | | |
| 3148535534 | Choice Inact CP Wireless | 37247978 | 49223772 | 10/26/2018 | Not Qualified - Income |

70.     For each of the sample telephone numbers above, I performed searches of TransUnion's database. Those search results returned several potential names and addresses, but none of the names returned by TransUnion are found in the Choice Hotels lead files, regardless of telephone number.

### 2.     Staledated Lead Data

71.     I understand that Choice provided leads to Bluegreen, and that Bluegreen provided the Choice Leads to Gold Mountain. I also understand that the Choice Leads originate with Choice Hotels Privileges program, which has been in place since 1998, and that the lead information relating to customer's phone numbers and other contact information is supplied and maintained by those Choice Privilege members. I also understand that if any of those Choice Privileges members were to stay in a Choice Hotel without updating any outdated phone numbers or other contact information, it would cause that outdated information to be transmitted in the Choice Lead files to Bluegreen. Some unknown part of the phone numbers and contact information in the Choice Lead files may therefore be staledated.

72.     As described above, the Choice lead data is supplied and maintained by Choice's loyalty members, and can date back as far as 20 years ago. This introduces the likelihood that the customer data in those lead files was originally entered as inaccurate or incomplete, has been updated over time with such flaws, or has become stale over time due to lack of updates to reflect changes to customer names and addresses.

73.     One such example of incomplete customer information is found in Plaintiff's proposed class of 24,969 call records. After eliminating the 2,600+ records described above with missing leads, and eliminating duplicate records, there are 20,774 distinct Choice lead records that match Plaintiff's class. Within these 20,774 lead records, 3,235 leads—nearly 16%—have an address of 'UNKNOWN'. But is unclear why they have unknown addresses.

74.     The missing lead records to which calls were allegedly placed, and the incomplete and stale nature of the remaining lead records provides a preview to the challenges that will have to be overcome in order to accurately identify potential class members.

### B.     Clicker Records

75.     Clicker Records produced by the TCN dialing system, and Disposition Records produced through Gold Mountain's agents cannot provide an accurate representation of the calls placed during Defendant's marketing campaign.

76.     The raw call data from TCN's dialer was produced by Gold Mountain in a folder titled "HCI Reports Sent to Bluegreen." The HCI term used in the folder name generally refers to *Human Call Initiator*, when used in reference to dialing systems.

77.     Each of the files in this folder begins with the prefix "CLKR," for "Clicker Records." As explained above, ¶ 64.b, the Clicker Records are the records that the TCN dialer produces each time a clicker agent manually clicks on a telephone number, in order to have the TCN system dial that individual telephone number. Each of the Clicker Records includes the telephone number dialed, the CH campaign name, two identifier fields that were provided as part of the CH lead file, the call date, and a result field. The result field contains a unique status result of each call, and differentiates (at a high level), calls that were answered by the calling party and transferred to a Gold Mountain agent, versus calls that were not completed or disconnected by the dialing system and never transferred to a Gold Mountain agent.

78.     The Clicker Records include the telephone number dialed and a result value for the attempted call but no names or contact information.

### C.     Disposition Records

#### 1.     Source of the Disposition Records and Values

79.     The Gold Mountain subpoena produced 64 "Disposition" files under a folder titled "Disposition Reports Sent to Bluegreen." These records are intended to represent calls that were placed and subsequently connected to one of Gold Mountain's agents for processing. The records in the Disposition Records have the same data columns as the Clicker Records, with the exception that each Disposition Record carries a Disposition column, in place of the Result column that appears in the Clicker Records.

80.     The Disposition column provides the status of the Gold Mountain agent's interaction with the called party—identifying if a sale was made, if the called party did not qualify for the campaign, if the called party scheduled a callback, etc. The critical difference is that the disposition values in the Disposition Record have been manually generated by a Gold Mountain agent—based on the results of their attempted phone call with the called party, while the Result value in the Clicker Records is automatically generated by the TCN Manually Approved Calling System—based on TCN's mechanized interpretation of the call feedback that is detected on the line. Within these files are 24,969 call records with the campaign designation of "Choice Inact CP Wireless," which comprise plaintiff's class of alleged call violations.[10]

81.     Although Plaintiff proposes a class that includes "connected" calls, the 24,969 call records must be analyzed to determine, if possible, which of the alleged calls were actually connected. At first glance, there are numerous values in the Disposition column that appear to

---

[10] Motion for Class Certification p. 6

represent calls that were never connected. For example, there are thousands of calls with Dispositions of "No Answer" that represent calls that were never actually connected. There are also thousands of calls with Dispositions of "Voicemail" that could possibly represent calls that were connected, but should never have been transferred to an agent for handling. These calls would potentially require manual investigation—to determine whether individual calls were properly routed and connected.

### 2. Conflicts between Clicker Records' Results Values and Disposition Records' Disposition Values

82.    Perhaps the most glaring problems with the Plaintiff's proposed call data are conflicts between the Clicker Records' result values (automatically provided by TCN's dialing system) and the Disposition Records' disposition values (manually provided by Gold Mountain's agents) for the same call records.

83.    I was able to load Plaintiff's 24,969 Disposition records into a Microsoft SQL database, and merge each of those records with the corresponding call record from TCN's Clicker Records. This produced a set of 24,969 call records that include both Disposition and Result values with result/disposition combinations.

84.    Some of the result/disposition combinations provide conflicting evidence, resulting in the inability to determine if a call was actually connected. For example, according to the Clicker Records from TCN, the only calls that should have been transferred to a Gold Mountain agent, and thus the only calls that should appear in Plaintiff's 24,969 Disposition Records, are those with a Clicker Record result value of "Answered Linkcall," which indicates that the TCN dialing system detected that a live person answered the call and that call was transferred to a Gold Mountain agent. But there are result/disposition combinations in my

merged call records data showing that some calls resulted in Disposition Records when the Clicker Record result was something other than "Answered Linkcall."

85.     In the following table of examples, telephone number 304-614-4925 was reported with the Clicker Record result value of "Failed Refused," indicating that the call was not connected by the TCN Manually Approved Calling System, and that no call should have been transferred to a Gold Mountain agent. But a corresponding call is found in the Disposition file for this call, indicating that the call was transferred to a Gold Mountain agent, and that agent recorded a disposition value of "No Sale-Not Interested."

86.     The second row displays telephone number 509-391-0706 with a Clicker Record result value of "Busy"—clearly indicating that a call should not have been connected. But the Disposition Record includes a disposition value of "No Sale-Not Interested," indicating that a Gold Mountain agent received the call, apparently spoke with a party, was unable to make a sale, and recorded the noted disposition.

87.     The third example shows telephone number 813-713-2108 with a Clicker Record result value of "No Answer," again clearly indicating that a call should not have been connected. But once again, the Disposition Record disposition value of "No Sale-Not Interested" indicates that a Gold Mountain agent received the call, apparently spoke with a party, was unable to make a sale, and recorded the noted disposition.

88.     And the fourth example, with telephone number 231-343-6911, reports a Clicker Record result value of "Machine Hangup"—indicating that the TCN Manually Approved Calling System detected an answering machine, and disconnected the call without transferring it to an agent. But the Disposition Record disposition value of "No Sale-Not Interested" indicates that a

Gold Mountain agent received the call, apparently spoke with a party, was unable to make a sale, and recorded the noted disposition.

| Phone | Campaign | AM ID | Unique Rec ID | Call Date | Result | Disposition |
|-------|----------|-------|---------------|-----------|--------|-------------|
| 3046144925 | Choice Inact CP Wireless | 12707828 | 49216857 | 10/29/2018 | Failed Refused | No Sale - Not Interested |
| 5093910706 | Choice Inact CP Wireless | 36920101 | 49222233 | 10/25/2018 | Busy | No Sale - Not Interested |
| 8137132108 | Choice Inact CP Wireless | 20760089 | 49217529 | 10/29/2018 | No Answer | No Sale - Not Interested |
| 2313436911 | Choice Inact CP Wireless | 37258614 | 49224078 | 10/25/2018 | Machine Hangup | No Sale - Not Interested |

89.     In these and other example call records, it is unclear whether any of the following occurred: (1) the TCN Manually Approved Calling System recorded an incorrect result value; (2) the TCN Manually Approved Calling System incorrectly transferred the subject call to a Gold Mountain agent; (3) a Gold Mountain agent was able to access a call record that should not have been transferred; or (4) a Gold Mountain agent recorded an incorrect disposition value on a transferred Disposition Record.

### 3.     Barriers to Resolving these Conflicts on a Class-Wide Basis

90.     These possible scenarios mean that, at a minimum, a subset of Plaintiff's 24,969 call records must be manually analyzed, including review of associated call recording (if available) to determine whether or not completed calls were made for the subject records. It is also my experience that call recordings are often difficult or impossible to analyze with definitive results, due to poor sound quality or incomplete recordings, and that even a manual investigation and analysis may not provide an objective outcome as to the question of whether or not a given call was completed.

91.     The inadequacy of call recordings and available evidence to determine whether or not completed calls were made is illustrated in the subject case by the call recording to Plaintiff's

telephone number. That recording, which was supplied as part of Gold Mountain's subpoena production, lasts nine seconds, and the only voice that can be heard on the recording is that of Gold Mountain's agent. There is no evidence on the recording that the agent spoke with Plaintiff, there is no audio of Plaintiff speaking, and it is not even clear from the recording whether a call was actually completed.

92.     And further evidence exists that even a manual investigation of call history can be inconclusive, based on Plaintiff's deposition testimony ("Wijesinha Deposition") regarding the call. At one point, after hearing the recording that included only the Gold Mountain agent's voice, Plaintiff agreed that the recording sounded correct:

> (Recording played) Choice Hotels from Bluegreen Vacations on a recorded line. How are you doing today?
>
> Hi. Good morning, Shehan. This is Jamie Lowery, calling on behalf of Choice Hotels from Bluegreen Vacations on a recorded line. How are you doing today?

BY MS. NATHAN:

> Q.     Does that recording reflect your recollection of the phone call that you received?
>
> A.     It sounds about right.

Wijesinha Dep. 18:8-18.

93.     But Plaintiff was also confused about the content of the call, later relaying that he thought there might have been more to the conversation, and also that he may have hung up after hearing the agent's introduction:

> Q.     But nowhere on the actual recording do they 15 mention that they were selling timeshares; is that correct?
>
> A.     I don't know if she proceeded from that point, but based on what she said there she did not, but I believe the conversation was a little bit longer than that, but I'm not sure.
>
> Q.     Did you hear yourself respond to the lady on the phone at all?

A.    No.

Q.    Do you believe it's possible you just hung up the phone and said nothing to the woman?

A.    It's very possible.

Wijesinha Dep. 19:14 – 20:1.

94.    The existence of call records with conflicting Clicker Record result values and Disposition Record disposition values makes both suspect as to their accuracy. Even for calls that do not have conflicting result/disposition combinations and appear to otherwise be normal, the TCN Manually Approved Calling System could be producing invalid Clicker Record result values; the Gold Mountain agents could be producing Disposition Records with invalid disposition values; or both. For example, if a given call's Call Record indicates a result value of "Answered Linkcall," and a Disposition Record indicates a disposition value of "No Sale - Not Interested" (which represents the status of more than 92% of Plaintiff's proposed class), the discrepancies identified above raise the prospect that the process that generated those results are fundamentally flawed and unreliable.

### 4. Additional Conflicts between the Clicker Records and Disposition Records

95.    Additional data analysis reveals that there are some call records in TCN's Clicker Records that should have been passed to Gold Mountain agents and recorded in Gold Mountain's Disposition file, but do not exist there. For example, telephone number 305-790-5546 appears in the Clicker Records, and is identified as part of the "Choice Inact CP Wireless" campaign. The Clicker Record reports that it was called on 1/23/2019, with a result value of "Answered Linkcall," indicating that the call should have been transferred to a Gold Mountain agent, and have a corresponding record in Plaintiff's file of 24,969 call records from the Choice Lead Files. However, there is no call record and no corresponding Disposition found in Plaintiff's file for

305-790-5546—indicating that Plaintiff's class of call records may also be under-inclusive, and further questioning the accuracy of TCN's Clicker Records, Gold Mountain's Disposition Records, or both.

96.    And the suspect nature of the TCN's Clicker Records and Gold Mountain's Disposition Records is further confirmed by analysis that I performed comparing the overall call records produced in response to the Gold Mountain Subpoena, which included all calling campaigns, beyond the "Choice CP Inact Wireless" campaign in which Plaintiff Wijesinha was included. When comparing the Call Record result values to the Disposition Record disposition values for call records from all campaigns, I found evidence of conflicting result/disposition combinations for tens of thousands of call records.

### 5.    Duplicate records

97.    Plaintiff's class of 24,969 call records also contains thousands of instances of duplicate records. For example, telephone number 201-492-7771 appears twice in Plaintiff's file, with the exact same values for all data fields: the same campaign name, the same ID values, the same date of 12/26/2018, and the same disposition value of "No Sale–Not Interested." Duplicate records also exist for telephone number 980-322-5258 called on 12/26/2018 with a disposition value of "No Sale–Not  Interested"; telephone number 972-567-7367 called on 12/26/2018 with a disposition value of "Not Qualified–Income"; telephone number 972-750-1612 called on 12/28/2018 with a disposition value of "No Answer"; telephone number 956-483-0425 called on 12/26/2018 with a disposition value of "Wrong Number"; and the list goes on. And without any additional identifying data, such as a call time, there is no way to determine if these records represent multiple distinct calls, or a single call that's has been recorded in duplicate. Many of the examples, such as those above with a Disposition of "No Sale–Not Interested", "Wrong Number", or "Not Qualified-Income" would not seem to support the idea that multiple calls were

placed resulting in duplicate dispositions. For example, a call resulting in a "Wrong Number" disposition value would not logically be followed by another call to the same number. Neither would a call that resulted in a Disposition of "Not Qualified–Income" warrant another call to that same number. With the current data as produced by Gold Mountain, Plaintiff's 24,969 call records are grossly overstated due to these duplicates, and further questions the validity of the call records.

### III.    Barriers to Identifying Historical Users or Subscribers

98.    For at least the 10.5 percent of Plaintiff's proposed class for which the Choice Lead files contain no matching lead name or address, it would then be necessary to accurately identify the users or subscribers associated with those numbers at the time of the alleged calls. This is an even more challenging task.

99.    Some cell phone accounts may have only one subscriber, who is also the sole user, but several other possibilities exist. For example, the subscriber may not be a user of the cell number at all, and there may be multiple authorized users of the number and one or more of the authorized users may not be the subscriber. This often occurs in the context of business plans (where a corporation or entity is the subscriber of a number with one or more different users) or family plans (where a single family member is the subscriber of an account with several different numbers used by other family members). Given these and other issues, as well as the lack of a single publicly-available database, directory, or other source to accurately identify historic subscribers and users of cell phone numbers as of particular historic dates, it is my opinion that any attempt to accurately and reliably determine the historic subscriber of a given cell phone number as of the date of a particular call will require obtaining and analyzing records and information from third-party sources, including, among other sources, cell phone providers and subscribers. Those sources will, in my opinion, vary from number to number, depending on

various factors such as the date of the call and the cell phone carrier for the number at issue. For similar reasons, it is also my opinion that the historic users or subscribers of particular cell phone numbers as of a particular date cannot be accurately and reliably identified without obtaining information from, among other sources, the subscribers or users themselves.

### A.   TransUnion

100.   It has previously been discussed that there are significant shortcomings with the data in the lead files that were used to place the alleged calls by Gold Mountain. For example, in paragraph 68 above, it was described that more than 2,600—or roughly 10.5 %—of Plaintiff's 24,969 call records have no matching lead for the telephone number called. It was also described in paragraphs 72-73 above, that the Choice lead data is prone to being incomplete and inaccurate, such as the 16% rate of unknown addresses that were found. The lead data from Choice Hotels would thus be insufficient to accurately identify all subscribers to whom the alleged calls were placed.

101.   Plaintiff may propose that other vendors who provide skip-tracing services, such as LexisNexis, TransUnion or others, may be used to augment the data in the lead files, by providing additional identification of subscribers associated with the telephone numbers at issue. It has already been described at length that there are significant issues with using such data vendors, due to their inherent inaccuracies, their lack of being able to identify associated subscribers at specific historic dates of calls, their inability to identify authorized users associated with telephone numbers, and the proprietary nature of their data sources and techniques used for identification.

102.   It is also apparent that using an alternate data vendor, such as LexisNexis or TransUnion, in conjunction with the data provided in the Choice Hotels lead files will introduce additional conflicts and questions as to the proper and correct ownership of any given telephone

number at any given historic dates of calls. If another data vendor provides a name associated with a telephone number that is different than the name specified in the Choice Hotels lead file, that discrepancy must be resolved, and would again introduce the need for individualized investigation.

103.    For example, as already described, I was able to compare Plaintiff's 24,969 call records with the Choice Hotel lead records. After eliminating all of the duplicate call records, there were 20,770 call records from Plaintiff's list that had matching leads in the Choice Hotels lead files.

104.    The telephone numbers for those 20,770 call records were submitted to TransUnion for a batch append process. The TransUnion batch append identifies up to five names and addresses for each telephone number, as well as a date range associated with each name/address combination. The data returned from the TransUnion batch append revealed that there were more than 6,500 name and address combinations returned from TransUnion that did not match the name and address in the Choice lead files for the telephone number and its associated call date—*a discrepancy between the two data sources of more than 31 percent.*

105.    In this example, telephone number 951-970-9031 appears in Plaintiff's proposed class of 24,969 call records, with a call date of 12/6/2018. When combined with the lead record from Choice Hotels for the given number, the following subscriber information results:

| Number | First | Last | Address | City | ST | Call Date |
|--------|-------|------|---------|------|----|-----------| 
| 9519709031 | Kenneth | ***** | 30090 ***** | Temecula | CA | 12/6/2018 |

TransUnion returned a single name associated with 951-970-9031, with a date range that covers the timeframe of the call to that number. The TransUnion name and address bear no similarity at all to the name and address from the Choice lead data:

| Number | First | Last | Address | City | ST | FirstSeen | LastSeen |
|---|---|---|---|---|---|---|---|
| 9519709031 | D**** | M***** | 12** **** *** | San Angelo | TX | 1/31/2015 | 5/14/2019 |

106.   The TransUnion process also returned more than 1300 telephone numbers (6.3 percent of the total numbers provided) with no associated names or addresses–indicating that, at a minimum, some combination of the TransUnion data and the Choice Hotels lead information would have to be used.

107.   Another trait of TransUnion's identification data is that, for telephone numbers with multiple names there are overlapping date ranges, indicating that multiple potential subscribers are associated with the same telephone number at the same date. This issue makes these records effectively unusable, because there is no other data or indication of the correct subscriber. From the data returned from TransUnion for Plaintiff's call records, there are more than 13,000 records with at least two names returned. Out of these records, more than 7,300 of the records report different last names. And within those records with different last names, nearly 1,200 have overlapping dates. And additional analysis would surely reveal more overlapping dates, since there are some 1,500 records with all five names, 1,800 records with four names, and 3,500 records with three names. The mere existence of these additional 7,000 telephone numbers with three, four or five names means that there is the potential for thousands of additional conflicting date scenarios.

108.   In this example, telephone number 757-277-8231 appears in Plaintiff's proposed class of 24,969 call records, with a call date of 10/30/2018. When combined with the lead record from Choice Hotels for the given number, the following subscriber information results:

| Number | First | Last | Address | City | ST | Call Date |
|---|---|---|---|---|---|---|
| 7572778231 | Gregory | S***** | 2400 * ***** ** | Wilmington | DE | 10/30/2018 |

TransUnion returned two names associated with 757-277-8231, with overlapping dates that both cover the timeframe of the call to that number:

| Number | First | Last | Address | City | ST | FirstSeen | LastSeen |
|--------|-------|------|---------|------|-----|-----------|----------|
| 7572778231 | P****** | M**** | 21* ******* *** | Suffolk | VA | 1/31/2010 | 5/14/2019 |
| 7572778231 | I**** | P***** | 4450 ***** | Las Vegas | NV | 1/31/2018 | 5/14/2019 |

109.    It is clear from this example that there are three distinct names associated with telephone number 757-277-8231 at the date of the call, with no apparent connection among them names, and no available data or evidence to assist in discerning which, if any, of the three names was the subscriber or authorized user of the number on 10/30/2018. And further comparison of the TransUnion data results with the Choice Hotels lead information will reveal that hundreds if not thousands of conflicting scenarios exist.

110.    It should be sufficiently clear that there are no reliable resources that would provide an administratively feasible method for identification of users or subscribers, as of the historic date(s) of alleged calls based on a set of phone numbers. And it should also be sufficiently clear that any such exercise would require a detailed, individualized inquiry to produce any reliable results.

**B.      Other Public Identification Services and Skip Tracing**

111.    In my experience, TCPA plaintiffs often suggest they can identify individual cell phone subscribers using public or pay identification services or skip tracing. There are a myriad of publicly available databases that purport to perform reverse phone number lookups and provide subscriber—not user—information like name and address, and there are a number of vendors who provide varying levels of commercial data lookups, usually via Application Program Interfaces ("APIs"). Based on my research and my business and expert experience, it is my opinion that these services cannot reliably and accurately identify historic cell phone subscribers because each service is subject to significant limitations and errors.

A.      These services are data aggregators. As a result, the reliability of these services is entirely dependent on the reliability of their source data. Many free, web-based services do not identify their data sources, and so it is not possible to evaluate their accuracy. Issues such as errors in data entry, number reassignment, and out-of-date data multiply these inaccuracies. Data from public records is typically available only with current values, and without the historical records that would be required to identify a subscriber at a given point in time in the past when alleged messages were sent. This is the case for all publicly available data sources of which I am aware, such as web-based reverse number lookups. As a result, these services cannot assist in identifying historic subscribers.

B.      Commercial databases, such as LexisNexis, that offer paid searches to businesses, advertise historical searches of their public record information. However, those data providers must aggregate that data themselves over time in order to store and produce historical results, leading to inaccuracies. LexisNexis even carries the following disclaimer on its web-site, specifically addressing these limitations: "Due to the nature of the origin of public record information, the public records and commercially available data sources used in reports *may contain errors*. Source data is sometimes reported or *entered inaccurately*, processed poorly or *incorrectly*, and is generally *not free from defect*. This product or service aggregates and reports data, as provided by the public records and commercially available data sources, and is not the source of the data, nor

is it a comprehensive compilation of the data. *Before relying on any data, it should be independently verified.*"[11] A partial image of the LexisNexis disclaimer is attached as Exhibit B. Upon deeper inspection of LexisNexis' various web pages, it is evident that they feel the need to provide ample publication of their disclaimer. My recent search of their websites revealed that the LexisNexis accuracy disclaimer appears in some form on more than *thirty-five (35)* different web locations, including services that cover insurance claims, health records, motor vehicle records, compliance data, and most notably—*public records*—and search results indicate that the disclaimer appears on dozens more locations that I did not verify. *See* Exhibit D. LexisNexis even provides a whitepaper offering services to improve the accuracy of their customers' data records — including phone numbers, names and addresses — but includes their standard disclaimer warning that data provided by LexisNexis is prone to errors.[12] It is also quite telling to find the *accuracy disclaimer* on LexisNexis' *Phone Finder* service, which purports to provide customer identity data based on phone number searches.[13] And the accuracy disclaimer that LexisNexis carries on their website is not unique among commercial skip-tracing and public record identification vendors,

---

[11] *See* WorldCompliance Data, LexisNexis (emphasis added), https://risk.lexisnexis.com/products/worldcompliance-data.

[12] *White Paper – A Business Case for Fixing Provider Data Issues*, LexisNexis (2014), available at http://techhubly.com/lexisnexis-resources/files/A%20Business%20Case%20for%20Fixing%20Provider%20Data%20Issues_WPNXR5062-0.pdf.

[13] *Phone* Finder, LexisNexis, https://risk.lexisnexis.com/products/phone-finder.

including well-known vendors such as MicroBilt, Experian and TransUnion. MicroBilt's accuracy disclaimer highlights some of the same pitfalls that LexisNexis and I have both raised: "Public Record Information provided to User from or through MicroBilt is derived solely from public records, which may not be 100 percent (100%) accurate or complete . . . *Public Record Information contained herein should not be used in legal proceedings* . . . Be aware that *Information is obtained and managed by fallible sources* and that for the Fee charged, MicroBilt does not guarantee or insure the accuracy, completeness, timeliness, depth or continuation of Information."[14] Experian and TransUnion also carry their own disclaimers in which they do not warrant the correctness or accuracy of information, products and services.

C.    In past cases, I have analyzed subscriber information by comparing results from LexisNexis against six web-based reverse number services, and a seventh, API-based service. In many cases, the subscriber names returned by these identification services varied significantly — however, in numerous examples, many of the seven search services produced common subscriber results, but *none of the seven services returned the same subscriber name identified by LexisNexis*. These variations are likely the result of differing source data, errors in data entry, variations in historic data, and other issues, but add doubt to the reliability of services such as those provided by LexisNexis.

---

[14] *User Agreement*, MicroBilt (emphasis added), http://www.microbilt.com/user-agreement. A partial image of the MicroBilt disclaimer is attached as Exhibit C.

D.      As an additional test of LexisNexis' accuracy, I recently requested a full file disclosure of *all* information that LexisNexis carries on my personal identity.[15] LexisNexis provided me with a comprehensive 470-page report, dated November 21, 2018. The report included a section titled "Phone Records," with the following description: "This section contains phone listings. The first and last seen dates correspond to the time periods when the source published the record, and *not necessarily to the time period with which you had the phone number.*" The report provided several phone numbers for which I have been the subscriber. However, absent from the report were *any* wireless phone numbers that I have used. The report did not list my current, primary wireless number, for which I've been the sole authorized user since 2005. This primary number is also prominently displayed on my publicly-available business website, and has appeared there for nearly four years.[16] The full file disclosure also did not list a prepaid wireless phone that I have used for the past seven months. For my phone numbers that it did list, each number was listed on multiple records from multiple data sources that included conflicting dates, and many of the dates provided (*first seen* and *last seen* dates) did not match the actual dates that I was the subscriber for those numbers – in some cases  being off by a number of years..

---

[15] *Access Your Full File Disclosure*, LexisNexis,
https://personalreports.lexisnexis.com/access_your_full_file_disclosure.jsp.

[16] See archived version of http://jankostyun.com/contact-info/ captured by archive.org on  April 7, 2015, at https://web.archive.org/web/20150407033904/http://jankostyun.com/contact-info/

E.   To further test the accuracy of reverse-lookup services, I recently performed a web-based reverse phone search using my daughter-in-law's cell phone number. I am familiar with her number, and I know she has been the subscriber of the cell phone service to which that number is assigned and that she has been the sole user of that cell phone number for the past 11 years. Several search sites provided no results at all. Using the search site spokeo.com, the phone number was found, and I paid a small fee to receive the report that should have returned my daughter-in-law's name and address. The results of the search instead indicated that the current owner is Duane Darling, and included the names Gerald Darling and Nic Darling as previous owners, all at the same address in Virginia. Duane Darling is not the name of my daughter-in-law or anyone in her immediate family, and she has lived in Connecticut for the past nine years. I also performed the same search using an API-based service from searchbug.com, and the results indicated Gerald Darling as the owner at the same Virginia address as provided by spokeo.com.

F.   In *Goins v. Walmart and Palmer Recovery Attorneys*—for which I provided an expert rebuttal report in support of the defendants—the plaintiff's  expert claimed that she processed the telephone number belonging to the plaintiff, using LexisNexis as her vendor, and that this process identified the number as belonging to Ms. Amber Goins. In reality, when Goins' expert provided Plaintiff Goins' telephone number to LexisNexis, the results that were returned included only the names

47

"LaShante McCall," "Kenia Ayala" and "Lesley Goins." The purported identification by LexisNexis was faulty in many ways: Plaintiff Amber Goins was never identified by LexisNexis as being associated in any way to the subject telephone number; in identifying Lesley Goins' association with the subject phone number, LexisNexis provided no data or indication that connected Lesley Goins to Plaintiff Amber Goins; in identifying Lesley Goins' association with the subject telephone number, LexisNexis did not provide a date range that covered the relevant time period of the call(s) at issue; once Goins' expert received the information from LexisNexis regarding Leslie Goins, she deviated from her documented methodology, and performed a manual, individualized investigation against other data sources in an attempt to connect Amber Goins with Lesley Goins, and therefore connect Amber Goins with the subject telephone number. And when questioned at deposition, Goins' expert even suggested that she might ask the plaintiff's counsel to help determine the relationship between Lesley Goins and Amber Goins. This example clearly shows how the usage of skip-tracing vendors such as LexisNexis to correlate phone numbers to users or subscribers has been unsuccessful, and further exhibits the need for individualized inquiries to provide accurate user identification.

G.   In another prior case for which I was engaged as an expert, the defendant utilized a verification service provided by Neustar that provides

information on the connection between a name and phone number.[17] The defendant provided Neustar with the name of one of the defendant's account holders, along with the phone number that the defendant believed was associated with that account holder. Neustar's verification service returned a result to the defendant that the number was still in service, and that there was a positive match between the phone number and the account holder name that was provided. However, carrier records subsequently revealed that the account holder had actually disconnected that phone number several months before the verification was performed. This example demonstrates that even services provided by a respected telecom vendor such as Neustar can be unreliable.

### C.    Name Directories

112.    Caller Name ("CNAM") is a service coupled with caller ID that displays a name associated with the calling phone number on the phone receiving the call. Some plaintiffs may assert that the CNAM database is a reliable source for subscriber data. In my opinion, it is not. The CNAM database exists for both landline and cellular phone numbers, but its content (like other public subscriber databases) is quite limited. Major phone carriers do not have incentives for keeping the CNAM database accurate and up-to-date. This is because there is little demand from customers to provide this service, and carrier participation in updating the CNAM database is voluntary and chargeable to the carrier. Furthermore, the CNAM database, like many of the other public data sources, only provides current subscriber information, and there is no known

---

[17] *See Contact Compliance Risk*, Neustar, https://www.risk.neustar/compliance-intelligence/tcpa.

historical version as would be required to identify a subscriber at a given point in time in the past when any of the calls were allegedly placed.

### D.     Reliability of Subscriber Information from Carriers

#### 1.     Barriers to Identifying Numbers Assigned to Particular Carriers

113.    While cell phone carriers are a source of historic subscriber information for a given cell phone number, there were many carriers during the most recent proposed class period from October 9, 2018 through January 28, 2019 as well as in the four years preceding the filing of the FAC in February 2019. Some of those carriers either no longer exist or have been combined with others, and their historic subscriber records (assuming they still exist) do not always accurately identify historical cell phone subscribers.  Cell phone carriers have limited capabilities and varying standards for collecting and maintaining information on subscribers. When a customer initially contracts for cell phone service, the carrier's main objective in collecting subscriber identification is for the purposes of collecting payment.  This may immediately result in limited or inaccurate customer information being recorded on the subscriber's account.  Customers might intentionally provide inaccurate contact information, or subscriber information might be incorrectly recorded via data entry.  Since cell phones are not tied to a physical location, there are limitations in verifying that the address provided by the subscriber is accurate.  Even if the customer data initially collected and recorded is accurate, changes to that data are common, due to actions like subscribers moving to a new address or changing names, but neglecting to report these to the carrier.

114.    In order to procure accurate, historical subscriber identification from carriers via subpoena, it is necessary to identify which subset of telephone numbers should be sent to each individual carrier for identification. Further, in order to subpoena cell phone carriers in an attempt to identify subscribers as of some prior date, one must first identify the specific cell

phone carrier that provided service to the given telephone number at the historical time of alleged calls. While there are resources available to identify the current cell phone carrier for a telephone number or block of numbers, I am not aware of any such services that can accurately identify historical cell phone carriers.

115.    Plaintiff or Plaintiff's expert might propose sending all telephone numbers to all carriers via subpoena, without regard to historical carrier ownership based on the dates of the calls. I find this solution impractical and unreliable for several reasons. Sending thousands of telephone numbers to smaller carriers would prove overly burdensome for them, and could very well result in no data being provided by such carriers. Sending the same fully-inclusive list of numbers to all carriers will also undoubtedly result in conflicting data results, which would be effectively impossible to resolve. For example, if all telephone numbers are sent to all carriers, Verizon and Sprint might both respond with historic customer records for that same telephone number. Those responses might identify different subscribers, or what appears to be the same subscriber with different service dates, different addresses, or variations in other key information. There would be no way, short of performing a manual investigation of all conflicting telephone numbers, to reliably determine which carrier's information (if either) was correct.

116.    Plaintiff, or Plaintiff's expert is likely to be unaware (or unconcerned) that the carrier ownership of numbers can change due to porting. In fact, the ported-number data that can be downloaded by vendors to track changes in wireless status due to number porting does not provide any identification of carrier changes as part of that porting activity. For example, any telephone number identified as a wireless number at the date it was allegedly called, might have been serviced by Verizon Wireless at the time of that call, but incorrectly identified as serviced

by T-Mobile (based on current ownership due to porting) when attempting to generate a subpoena for that number.

117.    The historical carrier ownership of telephone numbers can also change on a larger scale due to Number Pooling. Introduced at the same time as Number Portability, carriers are required to participate in Number Pooling, where large blocks of telephone numbers, usually in multiples of 1000 numbers, are donated from the control of one carrier to another. Similar to the number portability scenario, a telephone number that was owned at some point in the past by Verizon Wireless might now be owned by T-Mobile, due to donation of the block containing that number to T-Mobile from Verizon. Without a resource to identify the historical carrier ownership of numbers, a current lookup of the carrier that owns a telephone number would not accurately identify the correct carrier who owned that number at a given date in the past.

118.    In order to identify historic wireless subscribers, the carrier subpoena process is also hampered by the vast number of wireless carriers and the volatility of carrier ownership of telephone numbers over time.

119.    According to the FCC's Fact Sheet from its Communications Marketplace Report, there are four facilities-based nationwide wireless carriers (AT&T, Sprint, T-Mobile and Verizon Wireless) [18], as well a fifth facilities-based wireless carrier with semi-nationwide coverage (U.S. Cellular).[19] The FCC Fact Sheet also reports that there are dozens of other regional facilities-based wireless carriers. In addition, the FCC also reports that there are virtually countless wireless resellers (also known as Mobile Virtual Network Operators, or MVNOs), as it states that "The Commission is not able to provide an exact figure of the number of MVNOs that currently

---

[18] Facilities-based wireless carriers are those carriers who own and operate their own wireless networks and related equipment.

[19] See *FCC Fact Sheet*, dated November 21, 2018, ¶ 6, available at https://docs.fcc.gov/public/attachments/DOC-355217A1.pdf (last visited 3/26/2019)

offer services" and "Estimates of the number of MVNOs operating in the United States vary considerably. Many MVNOs are privately-held companies that do not publicly report financial or subscriber data."[20] Wikipedia documents that there are more than 60 facilities-based wireless carriers[21] and well over 100 MVNOs[22] – all of whom are potential carriers responsible for the wireless service of telephone numbers to which calls may have been placed.

120.   Plaintiffs may argue that a large percentage of potential class members can be identified by concentrating their subpoenas on the largest wireless carriers, who control a large market share of wireless subscribers. However, many of the lesser-known or even unknown carriers each have significant subscribership that would potentially exclude untold class members if those carriers were ignored. For just a few examples: U.S. Cellular services over 5 million wireless subscribers; Shenandoah Telecommunications (Shentel) and Cellular South (C Spire) each have over one million subscribers; wireless reseller Consumer Cellular has 3 million subscribers[23]; and MetroPCS (now known as Metro by T-Mobile), is estimated to serve 18 million subscribers.[24]

121.   The wireless industry is also infamous for the ever-changing landscape of wireless carriers. A significant number of carriers – particularly resellers and regional carriers,

---

[20] See *FCC Fact Sheet* ¶ 7, footnote 16.

[21] *List of United States wireless communications service providers* at https://en.wikipedia.org/wiki/List_of_United_States_wireless_communications_service_providers (last visited 3/26/2019)

[22] *List of United States mobile virtual network operators* at https://en.wikipedia.org/wiki/List_of_United_States_mobile_virtual_network_operators (last visited 3/26/2019)

[23] *Consumer Cellular Commemorates Three Millionth Customer by Gifting Three Million Dollars* at https://www.einnews.com/pr_news/464481279/consumer-cellular-commemorates-three-millionth-customer-by-gifting-three-million-dollars (last visited 3/26/2019)

[24] *Metro by T-Mobile: Everything you need to know* at https://www.androidauthority.com/metro-by-t-mobile-2-908138/ (last visited 3/25/2019)

close their doors each year, or become the objects of mergers or acquisitions.[25] Based on this high volume of churn, it is likely that many of the wireless numbers that received alleged calls during the relevant time period were owned and serviced by carriers who are no longer in business. Once again, there is no service or database that I am aware of that would allow for the identification of the carrier of record for those numbers at the historical date of alleged calls. And if any of those carriers could be identified, the fact that they are no longer in business would certainly prevent some or all of the requests to identify subscribers from being fulfilled.

122.    Besides the need to identify the correct carrier for given telephone numbers as of historical dates, there are still significant reasons why the subscriber identification provided via subpoena would be highly suspect. It has already been discussed that many wireless carriers who provided service to customers during the relevant period are no longer in business, and as such would be unable to identify any subscriber-related data. Carriers who are still active have their own set of limitations related to providing accurate, historical subscriber information.

### 2.    Carriers' Retention of Records

123.    Retrieving individual customer usage information (*e.g.*, call detail records and audit trails of texts) directly from wireless carriers potentially could assist in the identification of historic subscribers for that number. Through review and analysis of these records on an account-by-account basis, it may be possible to identify subscribers of individual cell phone numbers. This laborious analysis would, however, be incomplete and inaccurate. This is because the retention requirements for such types of records among carriers are much less stringent than for landline carriers, and vary widely in the industry. For example, the U.S. Department of Justice reported that Verizon retains subscriber information for three to five years; T-Mobile for

---

[25] See, for example, *10 years of consolidation in wireless: The rise of Verizon, AT&T, T-Mobile and Sprint* at https://www.fiercewireless.com/special-report/10-years-consolidation-wireless-rise-verizon-at-t-t-mobile-and-sprint

five years; and Sprint, Nextel, and Virgin as an "[u]nlimited" period.[26] For AT&T/Cingular, the DOJ reported that retention duration "[d]epends on length of service."  Additionally, the DOJ reported call detail records are retained for one year by Verizon, five years for T-Mobile post-paid customers, two years for T-Mobile pre-paid customers, as few as five years for AT&T, and 18 to 24 months for Sprint. More recent reports, such as one from the Massachusetts ACLU in 2014, indicate that those retention periods can be even shorter — with Sprint's retention of subscriber data reported as 18 months, and Verizon's retention reported simply as "more than one year."[27] Also with respect to data retention, Verizon's privacy policy states that "Personally identifiable and other sensitive records are retained only as long as reasonably necessary for business, accounting, tax or legal purposes"[28], indicating that subscriber data is essentially stored no longer than is absolutely necessary. Based on these retention periods, most carriers do not retain data long enough to cover records dating back to December 2013.

124. As expert for the defendants in the case of *Goins v. Walmart and Palmer Recovery Attorneys,* No. 6:17-cv-00654 (M.D. Fla.), I was recently provided with the results of a subpoena issued to wireless carrier MetroPCS. In that subpoena, MetroPCS was asked to identify the subscriber of the named plaintiff's phone number, as well as any communication or documentation concerning named plaintiff Amber Goins during the relevant time period, January 1, 2017 through December 31, 2017. Of the documents produced by MetroPCS in response to the subpoena, there were none that identified Amber Goins as a subscriber or user associated

---

(last visited 3/24/2019)

[26] *Cell Phone Location Tracking Request Response – Cell Phone Company Data Retention Chart*, Am. Civil Liberties Union, https://www.aclu.org/cell-phone-location-tracking-request-response-cell-phone-company-data-retention-chart (last visited Mar. 4, 2019).

[27] *How Long Does My Phone Company Store My Data? How Easily Will It Give My Info Up To The Cops?,* PrivacySOS (Feb. 9, 2014), https://privacysos.org/blog/how-long-does-my-phone-company-store-my-data-how-easily-will-it-give-my-info-up-to-the-cops/ .

with Goins' own phone number during the relevant period, and there were none that identified any communication or any other interaction between MetroPCS and Amber Goins during the relevant period. In this example, the wireless carrier was unable to identify its own subscriber who reportedly had service during a time period that was as recent as only four months prior to the subpoena – further demonstrating the unlikely prospect of reliably identifying historical subscribers/users for the relevant timeframe in the instant case.

### 3.      Prepaid Cell Phone Services

125.    Prepaid cell phones (often called "burner phones") create yet another layer of complexity in attempting to identify historic subscribers. Prepaid cell phones are available to customers from many sources—traditional cell phone carriers, department stores, convenience stores, online retailers such as Amazon, and online auction sites like Ebay, among others. This wide variety of sellers makes collection of subscriber information less uniform, and further reduces the reliability of any data that is collected by and potentially available from them. There is no requirement at the federal level for purchasers to provide any verification of name, address or other contact information. A federal bill was introduced in 2010 to institute an identification requirement for the purchase of prepaid mobile devices, but has never been passed into law.[29] More recently, a similar bill was introduced to Congress in 2016, and also never enacted.[30] As there is no requirement that prepaid cell phone carriers obtain and maintain subscriber identification data, the process of identifying individual, historic subscribers of prepaid cell phone services would likely be impossible.

### 4.      Cell Phone Number Reassignment

---

[28] *Privacy Policy*, Verizon Wireless, http://www.verizon.com/about/privacy/full-privacy-policy.

[29] Pre-Paid Mobile Device Identification Act, S. 3427, 111th Cong. (2010).

[30] Closing the Pre-Paid Mobile Device Security Gap Act of 2016, H.R. 4886, 114th Cong. (206).

126.    The generic process used in the mobile industry for deactivation and recycling cell phone numbers creates additional problems with the accuracy of historic subscriber data related to a number. Based on my experience in the provisioning of mobile service, the deactivation process typically follows this pattern:  (1) a subscriber chooses to cancel service with an existing provider, and chooses not to port their number to a new provider; (2) the service provider cancels service and adds the phone number to a deactivation list; (3) phone numbers stay inactive for a prescribed number of days, depending on the carrier, before they are recycled and assigned to a new subscriber; and (4) after the deactivation period, the number can be reassigned to a new subscriber.[31] Typically, the carrier or service provider will update its internal records to indicate the change of subscribership for the reassigned number. However, many of the downstream data sources that have been previously discussed have a high probability of carrying outdated subscriber data. Public data sources like those used in reverse lookup services, private data sources such as those used by vendors like LexisNexis, the CNAM database, and even the National Do Not Call registry all face the likelihood of including outdated subscriber data due to this reassignment process. And further supporting the idea that subscribers cannot be accurately identified based on phone numbers, including those limitations based on number reassignment, FCC Chairman Ajit Pai himself has opined that "no authoritative database … exists to 'track all disconnected or reassigned telephone numbers' or 'link[] all consumer names with their telephone numbers'."[32] And in making that statement, Chairman Pai referred to

---

[31] According to Federal guidelines, disconnected numbers must be made available for reassignment  in 90 days or less, but there is no minimum timeframe, indicating that carriers may reassign numbers in as little as one or two days. *See* 47 C.F.R. § 52.15.

[32] *DISSENTING STATEMENT OF COMMISSIONER AJIT PAI Re: In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, WC Docket No. 07-135.

documentation from Richard Fruchterman, the Associate General Counsel of industry data leader Neustar.[33]

### 5.     Authorized User Identification

127.     The complex, number-by-number process of attempting to reliably and accurately identify the historic subscriber associated with a cell phone number as of the date of alleged message(s) does not even begin to address the identification of cell phone users. Because the subscriber and authorized user of a cell phone number are not necessarily the same person, identifying the subscriber does not mean the user has been or can be identified. Many cell phone accounts have more than one user. For example, businesses often have a single account and a single cell phone number that is shared by several employees, or multiple numbers used by multiple employees. Families often have a single cell phone account and a single cell phone number shared by different family members, or multiple numbers that are used by multiple family members, but billed under a single subscriber name. Sometimes, individuals in a single "family plan" are not related and may not have the same surname. As a result, even if it were possible to use carrier records to identify a number as belonging to an individual family plan, a core family unit (*i.e.*, parents and children, or even grandparents, parents, and children) would not serve as a proxy for all potential users of that number. Typically, none of this user information is recorded in cell phone provider records.

128.     For example, in the case of *Wilson v. Badcock*, No. 8:17-cv-02739 (M.D. Fla.), for which I was engaged as an expert, named plaintiff Victoria Wilson testified that she is the user of the cell phone number that allegedly received calls from the defendant. But Wilson's Grandmother, with whom she lives, pays for that phone service. Subscriber records produced in

---

[33] *Id.* (citing Letter from Richard L. Fruchterman, Associate General Counsel to Neustar, to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278, at 1 (Feb. 5, 2015)).

that case confirmed that: Wilson's Grandmother (Colleen Powell) is the subscriber of the number at issue; there is no indication that anyone other than Wilson's Grandmother is associated with the account; the subscriber name on the account of Colleen Powell bears no similarity to plaintiff Victoria Wilson's name; and the subscriber records report a subscriber address that does not match the residential address that Wilson described during her testimony as being shared with her Grandmother. This example clearly describes the common occurrence in which both authorized user names and/or addresses are not associated with their own phone number.

129.   It would also be foolish to dismiss the effect that scenarios such as family plans have on the issue of user identification, since research has estimated that as many as 75 percent of wireless subscribers are on discounted, multi-line family plans.[34]

130.   As a result, in my opinion, there is no way to reliably and accurately attempt to identify the historic user(s) of a given cell phone number as of a particular date without, at a minimum, first obtaining information from the subscriber(s) and user(s) of that number as of the date of the alleged call(s). And, given that the multiple user scenario I have described might be combined with other scenarios, like a prepaid cell phone, even this level of number-by-number analysis may be insufficient to identify subscriber and user(s) for a given number at the time of the alleged message(s). In any case, it is my opinion that there is no class-wide solution available to accurately identify subscribers and users of cell phone numbers as of the historic date(s) of alleged message(s), and at best, an individualized, account-by-account investigation will be necessary to achieve that identification.

E.      **Confirmation of My Opinions from Other Sources**

---

[34] Andy Vuong, *Wireless subscribers are finding breaking up is hard to do*, The Denver Post (Sept. 14, 2012, 4:50 PM), https://www.denverpost.com/2012/09/14/wireless-subscribers-are-finding-breaking-up-is-hard-to-do/.

131.   The opinions that I have set forth regarding the lack of reliability in the historic identification of wireless status of phone numbers, the erroneous nature of identifying historic users and subscribers associated with those numbers, and the pitfalls associated with using third-party vendors for historic identification, are also supported by the opinions of other reputable experts, as well as reasoning documented in prior court rulings.

132.   For example, in *Sherman v. Yahoo*, No. 3:13-cv-00041 (S.D. Cal.), the court found that records from a cell phone provider and the use of reverse-lookup services failed to demonstrate "an administratively feasible method of identifying the putative class members" *Id.* D.E. 191 at 12 (S.D. Cal. Sept. 23, 2015) (order denying class certification).

133.   When ruling in *Jacobs v. Quicken Loans*, No. 9:15-cv-81386 (S.D. Fla.), the court stated: "As explained by Defendant's expert, Jan Kostyun, there is no public database of cell phone subscribers, and private services are often inaccurate and incomplete. (Kostyn [sic] Report ¶¶ 14-15, DE 136-1.) Additionally, even if a carrier-by-carrier investigation was undertaken, it still would not ensure accuracy. (*Id.* at ¶¶ 16-19.)" *Id.*, D.E. 167 at 7 (S.D. Fla. Oct. 19, 2017) (order denying class certification).

134.   And in its decision to deny class certification in *Wilson v. Badcock,* No. 8:17-cv-02739 (M.D. Fla.), the court similarly remarked that "According to Defendant's expert, there is no public database of cell phone subscribers and private services are often inaccurate and incomplete, and even a carrier-by-carrier investigation would not ensure accuracy." *Id.*, D.E. 102 at 6 (M.D. Fla. Dec. 19, 2018) (order denying class certification). Also in *Wilson*, the court refers to plaintiff's expert's proposal in that case to use "reverse directory database vendors and subpoenas to cell phone carriers to identify those persons whom Defendant called" and states that her proposal "suffers several mechanical shortcomings." *Id.* at 5-6. The court further refers

to Wilson's expert's proposal to identify cell phone subscribers by stating "Plaintiff's expert claims this is possible, though one of her chief sources is the *unobservable, proprietary "black box" techniques of LexisNexis.*" *Id*. at 6 (emphasis added).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and this declaration was executed on this 3<u>rd</u> day of June, 2019 at Burlington, CT.

_____

Jan Kostyun

# Exhibit A – Jan Kostyun CV



Jan Kostyun has over 35 years of experience in computer systems and software development, enterprise architecture, and telecommunications including extensive experience in the wireless industry.   Mr. Kostyun has broad telecom experience in both wireless and wireline disciplines. His wireless experience includes wireless telecommunications standards, text messaging, voice and voicemail internals, and in-depth experience with the end-to-end cellular provisioning process.   His wireline/landline experience includes development of software systems to support business operations and provisioning of landline services, including overall architectural knowledge of the wireline business. Mr. Kostyun is also recognized as an industry expert in the field of Local Number Portability (LNP) and the process of customer movement between cellular carriers, as well as significant experience in landline number portability and number pooling.   He also has a wide range of experience in database technologies as well as data analysis. Mr. Kostyun has held senior technical positions with Bell Telephone Laboratories, Exxon-USA, GTE and Verizon, as well as consulting positions with Informatics, Syniverse Technologies, BusinessEdge Solutions/EMC and eComp Consultants.

His experience encompasses successful assignments in implementing eCommerce, Business Intelligence & Telecommunications systems in the U.S. and Canada, as well as a collaborative effort with the National Regulatory Agency of Colombia.

Mr. Kostyun's extensive experience has enabled him to provide expert opinions, reports and analysis in legal matters covering trade secret misappropriation, copyright infringement, software financial valuation and damage assessment, patent infringement, and litigation involving the Telephone Consumer Protection Act (TCPA).

### Professional Experience:

**2012 to present**      *Independent Consultant*                                      *Middletown, NJ*

Technology consulting, including
- Expert witness representing defendant under civil case alleging violation of Telephone Consumer Protection Act (TCPA). Extensive review and critique of plaintiff's expert witness reports; data analysis and research of very large call-record databases, alleged call violations and ported telephone numbers; and ATDS evaluation. Preparation of expert report in support of defendant, contributing to denial of class certification and judgment in favor of defendants.
- Expert consultant representing defendant in civil case alleging violation of TCPA. Provided analysis and report of plaintiff telephone numbers, porting activity and subscriber information.
- Expert consultant representing defendant under class action complaint alleging

violation of TCPA involving text messaging/SMS activity. Provided analysis and report of CTIA/Wireless Industry best practices for short code messaging campaigns.

- In class action TCPA case, served as expert to provide ATDS evaluation, analysis of express consent and TCPA applicability of contested texts and voice calls.
- In class action TCPA matter, developed expert report addressing the feasibility and technical aspects of identifying users/subscribers of cell phones. Also developed expert report rebutting opposing expert's data analysis and subscriber identification, contributing to denial of class certification and exclusion of Plaintiff's expert report.
- Expert witness in class action TCPA complaint, providing in-depth analysis of National and internal Do Not Call (DNC) records and very large volume call record files, and critical assessment of opposing expert's data analysis.
- In class action TCPA case, developed expert report addressing the feasibility and technical aspects of identifying users/subscribers of fax telephone numbers. Also developed expert report rebutting opposing expert's opinions regarding successful completion of fax transmissions and identification of fax recipients.
- In class action TCPA matter, developed expert report addressing the feasibility and technical aspects of identifying users/subscribers of cell phones and residential landlines.
- In class action TCPA matter, developed expert rebuttal report challenging opposing expert's data analysis results of alleged DNC and wrong number calls, and addressing technical aspects of identifying users/subscribers of cell phones.
- In class action TCPA matter, performed extensive analysis of high-volume call data records against internal and national DNC files.
- In class action TCPA case, analyzed call data records, performed testing and analysis of defendant's telephone calling system and provided opinions addressing defendant's alleged use of an ATDS for telemarketing purposes.
- In class action TCPA case, developed expert rebuttal report challenging opposing expert's data analysis methodology, and addressed technical aspects of identifying users/subscribers of cell phones.
- In class action TCPA matter, developed expert rebuttal report challenging opposing expert's data analysis results of alleged DNC violations, and addressed technical aspects of identifying users/subscribers of cell phones.
- In class action TCPA matter, developed expert rebuttal report challenging opposing expert's data analysis results of alleged DNC violations, reliability of opposing expert's data vendors, and addressed technical aspects of identifying users/subscribers of cell phones.
- In class action matter involving the Washington Automatic Dialing and Announcing Device (WADAD) statute, provided expert analysis and support regarding carrier records, carrier subpoena responses, and identification of wireless/landline subscribers and calls within specific geographic boundaries.
- In class action TCPA case, rebutted opposing expert's analysis of wrong number designations, and class member identification, contributing to denial of class certification.
- In multiple class action matters, provided analysis of Defendant's dialing equipment and opinions addressing the capacity store or produce telephone numbers to be called, using a random or sequential number generator, as well as the capability to dial telephone numbers without human intervention.

| 2009 to 2011 | **Senior Consultant** | |
| | *eComp Consultants* | *Tampa, FL* |

Provided consulting on design and development of software products and wireless technology. Provided technology consulting and expert support for enterprise architecture, software engineering and telecommunications in the areas of:

- Patent portfolio evaluation, market valuation, and prior art analysis.
- Patent litigation consulting for information technology in telecommunications, wireless and enterprise architecture for validity/invalidity and infringement/non-infringement analysis.
- Software contract analysis for disputes involving custom software, software copyright and trade secret infringement, and software valuation.
- Functional analysis, Source Code reviews, Damage Assessment analysis and software tampering evaluation.

| 2009 to 2010 | *Independent Consultant* | *Tampa, FL* |

Collaborated with Value Partners Management Consulting firm in preparation of proposal to the Colombian National Regulatory Agency for implementation of Wireless Number Portability across Colombia.

| Prior experience | **Senior Consultant** | |
| | *BusinessEdge Solutions/EMC* | *Toronto, Ontario, Canada* |

Provided strategic and tactical guidance to Rogers Wireless, Canada's largest wireless carrier, in the successful, on-schedule implementation of Canadian wireless number portability.

- Developed detailed specifications for Rogers' internal business applications interface to the Syniverse/Telcordia Service Management Gateway (SMG) for communication of wireless port requests & responses to wireless and wireline trading partners.
- Served as Rogers' representative to several industry-level committees, including SMG Defect Management and SMG Testing, acting as liaison between Rogers and all Canadian carriers. Developed detailed specifications for acceptance and regression testing of SMG for entire Canadian industry.
- Provided integration expertise to Rogers' application development, network administration, system testing, production support, and program management teams.
- Provided in-depth knowledge of Telcordia SMG interface, Canadian portability standards (CWNPG and CLOG), Wireless to Wireline (WPR to LSR) translation requirements, and post-implementation data analysis to determine customer porting trends and roadblocks.

**Senior Consultant**
*Syniverse Technologies*                                              *Tampa, FL*

Served as development specialist & subject matter expert during implementation of U.S. Wireless Number Portability (WNP). Designed the reporting data warehouse and client billing processes which support Syniverse's WNP & ICC Clearinghouse product offerings.

- Provided significant expertise in the technical internals, database design and API requirements of Telcordia's SMG platform; WNP WICIS Industry standards; InterCarrier Communications (ICC) Process; Service Order Administration (SOA)/NPAC interaction; and Tekelec LSMS database access.
- Subject matter consultant to other Syniverse WNP product offerings, including Pre-

port Validation, Fallout Management, Wireline Porting and PortFlow Management. Responsible for interaction and consulting with Sales, Business Development, Training and Production Support organizations.

- In-depth experience with Cellular Provisioning, GSM/CDMA technologies, SIM Card provisioning

### Software Engineer
*Verizon Communications*                                      *Tampa, FL*

Served as Enterprise Integration Architect for Local Number Portability (LNP) and Telephone Number Pooling (TNP) projects. Responsible for development of enterprise-level architecture and system integration of 38 major applications in order to develop and deploy Wireline LNP and Number Pooling capabilities for the entire former-GTE operating area.

- Managed technical team of 30+ individual project architects, including interaction with program management, functional owners, development teams, system testers and production support personnel.
- Coordinated retail and wholesale ordering, provisioning, billing and service assurance business functionality.
- Developed significant expertise in number portability network element systems (Telcordia's LSMS and SOA), including low-level knowledge and direct access to LSMS internal databases.
- Directly responsible for the successful national deployment of LNP/TNP in GTE/Verizon West. Maintained close working relationship with Network Engineering's TN Administrator, assisting with LSMS extracts for reconciliation processes, TNP block donation and block allocation processing, and creative use of LNP capabilities for special customer requests.

### Senior Advisory Systems Engineer
*GTE Telephone Operations*                                    *Tampa, FL*

Provided extensive systems development work as enterprise architect and development team project manager.

- Developed technical specifications for numerous systems across GTE Telephone Operations, primarily within the Customer Contact and Operations domains. Technical specifications established the hardware, software and network architecture with emphasis on a distributed, UNIX-based, client/server environment.
- Established corporate standards for Relational DBMS products, including interaction with Oracle and Informix vendors
- Established corporate standards for UNIX hardware and operating system platforms, including interaction with SUN, HP and IBM vendors.
- Managed application development for TCOM, a distributed, IBM-based bulk mail processing application
- Application technical lead for Central Office personnel dispatch and work allocation application.

**Senior Database Analyst**
*Exxon Company, USA*                                        *Houston, TX*

Provided database analysis and database administration in large-scale IBM environment, specializing in project team support, implementation of DB2/SQL and use of IBM utilities, IBM Dialog Management Services.

**Senior Database Analyst**
*Ford Aerospace*                                              *Houston, TX*

Served as key member of application team for NASA contractor responsible for Shuttle Simulator Reconfiguration System.  Responsibilities included data analysis and database design, and application lead.

**Senior Consultant**
*Informatics, Inc.*                                           *Houston, TX*

Consulted for major oil & gas and technology clients, offering application conversions, development of new systems, and application optimization.  Conducted international technical training classes in IBM IMS DB/DC, IBM Utilities and IBM Internals

**Senior Systems Analyst**
*GTE Data Services*                                           *Tampa, FL*

Served as project lead and technical advisor for development of IBM/IMS-based customer billing application and IBM/CICS online order-entry application.  Specialized in deployment of mini-computer office-automation systems.

**Technical Lead**
*Bell Telephone Laboratories*                                *Piscataway, NJ*

Application lead for development of IBM/IMS-based Inventory Management system implemented across entire Bell System.

**Education:**

B.S. Mathematics – Magna Cum Laude                    Union College, Schenectady, NY

M.S. Computer Science                                        Union College, Schenectady, NY

| | | |
|---|---|---|
| **Wireless Communications** | 7 years | Syniverse/Telcordia Service Management Gateway (SMG), Canadian portability standards (CWNPG and CLOG), Wireless to Wireline (WPR to LSR) translation, Wireless Number Portability (WNP) & WICIS Industry standards, InterCarrier Communications (ICC), Service Order Administration (SOA)/NPAC,; and Tekelec LSMS database, Wireline Porting and PortFlow Management, Provisioning, GSM/CDMA technologies, SIM Card Provisioning |
| **Telecommunications** | 25 years | Local Number Portability (LNP), Telephone Number Pooling (TNP), Telcordia's LSMS and SOA, Customer Contact, Provisioning & Operations,  eCommerce applications |
| **Database Technology** | 30 years | IBM IMS Database/Data Communication; DB2/SQL database design, Performance Optimization, Query Specialist; Informix; |

| | | ORACLE; Logical Data Modeling; MS Access |
|---|---|---|
| **Software Engineering** | 20 years | Enterprise integration, Order Entry/CRM, Trouble Management, Provisioning, Customer Billing, Work Allocation/Work Management, Inventory Management |

### Tools & Platforms

| **Languages and tools:** | IBM Assembler, FORTRAN, COBOL, C, C++, JAVA, Visual Basic, IMS DB/DC, CICS, DB2/SQL, Informix, Oracle, MS Access/SQL, HTML, MS Office, WordPress |
|---|---|
| **Platforms:** | IBM Mainframe/370, IBM 4300, IBM 9700, IBM RS/6000, HP 9000, Sun SPARC, Windows-based PC |
| **Operating Systems:** | IBM MVS, IBM DOS/VSE, AIX, HP-UX, UNIX, Solaris, MS-DOS, Windows |
| | |
| **Professional:** | Published article in *Computerworld*, 9/24/84: "IBM ISPF dialog manager: More than meets the eye" |

### Case Experience:

***Alex Jacobs et. al. v Quicken Loans, Inc.***

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Southern District of Florida |
| Client: | Quicken Loans, Inc. as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Developed expert report addressing the feasibility and technical aspects of identifying users/subscribers of cell phones. Also developed expert report rebutting opposing expert's data analysis and subscriber identification, contributing to denial of class certification and exclusion of Plaintiff's expert report. |
| Represented by: | Goodwin Procter LLP |

***Amber Goins et. al. v Walmart and Palmer Recovery***

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Middle District of Florida |
| Client: | Walmart and Palmer Recovery as defendants |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Developed expert report rebutting opposing expert's data analysis, historic wireless identification and subscriber identification. |
| Represented by: | Shepard, Smith, Kohlmyer & Hand, P.A. / Sheppard, Mullin, Richter & Hampton, LLP |

***Ameranth v Six Continents Hotels***

| | |
|---|---|
| Jurisdiction: | Superior Court of DeKalb County, State of Georgia |
| Client: | Six Continents as defendant in complaint for web advertising misuse and trade secret infringement of web-based concierge application |
| Nature of Case: | Web Advertising Analysis and Intellectual Property Litigation |
| Nature of Engagement: | Consulting expert analyzing web-based advertising practices, user interfaces, and development models; provided expertise in web marketing, online advertising, and eCommerce technology development standards, design and architecture |

Represented by:      Alston & Bird

**_Carrie Couser et. al. v Cucamonga Valley Medical Group, Inc._**

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Central District of California |
| Client: | Cucamonga Valley Medical Group, Inc. as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Served as expert to provide ATDS evaluation, analysis of express consent and TCPA applicability of contested texts and voice calls |
| Represented by: | Schmid & Voiles |

**_Carrie Couser et. al. v Dish One Satellite, LLC_**

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Central District of California |
| Client: | Dish One, as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Served as expert to provide in-depth analysis of National and internal Do Not Call (DNC) records and very large volume call record files, and critical assessment of opposing expert's data analysis. |
| Represented by: | Benesch, Friedlander, Coplan & Aronoff LLP |

**_Comprehensive Health Care Systems of the Palm Beaches et. al. v M3 USA Corporation_**

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Southern District of Florida, West Palm Beach Division |
| Client: | M3 USA Corp., as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Developed expert report addressing the feasibility and technical aspects of identifying users/subscribers of fax telephone numbers. Also developed expert report rebutting opposing expert's opinions regarding successful completion of fax transmissions and identification of fax recipients. Provided deposition testimony. |
| Represented by: | Sheppard Mullin Richter & Hampton LLP |

**_Datamaxx Applied Technologies v Computer Projects of Illinois, Inc._**

| | |
|---|---|
| Jurisdiction: | United States District Court, Northern District of Florida |
| Client: | Datamaxx as plaintiff |
| Nature of Case: | Software Copyright Infringement |
| Engagement: | Prepared expert report assessing infringement of plaintiff's software copyrights, utilizing Abstraction-Filtration-Comparison test. Provided deposition testimony. |
| Represented by: | Pennington, Moore, Wilkinson, Bell & Dunbar, P.A. |

**_Derrick Thomas et. al. v Peterson's Harley Davidson_**

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Southern District of Florida |
| Client: | Peterson's, as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Provided expert report rebutting opposing expert's proposed methodology for identifying historic wireless status and historic users/subscribers of telephone numbers, and opposing expert's consent analysis. Also produced expert report addressing the dialing system used by Defendant for text message campaigns, and its capacity to perform as an ATDS. |
| Represented by: | Robert L. Switkes & Associates, P.A. |

**Eileen Nece et. al. v Quicken Loans, Inc.**

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Middle District of Florida |
| Client: | Quicken Loans, Inc. as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Developed expert report addressing the feasibility and technical aspects of identifying users/subscribers of cell phones and residential landlines. |
| Represented by: | Goodwin Procter LLP |

**Estrellita Reyes et. al. v BCA Financial Services, Inc.**

| | |
|---|---|
| Jurisdiction: | United States District Court, Southern District of Florida |
| Client: | BCA Financial Services as defendants |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Developed expert rebuttal report challenging opposing expert's data analysis methodology, and addressing technical aspects of identifying users/subscribers of cell phones. Provided deposition testimony. |
| Represented by: | Shepard, Smith, Kohlmyer & Hand, P.A. |

**Israel Garcia et. al. v Target Corporation**

| | |
|---|---|
| Jurisdiction: | U.S. District Court, District of Minnesota |
| Client: | Target, as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Provided affirmative report addressing the roadblocks to identifying historic wireless subscribers, as well as the challenges to identifying historic users and subscribers of telephone numbers. Also produced an expert report rebutting opposing expert's analysis of Defendant's dialing system. |
| Represented by: | Barnes & Thornburg  LLP |

***Jerry Eisenband et. al. v Schumacher Automotive, Inc.***

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Southern District of Florida |
| Client: | Schumacher, as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Provided expert analysis of Plaintiff's expert report, and analysis of systems used to send alleged SMS text messages. |
| Represented by: | Kurkin Forehand Brandes LLP |

***John Scherkanowski v Bluegreen Vacations***

| | |
|---|---|
| Jurisdiction: | U.S. District Court, District of New Hampshire |
| Client: | Bluegreen, as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Developed expert report analyzing Defendant's dialing system, it's capacity to store or produce telephone numbers using a random or sequential number generator, its capacity to place calls without human intervention, and the use an artificial or prerecorded voice. |
| Represented by: | Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A. |

***Kevin Buja et. al. v Novation Capital LLC, et. al.***

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Southern District of Florida, West Palm Beach Division |
| Client: | Novation, as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Developed expert rebuttal report challenging opposing expert's data analysis results of alleged DNC violations, and addressing technical aspects of identifying users/subscribers of cell phones. Provided deposition testimony. |
| Represented by: | Vedder Price, P.C. |

***Lori Shamblin et. al. v Obama for America et. al.***

| | |
|---|---|
| Jurisdiction: | United States District Court, Middle District of Florida, Tampa Division |
| Client: | Obama for America and DNC Services Corp. as defendants |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Extensive review and critique of plaintiff's expert witness reports; data analysis and research of very large call-record databases, alleged call violations and ported telephone numbers; and ATDS evaluation. Preparation of expert report in support of defendant, contributing to denial of class certification and judgment in favor of defendants. |
| Represented by: | Perkins Coie LLP |

***Mark Preman et. al. v Pollo Operations***

| | |
|---|---|
| Jurisdiction: | United States District Court, Middle District of Florida, Orlando Division |
| Client: | Pollo Operations as defendants |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Pre-trial review of text messaging procedures and data flow analysis. Provided expert report evaluating adherence to CTIA/Wireless Industry best practices for short code messaging campaigns. |
| Represented by: | Akerman LLP |

***Michael Lutman v Harvard Collection Services***

| | |
|---|---|
| Jurisdiction: | United States District Court, Middle District of Florida, Ft Myers Division |
| Client: | Harvard Collection Services as defendants |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Provided expert analysis of plaintiff telephone numbers, porting activity, subscriber information, and ATDS evaluation. |
| Represented by: | Wilson Elser Moskowitz Edelman & Dicker LLP |

***Moricz v Google***

| | |
|---|---|
| Jurisdiction: | United States District Court, Western District of Washington at Seattle |
| Client: | Michael Moricz as plaintiff |
| Nature of Case: | Patent infringement of search engine software capabilities |
| Engagement: | Provided technical research into history, evolution and current state of web-based search engine design and functionality. Development of claim construction report. |
| Represented by: | Schwabe, Williamson & Wyatt, P.C. |

***PCS4Less v Go Mobile***

| | |
|---|---|
| Jurisdiction: | State of Michigan, Circuit Court for Washtenaw County |
| Client: | Go Mobile as defendant |
| Nature of Case: | Copyright / Trade Secret on unlocking GSM/CDMA cell phone devices |
| Engagement: | Provided expert analysis of cell phone unlocking methods. |
| Represented by: | Gray Robinson |

***Resource Acquisition and Management Services v Mathews***

| | |
|---|---|
| Jurisdiction: | State of Florida, Circuit Court for Hillsborough County |
| Client: | Resource Acquisition and Management Services, Inc. as plaintiff |
| Nature of Case: | Breach of Contract and Conversion of disputed property including application source code |
| Engagement: | Provided expert report assessing the value of application source code. Provided deposition testimony. |
| Represented by: | Rocke, McLean and Sbar, P.A. |

***Sara Diaz-Lebel et. al. v TD Bank and Target Corporation***

| | |
|---|---|
| Jurisdiction: | U.S. District Court, District of Minnesota |
| Client: | Target, as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Developed expert report rebutting opposing expert's analysis of call records. Also provided analysis of Defendant's dialing system as it relates to TCPA's definition of an ATDS, as well as describing the restrictions to accurately ascertaining class members based on historic call data. |
| Represented by: | Barnes & Thornburg LLP |

***State of Florida v Poole***

| | |
|---|---|
| Jurisdiction: | State of Florida, Circuit Criminal Court for Hillsborough County |
| Client: | Poole as defendant |
| Nature of Case: | Criminal complaint involving damage of application components |
| Engagement: | Provided expert analysis and court testimony regarding the feasibility of performing a forensic analysis of hardware and software components. Provided court testimony. |
| Represented by: | Pawuk and Pawuk, P.A. |

***Thomas Cook v Palmer, Reifler & Associates and WALMART***

| | |
|---|---|
| Jurisdiction: | United States District Court, Middle District of Florida |
| Client: | PRA as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Developed expert rebuttal report challenging opposing expert's data analysis, and addressing technical aspects of identifying users/subscribers of cell phones. Provided deposition testimony. |
| Represented by: | Shepard, Smith, Kohlmyer & Hand, P.A. |

***Victoria Wilson v Badcock Home Furniture***

| | |
|---|---|
| Jurisdiction: | United States District Court, Middle District of Florida |
| Client: | Badcock as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |

| | |
|---|---|
| Engagement: | Developed expert rebuttal report challenging opposing expert's data analysis  and methodology for  identifying users/subscribers of cell phones, contributing to denial of class certification. Provided deposition testimony. |
| Represented by: | Johnson & Cassidy, P.A. |

### *Waddell Williams v Bluestem Brands*

| | |
|---|---|
| Jurisdiction: | United States District Court, Middle District of Florida |
| Client: | Bluestem Brands as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Developed expert report analyzing Defendant's dialing platform and its characteristics related to Automated Telephone Dialing Systems |
| Represented by: | Faegre Baker Daniels, LLP |

# Exhibit B – LexisNexis Disclaimer



\*You must have a permissible use to search these sources. Laws applicable to use of this product include the Drivers' Privacy Protection Act and related state laws (DPPA) and the Gramm-Leach-Bliley Act (GLBA). The data regulated by the DPPA and the GLBA may be used only for the permissible uses, e.g., litigation, fraud detection, etc., that you select from a list prior to searching. By selecting a permissible use prior to searching, you are certifying that the data returned to you will be used only for that purpose. The data provided to you by use of this product may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment or other purposes identified under the Fair Credit Reporting Act (FCRA).

Due to the nature of the origin of public record information, the public records and commercially available data sources used in reports may contain errors. Source data is sometimes reported or entered inaccurately, processed poorly or incorrectly, and is generally not free from defect. This product or service aggregates and reports data, as provided by the public records and commercially available data sources, and is not the source of the data, nor is it a comprehensive compilation of the data. Before relying on any data, it should be independently verified. For Secretary of State documents, the data is for information purposes only and is not an official record. Certified copies may be obtained from that individual state's Department of State. The LexisNexis SmartLinx report will be provided within certain search and privacy parameters and is subject to LexisNexis General Terms and Conditions located at **www.lexisnexis.com/terms/general.aspx**. Other restrictions may apply.

*For more information or assistance with your LexisNexis public records research contact your LexisNexis® representative or call*

**888.253.3901**

LexisNexis, Lexis Advance, LexID, the LexID logo, LexisNexis SmartLinx, SmartLinx and the Knowledge Burst logo are registered trademarks and FOCUS is a trademark of Reed Elsevier Properties Inc., used under license. Other products or services may be trademarks or registered trademarks of their respective companies. © 2016 LexisNexis. BMH00736-0 1116



www.microbilt.com/ser-agreet

# Exhibit C – MicroBilt Disclaimer

## User Agreement

**THIS USER AGREEMENT** ("Agreement") is entered into as of the "Effective Date" (defined below) by and between MicroBilt Corporation, ("MicroBilt") a Delaware corporation with its principal place of business at 1640 Airport Rd., Suite 115, Kennesaw, GA 30144 and the party electronically accepting the within terms and conditions, ("User").

.

.

   A.  **User Agrees to:**

.

.

 2.  Acknowledge that: Public Record Information provided to User from or through MicroBilt is derived solely from public records, which may not be 100 percent (100%) accurate or complete. User should consult state and federal laws, including the FCRA, before using Public Record Information in making business decisions based on the results. Neither we, nor the data Repositories, or our other vendors or suppliers,
are liable for claims or damages arising from the use of Public Record Information, beyond the cost of the particular search performed and report obtained by User. Because
misidentifications may occur when trying to identify a particular person, based solely upon name and other identifiers, extreme care must be exercised in the review and use of the Public Record Information contained herein. Public Record Information contained herein should not be used in legal proceedings; rather, it is recommended that User obtain the original public record document from the relevant jurisdiction for the purpose of legal proceedings.

.

.

 14.  Be aware that Information is obtained and managed by fallible sources and that for the Fee charged, MicroBilt does not guarantee or insure the accuracy, completeness, timeliness, depth or continuation of Information.

# Exhibit D – Partial List of Occurrences of LexisNexis Disclaimer

https://risk.lexisnexis.com/products/worldcompliance-data
https://risk.lexisnexis.com/products/property-data-report
https://www.lexisnexis.com/en-us/products/public-records.page
https://risk.lexisnexis.com/products/data-prefill
https://risk.lexisnexis.com/products/provider-data-masterfile
https://www.lexisnexis.com/pdf/public-records/Public-Records-Relationship-Identifier-on-Lexis-Advance.pdf
https://risk.lexisnexis.com/products/carrier-discovery
https://www.lexisnexis.com/en-us/privacy/bridger-privacy-info.page
https://risk.lexisnexis.com/products/motor-vehicle-records
https://risk.lexisnexis.com/products/claims-discovery
https://risk.lexisnexis.com/products/patient-data-masterfile
https://risk.lexisnexis.com/products/claims-datafill
https://risk.lexisnexis.com/products/providerpoint
https://risk.lexisnexis.com/products/contact-score
https://risk.lexisnexis.com/products/clue-auto
http://techhubly.com/lexisnexis-resources/files/A%20Business%20Case%20for%20Fixing%20Provider%20Data%20Issues_WPNXR5062-0.pdf
https://risk.lexisnexis.com/products/worldcompliance-data
https://www.lexisnexis.com/risk/downloads/assets/provider-data-masterfile.pdf
https://risk.lexisnexis.com/products/campaign-analyzer
https://risk.lexisnexis.com/products/clue-property
https://risk.lexisnexis.com/products/national-credit-file
https://risk.lexisnexis.com/products/small-business-credit-report-with-sbfe-data
https://risk.lexisnexis.com/products/attract
https://www.lexisnexis.com/pdf/public-records/Differences-that-Deliver-Public-Records-on-Lexis-Advance-Snapshot.pdf
https://risk.lexisnexis.com/products/account-monitoring
https://www.ahip.org/wp-content/uploads/2016/06/Blue-Plan-Yields.pdf
http://top100-hospice-homehealth.com/Portals/7/docs/12195_Top-100-HAA-Infographic.pdf
https://risk.lexisnexis.com/products/attract-commercial
https://www.aba.com/Products/Endorsed/Documents/IID-Brochure-March2014.pdf
https://risk.lexisnexis.com/products/accurint-for-collections---contact-and-locate-workflow
https://risk.lexisnexis.com/products/accurint-for-collections-decisioning-workflow
https://risk.lexisnexis.com/products/accurint-for-healthcare
https://risk.lexisnexis.com/products/active-insights
https://risk.lexisnexis.com/products/phone-finder