1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2
                       CASE NO: 1:19-cv-20073
3

4

5      SHEHAN WIJESINAH, individually and on
       behalf of all others similarly situated,
6
                                   Plaintiff,
7

8      V.

9

10     BLUEGREEN VACATIONS, INC,

11                                 Defendant,
       _____/
12

13

14          DEPOSITION TAKEN ON BEHALF OF THE PLAINTIFF
                     DEPOSITION OF JAN KOSTYUN
15
                     Wednesday, June 5, 2019
16                     9:30 AM - 2:20 PM

17

18      STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON,
                               P.A.
19                   Museum Tower, Suite 2200
                     150 West Flagler Street
20                     Miami, Florida 33130

21

22                   Stenographically Reported By:
23

24                    Dina Orlansky-Sosnow
                     Notary Public, State of Florida
25

DEPOSITION OF JAN KOSTYUN                    2

```
 1                        APPEARANCES:
 2
      On Behalf of the Plaintiff:
 3
           HIRALDO P.A.
 4         401 E. Las Olas Boulevard, Suite 1400
           Fort Lauderdale, Florida 33301
 5
           BY:  Mr. Manuel S. Hiraldo, Esq.
 6

 7         IJH LAW
           1200 Brickell Avenue, Suite 1950
 8         Miami, Florida 33131

 9         BY:  Mr. Ignacio Hiraldo, Esq.

10
           EISENBAND LAW, P.A.
11         515 E Las Olas Boulevard, Suite 120
           Fort Lauderdale, Florida 33301.
12
           BY:  Mr. Michael Eisenband, Esq.
13

14

15
      On Behalf of the Defendant:
16
           STEARNS WEAVER MILLER WEISSLER ALHADEFF &
17         SITTERSON, P.A.
           Museum Tower, Suite 2200
18         150 West Flagler Street
           Miami, Florida 33130
19
           BY:  Ms. Andrea Nathan, Esq.
20

21         STEARNS WEAVER MILLER WEISSLER ALHADEFF &
           SITTERSON, P.A.
22         Museum Tower, Suite 2200
           150 West Flagler Street
23         Miami, Florida 33130

24         BY:  Ms. Veronica De-Zayas, Esq.

25
```

DEPOSITION OF JAN KOSTYUN                    3

```
 1                    INDEX OF PROCEEDINGS
 2   Deposition of JAN KOSTYUN                      Page
 3
 4
     Direct Examination by Mr. Hiraldo              5
 5
     Cross Examination by Ms. Nathan              140
 6
 7
 8   Certificate of Oath                          148
 9   Certificate of Reporter                      149
10   Errata Sheet                                 150
11   Read Letter                                  151
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

DEPOSITION OF JAN KOSTYUN

4

```
 1                    INDEX OF EXHIBITS

 2

 3

 4      EXHIBIT            DESCRIPTION            PAGE

 5

       NUMBER 1        EXPERT REPORT OF JAN
 6                     KOSTYUN DATED MAY 24,
                       2019                       6
 7
       NUMBER 2        AMENDED EXPERT REPORT OF
 8                     JAN KOSTYUN DATED JUNE
                       3, 2019                     8
 9
       NUMBER 3        TCN WEBSITE PRINT OUT      50
10
       NUMBER 4        TCN WEBSITE PRINT OUT      52
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    DEPOSITION OF JAN KOSTYUN
                          June 5, 2019
 2

 3    Thereupon,

 4

                          JAN KOSTYUN
 5

 6    Was called as a witness, and after having been first

 7    duly sworn, testified as follows:

 8                      DIRECT EXAMINATION

 9    BY MR. HIRALDO:

10    Q.   Good morning.  Would you kindly spell and state

11    your name for the record?

12         A.   Jan Kostyun; J.A.N. K.O.S.T.Y.U.N.

13    Q.   Mr. Kostyun, my name is Manuel Hiraldo.  I

14    represent the plaintiff in this case.  I've previously

15    taken your deposition; is that correct?

16         A.   Correct.

17    Q.   That was about three months ago?

18         A.   Yes.

19    Q.   Have you given any testimony between that time and

20    today?

21         A.   Not that I recall.

22    Q.   Have you issued any reports between that last

23    deposition that I took of you and today?

24         A.   I may have issued a report between now and

25    then.
```

DEPOSITION OF JAN KOSTYUN                    6

```
 1    Q.    Okay.  And what was it related to?
 2          A.    I don't recall at this point.
 3    Q.    What type of case was it?
 4          A.    If you have a copy of my expert report, I
 5    might be able to refresh my memory.
 6    Q.    Sure.  Would you like the May 24 report or the
 7    amended June 3 report?
 8          A.    It doesn't matter.
 9    Q.    So I'm going to mark as Exhibit 1 the May 24th
10    report.  Here you go.
11
12          (Whereupon, Exhibit No. 1 was marked for
13    identification purposes.)
14
15          A.    So I don't believe I issued any reports since
16    that deposition.
17    Q.    Okay.  And you can hold on to that.
18          Tell me what you did to prepare for today's
19    deposition.
20          A.    I had some discussions with counsel.
21    Reviewed my expert report.  Reviewed some of the
22    related materials.
23    Q.    Did you review the Snyder report?
24          A.    I saw the Snyder report and have done a quick
25    review of it.
```

DEPOSITION OF JAN KOSTYUN                    7

1    Q.   You attended an inspection of the TCM platform at

2    TCN offices; is that correct?

3         A.   The inspection was held at their offices,

4    yes.

5    Q.   Was that last week?

6         A.   Yes, last Wednesday.

7    Q.   Okay.  Did you -- besides that inspection, have

8    you ever spoken or communicated in any other way with

9    anyone from TCN?

10        A.   No.

11   Q.   Okay.  In terms of preparing for today's

12   deposition besides your communications with counsel

13   from the defendant, have you spoken with anyone else?

14        A.   No.

15   Q.   If I recall correctly from the last deposition

16   that I took of you, you have not performed any work for

17   a plaintiff in a TCPA case; is that correct?

18        A.   That is correct.

19   Q.   Okay.  Does that still remain true?

20        A.   Yes.

21   Q.   Okay.  Can you tell me how many cases -- in how

22   many cases you've been retained as an expert by a

23   defendant in a TCPA case?

24        A.   I would say roughly 25 to 30 cases.

25   Q.   Okay.  And if I recall correctly from the last

DEPOSITION OF JAN KOSTYUN                    8

```
 1    deposition, your testimony was that you've never been
 2    disqualified as an expert by any court; is that
 3    correct?
 4         A.   Yes.
 5    Q.   Does that remain true?
 6         A.   Yes.
 7    Q.   And also from your last testimony, I believe you
 8    said your opinions have never been rejected by a court;
 9    is that correct?
10         A.   That's correct.
11    Q.   Okay.  Does that remain true?
12         A.   Yes.
13    Q.   Okay.  Let's look at -- I'm going to hand you what
14    I'll mark as Exhibit 2, which is your June 3rd report.
15    You have in front of you your report.
16         Just to be clear for the record, you issued two
17    reports, right?  One was in support of the defendant's
18    opposition to the motion for class certification, and
19    then you issued a subsequent amended report; is that
20    correct?
21         A.   That's correct.
22
23         (Whereupon, Exhibit No. 2 was marked for
24    identification purposes.)
25
```

DEPOSITION OF JAN KOSTYUN                    9

```
 1   Q.   Okay.  Are there any things in the amended
 2   report -- strike that.
 3        Are there any things from your original report
 4   that are not found in the amended report?
 5        A.   I don't believe so, no.
 6   Q.   Okay.  Meaning you only added to the amended
 7   report from the original report; is that correct?
 8        A.   To the best of my recollection, yes.
 9   Q.   Okay.  Was one of those additions related to the
10   inspection that you participated in of the TCM
11   platform?
12        A.   Yes.
13   Q.   Can you think of anything else that you have added
14   from the original report in to the amended report?
15        A.   I don't believe there was anything
16   substantive.  I may have mentioned a couple other
17   technologies that I had previously reviewed.  But I
18   don't believe there was anything else substantial that
19   was added.
20   Q.   Okay.  So then in reviewing your report today, the
21   amended report is the one that we should be looking at;
22   is that correct?
23        A.   I would say that's up to you.
24   Q.   Okay, fair enough.  But there is nothing in the
25   original report that's not included in the amended
```

DEPOSITION OF JAN KOSTYUN

1     report, correct?

2          A.   Again, to the best of my recollection, I

3     don't believe there is anything removed.

4     Q.   Okay.  How long did it take you to prepare the

5     amended report?

6          A.   I don't have a firm estimate of the number of

7     hours, but I would say it was roughly maybe five to

8     eight hours.

9     Q.   Did you copy anything into your amended report, in

10    this case, from the Schaevitz versus Braman action?

11         A.   I don't believe so, no.

12    Q.   Okay.  Not even sections discussing your

13    background or qualifications?

14         A.   I'm sorry.  Let's backup a little bit.

15         You're talking about the changes that I made to my

16    original report in my amended report?

17    Q.   No.  You issued a report in the Schaevitz versus

18    Braman matter; is that correct?

19         A.   Correct.

20    Q.   That report touched on issues related to -- let's

21    just stop for a second.

22         MS. NATHAN:  Thank you, sorry.

23                      (Brief interruption.)

24    Q.   All right.  So in the Schaevitz vs. Braman matter,

25    you issued a report that touched on issues regarding

DEPOSITION OF JAN KOSTYUN                          11

```
 1    ringless voicemails; is that correct?

 2         A.   Yes.

 3    Q.   As well as issues of ascertainability; is that

 4    correct?

 5         A.   Correct.

 6    Q.   Are there any sections from your ascertainability

 7    opinion in the Schaevitz matter that you used for your

 8    report in this case?

 9         A.   Yes.  I often incorporate sections from

10    previous reports into current ones.

11    Q.   Okay.  Do you know what percentage of your report

12    in this case came from the report that you drafted in

13    the Schaevitz matter?

14         A.   No.

15    Q.   Was it more than 50 percent?

16         A.   I have no idea.

17    Q.   Okay.  Do you know how many pages of the Schaevitz

18    report you copied into the report in this case?

19         A.   No.

20    Q.   The platform at issue in this case was provided by

21    TCN, Inc.; is that correct?

22         A.   That's my understanding, yes.

23    Q.   And is it your understanding that the vendor that

24    was retained by the defendant utilized a subset of the

25    TCN platform called "manually approved calling system"?
```

DEPOSITION OF JAN KOSTYUN

1    A.   Yes.

2  Q.   So we'll call it MAC for short during this

3  deposition; is that understood?

4    A.   Yes.

5  Q.   Did you have occasion to observe how the MAC

6  system operates?

7    A.   Yes, that was part of the demo that we

8  previously discussed.

9  Q.   And tell me what you observed during your

10  inspection of the MAC system.

11    A.   Well, I believe it was described in my

12  updated report and basically Mr. Bird, the

13  representative from TCN, setup several calling

14  campaigns and that included him executing at -- I

15  believe at least two campaigns using the MAC platform

16  where he went through the process of creating a calling

17  list, starting a campaign that involved that calling

18  list, having those numbers presented to a clicker

19  agent, approving those numbers to be called by the

20  clicker agent, and then seeing the calls transferred

21  over to a -- what we'll call a handling agent.

22  Q.   When the clicker agent approved the calls, how did

23  he or she do that?

24    A.   There is a previous screen that the clicker

25  agent sees that has the telephone number and related

DEPOSITION OF JAN KOSTYUN                    13

1    information in it.  Generally, I believe there is

2    default of maybe an account number that's associated

3    with it, and that's a configurable option.

4          In the demo, I believe he set up an account number

5    and a name associated with a telephone number.  The

6    clicker agent reviews the number, if he wants to call

7    it, he clicks an approve button.  If he wants to reject

8    it, he clicks a reject button.

9    Q.  Did the clicker agent actually punch in a

10   telephone number for that call to occur?

11         A.   The clicker agent did not.  That telephone

12   number was punched in as part of the creation of the

13   calling list.

14   Q.  Okay.  Did you actually observe the punching-in of

15   the telephone number into the list?

16         A.   Yes, that was part of the demo.

17   Q.  Somebody actually sat there and typed in the

18   telephone numbers?

19         A.   Correct.

20   Q.  Do you know if that occurred in the placement of

21   the calls at issue in this case?

22         A.   Well, at some point it would have because --

23         MS. NATHAN:  Sorry, is there a noise in here?

24         A.   Sorry, could you ask that again?

25   Q.  Did somebody at Gold Mountain -- which is the

DEPOSITION OF JAN KOSTYUN

```
 1    vendor that was used to place the calls; is that
 2    correct?
 3         A.   Yes, that's correct.
 4    Q.   Did someone at Gold Mountain actually sit there
 5    and punch in telephone numbers?
 6         A.   I don't know.
 7    Q.   Okay.  Did somebody at Bluegreen sit there and
 8    punch in telephone numbers?
 9         A.   I don't know how the telephone numbers ended
10    up in the specific calling list that were used in the
11    campaigns that were placed in this case.
12         But at some point, in order to put a number into a
13    system, somebody would have manually needed to punch in
14    the ten-digit telephone numbers.
15    Q.   How do you know that?
16         A.   Because there is no other way for them to end
17    up in a computer system.
18    Q.   There is no automated process for uploading
19    telephone numbers?
20         A.   Well, there might be a process to upload
21    telephone number lists, but they would have had to
22    eventually have come from somebody that manually keyed
23    those numbers in.
24    Q.   Okay.  But you don't know the process that was
25    used in this case, correct?
```

DEPOSITION OF JAN KOSTYUN

1   A.   Well, my understanding is that the telephone

2   numbers that were used originated in the lead files

3   that were provided to Gold Mountain.

4   Q.   Uh-hu.  Do you know how those numbers got into the

5   lead files?

6   A.   My understanding is that they were

7   accumulated over time by Choice Hotels.

8   Q.   Okay.  Do you know how those numbers were

9   accumulated by Choice Hotels?

10   A.   I don't know the specifics of that.

11   Q.   Okay.  If you look at page 11 of Exhibit 2, which

12   is your amended report, you cite testimony in here from

13   Sherry Ryan, who is the -- who was the corporate

14   designee for the defendant.  Do you see that there?

15   A.   Yes, I believe it actually starts on page 10.

16   Q.   Right.  And Ms. Ryan's testimony, what you said

17   here says in part, which is on page 11, it's the third

18   question from the top.

19   My question to her was, so somebody sitting there

20   punching the numbers, and then when the call is

21   connected, they are connecting it to an agent; is that

22   correct?

23   She says, correct.

24   That's not what occurred here for the placement of

25   the calls at issue, right?

DEPOSITION OF JAN KOSTYUN                    16

 1          A.    Well, she's testifying to the actual

 2     production activity that occurred.  I didn't see that.

 3     All I saw was what occurred in the demo.

 4     Q.    What do you mean, "production activity"?

 5          A.    The activity of the actual calls during the

 6     campaign that's at issue in the case.

 7     Q.    Okay.  So your understanding of what occurred in

 8     this case is that somebody at Gold Mountain sat there

 9     and punched in telephone numbers to initiate each of

10     the telephone calls at issue; is that correct?

11          A.    No, I didn't observe what happened.  So I'm

12     simply quoting her testimony here as what she

13     understood to be the process.

14     Q.    Okay.  You've issued an opinion in this case

15     regarding the technology that was used to place the

16     calls at issue, correct?

17          A.    Correct.

18     Q.    What is the factual foundation for that opinion

19     with respect to how the platform was used to place the

20     calls at issue?

21          A.    Sorry.  I don't understand the question.

22     Q.    Right.  Is it your opinion -- well, the factual

23     foundation for your opinion; is it based on the use of

24     this platform via clicker agent or from somebody

25     punching in a telephone number?

DEPOSITION OF JAN KOSTYUN                17

```
 1          MS. NATHAN:  Objection to form.
 2          A.   I don't think that aspect of it has affected
 3     my opinion.  I think my opinion applies in either case.
 4     Q.   So your opinion remains the same, whether somebody
 5     sat there and punched in a telephone number or somebody
 6     clicked on a button?
 7          A.   Well, again, as I described before, the
 8     numbers that were used to be called in this campaign
 9     had to have been punched into some repository at some
10     point in time.
11     Q.   I understand that.  But my question is:
12     How -- what is your understanding of how this platform
13     was used at the point in which these calls were
14     initiated?  Was somebody typing in the telephone number
15     or was somebody clicking an approve button?
16          A.   My understanding is that when the clicker
17     agent was used in this campaign, that they were
18     presented with telephone numbers one at a time.  Those
19     telephone numbers had been previously uploaded as a
20     file into the TCN platform.  And that they manually
21     clicked approve or reject on each one of those
22     telephone numbers as they were presented.
23     Q.   Okay.  Not that somebody sat there and punched in
24     telephone numbers, correct?
25          A.   Again, if you're referring to the clicker
```

DEPOSITION OF JAN KOSTYUN

18

1   agent, my understanding is that the clicker agent did

2   not manually punch in telephone numbers.

3   Q.   Okay.  Can you tell me why then you have this

4   testimony cited on page 11 of your report, and then

5   again you have similar testimony cited at the bottom of

6   pages 12 and the top of page 13?

7        A.   This was the testimony by Ms. Ryan that

8   addressed the manual nature of the process that was

9   used in the dialing campaign.

10  Q.   Okay.  Which did not, in fact, happen, correct?

11       A.   No, it did happen.  She may have used

12  terminology that didn't exactly apply to the function

13  that was occurring.  But the key information that was

14  part of this testimony was the fact that there was a

15  manual interaction for each telephone number that was

16  sent to be dialed.

17  Q.   On her testimony at the bottom of page 12 is that

18  somebody is punching in phone numbers.

19       Do you see that there?

20       A.   Yes.

21  Q.   Okay.  That didn't occur, correct?

22       A.   Well, again, she used terminology that we

23  might not agree with.  But your question was manually

24  dialing, and her answer was to support the fact that

25  there was manual activity for that dialing.

DEPOSITION OF JAN KOSTYUN

19

```
 1    Q.   That's how you reconcile that testimony with what
 2    actually occurred?
 3         A.   Well, I don't believe that I need to
 4    reconcile it.  But again, the reason that I included
 5    this was to address the manual nature of what occurred
 6    in the dialing.
 7    Q.   Now, on page 14 of your amended report, you have
 8    testimony from Henry Seavers, the President of
 9    Gold Mountain, where he says in response to my question
10    which was, so in terms of the outbound calls that were
11    made on behalf of Bluegreen in 2018, describe to me how
12    those calls would occur using a TCM platform.
13         His answer was, okay.  The clicker agent station
14    will be presented a record with the customer's name and
15    phone number, and any other information provided by
16    Bluegreen, and the clicker agent would click "approved"
17    to dial.
18         Is that your understanding of what occurred?
19         A.   That is my understanding that, that's the
20    process that would have occurred for the telephone
21    numbers that the clicker agent chose to dial.  My
22    understanding is also that there was the option for the
23    clicker agent to reject numbers, so that not
24    necessarily every one -- every number that was
25    presented was approved.
```

DEPOSITION OF JAN KOSTYUN                    20

```
 1   Q.   Do you know what percentage of records that were
 2   presented to a clicker agent were not approved by
 3   Gold Mountain?
 4        A.   No, I haven't seen any evidence that would
 5   describe that.
 6   Q.   Do you know if the clicker agents for
 7   Gold Mountain approved every single record that was
 8   presented to them?
 9        A.   I don't know if they approved every single
10   number.  I don't know if they approved one out of 100
11   numbers.
12   Q.   The -- what is your definition of the word "dial"?
13        A.   I assume you're referring in the context of
14   making a telephone call?
15   Q.   Yes.
16        A.   Well, then I think that my answer is:  Dial
17   is the initiation to have a telephone call placed.
18   Q.   Okay.  Can you tell me what a session-initiation
19   protocol is?
20        A.   Yes.  It's actually session-initiated
21   protocol.
22   Q.   Okay.
23        A.   And that is the software process that's used
24   by a piece of software to communicate with a telephone
25   number and it has various functions.  One of those
```

DEPOSITION OF JAN KOSTYUN

1    being to initiate a telephone call.  It has functions

2    allowed to receive telephone calls as inbound calls.

3    It also has functions that allow it to detect the

4    signals on the line and make a determination whether or

5    not a call has been connected.

6    Q.   Can you tell me what the network components are

7    involved in signaling?

8         A.   Well, at a high level, the network components

9    would be the actual application that's using the SIP

10   protocol, and then the front end of the network that

11   it's trying to communicate with.  Typically that would

12   be the public switch telephone network or a cellular

13   network.

14   Q.   Can you tell me what a SIP user agent it?

15        A.   SIP user agent is a subfunction of the SIP

16   protocol that actually issues SIP calls or SIP

17   messages.

18   Q.   What is SIP -- did you tell me what SIP signaling

19   was?

20        A.   Well, I described it when I was describing

21   how the SIP protocol works.  But SIP signaling is the

22   interaction with the messages that are sent to and from

23   the network.

24   Q.   Okay.  Is it correct that the SIP user agent

25   either originates or terminates the SIP signaling?

DEPOSITION OF JAN KOSTYUN                           22

```
 1          A.   That's my understanding, yes.
 2     Q.   Meaning that they perform the actual function of
 3     dialing, answering, transferring, or hanging up a call,
 4     correct?
 5          A.   No, I wouldn't go that far.
 6     Q.   Okay.  Why not?
 7          A.   Well, again, I gave my definition of dialing;
 8     it is the process to initiate a call.
 9     Q.   Uh-hu.
10          A.   There might be multiple components involved
11     with that process.  In this case, for instance, it was
12     actually a human who dialed the call and did the
13     original initiation, and then used something that was
14     provided through the TCN platform, such as the SIP
15     protocol, to make the physical connections required for
16     that call.
17     Q.   Your definition for the word dial is to initiate a
18     call, correct?
19          A.   That's the best one that I can think of at
20     this point, yes.
21     Q.   So it's the actual process that launches that call
22     that you consider to be the dialing?
23          A.   Yes.
24     Q.   Okay.  With respect to the TCN platform, can you
25     tell me at which step the SIP signaling occurs?  Is it
```

DEPOSITION OF JAN KOSTYUN

```
 1   within the dialing engine or within the web-based
 2   interface?
 3        A.   Well, you've introduced two terms that
 4   haven't been defined.
 5   Q.   Okay.  So let's define them.
 6        Does the TCN platform have a dialing engine
 7   component to it?
 8        A.   From the testimony of Mr. Bird and some of
 9   the discussions during the demo, it is my understanding
10   that they have a computer program that might be
11   referred to as a dialing engine.  And my understanding
12   is that that is one of the background processes that's
13   involved in their system making a call.
14   Q.   Does the MAC platform share a dialing engine with
15   the TCN predicted dialing product offered by TCN?
16        A.   There were some discussion of that during the
17   deposition and I don't recall whether there were
18   multiple instances of their dialing engine, but at some
19   point I believe there was discussion that that
20   functionality could be shared.
21   Q.   Do you know?
22        A.   No, I don't know.
23   Q.   Did you ever inspect it?
24        A.   Well, that would have involved me inspecting
25   their actual software, which is -- would be very
```

DEPOSITION OF JAN KOSTYUN

24

1    unlikely.

2    Q.   Okay.  So we can establish that the TCN platform

3    has a component -- well, the MAC platform has a

4    component which is a -- referred to by TCN as the

5    dialing engine, correct?

6        A.   I don't know if they use that specific

7    language.  But again, a piece of software that

8    interfaces with the network to place calls.

9    Q.   What would you call that piece of software?

10       A.   I would call it the back-end dialing process.

11   Q.   Okay.  The back-end dialing process.

12       So we agree that the TCN MAC platform has a

13   back-end dialing process, correct?

14       A.   Well, let's just qualify the discussion here

15   because we're basing, really, a computer architecture

16   on some very short descriptions that were provided by

17   Mr. Bird.  I happen to be a software person.  I

18   wouldn't feel totally comfortable making a broad

19   assumption that from those short discussions that I can

20   understand everything that's in the -- in the computer

21   architecture of the system that they built.

22   Q.   So you don't understand how the MAC platform

23   operates?  Is that what you're telling me?

24       MS. NATHAN:  Objection to form.

25       A.   No, that's not what I said.

DEPOSITION OF JAN KOSTYUN                    25

1    Q.   What are you saying?

2         A.   I'm saying that you want to put a tag on a

3    piece of software that TCN built that we have a very

4    high level description of, and that would involve any

5    evidence that's been provided by TCN to you or me or

6    your expert.  As part of that discussion, they did

7    describe that there is a piece of software that works

8    in the back end that places the calls.

9    Q.   Okay.  So do you have any reason to dispute that

10   testimony?

11        A.   Well, understanding that their system has to

12   place calls, then there would be some high-level

13   function, at the very least, that would do that kind of

14   job.

15   Q.   Okay.  So can we agree that there is a back-end

16   dialing component to the MAC platform?

17        A.   At a very high level and based on Mr. Birds

18   limited testimony, yes.

19   Q.   Okay.  Is there a web-based interface component to

20   MAC platform?

21        A.   Yes, there is.

22   Q.   That was accessed by Gold Mountain employees on

23   their computer desktops, correct?

24        A.   That's my understanding, yes.

25   Q.   Now, having established that there is a web-based

DEPOSITION OF JAN KOSTYUN

1    interface platform and a dialing -- or as you call it,

2    a back-end dialing process component to the MAC

3    platform, can you tell me where the SIP signaling

4    occurs between those two components of the platform?

5        A.    Any SIP signaling that would be used to place

6    or monitor calls would happen as part of the back-end

7    dialing process.

8    Q.    Okay.   Thank you.

9        Can you tell me what a SIP invite message is?

10       A.    Yes.

11   Q.    What is it?

12       A.    It's basically a handshake that SIP uses to

13   establish its connection protocol with the network

14   to -- in order to place calls.

15   Q.    Does the MAC -- does the TCN MAC server initiate

16   the invite message or does the clicker agent initiate

17   the invite message?

18       A.    Well, the clicker agent's action is the first

19   one that would result in an invite occurring.

20   Q.    Does the invite message come from the web

21   interface or does it come from the back-end dialing

22   process?

23       A.    Well, I'm sure you know the answer to this.

24   But the clicker agent clicks the approve button, which

25   initiates a message from the web interface to the

DEPOSITION OF JAN KOSTYUN

1   back-end dialing process.  The back-end dialing process

2   would then act on that message that says telephone call

3   wishes to be placed, and it would ultimately issue the

4   invite message -- invite protocol to SIP to initiate

5   that call.

6   Q.   Okay.  Thank you.

7        Do you know where the code is housed for the MAC

8   platform?

9        A.   Yes, my understanding is that it sits on

10  servers that belong to TCN.

11  Q.   Do you know if the MAC Platform shares any code

12  with the predicted dialing part that's offered by TCN?

13       A.   My understanding, from Mr. Bird's testimony,

14  is that there are some common functions that they have

15  shared between the two.

16  Q.   Do you know what came first; the MAC platform or

17  the predicted dialing products?

18       A.   My understanding is that the predictive

19  dialing platform was developed first.

20  Q.   Do you know if the MAC platform was built upon the

21  predicted dialing platform that's offered by TCN?

22       A.   I wouldn't feel comfortable answering that

23  question in the form because being "built upon" could

24  have a hundred different ideas to it.

25  Q.   Was the MAC platform developed from scratch or did

DEPOSITION OF JAN KOSTYUN

1    it borrow components from the predicted dialing

2    platform?

3        A.   I believe Mr. Bird testified that it borrowed

4    components from the existing platform.

5    Q.   Okay.  Does the MAC Platform store telephone

6    numbers?

7        A.   Yes, it does.

8    Q.   Okay.  Can you tell me why your report says that

9    it does not?

10        MS. NATHAN:  Objection to form.

11    Q.   You can look at it.  It's paragraph 20(a).

12        A.   Paragraph 28, you said?

13    Q.   Paragraph 20(a).

14        A.   So which part are we referring to?

15    Q.   Within this section of your report, you say, all

16    calls at issue were placed with the TCN manually

17    preapproved calling system, which is equipment that

18    does not have the capacity to produce telephone numbers

19    to be called at using random sequential -- using a

20    random or sequential number generator to store such

21    numbers or to dial such numbers.

22        And my question to you is:  Why are you saying

23    here that the platform does not have the capacity to

24    store numbers?

25        MS. NATHAN:  Objection to form.

DEPOSITION OF JAN KOSTYUN

1      A.   It does not say that it doesn't have the

2   capacity to store numbers.  It says that it doesn't

3   have the capacity to store such numbers.  And "such

4   numbers" refers to numbers to be called using a random

5   or sequential number generator.

6   Q.   So we can agree that the platform does, in fact,

7   store telephone numbers that are inputted into it,

8   correct?

9      A.   Yes.

10  Q.   Do you know where within the -- strike that.

11     Do you know if the -- if TCN stores telephone

12  numbers that are uploaded by its customers within a

13  specific database in its servers?

14     A.   I'm sorry.  Can you repeat that.

15  Q.   Sure.  Does TCN store the telephone numbers that

16  are uploaded by its customers within a specific

17  database found within its servers?

18     A.   I don't recall if there was specific

19  testimony to that effect.

20     But understanding the process on how the TCN

21  dialer works, it would be my presumption that they are

22  stored in some type of database.  Just as with a smart

23  phone when there are a number of contacts that are used

24  there that can be manually dialed, those would be

25  stored in a database in a smart phone.

DEPOSITION OF JAN KOSTYUN

1    Q.   Do you know if the other dialing products that are

2    offered by TCN have access to that same database of

3    stored telephone numbers?

4         A.   I believe there was testimony that stated

5    that the predictive dialer, for instance, has access to

6    the same database, but they have instituted a

7    significant set of permissions and a permission scheme

8    that prevent the two from being intermingled

9    inappropriately.

10   Q.   Have you ever yourself inspected the -- what did

11   you call it?  Significant what?

12        A.   Could you?

13        (Whereupon, a portion of the record was read.)

14        A.   Oh, a significant set of permissions that

15   separate the two?

16   Q.   Okay.  Have you ever, yourself, personally

17   inspected the significant schemes of permissions that

18   TCN claims to have implemented?

19        A.   During the demo that Mr. Bird provided, I

20   believe there was discussion of the permissions.  I

21   don't recall whether he, for instance, showed a

22   comparison of the permissions that allowed manually

23   dialing versus those that allow predicted dialing.

24   Q.   So the answer to my question is "no"?

25        A.   Again, that was discussed during the

DEPOSITION OF JAN KOSTYUN                    31

1    demonstration.

2    Q.   Do you know if the permission schemes that TCN

3    claims they have implemented actually exist?

4         A.   Based on the discussions of Mr. Bird and my

5    understanding of their product offerings, I feel

6    comfortable saying that I believe that they exist.

7    Q.   Okay.  Based on the representations that TCN has

8    provided you, correct?

9         A.   Yes.

10   Q.   Okay.  Now, going back to the process that you

11   observed of a clicking agent hitting the approve

12   button.  When that occurs, does the -- do you -- what

13   terminology do you use for these agents?  Do you call

14   them clicker agents, approval agents?

15        I want to make sure we are on the same page.

16        A.   Either one works for me.  We can call them

17   clicker agents today.

18   Q.   Great.  The clicker agent, when he or she is

19   presented the review screen, does he or she have any

20   option other than to approve or reject that number?

21        A.   No, those are the two options.

22   Q.   Can they punch in a telephone number at that

23   point?

24        A.   I don't believe they have the option to add

25   additional numbers at that point.

DEPOSITION OF JAN KOSTYUN

```
1    Q.   Now, what is your understanding, from a technical
2    standpoint, as to what occurs once the clicker agent
3    hits that approve button?
4         A.   Well, that's kind of an open-ended question.
5    Q.   Uh-hu.
6         A.   Would you like to narrow it down a little
7    bit?
8    Q.   No.  I want to know if you understand what happens
9    from a technological standpoint; when that person hits
10   the approve button, what does that cause the system to
11   do?
12        A.   Well, I think we've already discussed one
13   aspect of this.  And that is that a message is
14   generated from the approval agent's process to the
15   back-end dialing process that includes that telephone
16   number, the message is sent to it via a message queue,
17   and my understanding from Mr. Bird's testimony, is then
18   that telephone number is immediately dialed.
19   Q.   Okay.  Is it your understanding that the number is
20   immediately dialed or that it's passed from one list to
21   another and then dialed?
22        A.   My understanding is that it's inserted into a
23   message queue that gets passed to the dialing process,
24   and when the dialing process receives it, it is
25   immediately inserted into the network as a call.
```

1    Q.   Okay.  So do you recall the testimony in which he

2    described the creation of a queue of telephone numbers

3    once a campaign is initiated using the MAC platform?

4         MS. NATHAN:  Objection to form.

5         A.   I recall his testimony to the fact that

6    queues were used to communicate between the two

7    processes.

8    Q.   Okay.  So the clicking of the approved button then

9    results in the telephone number being passed from that

10   queue to the back-end dialing process as you call it;

11   is that correct?

12        A.   That's generally correct, yes.

13   Q.   Okay.  What is call progress analysis?

14        A.   Call progress analysis is the process that is

15   used by a dialing system, in general, to monitor the

16   result of a call that it has placed.  It monitors the

17   ring tone once it's been told that a call has been

18   placed; it monitors the result of that call to

19   determine whether or not the call has been answered;

20   whether -- and then it has logic to determine whether

21   or not it's been answered by a human versus an

22   answering machine.  And generally has a number of

23   different options that it can perform.

24   Q.   Does the MAC platform perform call progress

25   analysis?

DEPOSITION OF JAN KOSTYUN

34

```
 1        A.   It is my understanding, yes, that it does.
 2   Q.   Is that an automated function of the platform?
 3        A.   I would -- I would refer to it as a computer
 4   process.
 5   Q.   Do the clicker agents perform any kind of call
 6   progress analysis?
 7        A.   In the -- in the form that we've just
 8   described, no.  The clicker agents initiate the call,
 9   and that's their extent of their involvement with it.
10   Q.   Meaning that the clicker agent does not listen for
11   a dial tone, correct?
12        A.   That's correct.
13   Q.   The clicker agent does not listen for a ring-back
14   tone, correct?
15        A.   That's correct.
16   Q.   The clicker agent does not listen for a busy
17   signal; is that correct?
18        A.   Correct.
19   Q.   The clicker agent does not listen for a voicemail
20   system, correct?
21        A.   That's correct.
22   Q.   The clicker agent does not listen for answering
23   machine?
24        A.   That's correct.
25   Q.   The clicker agent does not listen to determine
```

DEPOSITION OF JAN KOSTYUN                    35

```
 1    whether it's a fax machine?
 2         A.    That is correct.
 3    Q.    The clicker agent does not listen to determine
 4    whether the telephone number is out of service,
 5    correct?
 6         A.    That is correct.
 7    Q.    Now --
 8         A.    And if I can just add.
 9    Q.    Sure.
10         A.    All of those things are correct, and they are
11    correct only because it is the clicker agent themselves
12    who have dialed that telephone number and caused it to
13    be called.
14    Q.    Now, when somebody uses a traditional desktop
15    phone to place a call, who conducts, in that is he
16    scenario, the call progress analysis?
17         A.    Well, call progress analysis typically is
18    something that is only associated with a computer
19    software function.
20    Q.    Okay, that's fair.  I'll rephrase the question
21    then.
22         When somebody sits there and punches in a
23    telephone number on a desktop phone, who listens for
24    the ring tone?
25         A.    The initiator of the call or whoever happens
```

DEPOSITION OF JAN KOSTYUN

36

1    to be listening to the handset at the time.

2    Q.   The actual human that's performing the call,

3    correct?

4         A.   The human that happens to have the telephone

5    in their ear at that time.  I might initiate a

6    telephone call, and hand it over to another person

7    before the call continues.

8    Q.   All right.  But in either one of these scenarios

9    that you described, it's an actual human that's

10   listening for the ring tone to see if someone answers

11   the phone call on the other ends, et cetera, correct?

12        A.   Correct.

13   Q.   Now, once the MAC platform performs its call

14   progress analysis and determines that the call has been

15   answered, what is does the system do with that call?

16        A.   Maybe we can be a little more specific when

17   you say what does the system do with that call.

18   Q.   Uh-hu.

19        A.   What system are you referring to?

20   Q.   The MAC platform.

21        A.   Okay.  So the scenario is:  A call has been

22   placed.

23   Q.   Yes.

24        A.   It monitors the call, the result.

25   Q.   It performs call progress analysis to the result

DEPOSITION OF JAN KOSTYUN

```
 1   of which is an answered call?

 2        A.   Okay.

 3   Q.   What occurs next?

 4        A.   It is my understanding that the MAC Platform

 5   records a result of answered link call, and at the same

 6   time transfers that call over to another agent that's

 7   involved in the system that actually handles the calls.

 8   Q.   When that occurs and the call is transferred, how

 9   does the agent know that there is an incoming call?

10        A.   I believe they have a screen on their web

11   interface and they get an indicator that there is an

12   incoming call.  At the same time, they have a headset

13   and they'll hear the call come over their headset.

14   Q.   So it's both an audible and visual alert that

15   there is an incoming call?

16        A.   That is my understanding.

17   Q.   And the audible notification, do you know what it

18   sounds like?

19        A.   My understanding is that it sounds just like

20   a normal phone call.

21   Q.   So there is an actual -- the agent that answers

22   the call hears the -- basically a phone ringing?

23        A.   They might hear the phone ringing or they

24   might hear some dead air if somebody has already

25   answered the call.  They might hear a person speaking,
```

DEPOSITION OF JAN KOSTYUN                38

```
 1    they might hear an answering machine, they might hear a
 2    busy tone.
 3    Q.   What does the MAC Platform do in the event that
 4    there are no agents available to answer the connected
 5    call?
 6         A.   I believe the testimony was that the calls
 7    can be placed into a hold status waiting for an agent
 8    to become available.
 9    Q.   What does the person hear during that hold status,
10    the person who has received that call?
11         A.   I don't know.
12    Q.   Your opinion, based on reading your report, is
13    that the MAC Platform is not a predicted dialer; is
14    that correct?
15         A.   My opinion is that the MAC Platform does not
16    have predicted dialing capability.
17    Q.   And what are you basing that off of?  What are
18    your opinions?
19         Well, I'll rephrase it.  Let's take a step back.
20         Look at paragraph 37 of your report.
21         And in it, you say predictive dialing abilities
22    are not sufficient for a system to qualify as an ATDS.
23         Do you see that?
24         A.   Yes, I do.
25    Q.   What do you mean by that?
```

DEPOSITION OF JAN KOSTYUN                    39

```
 1        A.   Well, there is a statutory definition of
 2   ATDS.  And at a very high level, it involves the
 3   requirement for a system to be able to generate
 4   telephone numbers.  There are some predictive dialers
 5   that generate telephone numbers, there are other
 6   predictive dialers or systems with predictive dialing
 7   capability that do not generate telephone numbers.
 8        So they don't -- ATDS does not necessarily equate
 9   to predictive dialer.
10   Q.   Is it your opinion that the MAC Platform is not an
11   ATDS?
12        A.   I did not make that opinion.  I believe that
13   would require legal opinion.
14   Q.   Well, is this opinion you have here in
15   paragraph 37 a legal opinion?
16        A.   No, it's a technical opinion that, as I
17   described, says that there are predicted dialing
18   capabilities or predicted dialing systems that do not
19   match the statutory definition of an ATDS.
20   Q.   Are you aware of the FCC order holding that a
21   predictive dialer is an ATDS?
22        A.   I'm aware that there have been FCC orders in
23   the past regarding that.  I'm also aware that there
24   have been court decisions where predictive dialers have
25   been found not to be ATDSs.
```

DEPOSITION OF JAN KOSTYUN

1    Q.   All right.  So back to the MAC Platform.  Your

2    opinion is that the MAC Platform is not a predictive

3    dialer, correct?

4        A.   My opinion is that the MAC Platform does not

5    have predicted dialing capabilities.

6    Q.   Okay.  What are the differences between -- well,

7    how do you define a predictive dialer, first off?

8        A.   Predictive dialer is a system that has a core

9    feature to be able to predict agent availability based

10   on monitoring the status of calls and a number of

11   different variables; to the number of agents that are

12   available, the rate in which calls are placed, the

13   average length of each call.  And it dynamically

14   adjusts the pace and the frequency that calls are

15   placed, based on those parameters.  Trying to predict

16   the most productive -- the most productive means by

17   which agents will be available to take those calls.

18   Q.   And the MAC Platform does not have that function,

19   correct?

20       A.   That is correct.

21   Q.   It's actually the clicker agents who are the ones

22   that are predicting and placing the calls?

23       A.   My opinion is that the clicker agents are not

24   doing any prediction at all.  That they are placing the

25   calls based on the speed that the calls are presented

DEPOSITION OF JAN KOSTYUN

41

1    to them, the amount of time that it takes for them to

2    review those calls, the amount of time that it might

3    take them to take a bathroom break.  Any other number

4    of physical, manual, variables that would be involved

5    in their activity of doing that approval.

6    Q.   Besides that difference that we just discussed,

7    are there any other differences to what you consider to

8    be the predictive dialer and the MAC Platform?

9         A.   Well, there are probably a lot of differences

10   as far as the actual activity that goes on in a

11   predictive dialer versus the MAC Platform.

12        For instance, very informally, my experience is

13   that predictive dialers would typically be able to

14   place calls at a higher rate and a higher volume than

15   what the MAC Platform can do.

16   Q.   How do you know that?

17        A.   Well, understanding the technology that was

18   used, understanding the evidence that was presented on

19   how the clicker agents interacted with the system, the

20   fact that it did take manual activity of finger

21   clicking a number and a manual review of those

22   telephone numbers, would typically be a much slower

23   process than what a predictive dialer would need to do,

24   where it can simply run through a list of telephone

25   numbers milliseconds at a time.

DEPOSITION OF JAN KOSTYUN

1    Q.   Does a predictive dialer perform call progress

2    analysis?

3        A.   Part of the function of a system that has

4    predictive dialing capabilities would be to perform

5    call progress analysis, all of which happens after the

6    call is placed.  One of the key differences in

7    predicted dialing is that it uses its call pacing to --

8    prior to when a call is placed.  So as opposed to

9    having somebody manually initiate a call or dial that

10   call, it's the pacing algorithm that determines how far

11   often those calls are placed.

12   Q.   I understand the difference that the MAC platform

13   does not have a pacing algorithm.  My question is about

14   call progress analysis.  Do both predictive dialers and

15   MAC platform perform call progress analysis?

16       A.   And my answer was yes; but I was pointing out

17   the fact that that call progress analysis happens after

18   the calls are placed.

19   Q.   Within a predictive dialer, at which point does

20   the SIP invite message occur?

21       A.   At the point that it's attempting to

22   interface with the telephone network.

23   Q.   Is within a predictive dialer the SIP invite

24   message -- I'll start over.

25       Within a predictive dialer, does the SIP invite

DEPOSITION OF JAN KOSTYUN

1    message occur at the back end dialing process?

2         A.   It would be the same answer.

3    Q.   That's a yes?

4         A.   I thought you were asking me at what point it

5    occurred.

6    Q.   Yes.

7         A.   And I said at -- it would be the same answer

8    as the previous one.

9    Q.   What was the previous answer?

10        A.   The previous answer was when the system is

11   attempting to connect to the telephone network.

12   Q.   And that occurs at the back-end dialing process?

13        A.   Yes.

14   Q.   Thank you.  Your report makes comparisons between

15   Mr. Snyder's opinions and how they would encompass all

16   cellular telephones; is that correct?

17        A.   My report didn't address Mr. Snyder's

18   opinions at all.

19   Q.   You don't talk about Mr. Snyder's opinions?

20        A.   No.

21   Q.   Okay.  Do you talk about comparisons with cellular

22   telephones?

23        A.   There is a section that talks about smart

24   phones.

25   Q.   Okay.  And your opinion is that classifying the

DEPOSITION OF JAN KOSTYUN

1    MAC system as an ATDS would make all modern smart

2    phones ATDSs, correct?

3         A.   Correct.

4    Q.   When a cell phone call is placed, at which point

5    does the SIP invite message occur?

6         A.   I don't believe there is a SIP usage

7    in -- with a smart phone.

8    Q.   There is no SIP usage at all?

9         A.   Not to my knowledge.  There might be some

10   applications on a smart phone that could possibly use

11   SIP technology.  But when a smart phone makes a

12   traditional call, I'm not aware of any usage of SIP

13   protocol.

14   Q.   In a traditional cellular telephone call, is there

15   an automated call progress analysis?

16        A.   Well, I think you just introduced the concept

17   of automated call progress analysis; we've only talked

18   about call progress analysis before.  I don't know if

19   you're trying to talk about something different.

20   Q.   I'll rephrase it.

21        In a traditional cellular telephone call, is there

22   a computerized call progress analysis?

23        A.   No, as we discussed before, it's the human

24   that does the equivalent functions.

25   Q.   In a traditional cellular telephone call, are

DEPOSITION OF JAN KOSTYUN

45

```
1    telephone numbers loaded into an external server?
2         A.   External to what?
3    Q.   In the use of the MAC Platform, telephone numbers
4    are loaded -- a list of telephone numbers are loaded
5    and stored into an external server, correct?
6         A.   Well, they're loaded into the TCN server
7    which is all part of the dialing system.
8    Q.   Does that occur in the placement of a traditional
9    telephone call through a cell phone?
10        A.   Well, if you're trying to show a difference
11   between a traditional cell phone and the TCN system,
12   then in that respect, there is no difference because a
13   smart phone or a traditional cell phone has an, in
14   effect, database or a table of contacts and recent
15   calls that would be stored within it, just as the TCN
16   platform has a database of calls that are -- or calls
17   or telephone calls to be called that are stored within
18   it.
19        At some point those telephone numbers were
20   uploaded into the TCN platform, just as at some point
21   those telephone numbers were uploaded into the smart
22   phone.
23   Q.   Your report in paragraph 48, top of page 22, in it
24   you state you do an analysis of how quickly calls were
25   being placed using the MAC platform.  And your
```

DEPOSITION OF JAN KOSTYUN

1    conclusion is that the clicker agents were placing

2    24 calls per minute, or roughly one call every

3    2.5 seconds; is that correct?

4         A.   That's correct.

5    Q.   Okay.  If you picked up a desktop phone or a cell

6    phone, how long would it take you to make a call from

7    the point of punching in the telephone numbers,

8    listening for a dial tone, and waiting for somebody to

9    answer that call?  Do you know?

10        A.   I'm a little confused by your question.

11   Q.   Okay.  If I were to pick up my cell phone and

12   place a call to your cell phone right now, and wait for

13   you to answer, how long would that take me?  On

14   average?

15        A.   Typically a few seconds.

16   Q.   2.5 seconds?

17        A.   I have no idea.

18   Q.   10 seconds?

19        A.   I have no idea.

20   Q.   Have you ever tested it?

21        A.   No.

22   Q.   Would you like to?

23        A.   No.

24   Q.   I'll give you my phone number and you can call me

25   and we can time it.

DEPOSITION OF JAN KOSTYUN

1          Ready?  Do you have your cell phone with you?

2          A.   No.

3     Q.   You didn't bring a phone?

4          A.   No.

5     Q.   If I represent to you that it takes, on average,

6     20 to 30 seconds to place a call on your cell phone,

7     would you have any reason to dispute that?

8          MS. NATHAN:  Objection to form.

9          A.   I could believe that that would be typical,

10    but again, I haven't tested it.  So I don't know

11    whether that would be typical or not.

12    Q.   Do you know if a tradition phone call, meaning

13    when I say traditional, punching in telephone numbers,

14    can be performed in 2.5 seconds?

15         A.   Are you talking about punching in ten digits

16    or are you talking about swiping a number that's

17    already on your call log?

18    Q.   Either one.

19         A.   Well, obviously touching an icon or swiping a

20    number takes a half a second.

21    Q.   Okay.  We are talking about from punching in the

22    number through the actual answering or hearing a dial

23    tone or a busy tone, et cetera.  Can that occur in

24    2.5 seconds?

25         A.   I have no idea.  Again, I haven't tested it.

DEPOSITION OF JAN KOSTYUN

1   Q.   Okay.

2        A.   But also, I'm a little confused on why you're

3   trying to make that comparison.  Because in

4   paragraph 48, I'm talking about the amount of time that

5   it took for the clicker agent not to place the call and

6   listen to it and answer it, I'm talking about the

7   amount of time that it would have taken them simply to

8   approve the number of calls that was in the example.

9   Q.   How long would it have taken a group of 40 agents

10  to manually place, and when I say "manually," I mean

11  punching in telephone calls, to manually place 18,000

12  calls?

13       A.   I haven't done the math, but again, nobody

14  punches in ten digits anymore.  Everybody sees a

15  telephone number, clicks it, and places it.  So the

16  process is relatively fast, even for a manual telephone

17  call to be placed.

18  Q.   What do you mean by everyone uses -- everybody

19  sees a telephone number clicks it and places it?

20       A.   It's very rare now to place a call by having

21  to punch in ten digits.  In most cases, a call is

22  placed by reviewing a call that's on a call log or

23  reviewing a telephone number that's on a contact list.

24  Telephone number that you've received via text message,

25  typically somebody just touches a number and that

DEPOSITION OF JAN KOSTYUN

1  results in it being called.

2  Q.   Okay.  But my question to you is:  Assume for me

3  that these people don't have any relationship with the

4  individuals they are calling, and there is no button

5  for them to press.  If they want to sit there and they

6  have a list of telephone numbers, and they have to

7  punch in every telephone number that they want to call,

8  how long would that take to place 18,000 calls?

9       A.   Well, I doubt if there would be any business

10  that would want to place calls in a nonproductive mode

11  such as that.  Because again, there is a very common

12  technology that allows people to dial numbers off of

13  lists without having to punch in all ten numbers.

14  Q.   Right.

15       A.   But, having said that, I have no idea on the

16  amount of time.  I haven't tested any of that.

17  Q.   This technology that was utilized on behalf of

18  Bluegreen was done because it was efficient, right?

19       A.   I assume that was part of their motivation.

20  Q.   Because it allowed them to place a high volume of

21  calls with few individuals, correct?

22       A.   Again, you're asking me what their business

23  plan was, and I don't know that.

24  Q.   I'm going to hand you what we'll mark as

25  Exhibit 3.

DEPOSITION OF JAN KOSTYUN                    50

```
 1        Exhibit 3 -- did I give you a copy of this?

 2

 3        (Whereupon, Exhibit No. 3 was marked for

 4   identification purposes.)

 5

 6        MS. NATHAN:  No.

 7        MR. HIRALDO:  I'm sorry.  Can you please show to

 8   counsel?

 9        MS. NATHAN:  That's fine.

10   Q.   Exhibit 3 is an exhibit that we used in a prior

11   deposition, and it's Bates labeled 106 through 112.

12        Have you seen this document prior to today?

13        A.   I believe I received a copy of this recently.

14   Q.   Okay.  Do you see under the "how it works"

15   section, in the last sentence, it says "the agent then

16   simply presses the approve button to add it to a call

17   queue or reject to cancel a call."

18        Do you see that?

19        A.   Yes, I do.

20   Q.   Is that your understanding of how this MAC

21   platform operates?

22        A.   That's my understanding of how the call

23   dialing process works, yes.

24   Q.   Okay.  Now, if you flip over to Bates 111, and

25   under here where it says "manually approved calling
```

DEPOSITION OF JAN KOSTYUN

1    MAC," it's the last sentence of the second paragraph.

2         It says, "approved calls continue to the

3    autodialing sequence, while others are archived."

4         Is that your understanding of how this platform

5    works?

6         A.   I have not seen or heard testimony, for

7    instance, from Mr. Bird that described their process in

8    this way.  So, I would not have an opinion on it,

9    whether or not the system worked according to that

10   statement.

11   Q.   Okay.  Do you have any reason to believe that TCN

12   would put false information about how its platform

13   operates on its website?

14        A.   Well, I believe in the Bird deposition, that

15   it was his opinion that some mistakes had been placed

16   there.

17   Q.   Okay.  Do you think that's a mistake what's on

18   this handout that I've just given you?

19        A.   Well, it appears to me like it wasn't written

20   by a technician.  It's not a very specific statement,

21   so it sounds more like marketing material to me.  So I

22   think it could be interpreted in any number of

23   different ways.

24   Q.   I'm going to hand you Exhibit 4 and please share

25   it with your counsel because I only have one copy.

DEPOSITION OF JAN KOSTYUN

52

1

2          (Whereupon, Exhibit No. 4 was marked for

3     identification purposes.)

4

5     Q.   Exhibit 4 is a seven-page document.  It's also,

6     I'll represent to you, a printout from TCN's website.

7     And if you would please look on page 3 under the stay

8     in TCPA compliance with manually approved calling.

9          The second sentence of the first paragraph says,

10    it, referring to the MAC platform, combines predictive

11    and manually dialing so that agents call the right and

12    approved people at the right time.

13         Do you agree or disagree with the statement that

14    the MAC platform combines predictive and manual

15    dialing?

16         A.   I don't agree that it has any characteristics

17    of predictive dialing.  Predictive dialing.

18    Q.   Not even call progress analysis?

19         A.   Well, call progress analysis that is

20    performed by the MAC platform is something that is used

21    in predictive dialing, but also used in other types of

22    dialing as well.  So that does not necessarily equate

23    them.

24    Q.   Well, let's talk about that.  What other type of

25    other platforms -- what type of other dialing systems

DEPOSITION OF JAN KOSTYUN

53

1    use computerized call progress analysis?

2         A.   Well, originally I was not talking about

3    computerized call progress analysis, I was talking

4    about call progress analysis which is what you asked.

5         And obviously anybody that makes a phone call uses

6    that in a manual mode.

7    Q.   Okay.  So let's talk about computerized call

8    progress analysis.  Does predictive dialing technology

9    use computerized call progress analysis?

10        A.   In the cases that I'm aware of, yes.

11   Q.   Okay.  Does predictive dialing technology use

12   computerized call progress analysis?

13        A.   Sounds like you just asked me the same

14   question.

15   Q.   Does the MAC platform use computerized call

16   progress analysis?

17        A.   The MAC Platform does, as we discussed, have

18   call progress analysis that it performs after the

19   placement of the call.

20   Q.   What other dialing platforms are you aware of that

21   use computerized call progress analysis?

22        A.   Well, preview dialing mode would perform call

23   progress, progressive dialing mode would use call

24   progress analysis.  And in some cases, purely manual

25   dialing mode may have some call -- some computerized

DEPOSITION OF JAN KOSTYUN

54

1    call progress analysis built into it.

2    Q.   What do you mean by that?

3         A.   Well, a purely manual dialing mode, in which

4    an agent who's going to field the call also initiates

5    the dialing of the call, would initiate that call.  And

6    there may be some progress analysis performed by a

7    system that would prevent certain types of calls from

8    being returned back to the agent to improve their

9    productivity.

10   Q.   Are you aware of any platform that operates in the

11   manner that you just described?

12        A.   I believe I have reviewed platforms in the

13   past that have had that option in them.

14   Q.   What are their names?

15        A.   I believe the Avia, some of the Avia

16   platforms have provided that capability.  I believe the

17   Livebox platform might have that capability as well.

18   Q.   Do you know?

19        A.   As I said, I believe that those platforms

20   have that capability.

21   Q.   Okay.  Any other platforms that you can think of

22   that have a computerized call progress function?

23        A.   By call platforms, you mean types of dialing

24   systems?

25   Q.   Yes.

DEPOSITION OF JAN KOSTYUN

```
1         A.   Well, that pretty much covers most of the

2    ones that is are available, other than unattended

3    calling.

4         MR. HIRALDO:  All right.  I think this is a good

5    time to take a break.  So let's go ahead and do that.

6

7         (Whereupon, a short break was taken.)

8

9    Q.   All right.  Just a couple more questions on the

10   dialer.  When the clicker agent is in the process of

11   reviewing and approving or rejecting calls, does he or

12   she have the ability to actually listen in on a

13   telephone call?

14        A.   I believe you asked this before and the

15   answer was no.

16   Q.   Okay.  Do they have the ability to --

17        A.   Well, I'm sorry.  Let me qualify.

18        If they are preparing to approve or reject a call,

19   there wouldn't be any call in place so there would

20   never be a chance for them to listen in on a call since

21   it hadn't happened yet.

22   Q.   I'll ask it in a different way.  Do the clicker

23   agents participate in the calls that they initiate in

24   any way?  Beyond the actual clicking of the approve or

25   reject button?
```

DEPOSITION OF JAN KOSTYUN

1      A.    I believe that Mr. Bird testified that that

2  was an option with their system.

3  Q.    During -- do you know that to be the case?

4      A.    To my recollection, I believe that was his

5  testimony.

6  Q.    Okay.  And this is during the actual approval

7  process?

8      A.    I believe the testimony was that if they

9  approved a call, that that call could come back to them

10  to be handled as a typical agent.

11  Q.    Do you know if that's -- that's your recollection

12  of his testimony?

13      A.    That's correct.  That's my recollection.

14  Q.    So your understanding is that the MAC platform

15  allows the clicker agent to actually participate in

16  calls?

17      A.    Yes.

18  Q.    Okay.  All right.  Let's look at you -- one of

19  your opinions in this case was with respect to the

20  ascertainability of punitive class members, correct?

21      A.    Yes.

22  Q.    And in conducting your analysis and preparing your

23  report, you, according to paragraph 16 of your amended

24  report, reviewed 230 CSV files containing lead records,

25  correct?

DEPOSITION OF JAN KOSTYUN

1          A.   You said page 16 or paragraph 16?

2    Q.   Paragraph 16, page 6.  It's all the way at the

3    bottom.  It says 230 CSV files containing lead records.

4          A.   Yes.

5    Q.   Okay.  Where -- what was the -- from the

6    production standpoint, what was the originating source

7    of those lead files that you reviewed?

8          A.   I believe those -- all of those files, the

9    lead files as well as the clicker files and the

10   disposition files, were sent from you to our counsel.

11   Q.   Okay.  I'll represent to you that we did not send

12   230 CSV lead files to Bluegreen's counsel.  So did you

13   get those lead files from Choice Hotels or

14   Gold Mountain?

15         A.   Neither.  I received a set of files from our

16   counsel.  And they were -- all of the clicker files,

17   the lead files, and the disposition files were combined

18   together in a single directory.  And my understanding

19   is that that was the way that they had received them

20   from you.

21         MR. HIRALDO:  Do we have clarity on the

22   discrepancy between the lead files?  And have you

23   guys -- are you going to produce any more lead files?

24         MS. NATHAN:  We are going to produce the entire

25   lead files that were provided to Gold Mountain.  And I

DEPOSITION OF JAN KOSTYUN

1    can ask my client to provide that, and they are in the

2    process of uploading that to us.

3         MR. HIRALDO:  How many files is that.

4         MS. NATHAN:  I don't know.  I haven't received it

5    yet.  But it is the entirety of the lead files that

6    were provided to Gold Mountain during the term of their

7    most recent contract with Gold Mountain.

8    Q.   Do you know if you have been provided all of the

9    lead files in this case?

10        A.   I -- my understanding was that the lead files

11   that I received and that I analyzed were all that were

12   available at the time.

13   Q.   Okay.  Your opinion, in part, states that the cost

14   data that we've used in support of our class

15   certification motion is unreliable because there are

16   missing lead files; is that correct?

17        A.   That was a portion of my opinions, yes.

18   Q.   Your analysis is, in fact, that 10 1/2 percent of

19   the punitive class lead information is missing,

20   correct?

21        A.   That was the correct result of my analysis

22   when I compared the lead files against the disposition

23   files that you had provided.  That was not the only

24   reason that I gave the opinion that the lead files were

25   unreliable.

DEPOSITION OF JAN KOSTYUN                                    59

1    Q.    I understand that.  But we are talking about the

2    missing lead information for now.

3          When you conducted your analysis to determine the

4    number of missing lead files, what lead files did you

5    use?

6          A.    First of all, it wasn't an opinion of missing

7    lead files; it was an opinion of missing lead records.

8    Q.    Missing lead information.

9          A.    Okay.  And the lead files that I used were

10   those 230 that we have received that I understood came

11   through production.

12   Q.    Where is the work product of the actual analysis

13   that you conducted?

14         A.    I'm not sure which product you're referring

15   to.  The results were documented in the report.

16   Q.    Okay.  Where is the documentation supporting the

17   results that are outlined in your report?

18         A.    I gave some examples of missing lead

19   files -- lead information, and I may have saved the

20   results of that analysis.  It might be necessary for me

21   to reproduce those database queries in order to produce

22   the supporting evidence.

23   Q.    What did you do to determine that 10 1/2 percent

24   of lead information for punitive class members were

25   missing?

DEPOSITION OF JAN KOSTYUN

```
 1        A.   At a high level, I compared the telephone

 2   numbers that were in the class file, the 24,969

 3   records.  I took the telephone numbers that appeared in

 4   there, and compared them with the lead records in the

 5   CSV files.

 6   Q.   Did you combine the 230 lead records into one

 7   file?

 8        A.   I have a version that is -- that has all the

 9   records combined, yes.

10   Q.   Okay.  How many -- is that on Excel?

11        A.   It's in an SQL database.

12   Q.   And how many lead -- independent lead -- how many

13   independent leads do you have within that file?

14        A.   Across the total production, that's what

15   you're asking me?

16   Q.   Yes.

17        A.   I don't recall the exact number, but I

18   believe it was in the neighborhood of over a million.

19   Q.   Okay.  And you said it's in an SQL file?

20        A.   Correct.

21   Q.   What type of format is that?

22        A.   That is the format.

23   Q.   Okay.  What program uses that format?

24        A.   Microsoft SQL server, that's one program that

25   uses it.  That's the tool that I use.
```

DEPOSITION OF JAN KOSTYUN

1    Q.   And using this SQL file, how did you determine

2    that there was 10 percent of the lead information

3    missing from our punitive class list?

4         A.   Well, SQL is a relational database system, so

5    it allows you to compare files.  Kind of a more robust

6    version of Excel.  And I performed a comparison between

7    the records that were in your class representation,

8    took the telephone numbers, and checked to see whether

9    or not they existed in the lead files.

10   Q.   Okay.  And where is the result of that analysis?

11        A.   Again, I'm not sure if I saved the actual

12   individual telephone numbers, but the result was

13   documented in here as the 10.5 percent.

14   Q.   Okay.  If I wanted to test your methodology to

15   make sure that you didn't make any mistakes, what would

16   I be looking at?

17        A.   Well, you have all the data so you certainly

18   would have all of the information that I used to do it.

19   Q.   Well, again, we did not have all the data until

20   your production last night.

21        A.   No, this was based on the data that was

22   produced --

23        MS. NATHAN:  It's based on the Gold Mountain

24   production, if I may interject.

25   Q.   Okay.  Gold Mountain did not produce to us 230 CSV

DEPOSITION OF JAN KOSTYUN

1  files.  So that's why it's unclear to us where these

2  additional CSV files came from, and what you looked at

3  in order to perform your analysis.

4       A.   All I can tell you is that the data that I

5  used was provided to me by counsel, and my

6  understanding was that counsel received it from you as

7  part of the Gold Mountain subpoena.

8  Q.   Okay.  Did you ever ask if you had been provided

9  all of the lead information?

10      A.   It was understood as part of the exchange of

11 information that that was all there was.

12 Q.   Okay.  Did you ever ask?

13      A.   Did I ask specifically if everything was

14 there?

15 Q.   Yes.

16      A.   Did I use those words?

17 Q.   Yes.

18      A.   No.

19 Q.   When you came up with 2,600 lead files missing,

20 did you ever go back to counsel and say, we have 2,600

21 lead information missing from the class data, are you

22 sure you gave me everything.

23      MS. NATHAN:  Objection to form.

24      A.   No, I had no reason to suspect that the data

25 was incomplete.  So I simply reported on the results

DEPOSITION OF JAN KOSTYUN

63

1   that I found.

2   Q.   Okay.  Do you know where the telephone numbers

3   that were dialed by Gold Mountain came from?

4        A.   If you're asking me if I personally or

5   physically viewed the chain of custody on all the data,

6   the answer is "no," obviously.  My understanding is

7   that they placed calls based on leads that were

8   provided originally from Choice Hotels.  But I have no

9   information as to whether or not there was any

10  additional augmentation to that data.

11  Q.   What do you mean by "augmentation"?

12       A.   I have no information if they, if the limit

13  of the calls that they made were only done based on

14  those lead files.

15  Q.   Do you know if Gold Mountain was calling numbers

16  that were not provided to it within Choice lead files

17  from Gold -- from Bluegreen?

18       A.   All I know is that I found calls in the

19  disposition records that had telephone numbers that did

20  not match up with telephone numbers that were in the

21  universe of lead files that I was provided.

22  Q.   Okay.  And again, you never specifically asked if

23  you had been provided all of the lead files, correct?

24       A.   And again, it was my understanding when I

25  received it that that was -- that the data was

DEPOSITION OF JAN KOSTYUN

1    complete.

2    Q.   The answer being, you never specifically asked?

3         A.   I did not use the words:  Is there any other

4    data missing from here.

5    Q.   And you didn't have any questions about why 2,600

6    lead files were missing?

7         A.   No.

8    Q.   Your -- your conclusion was just to go directly to

9    that as the data is unreliable, correct?

10        A.   Again, that was one of the factors that was

11   involved.  I found other factors as well that were

12   documented in the report.  I'm sure you're familiar

13   with them.

14   Q.   All right.  Let's look at, again, paragraph 16 on

15   pages 6 and 7.

16        You say, 230 CSV files contain in lead records

17   originating from Choice.

18        Do you see that?

19        A.   Yes.

20   Q.   Okay.  Why did you say originating from Choice and

21   not originating from Gold Mountain?

22        A.   My understanding was that

23   Gold Mountain -- well, that Choice provided them to

24   Bluegreen, and that Bluegreen provided them to

25   Gold Mountain.

DEPOSITION OF JAN KOSTYUN                    65

1    Q.   Okay.  And in paragraph 66, if you flip over, you

2    say Gold Mountain provided Choice lead files.

3         Do you see that?

4         A.   Yes.

5    Q.   So you, as far as you're concerned, you reviewed

6    lead files that were produced by plaintiff's counsel,

7    that were received by Gold Mountain; is that correct?

8         A.   My understanding is that plaintiff's counsel

9    received these files from you, and that you received

10   them as a result of a subpoena to Gold Mountain.

11   Q.   That's defense counsel; I'm plaintiff's counsel.

12        A.   Yes.

13   Q.   You said "plaintiff's counsel received."

14        A.   I'm sorry.  Defense counsel received them

15   from plaintiff's counsel, who received them as a result

16   of subpoena to Gold Mountain.

17   Q.   Does Bluegreen -- do you know if Bluegreen has the

18   lead files in its possession?

19        A.   I don't know.

20   Q.   Did you ever ask?

21        A.   I had no reason to ask.

22   Q.   Did you ever ask why you were relying on a

23   production from an outside vendor, and not directly

24   from Bluegreen?

25        A.   Well, the -- in cases like this, there are

DEPOSITION OF JAN KOSTYUN

```
1    often multiple parties involved, and the exchange of
2    information is -- often goes through different paths.
3    So again, I didn't have any reason to ask that.
4    Q.   All right.  Page 29 of your report talks about
5    stale-dated lead data.
6         Do you see that?
7         A.   Yes.
8    Q.   And within -- at the last paragraph of 71, you say
9    some unknown part of the phone numbers and contact
10   information in the Choice lead files may therefore be
11   stale dated.
12        Do you see that there?
13        A.   Yes.
14   Q.   Okay.  Did you ever perform an analysis to
15   determine what percentage, if any, of the lead
16   information is stale dated?
17        A.   Well, an analysis such as that would require
18   some significant individualized inquiry.  So you know,
19   if I were expected to do something like that, and I was
20   never asked to do that, you know, it might involve
21   calling telephone numbers and seeing who the current
22   owner was.  And typically, I don't do that type of
23   analysis.
24   Q.   Okay.  So the answer being, no, you never
25   performed any such analysis?
```

DEPOSITION OF JAN KOSTYUN

1      A.    That's correct.

2    Q.    Okay.  And so when you say that the lead files may

3    be stale dated, you don't know if they are, in fact,

4    stale dated, correct?

5      A.    Well, as I discussed before based on my

6    experience with customer data, it's -- there are a

7    number of reasons why it can be inaccurate.  And even

8    if it were not "stale dated," that is, changed over

9    time, it could possibly have been entered inaccurately

10   from the very beginning.  So there could be records out

11   there that are 20 years old that were inaccurate the

12   entire time.

13      And again my experience is, particularly working

14   with telephone customers, that there is contact

15   information that people never update over time and it

16   becomes inaccurate.

17   Q.    But you don't know if that's, in fact, the case

18   here because you never performed analysis, correct?

19      A.    I don't know a hundred percent.  But again

20   based on my experience, I would say there is a very

21   high likelihood.

22   Q.    Can you tell me with a hundred percent certainty

23   that any Choice lead file is stale dated?

24      A.    I cannot tell you with a hundred percent

25   accuracy that any of that is stale dated, and I can't

DEPOSITION OF JAN KOSTYUN

1    tell you with a hundred percent accuracy that none of

2    it is stale dated.

3    Q.   Okay.  Paragraph 73 of your report, the last two

4    sentences talk about -- and I'll read them to you.

5        It says, within these 20,774 lead records, 3,235

6    leads, nearly 16 percent, have an address of unknown,

7    but it is unclear why they have unknown addresses.

8        Do you see that there?

9        A.   Yes, I do.

10   Q.   For these leads, is there any other -- when you're

11   talking about an unknown address, are you talking about

12   an unknown home address?

13       A.   The lead data has two columns for address

14   information; address 1 and address 2.  They don't

15   specify whether or not they are home addresses or

16   business addresses or anything else.

17   Q.   For these 3,235 leads, are they both -- are they

18   all missing addresses in the first and second column?

19       A.   From my recollection, these were records that

20   have unknown in the first address field, and I don't

21   recall seeing any of them that had anything in the

22   second address field.

23   Q.   So unknown in the first and then blank in the

24   second?

25       A.   Generally that's correct, yes.

DEPOSITION OF JAN KOSTYUN                    69

1    Q.   Where is the actual result of this analysis that

2    you conducted?

3         A.   Well, it's built into those databases that I

4    analyzed.  I don't believe I saved the specific

5    records, but it's something that could be reproduced

6    just as you can easily check your own files.

7    Q.   Okay.  If I wanted to test your methodology, I

8    would be unable to do so today because that record does

9    not exist, correct?

10        A.   No.  Again, you could look at your own data

11   and perform the same analysis very simply.  You can

12   even do that in Excel.

13   Q.   I'm not talking about performing my own analysis;

14   I'm talking about checking your work product, and how

15   would I do that.

16        A.   You can check my work product by performing

17   your own analysis, and seeing if you got the same

18   results.

19   Q.   And that's an interesting point.  Because the

20   analysis that you performed in evaluating this class

21   data, it doesn't require any kind of specialized skill,

22   correct?

23        A.   Well, it required the skill to know to look

24   for inconsistencies like this, based on my experience

25   with the fact that a lot of times customer records are

DEPOSITION OF JAN KOSTYUN

1  corrupted.

2      Bad address information wasn't the only data that

3  I looked for.  I looked for problems with customer

4  names, and inconsistencies between addresses and zip

5  codes, and various factors like that.

6  Q.   Right.  But you're telling me that in order to

7  check your work, I can just perform my own analysis,

8  correct?

9      A.   In order to check this specific instance, you

10 can do the analysis yourself.

11 Q.   Okay.  Meaning that there is no specialized skill

12 necessary to perform the analysis that you conducted,

13 correct?

14     A.   Well, once again, my skill was involved in

15 being able to identify this as a potential problem in

16 the first place.  So it was experience-based testing

17 that I performed.  Now that I've opened the door for

18 you, as a layman, you can do the same thing.

19 Q.   Okay.  So in total, your experience of identifying

20 the issue came into play, I would not have been able to

21 do it.  But now since you've identified the issue, I

22 can perform the analysis?

23     A.   That would be one way of putting it.

24 Q.   Okay.  And then in terms of performing the

25 analysis, no specialized skill is required, correct?

DEPOSITION OF JAN KOSTYUN

1        A.   For this particular instance, yes.

2        Other ones such as combining the -- for instance,

3   the disposition files and the clicker files, to find

4   inconsistencies between the clicker results and the

5   dispositions is a fairly complex process.  Finding the

6   leads that were missing that were in the disposition

7   file but not in the lead files, obviously requires some

8   fairly high-level analysis skills.

9   Q.   So then how would I test your analysis there,

10  given that specialized skill is needed?

11       A.   You can do it manually.

12  Q.   What do you mean by that?

13       A.   You can take each number out of your 24,969

14  and do a look up in the clicker Excel files.

15  Q.   So then no specialized skill required --

16       A.   Sorry.

17  Q.   Go ahead.

18       A.   Well, after you do that, you can come back in

19  six months and tell me whether or not it took any

20  specialized skills.

21  Q.   So the answer then is, no specialized skills are

22  needed or specialized skills are needed?

23       A.   Once again, the skill that was involved is;

24  understanding the data inconsistencies like that can

25  exist.  And in order to do a reasonable analysis within

DEPOSITION OF JAN KOSTYUN

1    the time frame that was required for a report like

2    this, it certainly took the skill to be able to do the

3    database comparisons.

4    Q.   Well, you understand the dilemma, right?

5         Because I mean, it's not a trick question.  On the

6    one hand you're telling me you didn't keep your work

7    product, but I can recreate it.  But on the other,

8    you're telling me that you need specialized skills to

9    recreate it.

10        So which one is it?

11        A.   Well, the bottom line is that I was asked to

12   produce results of the analysis and point out problems

13   in the data.  I was not asked to produce the individual

14   files that resulted in this.  And so that's what you

15   got in the report.

16   Q.   You didn't think -- you didn't deem those files to

17   be important for purposes of checking the reliability

18   and your methodology?

19        MS. NATHAN:  Objection to form.

20        A.   Well, there was a lot of analysis that I did.

21   I could have saved a lot of intermediate results, and I

22   kind of made judgment decisions as I went through the

23   process and decided to save some of them, and some of

24   them I knew I could recreate if I needed to.

25   Q.   Do you typically discard your work product when

DEPOSITION OF JAN KOSTYUN                    73

```
 1    performing expert analysis in cases?
 2         MS. NATHAN:  Objection to form.
 3         A.   Again, when I do analysis, there are a lot of
 4    immediate results that are created in some cases.  I
 5    make judgment decisions to save some of them, and in
 6    other cases I discard them knowing I can recreate them.
 7    Q.   Going back to paragraph 73, where you talk about
 8    missing addresses.  Is there any -- for these
 9    3,235 files, is there any other identifying information
10    contained within each one of those leads?
11         A.   Other identifying information besides the
12    address?
13    Q.   Correct.
14         A.   Well, if I remember correctly, the format of
15    the lead files included first name -- telephone number,
16    first name, last name, address 1, address 2, city,
17    state, and ZIP code.
18    Q.   What about e-mail address?
19         A.   I don't believe there were e-mail addresses
20    here.
21    Q.   Okay.  These files that you have identified here
22    are just missing home addresses, and that's it?
23         A.   There could be other problems.  In this case,
24    the numbers that I reported were specifically those
25    with the value of unknown in the address 1 field.
```

DEPOSITION OF JAN KOSTYUN

1    Q.   But they still have first and last name, correct?

2         A.   Not necessarily, no.

3    Q.   How do you know?

4         A.   Because there were a number of records that I

5    observed in looking at results that might have a last

6    name, but no first name; they might have had the first

7    and last name combined together in the last name field.

8    There were a number of anomalies.

9    Q.   How many of the 3,235 leads that you've identified

10   here without addresses have missing first or last

11   names?

12        A.   I don't know.  I didn't -- I didn't record

13   those results.

14   Q.   What percentage of the 3,235 leads that you

15   identified here with missing addresses, are missing

16   first or last names?

17        A.   Again, if I knew the raw number I would know

18   the percentage.

19   Q.   When they -- when you say address unknown, does

20   that also mean it's also missing a city, state, and ZIP

21   code?

22        A.   Not necessarily.

23   Q.   Okay.  What percentage of the 3235 leads that

24   you've identified here have a missing city, state, and

25   ZIP code?

DEPOSITION OF JAN KOSTYUN

1      A.   I did not measure those results.

2    Q.   Okay.  All right.  Let's look at page 31 of your

3    report.  And in it you talk about -- what is your

4    understanding of what the disposition reports reflect?

5      A.   The disposition reports, as I understand it,

6    are a record of the action and the results of the agent

7    that handled the call, and potentially spoke with the

8    person; the disposition field being a selection of

9    available -- I don't want to use the term results

10   because that's used in the clicker files, but the end

11   product of their telephone call.

12   Q.   Do the disposition reports only show telephone

13   calls in which an agent spoke to a consumer?

14     A.   I don't know.  The intention is that they

15   were calls that were detected by the TCN system to have

16   been answered by a human and then transferred to

17   the -- to the handling agent.

18     My experience is that the software and the logic

19   in order to make that determination is not full proof.

20   So in some number of cases, there are going to be calls

21   transferred to an agent where there is no live person

22   there.

23   Q.   Okay.  Is it your opinion that the proposed

24   class -- strike that.

25     Is it your opinion that plaintiff's proposed class

DEPOSITION OF JAN KOSTYUN

1    contained calls that were, in fact, not connected?

2         A.   Yes, I believe that's a high likelihood.

3    Q.   Okay.  How do you know that?

4         A.   Again, based on my experience, I know that

5    the call analysis done by platforms like TCN and other

6    dialers are not foolproof.  And that the logic that

7    they use can be misinterpreted.  And there is a regular

8    occurrence of calls sent to agents where the system

9    believes that there is a human on the other end, but

10   there isn't.

11   Q.   Okay.  Do you know?  Or is that your assumption?

12        A.   I know from observing prior evidence that

13   that's the case, yes.

14   Q.   You say in here, there are thousands of calls with

15   the disposition of "no answer" that represents calls

16   that were never actually connected.

17        Is that correct?

18        A.   That's correct.  I said that, yes.

19   Q.   And your -- your assumption is that the word

20   "connected" means calls in which an agent actually

21   spoke to a consumer, correct?

22        A.   No.  The term connected is used to refer to

23   calls that were completed at the receiving end.

24   Q.   I don't understand what that means.

25        A.   If you make a call to me and I press answer

1    on my phone.

2    Q.   Uh-hu.

3         A.   Then that call has been connected.

4    Q.   Okay.  What if I don't answer my phone?

5         A.   Depends on how your phone is setup.  If call

6    forwarding is setup to go to a voicemail, then that

7    call is still connected.

8    Q.   Okay.

9         A.   It could -- if the call is not answered, then

10   it's not connected.

11   Q.   So your -- why is it in the scenario when the call

12   is not answered, then it's not connected?

13        A.   If there is no call forwarding on a phone to

14   go to voicemail and the call to go to simply rings, and

15   the dialers don't let calls ring an unlimited number of

16   times, receiving phones also don't let calls ring an

17   unlimited number of times.  So if no voicemail is

18   setup, that where unanswered calls were forwarded to, a

19   call will be terminated before any answer occurs.

20   Q.   I understand.  So then no-answer designation is

21   from calls where the phone just rang and rang and rang

22   and nothing happened, and then the system just dumps

23   the call?

24        A.   In general, yes.

25   Q.   And your definition of connected is that that is

1    not a connected call, correct?

2         A.    Correct.

3    Q.    Okay.   Your definition of connected does include

4    voicemails, calls where a call is forwarded to a

5    voicemail, correct?

6         A.    That is generally understood to be a

7    connected call, yes.

8    Q.    So why do you say in here, there are also

9    thousands of calls with dispositions of voicemail that

10   could possibly represent calls that were connected,

11   which never had been transferred to an agent for

12   handling.

13        A.    Because as I understand it, the TCN system

14   was configured such that calls that were determined to

15   be voicemail should not have been transferred over to a

16   live agent.   But there was evidence that there were

17   calls in the disposition file, and in the proposed

18   class, that had a result of an answering machine had

19   been detected.

20   Q.    But I thought your testimony is an answering

21   machine or a voicemail is a connected call?

22        A.    It's a connected call, but it's still not a

23   call that should have been transferred to a live agent.

24   Q.    Okay.   But our class definition is connected

25   calls; do you agree?

DEPOSITION OF JAN KOSTYUN

1      A.   I believe that was the distinction.

2      However, because there was -- there were

3 inconsistencies between the result values that were

4 setup by the TCN dialer and the disposition codes.  And

5 the fact that calls were transferred over to live

6 agents, then it calls into question the accuracy of the

7 TCN system in determining whether or not calls were

8 connected.

9 Q.   Let's talk about that.  So in paragraph 34 of your

10 report, you talk about instances where there are

11 discrepancies between the clicker reports and the

12 disposition reports; is that correct?

13     A.   Okay, you --

14 Q.   I'm sorry, page 34.

15     A.   And which paragraph?

16 Q.   88.

17     A.   Yes, the discussion starts back on

18 paragraph 82.

19 Q.   Yes.  But this is the summary on 88 of examples

20 that you have identified where there are discrepancies

21 between the clicker report and the disposition report,

22 correct?

23     A.   Yeah.  I'm not trying to split hairs, but 88

24 is really just discussing the fourth example that I

25 provided, and is followed by the table.

DEPOSITION OF JAN KOSTYUN                    80

1    Q.   So the table is just floating there then?  It's

2    not part of 88?

3         A.   It's a result of the four examples that were

4    described in 85 through 88.

5    Q.   All right.  So for example, if you look at the

6    second number, 509-391-0706, the clicker report says

7    that the result of that call was busy, right?

8         A.   Yes.

9    Q.   And then the disposition report says that there

10   was no sale, not interested; correct?

11        A.   Correct.

12   Q.   And so you identify that as a discrepancy because

13   how can the consumer have said they were not interested

14   if it's a busy call, correct?

15        A.   Correct.

16   Q.   Did it ever occur to you that Gold Mountain was

17   placing multiple calls to the same telephone number?

18        A.   Yes, it definitely occurred that that was a

19   possibility.  Although it was my understanding that

20   that was not the business plan.

21   Q.   Did you ever check?

22        A.   I had no way to check.

23   Q.   Did you ever look for the same telephone number in

24   the clicker report before jumping to the conclusion

25   that there were inconsistencies between these two

```
 1   files?

 2        A.   Yes, I did.

 3   Q.   Okay.  So let's look at (509)391-0706.

 4        MR. HIRALDO:  Can you pull it up on yours or --

 5        MS. NATHAN:  Yeah.  Which one do you want to show

 6   him first?

 7        MR. HIRALDO:  I'm looking at CLKR_2018-1022-1027.

 8   Q.   Do you have the report in front of you,

 9   Mr. Kostyun?

10        A.   Yes.

11   Q.   Okay.  So the number that we're looking at is the

12   second telephone number that was identified in your

13   chart here on page 34 of your report, which is

14   (509)391-0706.

15        Now, if you do a simple control-F function for

16   that number, you'll see that it appears on line 16,808.

17   And go ahead and do that.

18        Do you see it there?

19        A.   And you said what row number?

20   Q.   16,808.

21        A.   Yes.

22   Q.   Now if you go -- click find next, do you see that

23   the number -- well, sorry.  Go back, if you would, to

24   the first one.

25        What is the -- what -- how is the system, the last
```

DEPOSITION OF JAN KOSTYUN

1  column is -- well, sorry.  Let me start over again.

2        The last column in this report is what?

3        A.   This is the reason code returned by the TCN

4  dialer.

5  Q.   Okay.  What is the reason code for this telephone

6  number on line 16,808?

7        A.   Machine hang up.

8  Q.   Okay.  And that's -- what does that mean?

9        A.   It means that the TCN system determined that

10  the call was answered by an answering machine, and that

11  the call was disconnected.

12  Q.   Okay.  Now hit find next, and tell me where you

13  see this 509 telephone number next within this chart?

14        A.   41,423.

15  Q.   Okay.  And what is the result of that call?

16        A.   Busy.

17  Q.   Okay.  And that's the result that you've

18  identified here in your chart, correct?

19        A.   Correct.

20  Q.   Now hit next.  Do you see the telephone number

21  again?

22        A.   Yes.

23  Q.   Okay.  And what is the result?

24        A.   Answered link call.

25  Q.   What does that mean?

DEPOSITION OF JAN KOSTYUN

1    A.   That means that they determined that the call

2    was connected, and determined that they thought there

3    was a human there, and it was transferred to an agent.

4    Q.   So should the 509 number have been included in

5    this chart here as an instance where there was a

6    discrepancy between the clicker report and the

7    disposition report?

8    A.   Yes.

9    Q.   Why?

10   A.   Well, because all of these calls appeared

11   with a call date of 10-25-2018.

12   Q.   Uh-hu.

13   A.   And all of the other identifying information

14   is the same, the same -- the same campaign number, the

15   two identifying numbers are the same.  There is no way

16   to distinguish between these rows.  So there is the

17   definite potential that the call was transferred over

18   to an agent based on this TCN result of a busy

19   condition.

20   Q.   There was a connected call on 10-25-2018 for the

21   509 number, right?

22   A.   There was a call that TCN interpreted to be

23   connected, and to be interpreted as a human answering

24   the call.  And as I explained, that's not an exact

25   science.

DEPOSITION OF JAN KOSTYUN

84

1    Q.    Okay.  And then there is a disposition that says

2    that there was no sale.

3         A.    Yes.

4    Q.    Okay.  Where is the discrepancy there?

5         A.    The discrepancy is that there is a record

6    that says that this call received a busy signal, and

7    that that call should never have been transferred to a

8    live agent.

9    Q.    But you never -- did you ever perform the function

10   that we just did, of looking to see if a telephone

11   number had been called more than one time?

12        A.    Absolutely.

13   Q.    So why didn't you include that in your report?

14        A.    Because that was not a discrepancy.  This is

15   the discrepancy.

16   Q.    You don't find your findings in this report to be

17   misleading to the court?

18        A.    I have no way to know whether or not the

19   no sale/not interested disposition is tied to the

20   result of busy or the result of answered link call.

21        All I know is that when I combine the records from

22   the clicker files and the disposition files, that there

23   are potential inconsistencies between the results.

24   Q.    What does your gut tell you about what the

25   no sale/no interested disposition, which of these calls

DEPOSITION OF JAN KOSTYUN                          85

1    it's related to?

2         A.   I don't have a gut on this.

3    Q.   How -- do you have an opinion on it, one way or

4    the other?

5         A.   Well, what I did was pure data analysis.  I

6    compared records with the same identification.  And the

7    entry in this table accurately reflects the connection

8    that there are two records; one in the clicker file and

9    one in the disposition file with all of the same

10   identifying information, but conflicting results.

11   Q.   So as you sit here today, you stand by the

12   analysis that you performed here; is that correct?

13        A.   Yes, I do.

14   Q.   You don't think there are any flaws in your

15   opinions?

16        A.   No.

17   Q.   Did you know if the same instance of multiple

18   calls is the case for these other telephone numbers

19   that you've identified in this chart?

20        A.   I believe each one of them had multiple

21   occurrences in the clicker records.

22   Q.   And you did not find -- you didn't believe that to

23   be important to include in your report?

24        A.   Well, the report, that section that I'm

25   addressing here, involves discrepancies that were found

DEPOSITION OF JAN KOSTYUN

86

1    and questions about the reliability of the data.

2    Q.    There is no -- there is no issue with the

3    reliability of this data when there are multiple calls

4    and one of them is actually connected which results in

5    a disposition; is that correct?

6         A.    No, you're making the assumption that the

7    call that shows a not interested disposition is tied to

8    the answered link call result from TCN.  And there is

9    no reason to make that assumption.

10   Q.    Other than common sense?

11        A.    Well, common sense doesn't drive the data;

12   it's the results that occurred that drive the data.

13   And there are potential results that there are

14   inconsistencies between these.

15   Q.    Is this a sworn report that you've entered into

16   this case?  Under penalty of perjury?

17        A.    Yes.

18   Q.    And as you sit here today, you have no amendment

19   or corrections that you'd like to make to this chart

20   that you've identified discrepancies in?

21        A.    No.

22   Q.    Okay.  Do each one of these telephone numbers

23   identified in your chart have an instance of answered

24   link call within the clicker reports?

25        A.    I don't recall.

DEPOSITION OF JAN KOSTYUN                87

1    Q.   Well, let's go through each one then.

2         Let's look next at the same chart, perform a

3    control-F function for me for the (231)343-6911 number.

4    And the first instance of that number appears on

5    line 15,774, correct?

6         A.   With no answer.

7    Q.   Right.  Now, find next.  What do you -- what do

8    you see that next telephone number appear?

9         A.   Row 26,715, machine hang up.

10   Q.   Okay.  And that's what is reflected in your chart,

11   correct?

12        A.   No.  I have -- oh, yes, it is.  Sorry.

13   Q.   Okay.  Find the number again, please.

14        A.   Another machine hang up.

15   Q.   Okay.  And one more time.

16        A.   Answered link call.

17   Q.   And you did not find it important to note in your

18   report that this telephone call had an answered link

19   call reflected in the clicker report?

20        A.   Well, there are thousands of entries in here

21   that have a result of answered link call where they

22   were apparently correctly transferred over to an agent.

23        What this table notes, in these examples, is -- do

24   is point out the potential problems that there may have

25   been records that either were incorrectly interpreted

DEPOSITION OF JAN KOSTYUN                    88

1    by the TCN dialer or were incorrectly transferred over

2    to an agent.  And again, this is one of those examples.

3    Q.   That's your opinion, right?  That there are errors

4    in the records and not in your analysis?

5         A.   Yes.

6    Q.   Okay.  Let's look at the next file.  If you

7    could -- somebody could pull it up over there.  It's

8    the 2018-1029 through 11-03.

9         And let's look at the first number, which is

10   (509)391-0706.

11        A.   We already looked at that one.

12   Q.   Sorry.  Let's look at the first number,

13   (304)614-4925.

14        And before you do that, is the result of answered

15   link call what causes that call to be placed in a

16   disposition record?

17        A.   No.

18   Q.   Right.  It's the agent's designation, correct?

19        A.   Correct.

20   Q.   Okay.  All right.  Let's look at the number.

21        Where do you see the first instance of the 304

22   number appear within this chart, which is

23   CLKR_2018-1029-1103?

24        A.   I see an occurrence in Row 9,314 with failed

25   refused.

DEPOSITION OF JAN KOSTYUN

```
 1    Q.    And that's what's reflected in your report,

 2    correct?

 3         A.    Yes.

 4    Q.    And what's the next instance of that number?

 5         A.    Row 11,073, answered link call.

 6    Q.    Okay.  Why is that not reflected in your report?

 7         A.    Because this report identified the potential

 8    discrepancies.

 9    Q.    Okay.  And then let's look at the next number,

10    which is (813)713-2108.

11         And tell me where you see the first instance of

12    that number, and what is the result of that call?

13         A.    Looks like row 8,807 with a result of no

14    answer.

15    Q.    And what is the next instance of that number

16    within this report, and what is the result?

17         A.    Row 11,095, with a result of answered link

18    call.

19    Q.    And again that's not reflected in your chart?

20         A.    The first discrepancy was reflected.

21    Q.    Only the first discrepancy?

22         A.    Yes.

23    Q.    Okay.

24         MR. HIRALDO:  Should we break for lunch?

25         MS. NATHAN:  If it's a good stopping point for
```

DEPOSITION OF JAN KOSTYUN          90

```
 1   you.

 2        MR. HIRALDO:  Yeah.

 3

 4        (Whereupon, a lunch break was taken.)

 5

 6   BY MR. HIRALDO:

 7   Q.   All right.  Mr. Kostyun, your testimony earlier

 8   was that you reviewed 230 CSV lead files, correct?

 9        A.   Yes.

10   Q.   Okay.  If you look at paragraph 66 of your amended

11   report, in it you say, in part, the calls that

12   plaintiff has included in his proposed class were made

13   to the leads for the -- then you have a file name

14   there, which I'm not going to read, which consist of

15   11 files and a total of 81,092 lead records.

16        Do you see that?

17        A.   Could we take a quick break?

18   Q.   Yeah, you got a cramp?

19        A.   No, these reports kind of got jumbled,

20   jumbled up from going over those tables.

21        MS. NATHAN:  How did this get here?

22        MR. HIRALDO:  I might have printed it out.

23        A.   Okay.  I'm sorry, you were at where?

24   Q.   66.

25        A.   Okay, I'm at 66.
```

DEPOSITION OF JAN KOSTYUN

1    Q.   And in it you make reference to 11 lead files

2    consisting of 81,092 lead records.

3         Do you see that?

4         A.   Yes.

5    Q.   Are those the lead records you reviewed when

6    making the determination that there were missing lead

7    files?

8         A.   Well, what this represents is all of the CSV

9    files that had the Choice inactive campaign name

10   included in them.  Which is, my assumption, the one

11   that you used to generate the dispositions.

12        So initially when I was comparing, when I was

13   looking for the missing lead information, I compared it

14   against these files.  When I didn't find them in these

15   files, I looked for those numbers across the entire

16   universe of all of the produced lead files, and didn't

17   find them in those either.

18   Q.   Understood.  Okay.

19        All right.  Let's look now at paragraph 94 of the

20   report.  All right.  In it you state, in part, that the

21   TCN manually approved calling system could be producing

22   invalid clicker record result values.

23        Do you see that there?

24        A.   Yes.

25   Q.   Okay.  What do you base that on?

DEPOSITION OF JAN KOSTYUN

1    A.   I base it partially on the inconsistencies

2  that I found in the examples that we had previously

3  discussed, where there appeared to be the possibility

4  of clicker result values that ended up in the hands of

5  Gold Mountain agents and had dispositions associated

6  with them.

7  Q.   Are you referring to the chart where we reviewed

8  previously where you omitted all of the call records

9  from the clicker report?

10    MS. NATHAN:  Objection to form.

11    A.   I'm referring to the chart where I noted the

12  inconsistencies between the clicker records and the

13  associated disposition records that were with same

14  telephone number.

15  Q.   Okay.  Besides that, what else do you rely on to

16  make this conclusion?

17    A.   There were, if I remember correctly, there

18  were other problems with clicker records where I

19  believe there were ones that appeared to have results

20  associated with them that, once again, should not have

21  been transferred over to the calling agents.  And to

22  the best of my recollection, those -- that was the

23  basis for that inconsistency.

24  Q.   What -- give me an example of an instance where a

25  call should not have been transferred to an agent?

DEPOSITION OF JAN KOSTYUN

1      A.   Well, any of the disposition -- or any of the

2  records that ended up in the class file of 24,969 that

3  had -- that translated to a clicker result value other

4  than answered link call, were calls that should not

5  have ended up with a Gold Mountain agent.

6  Q.   Are you talking about the instances that you

7  referred to before?  Your chart?

8      A.   Those would be examples.  But as I recall,

9  those were not the only examples of result values that

10 ended up in the 24,969 value that did not have -- that

11 were other than answered link call.

12 Q.   Okay.  Give me another example.

13     A.   I don't have the data at hand right now.

14 Q.   As you sit here today, can you give me any

15 concrete examples that support this opinion, besides

16 your reference to your chart under paragraph 88?

17     A.   I don't see the exact reference in the report

18 right now.  But if I remember correctly, we had an

19 earlier discussion about several thousand records that

20 had a result value of no answer that were part of the

21 class representation.  And that would be, again, one of

22 the large examples of the inconsistencies in records

23 that should not have been there.

24 Q.   Result value of no answer in the disposition

25 report, correct?

DEPOSITION OF JAN KOSTYUN

94

1      A.   No, the no answer was the result value which

2   is part of the clicker file.

3   Q.   So there are -- your testimony is that there

4   are -- well, in that instance, did you check to see if

5   there were multiple calls to those numbers, one of

6   which was an answered link call disposition?  Or

7   results rather, not disposition.

8      A.   Yeah, I don't recall whether I did that

9   analysis or not.

10  Q.   Okay.  You don't remember.

11     Right.  So your report on paragraph 81 talks about

12  dispositions of no answer.  Is that what you are

13  referring to?

14     A.   Yes, that's correct.

15  Q.   Okay.  Are you aware of any instance where there

16  is a record for a call in a disposition report that

17  doesn't have a corresponding answer link call record in

18  a clicker report?

19     A.   I'm not sure if I did that analysis.

20  Q.   So you're not aware of any instance, correct?

21     A.   Yeah, that's an analysis that -- no, that I

22  didn't do, so I wouldn't know the results of it.

23  Q.   Now, going back to paragraph 94.  In it you also

24  state, in part, the Gold Mountain agents could be

25  producing disposition records with invalid disposition

1    values.

2         Do you see that there?

3         A.   Yes.

4    Q.   What does that mean?

5         A.   What it means is that it's a manual process

6    for them to select from a drop-down list what the value

7    of the -- or what the disposition result was to reflect

8    the nature of the call that they had with the customer.

9         So just based on that, with manual selection there

10   is kind of an inherent possibility for those results to

11   incorrectly identify what their interaction with the

12   customer was.  There is also, based on the existence of

13   the potential conflicts between the disposition codes

14   and the result codes that we had talked about, those

15   four examples from the table, if the TCN result value

16   was actually correct, then the disposition code that

17   was recorded on there would not be correctly reflected

18   of the conversation.

19   Q.   Can you give me a concrete example?

20        A.   Yes.  In the table that appears in -- at the

21   end of paragraph 88, we have a result value of

22   failed/refused and a disposition of no sale/not

23   interested.  Well, if the result value was

24   failed/refused, the call should not have gone to a

25   handling agent, and so a disposition code of

DEPOSITION OF JAN KOSTYUN

 1    not -- no sale/not interested would be invalid for that

 2    scenario.

 3    Q.   And here again, you're ignoring the subsequent

 4    call that was made to that number, which resulted in

 5    answered link call, correct?

 6         MS. NATHAN:  Objection to form.

 7         A.   I wouldn't say I'm ignoring it.  I would say

 8    that this combination, based on the data values, is

 9    just as possible a result as the result of the

10    disposition no sale/not interested being associated

11    with an answered link call.

12    Q.   So you're choosing which data to evaluate for

13    purposes of reaching your opinion, correct?

14         A.   No.  I was asked to report on potential

15    inconsistencies, and that's what's reported here.

16    Q.   In creating this chart and the example you just

17    gave me, did you consider the fact that there was a

18    subsequent call to that number that resulted in an

19    answered link call?

20         MS. NATHAN:  Objection to form.

21    Q.   Result?

22         A.   Yes, I considered that.

23    Q.   Why didn't you include that in your report?

24         A.   Because it didn't reflect an inconsistency.

25    These are the results that reflected an inconsistency.

DEPOSITION OF JAN KOSTYUN

1   Q.   So you chose only to show partial information to

2   create an inconsistency?

3        A.   Well, there are literally billions of

4   combinations of potential results, based on the data

5   that's available.  I certainly -- every time I

6   presented an example of an inconsistency or a problem,

7   I certainly couldn't present the billions of other

8   results that were possibly correct or possibly

9   inconsistent.

10  Q.   We looked at earlier for the (304)614-4925 number,

11  there were two calls placed to that number, that's the

12  first number that appears on your chart.

13       Can you explain to me how there are a billion

14  combinations of that telephone number being called when

15  comparing it to the disposition report?

16       A.   No.  The reference to the billions of

17  combinations was the possible combinations of all the

18  data that's involved in this case.

19       So every time I present a result of some analysis,

20  I can't present all of the other possible combinations

21  that could have been involved with other numbers that

22  might be similar or might somehow be related to it.

23  Q.   There were two calls placed to the 304 number on

24  10-29-18, right?

25       A.   That's my recollection, yes.

DEPOSITION OF JAN KOSTYUN

1    Q.   And then one disposition value, correct?

2         A.   Yes.

3    Q.   How many combinations can you have in that

4    scenario?

5         A.   Two combinations.

6    Q.   Okay.

7         A.   And I might add that both of those

8    combinations, based on the data that's available, have

9    in, my opinion, an equal probability of happening.  So

10   it was my decision to report on the inconsistencies

11   that could possibly call into question the value of the

12   data.

13   Q.   Why would you say there is an equal probability of

14   occurrence?

15        A.   Because there is no other data to distinguish

16   what the relationship was between those two clicker

17   records.

18   Q.   That's it?

19        A.   Yes.

20   Q.   Okay.  Let's look at paragraph 95.  In it you

21   state in part, for example, telephone number

22   (305)790-5546 appears in the clicker records, and is

23   identified as part of the Choice inactive wireless

24   campaign.

25        And so you're talking about an instance where a

DEPOSITION OF JAN KOSTYUN

```
 1    telephone number appears in -- strike that.
 2         What are you talking about in this paragraph?
 3         A.   I'm talking about potential calls that were
 4    not included in your -- in the plaintiff's 24,969
 5    proposed class.  That there are combinations of clicker
 6    records and dispositions that could have been included,
 7    and could have reflected actual calls that were
 8    completed, and calls that were handled by a downstream
 9    handling agent that were not included.  And this is an
10    example of one of them.
11    Q.   How many examples did you identify of this
12    instance?
13         A.   This was the only one.
14    Q.   Okay.  Now moving onto paragraph 96.
15         In the last sentence of that paragraph, you talk
16    about -- you say, when comparing the call record result
17    values to the disposition record, disposition values,
18    for call records from all campaigns, I found evidence
19    of conflicting result disposition combinations for tens
20    of thousands of call records?
21         Do you see that?
22         A.   Yes.
23    Q.   Does this analysis that you performed here impact
24    the proposed class definition in any way?
25         MS. NATHAN:  Objection to form.
```

DEPOSITION OF JAN KOSTYUN

1    A.   Well, as far as the specific records that are

2    included in the proposed class definition, it would not

3    change the existence or the number of -- the number of

4    conflicting instances that are in there.

5        However, what it does is it, when it shows that

6    those conflicting instances were not isolated just to

7    the Choice inactive campaign, that they were -- broadly

8    appeared across the entire universe of call records.

9    Q.   So then the answer to my question is that this,

10   this analysis here that you're discussing does not have

11   an impact with respect to the records that are at issue

12   for the proposed class definition, correct?

13       A.   No, I won't agree with that statement because

14   you questioned earlier the fact that there were

15   multiple clicker records associated with a single

16   disposition code, and implying that the answered link

17   call result would have been the proper one to associate

18   with the disposition code that was found.  However,

19   just the fact that these inconsistencies were very

20   broad across the entire class, increases the likelihood

21   that those are actually valid inconsistencies that I

22   drew as examples.

23   Q.   Are you saying that a result of answered link call

24   means that that call should or should not be in a

25   disposition report?

1        A.    That it should be in the disposition report.

2   Q.    Okay.  All right, let's look at paragraph 97.

3        You talked about duplicate records.  And you say,

4   plaintiff's class of 24,969 call records also contains

5   thousands of instances of duplicate records.

6        What you do you mean by that?

7        A.    Records where all the data values were the

8   same.

9   Q.    And why is that an issue?

10        A.    Well, the proposed class presumably

11   identifies calls that were made in violation.  If all

12   of the data for an individual telephone number is the

13   same, then there is no way to distinguish whether that

14   represents multiple calls or just a single call or

15   whether somehow the data was incorrectly produced.

16   Q.    And when you arrived at this conclusion, did you

17   do any comparison with the clicker reports?

18        A.    I don't believe so.

19   Q.    Okay.  Based on your review of the clicker

20   reports, do you know if Gold Mountain agents were

21   placing multiple calls to the same telephone numbers?

22        A.    That was not an analysis that I was asked to

23   perform and I don't believe I performed that.

24   Q.    Okay.  Do you know if Gold Mountain agents were

25   placing multiple calls to the same telephone numbers?

DEPOSITION OF JAN KOSTYUN          102

```
 1        A.   No, I don't know whether they were or whether
 2   they were not.
 3   Q.   Do you know if these instances of multiple -- of
 4   duplicate records are the result of multiple calls
 5   being placed to those telephone numbers by
 6   Gold Mountain agents?
 7        A.   Well, if I don't know whether or not they
 8   placed multiple calls, then I couldn't know whether it
 9   affected it.
10   Q.   So the answer is "no"?
11        A.   The answer is no.
12   Q.   Going back to that chart at the bottom of
13   paragraph 88.  We confirmed that there were multiple
14   calls to those telephone numbers, correct?
15        A.   We confirmed that there were multiple clicker
16   records for those telephone numbers.
17   Q.   And what do the clicker records represent?
18        A.   Clicker records represent records that were
19   produced out of the TCN system, reflecting potential
20   calls made to those numbers.
21   Q.   Attempted calls?
22        A.   Potential calls.
23   Q.   Okay.  Do you have any indication of any instance
24   where the TCN platform created a clicker record for a
25   call that was not attempted?
```

DEPOSITION OF JAN KOSTYUN                    103

1          A.   I don't know if it would be possible for me

2     to make that analysis.

3     Q.   So you don't know?

4          A.   No.  In the same way that I don't know

5     whether Elvis is still alive or not.

6     Q.   Let's look at paragraph -- page 39, which is the

7     TransUnion, is where the TransUnion section of your

8     report starts.

9          And so preliminary my question to you is:  Did you

10    use the TransUnion platform to perform any sort of

11    ascertainability analysis for the punitive class

12    members?

13         A.   Well, that's kind of a broad question that I

14    can interpret a number of different ways.  Maybe you

15    can be a little more specific.

16    Q.   Did you use -- did you manipulate the class data

17    using TransUnion in any way?

18         A.   I don't know what you mean by "manipulate."

19    Q.   Did you use the class data in any way as it

20    relates to the TransUnion services provided?

21         A.   Yes, I took a subset of the class data and

22    ran it through a TransUnion batch process to identify

23    associated names and addresses with those telephone

24    numbers.

25    Q.   How many numbers did you analyze using TransUnion?

DEPOSITION OF JAN KOSTYUN

1    A.   I don't recall specifically, but I believe it

2    was in the range of just over 20,000.

3    Q.   Where are the results of this analysis that you

4    performed?

5    A.   They are recorded in this report.

6    Q.   Okay.  Where is the actual printout from

7    TransUnion showing these instances of -- showing the

8    batch analysis that you performed?

9    MS. NATHAN:  Objection to form.

10    A.   I have the results on my personal computer.

11    Part of my contract with TransUnion doesn't allow me to

12    disclose the actual data.  It only allows me to perform

13    comparisons between TransUnion data and an external

14    source.

15    Q.   If I wanted to check the analysis that you

16    performed, how would I be able to do that?

17    A.   I could produce a redacted version, possibly,

18    of the results that I received from TransUnion.

19    Q.   Okay.  Is there any specialized skill that is

20    needed to perform the functions that you performed

21    using the TransUnion platform?

22    A.   I'm sorry, maybe you have to explain to me a

23    little bit more what you mean by "specialized skill."

24    Q.   Can I perform the batch upload process that you

25    performed using TransUnion?

DEPOSITION OF JAN KOSTYUN                    105

```
 1        A.   Well, the use of the TransUnion platform

 2   requires quite an involved process, as far as applying

 3   for that capability, and there is actually a pretty

 4   complex vetting process that they go through to allow

 5   somebody access.

 6   Q.   How is a vetting process a skill?

 7        MS. NATHAN:  Objection to form.

 8        A.   Well, part of the vetting process is they

 9   require me to provide proof that I have a valid need

10   for that access to that data.  I had to provide them

11   evidence of my -- my business existence.  I had to

12   provide them with some sample cases that I had worked

13   on in the past.

14   Q.   Okay.

15        A.   They had to perform a site visit of my

16   environment to verify that it was adequate to house the

17   data that I access.

18   Q.   Did somebody from TransUnion actually visit your

19   office?

20        A.   A representative that was contracted by

21   TransUnion did.

22   Q.   Okay.  After this vetting process is completed, is

23   there any specialized skill that is needed to perform

24   the batch upload process that you did using TransUnion?

25        A.   Well, there is some specialized skill
```

DEPOSITION OF JAN KOSTYUN

1    involved in being able to select the subset of data

2    that was available.  There were -- as I said, there

3    were duplicate records in the proposed class.  There

4    were also records that did not have lead data

5    associated with it, so I did some de-duplication.  I

6    did some elimination of the records that I knew didn't

7    have lead records associated with them.  So there were

8    certainly was specialized skill involved with that.

9        And there was also the analysis process, working

10   with the representative of TransUnion to decide the

11   type of batch process and the type of data that was

12   going to be returned.

13   Q.   Did you receive any training from TransUnion prior

14   to conducting your batch upload process?

15       A.   There was no formal training, but again there

16   was quite a bit of discussion with their sales

17   personnel, and also with their technical personnel to

18   talk about the types of data that they had available

19   and the types usage that I would be performing in some

20   of the batch queries.

21   Q.   Did you receive any type of training, whatsoever,

22   regarding the TransUnion platform prior to performing

23   your batch upload process?

24       A.   Yes.  Again, in those discussions it would

25   have qualified as training to be able to understand

DEPOSITION OF JAN KOSTYUN                107

1    what was available in their product suite and their

2    technical repository of data.

3    Q.    Besides that, did you receive any other type of

4    training?

5         A.    No, I'm not aware that they offer any

6    additional training beyond that.

7    Q.    How many times have you used the TransUnion

8    platform to perform batch upload analysis?

9         A.    I would estimate two to three times.

10   Q.    And when you were performing the batch analysis,

11   you were doing it for purposes of identifying what type

12   of information?

13        A.    Well, the batch process that I performed,

14   again, was providing them with a list of telephone

15   numbers, and having them return to me up to five owners

16   associated with those telephone numbers.  Each owner

17   had address information and date ranges associated

18   with -- where the owner was associated with the

19   telephone number.

20   Q.    Right.  That analysis that you performed though,

21   is that -- is it subscriber and/or user identification?

22        A.    They don't -- they don't use those terms.

23   They basically identify that the names they are

24   returning are individuals that were associated with the

25   telephone number.

DEPOSITION OF JAN KOSTYUN

```
 1    Q.   Okay.  Do you use that terminology?  Subscriber
 2    user identification?
 3         A.   Do I personally use it?
 4    Q.   Yes.
 5         A.   Yes.
 6    Q.   Okay.  You used it prior reports, correct?
 7         A.   Yes.
 8    Q.   So were you conducting a user/subscriber
 9    identification analysis when using TransUnion?
10         A.   I was performing, basically, exploratory
11    analysis to see what type of subscriber and -- or user
12    information could be returned from a vendor like
13    TransUnion, to see whether it might be useful in
14    ascertaining members of a class.  And also whether or
15    not it might introduce problems in ascertaining members
16    of a class.
17    Q.   And you said you've used TransUnion two to three
18    times.  When was the first time you used TransUnion?
19         A.   The first time I used it was performing a
20    test batch when I was applying for access to it, and it
21    would have been probably two months ago.
22    Q.   Okay.  The last time I took your deposition you
23    had no experience with TransUnion; is that correct?
24         A.   I had no experience with using their batch
25    process.
```

1    Q.   And the first instance where you used TransUnion,

2    were you supervised by anyone or did you use it by

3    yourself?

4         A.   Well, by supervision, again, there are batch

5    data representatives that work in conjunction with

6    users such as myself when the jobs are set up.  So

7    effectively, I was supervised by that person.

8    Q.   In the second instance where you used the

9    TransUnion platform, when did that occur?

10        A.   Probably a month ago.

11   Q.   And how many telephone numbers did you analyze

12   during that second instance?

13        A.   I believe there were roughly 5,000.

14   Q.   How many telephone numbers did you analyze in the

15   first instance?

16        A.   Roughly 100.

17   Q.   Okay.  And were you supervised in any way during

18   the second time you used the platform?

19        A.   The process is the same.  Each time a batch

20   is run, it wasn't quite as complex because the

21   subsequent batch processes that I ran were effectively

22   the same as the first one.

23   Q.   Okay.  How do you know that you were using the

24   platform correctly?

25        A.   Well, through the discussions with the batch

DEPOSITION OF JAN KOSTYUN

110

```
 1    processing expert, there were -- there was quite a bit
 2    of back and forth, as far as what my desired objectives
 3    were.  And it was understood that by providing them
 4    just with a list of telephone numbers, that they would
 5    be able to process those against their databases and
 6    provide me with the list of up to five users that I
 7    described before.
 8    Q.   Okay.  Have you ever used LexisNexis to perform a
 9    subscriber user identification process?
10        A.   I've used LexisNexis in at least two
11    instances to retrieve what they refer to as a full-file
12    disclosure.  It's not a batch process.  It's an
13    individual process where you provide identifying
14    information for an individual, and they provide back a
15    full set of their internal data that they have
16    associated with that individual, including telephone
17    numbers.
18    Q.   Is there any specialized skill needed to use the
19    LexisNexis platform?
20        A.   If I were performing batch processes with
21    LexisNexis, then there would be similar types of skills
22    as what I described with TransUnion.  For the full-file
23    disclosure, there is no particular skill in requesting
24    it but there is quite a bit of skill in analyzing the
25    results.
```

DEPOSITION OF JAN KOSTYUN                    111

1    Q.   The skills that you are -- the skill that you

2    identified, with respect to TransUnion, were related to

3    the vetting process; is that correct?

4         A.   I think that was one aspect of it, but then

5    we also discussed the fact that there is a lot of

6    interaction in setting up the batch jobs and in

7    determining what the inputs and the outputs would be.

8    Q.   And you received the training for that in

9    how -- what length of time, how long was that?

10        A.   I don't have a specific -- a specific number,

11   but it probably involved half a dozen conversations

12   between and probably some additional e-mails going back

13   and forth.

14   Q.   For a total of how much time?

15        A.   I didn't measure it.

16   Q.   Was it an hour?

17        A.   I didn't measure it.

18   Q.   Two hours?

19        A.   I didn't measure it.

20   Q.   You don't recall?

21        A.   Correct.

22   Q.   And with respect to LexisNexis, have you received

23   any type of training?

24        A.   I've been aware of LexisNexis batch

25   capability in multiple cases in the past.  So even

DEPOSITION OF JAN KOSTYUN                    112

1    though I haven't performed the analysis myself, I've

2    seen the result of analysis in many cases, and I've

3    been able to do comparisons of their results against

4    other data sources.

5    Q.   Okay.  But I'm talking about using the platform.

6    What type of training, if any, have you received with

7    respect to using the platform?

8         A.   Again, I don't use their platform in a batch

9    mode so I haven't received any training in that

10   respect.

11   Q.   You've never used the LexisNexis platform for a

12   batch user/subscriber process?

13        A.   That's correct.

14        Again, that's typically a process that plaintiff

15   expert would use or a class-action administrator in

16   trying to provide what I have found to be inaccurate

17   results of associations between individuals and

18   telephone numbers.

19   Q.   Have you ever been involved in anyway in the

20   process of having a class-action administrator perform

21   user/subscriber identification?

22        A.   You have to be a little more specific on

23   that.

24   Q.   Okay.  It's a very broad question because I want

25   to know if you've had any involvement, whatsoever, in

DEPOSITION OF JAN KOSTYUN                    113

1    any case at any point in time, where a class

2    administrator was performing a subscriber/user

3    identification process, using either Experian or Lexis

4    or TransUnion or any other data base?

5        A.   Again, I've been involved in a number of

6    cases where experts have performed that type of

7    analysis in order to be fed into a potential

8    class-action identification process.  So in my mind,

9    that is effectively the same as that -- as would be

10   used in actual class-action identification.

11   Q.   Well, I'm talking about administrators, not

12   experts.

13       A.   At least one of the plaintiff experts that I

14   have rebutted in the past is also a class-action

15   administrator, so I'm familiar with her work and

16   familiar with the process that she's gone through with

17   LexisNexis in preparing that data as a preliminary feed

18   into a class identification list.

19   Q.   Have you ever provided an opinion in which you

20   have agreed with a proposed subscriber/user

21   identification process to be performed by a

22   class-action administrator?

23       A.   Well, agreeing with the process is very

24   broad.  But I can say that in virtually every case that

25   I've been involved with where a plaintiff's expert has

DEPOSITION OF JAN KOSTYUN

114

1    proposed a methodology for identifying potential class

2    members, I have found inaccuracies with the results.  I

3    have found shortcomings in the methodology, and I've

4    generally expressed the opinion that the data sources

5    that they attempt to use are not reliable.

6    Q.   And I understand that, but my question is:  Is

7    there any instance where you have agreed or approved or

8    signed off, whatever terminology you want to use, with

9    a proposed subscriber/user identification process to be

10   performed by a class-action administrator?

11        A.   I've never been asked to sign off on any type

12   of action like that.  So the answer would be no.

13   Q.   Okay.

14        MR. HIRALDO:  Let's take a quick bathroom break.

15

16             (Whereupon, a break was taken.)

17

18   Q.   So we were speaking about the LexisNexis platform.

19   My understanding from your testimony is you have never

20   used it for a reverse-append batch process; is that

21   correct?

22        A.   I have never performed a batch process

23   directly by submitting numbers to LexisNexis and

24   reviewing the results.  I have reviewed the results

25   many times where other people have submitted the

DEPOSITION OF JAN KOSTYUN                    115

```
 1    request.
 2    Q.    When I say "reverse-append," you understand that
 3    to mean the same thing as the process of identifying
 4    subscriber-user information, correct?
 5          A.    Yes, the attempted process.
 6    Q.    Okay.  Have you ever MicroBilt to perform a
 7    reverse-append process?
 8          A.    I have not.
 9    Q.    Have you ever used Experian to perform a
10    reverse-append process?
11          A.    I have not.
12    Q.    With respect to TransUnion, are you aware of the
13    different products that they offer?  The different
14    reverse-append products?
15          A.    Yes, I am.
16    Q.    Okay.  Are you aware with the different levels of
17    access that they provide?
18          A.    Yes, I am.
19    Q.    What are the different levels of access?
20          A.    Basically they have a standard access, and
21    they have an access that's referred to as TLO.  And TLO
22    is considered to be their highest level of data access.
23    Q.    Did you obtain TLO access during this vetting
24    program that you previously discussed?
25          A.    Yes.
```

DEPOSITION OF JAN KOSTYUN

116

1    Q.   Now, your report identifies instances of

2    discrepancies between the lead files in this case and

3    the information that was returned to you by TransUnion;

4    is that correct?

5        A.   That is one aspect of inconsistencies that

6    were reported, yes.

7    Q.   Now these inconsistencies that you observed, do

8    you know if those were inconsistencies that were in the

9    lead file, or inconsistencies or an error with the

10   TransUnion information that was provided to you?

11       A.   To my knowledge, without some type of

12   individualized investigation, there is no way to

13   determine which of those would be the overriding factor

14   if either one was correct.

15   Q.   So as far as you know, the lead files could be

16   accurate, and the TransUnion information could be

17   inaccurate, correct?

18       A.   Yes.  And as far as I know, both pieces of

19   information could be inaccurate.

20   Q.   Okay.  Did you perform any analysis in this case

21   to determine which, if any, of the telephone numbers

22   within the lead files are cellular telephone numbers?

23       A.   Yes, I did.

24   Q.   Okay.  And what were the results of your findings?

25       A.   I did not record the results and I did not do

DEPOSITION OF JAN KOSTYUN

1   a thorough investigation.  I did more of a sampling

2   process, and in the sampling, I found that there were

3   some instances of landline telephone numbers included

4   in the -- in the proposed class, the 24,969 data.

5   Q.   Is that reflected in your report?

6        A.   No, it's not.

7   Q.   Why not?

8        A.   I performed that analysis on my own and

9   counsel did not request --

10       MS. NATHAN:  I'm going to object to the extent

11  that you discuss communications you had with counsel

12  regarding draft reports.

13  Q.   Okay.  So what were the results of this analysis

14  that you performed?

15       A.   The results, as I said, were that I found

16  that there were some landlines that were included in

17  the samples that I selected.

18  Q.   How many?

19       A.   I do not recall.

20  Q.   Okay.  Besides using TransUnion to perform a

21  reverse-append process, did you use any other databases

22  to perform reverse-append for the class data in this

23  case?

24       A.   Nothing in a large volume of data.  I may

25  have taken some individual telephone numbers and done

DEPOSITION OF JAN KOSTYUN                        118

1    some individual web-based lookups on them.  But nothing

2    of any significants.

3    Q.   All right.  Let's turn to page 50 of your report,

4    please.

5         What is your understanding with respect to the

6    class period for this case?

7         A.   Well, I see it's documented here as

8    October 9, 2018, to January 28, 2019.  I believe that

9    might have come from your motion for class

10   certification, but I do not recall the source exactly.

11   Q.   Do you understand that time period to be the time

12   period during which the calls were made to the punitive

13   class members?

14        A.   I believe that represents the time period of

15   the calls that were identified in the proposed

16   24,969 class data.

17   Q.   Okay.  And then today is June 5, 2019, so you

18   would agree with me that the earliest instance of calls

19   to punitive class members occurred approximately

20   eight months ago, correct?

21        MS. NATHAN:  Objection to form.

22        A.   You're referring to the start date of

23   October 9, 2018?

24   Q.   Correct.

25        A.   Yes, that sounds roughly right.

DEPOSITION OF JAN KOSTYUN

```
1    Q.   Okay.  And with the latest instance of a call to a

2    appear to a class member being approximately

3    five months from today, correct?

4         A.   Yes.

5    Q.   Okay.  What is the shortest period of time that

6    you're aware of for which carriers keep telephone

7    subscriber information?

8         A.   In some cases after a subscriber drops a

9    telephone number, I'm aware that there are some

10   carriers that may not keep it at all.

11   Q.   Which carriers are those?

12        A.   If I remember correctly, I believe I saw

13   testimony from a representative from Metro PCS that

14   indicated that that was the case.

15   Q.   That they immediately discard subscriber

16   information the second the individual terminates his or

17   her plan?

18        A.   Well, that would -- assume that I understood

19   the actual programs that maintain that information.

20   But the implication was that there was no guarantee

21   that that information would be available any time after

22   the subscriber drops the service.

23   Q.   Do you know?

24        A.   What I know is what I just described.

25   Q.   Okay.  So you don't know with a hundred percent
```

DEPOSITION OF JAN KOSTYUN                      120

```
 1    certainty; is that correct?
 2         A.    I know with a hundred percent certainty that
 3    I heard that testimony.
 4    Q.    How long -- where did you hear that testimony?
 5         A.    It was in another related case, and I don't
 6    know the specific case.
 7    Q.    When did you hear that testimony?
 8         A.    Probably some time within the past 12 months.
 9    Q.    You don't remember what case it was in connection
10    with?
11         A.    Correct.
12    Q.    Who was the individual testifying?
13         A.    I don't recall a name, but he was the records
14    custodian for Metro PCS.
15    Q.    Do you know for how long AT&T keeps subscriber
16    information?
17         A.    I don't recall offhand.
18    Q.    Do you know for how long Verizon keeps subscriber
19    information?
20         A.    I don't recall offhand.
21    Q.    Do you know for how long Sprint keeps subscriber
22    information?
23         A.    I don't recall offhand.
24    Q.    Do you know for how long T-Mobile keeps subscriber
25    information?
```

DEPOSITION OF JAN KOSTYUN

121

```
1         A.   I don't recall offhand.
2    Q.   Do you know for how long US Cellular keeps
3    subscriber information?
4         A.   I don't recall offhand.
5    Q.   Now, within your report, you discuss the process
6    of issuing subpoenas to carriers for the purpose of
7    obtaining historical subscriber information, correct?
8         A.   Correct.
9    Q.   And your opinion is, in part, that sending
10   thousands of telephone numbers to smaller carriers
11   would prove overly burdensome for them, and could very
12   well result in no data being provided by such carriers.
13   Correct?
14        A.   Could you refer me to where you're reading?
15   Q.   Paragraph 115 of your report.  Second
16   sentence -- no, third sentence.
17        A.   Yes.
18   Q.   Okay.  What do you base that opinion on?
19        A.   Experience with carriers.  Understanding that
20   the job of responding to subpoenas is one that's
21   essentially considered overhead with telephone
22   companies and that they certainly don't make any money
23   off of it, so it's not the foremost reason why they're
24   in business.  In fact, it's probably one of the lowest
25   levels on the pole as far as why they're in business.
```

DEPOSITION OF JAN KOSTYUN

122

```
 1  Q.   So you make reference to smaller carriers here.
 2  So this opinion doesn't apply to AT&T or Verizon, for
 3  example, correct?
 4       A.   Well, the specifics of the overwhelming
 5  nature of it does not apply.  But there are -- the
 6  discussion we just had about the fact that a Verizon or
 7  an AT&T or a Sprint, that it's not at the forefront of
 8  their business plan to be able to respond to subpoenas,
 9  still applies.
10  Q.   Are you aware of any instance where any carrier
11  has provided no data in response to a subpoena of
12  thousands of telephone numbers?
13       A.   Yes.
14  Q.   Okay.  When did that occur?
15       A.   Again, previous cases that I've been involved
16  with.  I know specifically that I've seen at least two
17  subpoenas that went to Frontier telecommunications, and
18  their response was they do not maintain that data in
19  their regular course of business and did not provide
20  anything.
21  Q.   So in those instances, it wasn't an issue where
22  the response was burdensome for them, but rather that
23  they did not have the data, correct?
24       A.   From my recollection, the response did not
25  say -- did not mention burdensome.
```

DEPOSITION OF JAN KOSTYUN                    123

1    Q.   How far back was the data that was being

2    requested?  How far back did it go?

3         A.   I don't recall.  But in general, it may have

4    been a year or two.

5    Q.   Are you aware of any instance where any major

6    carrier has provided no data in response to a subpoena

7    identifying thousands of telephone numbers and asking

8    for subscriber information for those numbers?

9         A.   I'm not aware of a large subscriber failing

10   to reply to subpoenas, but I'm certainly aware of

11   problems with the data that has been returned and

12   conflicts that have been received from those carriers.

13   Q.   If I were to send a subpoena to AT&T with 24,000

14   telephone numbers and ask them to identify the name and

15   address of subscribers for any of the telephone numbers

16   that they serviced, what process would AT&T undergo to

17   provide me with that information?

18        A.   Well, I haven't worked for AT&T, so I don't

19   know specifically what their internals.  But in

20   general, there is a specific business entity that takes

21   care of subpoena responses and they may or may not have

22   a standard program set up to be able to retrieve the

23   telephone numbers.  They may also require some type of

24   special processing to retrieve those telephone numbers.

25   And I think there is probably a number of variables

DEPOSITION OF JAN KOSTYUN

1   that would define whether -- which way they would go on

2   that.

3   Q.   But you don't know one way or the other, correct?

4        A.   I don't know the specifics.  But again, based

5   on my experience with other carriers, that would be the

6   general process that any large carrier would perform.

7   Q.   Do you know if these large carriers are able to

8   perform a batch upload process similar to what you did

9   with TransUnion for their own subscriber information?

10       A.   I would not characterize it as a process that

11  was similar to what occurred with TransUnion, as far as

12  the batch append.

13  Q.   Are these major carriers able to batch upload

14  lists of telephone numbers and identify subscriber

15  information for the telephone numbers for which they

16  provide service?

17       A.   Well, I think I answered that already by

18  describing the couple of different options that a

19  carrier might have as far as possibly having a standard

20  process available or possibly requiring a specialized

21  custom process.

22  Q.   You don't know one way or the other?

23       A.   I know that both of those entities exist in

24  carriers like Verizon.  And again, there are a number

25  of factors that would determine which of those avenues

DEPOSITION OF JAN KOSTYUN

125

1    was followed.

2    Q.    All right.  Back to paragraph 115.

3          You state, for example if all telephone numbers

4    are sent to all carriers, Verizon and Sprint might both

5    respond with historical customer records with that same

6    telephone number.

7          Do you see that there?

8          A.    Yes.

9    Q.    Same historic information for the same telephone

10   number during the same time period?

11         A.    Yes.

12   Q.    Okay.  How do you know that?

13         A.    Well, again based on some of the inaccuracies

14   that we've seen with things like TransUnion data and

15   LexisNexis data, there often are not specific time

16   frames that are associated with telephone numbers,

17   particularly when they're looking at historic numbers.

18         So a response from a Verizon, for instance, might

19   come back with telephone number 123, and it might say

20   here's the carrier -- or here's the subscriber that was

21   associated with it and they were associated with it

22   during the year 2018, but not have specific month and

23   day ranges.

24   Q.    Okay.

25         A.    And certainly if another large carrier, like

DEPOSITION OF JAN KOSTYUN

1    a Sprint or T-Mobile came back with similar

2    information, it would be indeterminate as far as

3    whether or not there were conflicts.

4    Q.    That scenario that you just described to me, have

5    you ever personally observed that?

6        A.    I haven't personally observed it with respect

7    to a subpoena, but I'm familiar with some of the data

8    that is available for carriers like Verizon, and

9    understand that that certainly would be one possible

10   outcome of a subpoena request.

11   Q.    Okay.  You've never -- you're saying it's one

12   possible outcome, but you never personally observed

13   such an outcome, correct?

14       A.    I don't know that I have actually seen in the

15   cases that I've been involved with, a scenario that had

16   a generalized date as opposed to specific dates.

17   Q.    Based on your report, my understanding is that

18   there are four facilities-based nationwide wireless

19   carriers, correct?

20       A.    Yes.

21   Q.    What is a facility based nationwide carrier?

22       A.    Those are carriers that basically operate

23   their own networks.  They use their own equipment, they

24   have their own switching systems and their own

25   networks.

DEPOSITION OF JAN KOSTYUN

1    Q.   And those are AT&T, Sprint, T-Mobile, and Verizon

2    Wireless, correct?

3         A.   Yes.

4    Q.   What percentage of the market for wireless

5    cellphone numbers do these big four carriers service?

6         A.   I haven't seen the latest numbers recently,

7    but it's a very high percentage.  Probably in the range

8    of 98 percent.

9    Q.   Okay.  And the fifth facilities-based wireless

10   carrier with semi nationwide coverage is US Cellular,

11   correct?

12        A.   Yes.

13   Q.   Okay.  With these five combined, what percentage

14   of the cellular service market do they service?

15        A.   Again, I would guess roughly 98 percent.  You

16   know, there could be some variations on that.

17        And also, that's a very broad number.  Particular

18   carriers often have different coverages and different

19   geographic areas.  So a particular case, for instance,

20   where a number of the telephone calls happened in

21   Florida, the percentages might be completely different

22   depending on the specific carrier that was involved.

23   Q.   Have you ever personally been involved in the

24   process of issuing subpoenas to carriers for the

25   purpose of identifying subscriber information?

DEPOSITION OF JAN KOSTYUN                          128

1           A.   Yes.

2    Q.   How many times?

3           A.   I would say that I've been involved in it at

4    some level on probably three or four cases.

5    Q.   Okay.  And what was your involvement in those

6    cases?

7           A.   Generally providing input to counsel on the

8    types of data that should be requested, in the format

9    of the way the subpoena should be issued.

10   Q.   In those instances, how many numbers did

11   you -- how many numbers were being provided to the

12   carriers in the subpoenas?

13          A.   I don't recall any specific counts.  But in

14   general, it would have been in the tens or hundreds of

15   thousands.

16   Q.   Okay.  And did the carriers respond?

17          A.   Some carriers did; some carriers didn't.

18   Q.   What percentage of information did you receive

19   back in response to these subpoenas?

20          A.   I have no measurement of that.

21   Q.   You don't know?

22          A.   No.

23   Q.   Did you review the responses to the subpoenas?

24          A.   In some cases, yes.

25   Q.   Were there any instances where the carriers did

DEPOSITION OF JAN KOSTYUN

1    not respond to the subpoenas?

2          A.   Yes.

3    Q.   How many instances?

4          A.   Again, no specific numbers.  But enough that

5    it was noticeable, that it was a common problem.  And

6    anytime a subpoena was sent to a carrier, there was

7    certainly no guarantee that a response would be

8    received.

9    Q.   But you can't tell me what percentage of

10   information was not received back from the carriers,

11   correct?

12         A.   Correct.

13   Q.   Just that it was a "common problem"?

14         A.   That it was a common problem, yes.

15   Q.   On the -- in the last sentence of paragraph 123 of

16   your report, you say, based on these retention periods,

17   most carriers do not retain data long enough to be able

18   to cover December 2013.

19         Do you see that?

20         A.   Yes.

21   Q.   Okay.  Why is December 2013 a significant date to

22   you?

23         A.   That date may have been in there from the

24   original class period that I determined from the

25   original class action complaint.

DEPOSITION OF JAN KOSTYUN

1   Q.   Okay.  But so we agree that this is not -- the

2   period as far as back as we're going, is

3   October of 2018, correct?

4        A.   My understanding is that is the current

5   period.  I don't know whether that's flexible or not.

6   Q.   Would you expect at least the five major carriers

7   to have subscriber data dating back to October of 2018?

8   As of today?

9        A.   I really can't comment one way or the other.

10  I would not say that I could say with certainty that

11  every one of the large carriers would have that data.

12  Q.   Do you know one way or the other?

13       A.   I do not know one way or the other.

14  Q.   Okay.  Do you know what percentage -- do you know

15  what percentage of subscriber information that is

16  maintained by carriers is inaccurate?

17       A.   I would say it's similar to my previous

18  answer, and that is:  I don't have any specific

19  percentages.  But based on my observation of carrier's

20  business, it is certainly a problem with carriers to

21  keep that subscriber information accurate.

22  Q.   Have you ever learned of any rate of inaccuracy

23  for information maintained by carriers?

24       A.   To my knowledge, carriers have never

25  performed any measurement that would produce those

DEPOSITION OF JAN KOSTYUN                    131

1   numbers.

2   Q.   If I were to subpoena 100,000 subscriber records

3   from AT&T, how many of those records are going to be

4   inaccurate?

5        A.   Well, that's the same question you asked

6   before.  You're asking for a percentage and I don't

7   have those numbers.

8        MR. HIRALDO:  Can I stop you for a second?

9

10       (Discussion was held off the record.)

11

12       A.   What was the question again?

13  Q.   If I subpoena 100 [sic] subscriber records from

14  AT&T, how many of those are going to be inaccurate?

15       A.   So I don't have specific percentages

16  obviously, but based on my experience, I certainly

17  would expect that there would be a nontrivial number

18  that were inaccurate.

19  Q.   A nontrivial number?

20       A.   Yes.

21  Q.   But you can't tell me the exact number, correct?

22       A.   Once again, correct.

23  Q.   Do you know if the majority of carriers maintain

24  records from 2018?  Subscriber records from 2018?

25       A.   I think that's another version of something

DEPOSITION OF JAN KOSTYUN

132

```
1    you asked me earlier.
2         And the answer is:  I don't know one way or the
3    other, but I would suspect that they would certainly be
4    gaps from some carriers and in the coverage.
5    Q.   Have you ever received any training, besides what
6    we already discussed, related to the identification of
7    subscriber/user information for cellular telephones?
8         A.   Well, I think I have experienced in that
9    realm which would certainly be valuable, much more
10   valuable, than any kind of formal training.
11        But when I worked for cellular carriers, I
12   certainly understood the way that their internal
13   systems worked.  The systems that store that carrier
14   information; the process by which that information is
15   initially collected; the process that that information
16   is updated afterwards.  And had the opportunity to
17   observe on multiple instances inaccuracies with that
18   data, and some of the problems that it caused.
19   Q.   I'll be more specific.  Have you received any
20   training, education, or anything else with respect to
21   the performance of a reverse-append process?
22        A.   Well, I think we discussed this in the
23   TransUnion description that we talked about earlier.
24   So there was training involved in the vetting process,
25   and setting up the initial batch appends that I ran
```

DEPOSITION OF JAN KOSTYUN                          133

1    with TransUnion.

2    Q.    Okay.  Besides that, have you received any other

3    training or education?

4         A.    Well, there were certainly was the experience

5    that I also described in analyzing the results that had

6    been produced in other cases or from other experts that

7    came out of systems like TransUnion and LexisNexis.

8    Q.    Do you know if Experian provides different levels

9    of access to the parts it offers for the reverse-append

10   of numbers?

11        A.    No, I don't.

12   Q.    Have you ever conducted your own independent

13   testing or analysis of the Experian reverse-append

14   product?

15        A.    No, I haven't.

16   Q.    Are you aware of any disclaimers that apply

17   specifically to the Experian reverse-append product or

18   products?

19        A.    If I recall correctly, I believe Experian has

20   a generalized disclaimer about the accuracy of their

21   data.

22   Q.    Can you tell me anything specific to the

23   disclaimer that you would have seen for Experian

24   regarding its reverse-append product?

25        A.    Well, if I recall correctly, the disclaimers

DEPOSITION OF JAN KOSTYUN

1   that I saw or the disclaimer that I saw applied to the

2   validity of their data, with the understanding that

3   that data would have been the basis of any

4   reverse-append that they might provide.

5   Q.   Okay.  But nothing specific to reverse-append,

6   correct?

7        A.   Are you asking me if I saw a disclaimer with

8   the "word reverse-append" in it?

9   Q.   No, not specific words reverse-append; but

10  specifically related to reverse-append.

11       A.   If a disclaimer described potential

12  inaccuracies with their base data, then it would be a

13  natural conclusion that that is the data that would be

14  used by any reverse-append process.  So, yes.

15  Q.   Okay.  Are you aware of any instance in which

16  Experian has used a ported-number activity file that

17  was inaccurate?

18       A.   I'm not aware of any instances where they

19  used a ported-number activity file that was either

20  accurate or inaccurate.

21  Q.   Have you ever -- have you ever tested the accuracy

22  of the Experian reverse-append product?

23       A.   Isn't that the same thing we were just

24  talking about?

25  Q.   Possibly.

DEPOSITION OF JAN KOSTYUN

135

1      A.   Well, the answer was no.

2  Q.   Okay.  So I'm going to ask you the same questions

3  for MicroBilt.

4      Have you ever -- are you aware of the different

5  levels of reverse-append products offered by MicroBilt?

6      A.   No, I'm not.  But I'll qualify that answer

7  and it would also apply to the previous answer about

8  Experian.  And that is:  It is my general opinion that

9  all of the major vendors that deal with identification

10 and reverse-append capabilities work on the same

11 infrastructure and the same type of data that they've

12 collected from various sources.  And they all seem to

13 tout the ability to collect data from thousands of

14 sources, and be able to provide reverse-append, and

15 skip-tracing capabilities.

16 Q.   Have you ever performed any testing or analysis

17 with respect to the MicroBilt platform?

18     A.   No.

19 Q.   So how can you make the generalized statement that

20 there might be issues with, for example, Experian or

21 MicroBilt if you never used or tested those products?

22     A.   Well again, that would be based on the

23 description that I just gave.  And understanding the

24 world of data processing, and understanding very well

25 the world of connection between telephone numbers and

DEPOSITION OF JAN KOSTYUN          136

1    individuals, is that I'm not aware of any special magic

2    databases that Experian or MicroBilt might have access

3    to that TransUnion and LexisNexis didn't have access

4    to.

5    Q.   But you don't know for certain because you never

6    tested, inspected, reviewed, or used any of these

7    platforms, correct?

8         A.   I don't know for certain whether they have

9    inaccuracies and I don't know for certain whether they

10   are accurate.

11   Q.   Are you aware of any disclaimers that apply

12   specifically to the MicroBilt reverse-append product?

13        A.   Yes.  I believe that might have been included

14   in my expert report.

15   Q.   Your background is in computer science and

16   telecommunications software, correct?

17        A.   Well, my background is with

18   telecommunications companies.  And for the most part,

19   working for those companies, I've been involved in

20   building software systems that support their business

21   operations.

22   Q.   When is it that you worked for these companies?

23        A.   Well, I started working for Bell Labs in

24   1976.  In case you don't know, Bell Labs was and still

25   is probably the foremost telecommunications research

DEPOSITION OF JAN KOSTYUN                    137

1    company in the world.  It was founded by a man named

2    Alexander Graham Bell who invented the telephone.  And

3    it gave me a pretty good base of technical information.

4         After Bell Labs, I worked for GTE, which became

5    Verizon.  And between those combined companies, I

6    probably worked for roughly 25 years up until the early

7    2000's.

8         After that time period, I have worked as a

9    consultant for Syniverse Technologies, who is one of

10   the major players in the telecom world, and worked

11   particularly in the area of cellular telephone

12   communication services.

13        I worked in the number portability arena during

14   the initial rollout of number portability for the

15   wireless industry, which gave me an

16   extreme -- extremely strong and unique insight into the

17   movement of telephone numbers and understanding the

18   status of numbers, which is critical in cases like

19   this.

20        And that, I worked for Syniverse in various

21   capacities through about the middle of 2000's.

22        After Syniverse, I did some expert witness work.

23   And also worked as a consultant in the late 2000's up

24   through roughly 2010 for Rogers Wireless, which is the

25   largest wireless telephone company in Canada.  And

DEPOSITION OF JAN KOSTYUN

138

1    worked there in a strategic process that was involved

2    in the implementation of number portability across

3    Canada.

4    Q.   How long has it been since you last worked within

5    the telecommunications industry?

6         A.   Well, I work in the telecommunication

7    industry now, so approximately five seconds.

8    Q.   What is your involvement within the

9    telecommunications industry as you sit here today?

10        A.   Well, you might imagine that being able to

11   work as an expert in TCPA cases, there is quite a bit

12   of work involved in keeping up with the industry,

13   reviewing cases, understanding the technology,

14   understanding what goes on with the latest smart

15   phones, what goes on with wireless carriers, the

16   advancements in technology, such as ringless voicemail

17   and other product offerings.  So I would say I'm at

18   least as intensely involved in the telecom industry now

19   as I was when I worked full time for telecom companies.

20   Q.   When was the last time you worked for a telecom

21   company?

22        A.   I would say, roughly, 2010 time frame.

23        MR. HIRALDO:  I think we're almost finished.  Let

24   me just talk to these guys and we'll be right back.

25

1              (Whereupon, a break was taken.)

2

3        MR. HIRALDO:  I don't have anything else, so I'll

4   turn it over to you guys.

5        MS. NATHAN:  Okay.

6                    CROSS-EXAMINATION

7   BY MS. NATHAN:

8   Q.   Good afternoon, Mr. Kostyun.

9        A.   Hi.

10  Q.   I just have a few follow-up questions.  I know

11  we've been talking about the issues in your report for

12  several hours now.

13       One quick question regarding Sherry Ryan's

14  testimony, which you referred to in paragraph 25 of

15  your report.  And you recall you spoke with Mr. Hiraldo

16  regarding this testimony earlier today?

17       A.   Yes, I recall.

18  Q.   Why did you specifically include these exchanges

19  in Ms. Ryan deposition in your expert report?

20       A.   Well, there was a wealth of evidence to

21  support the fact that the TCN MAC system that was used

22  by -- in the case was actually a manual system and had

23  a number of manual activities associated with it.  And

24  the Ryan deposition addressed a number of those;

25  talking about the action that the clicker agent needed

DEPOSITION OF JAN KOSTYUN

1    to take, and the fact that that was the only way for a

2    telephone number to be introduced and actually be

3    dialed by the system.

4    Q.   If you look at paragraph 20(a) of your report.

5    Whether you enter a ten-digit number or you click an

6    approval or dial button, would that affect the

7    substance of the opinion that you have in this case

8    that's reflected in 20(a)?

9         A.   No, not at all.  I believe we also discussed

10   the idea of swiping a telephone number on a smart phone

11   and using that as the dial process, and that would fit

12   right into this definition of manually initiating a

13   dialed number.

14   Q.   And earlier today there was a lot of questioning

15   regarding about a back-end dialing process.  And can

16   you remind me again how that term would be defined, in

17   your opinion?

18        A.   Yes, the discussion was that once a telephone

19   number was approved through the MAC system, that there

20   was communication between the front end, where the web

21   interface, where the number was approved, and then what

22   we described as the back-end dialing process.  And that

23   telephone number was sent back to the back-end dialing

24   process for it to be inserted into the network for a

25   call.

DEPOSITION OF JAN KOSTYUN

```
 1    Q.   Is there a corresponding front-end dialing

 2    process?

 3         A.   The equivalent to the front-end dialing

 4    process would be that web interface that actually

 5    initiates the call, and performs what I would be

 6    considering -- what I would consider as the actual

 7    dialing of the telephone number.

 8    Q.   And using a MAC platform, how is the front-end

 9    dialing process initiated?

10         A.   Using the MAC platform, the front-end dialing

11    process is that web interface that we discussed, where

12    the clicker agent is presented with a telephone number

13    and they select either the approve or reject button;

14    when they select the reject button, they are dialing

15    the number.

16    Q.   How is the front-end dialing process initiated in

17    a standard predictive dialer?

18         A.   In a standard predictive dialer, the

19    equivalent to the front-end dialing process would be

20    the result of the uploaded data file.  It's generally

21    understood that in order for a predictive dialer to

22    work, a file of telephone numbers to be called has to

23    be uploaded into it.  Once the predictive dialing

24    campaign is initiated, then the dialing process is

25    effectively the mechanical selection of each one of
```

DEPOSITION OF JAN KOSTYUN                        142

1    those telephone numbers to be presented to the dialer

2    to be called.

3    Q.   Is there any way for the front-end dialing process

4    to be initiated using the MAC platform without a human

5    being taking some action?

6         A.   No.  As we've discussed, there is no

7    automatic insertion of telephone numbers into the MAC

8    process, and every telephone number that is going to

9    result in a call has to be initiated by that click of

10   the approved button.

11   Q.   Who or what entity made the calls at issue in this

12   case?

13        A.   It's my understanding that it was

14   Gold Mountain representatives that made the calls at

15   issue, and specifically it was the clicker agent that

16   initiated each one of those calls.

17   Q.   Would you expect the party that made the calls to

18   have associated lead files in its records?  If such

19   lead files did, in fact, exist?

20        A.   Yes, that would be the normal case.  That

21   that's where the telephone numbers that they dialed

22   would normally come from.

23   Q.   You mentioned earlier in your responses to

24   Mr. Hiraldo that you are aware a subpoena was issued on

25   Gold Mountain; is that correct?

DEPOSITION OF JAN KOSTYUN                 143

1        A.   Yes.

2   Q.   Do you know which entity served the subpoena on

3   Gold Mountain?   Whether it was Bluegreen or plaintiff

4   in this case?

5        A.   My understanding was that it was plaintiff.

6   Q.   Were you aware that Gold Mountain was required to

7   produce all lists identifying the target name and/or

8   telephone number for all phone calls transmitted by or

9   on behalf of the defendant?

10        A.   That was my understanding of the subpoena.

11   Q.   Were you aware that they were required to produce

12   all documents relating to the sources from where the

13   telephone numbers were obtained for the phone calls

14   that were sent or transmitted by or on behalf of the

15   defendant?

16        A.   Yes, that was my understanding of the

17   content.

18   Q.   Do you have any reason to believe that when

19   Gold Mountain made their production in compliance with

20   the subpoena that they did not do so fully?

21        A.   No, I have no reason.

22   Q.   If you could turn to the chart following

23   paragraph 88 of your report.  And in this chart, and I

24   know you spoke at length with Mr. Hiraldo about this

25   chart, there is a call date reflected here; is that

DEPOSITION OF JAN KOSTYUN                    144

1    correct?

2         A.   Correct.

3    Q.   And was there a call date in each of the clicker

4    records that were produced in this case?

5         A.   That is correct.

6    Q.   Was there a call date in all of the disposition

7    records that were produced in this case?

8         A.   Yes.

9    Q.   Was there any time stamps associated with the

10   calls that were made at issue in the clicker records

11   that were produced in this case?

12        A.   No.

13   Q.   Were there any time stamps associated with the

14   calls that were placed in this matter that were within

15   the disposition records that you reviewed --

16        A.   No.

17   Q.   -- in this case?

18        So can it be determined with certainty which

19   number called on a certain date is associated with a

20   specific disposition file for that same number on that

21   same date?

22        A.   No.  Effectively, the only identifying

23   information that's available in both the clicker file

24   and the disposition file was the phone number and the

25   call date.

DEPOSITION OF JAN KOSTYUN                    145

```
1    Q.   In paragraph 97, you state, in the bottom half of

2    page 37, and without any additional identifying data

3    such as a call time, there is no way to determine if

4    these records represent multiple distinct calls or a

5    single call that's been recorded in duplicate.

6         Does that in any way relate to some of the issues

7    that could occur from the fact that there were multiple

8    calls without any date stamp available?

9         A.   Yes.

10   Q.   Or time stamp -- excuse me.

11        A.   Yes.  That directly addresses the issue.  The

12   fact that all of these call records and disposition

13   records only have a date on them makes, once again, the

14   telephone number and the date the only way to

15   distinguish among records.

16   Q.   And what was your goal in terms of identifying

17   this, this issue in paragraph 97?

18        A.   The goal in this section was to point out the

19   fact that out of the potential class of 24,969 call

20   records, that there -- the content of that was most

21   likely overstated, as far as the extent of calls that

22   it addressed.  Because as I said, there were thousands

23   of those calls that had the same telephone number and

24   date, indicating that they could have been the same

25   call that was reported multiple times.
```

DEPOSITION OF JAN KOSTYUN                      146

```
 1    Q.   In your experience, have you seen other call logs
 2    produced in other matters where there are time stamps
 3    associated with the calls made?
 4         A.   Yes.
 5    Q.   Is that the standard type of call logs that you've
 6    reviewed in your experience or is it more common that
 7    it's simply a date without a time stamp?
 8         A.   I would say that there is no specific
 9    standard, but it is probably more common to see time
10    stamps associated with the calls than just the date by
11    itself.  Although I have observed a number of instances
12    where the call logs did only include a date without the
13    time stamp.
14    Q.   Without the time stamp, what further investigation
15    could be done to determine which calls correspond with
16    one another with respect to the disposition records and
17    the call records?
18         A.   Well, I believe I discussed in my expert
19    report that there may be call recordings associated
20    with some or all of these calls.  Those call recordings
21    possibly could be investigated to see whether or not
22    they qualified as a call.  But I also documented the
23    fact that the one call recording that was produced as
24    part of the discovery was the call recording associated
25    with plaintiff's telephone call, and that the results
```

DEPOSITION OF JAN KOSTYUN

147

1   of the call recording were indeterminate.  Even having

2   that recording, it wasn't possible to determine if a

3   call was completed, and if the plaintiff was actually

4   on the other end of that call.  So I guess --

5   Q.   What do you mean by if the plaintiff was on the

6   other end --

7        A.   I'm sorry.  The call recording had the voice

8   of what appeared to be a Gold Mountain representative

9   introducing herself, but the call recording never

10  included any audio that sounded like the plaintiff

11  speaking back to the Gold Mountain rep.

12       MS. NATHAN:  I have no further questions.  Thank

13  you.

14       MR. HIRALDO:  I don't have anything.

15

16       (Whereupon, the deposition concluded at 2:20 PM.)

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3    STATE OF FLORIDA,   )
     COUNTY OF DADE.     )
4

5

6

7         I, the undersigned authority, certify that

8    the aforementioned witness, JAN KOSTYUN, personally

9    appeared before me and was duly sworn.

10

11

12

13

14            WITNESS my hand and official seal this 5th

15   day of June, 2019.

16

17

18

19

20   _____

21   Dina Orlansky-Sosnow
     Notary Public-State of Florida
22   Commission No.:  GG 045000
     Commission Expiration:  12/16/2020
23

24

25

```
 1                    C E R T I F I C A T E

 2

 3   STATE OF FLORIDA,   )
     COUNTY OF DADE.     )

 4

 5          I, DINA ORLANSKY-SOSNOW, Court Reporter,
     State of Florida at Large, do hereby certify that the

 6   aforementioned witness was by me first duly sworn to
     testify the whole truth; that I was authorized to and

 7   did report said deposition in stenotype; and that the
     foregoing pages, numbered 1 to 147, inclusive, are a

 8   true and correct transcription of my shorthand notes of
     said deposition.

 9
            I further certify that said deposition was

10   taken at the time and place hereinabove set forth and
     that the taking of said deposition was commenced and

11   completed as hereinabove set out.

12          I further certify that I am not attorney or
     counsel of any of the parties, nor am I a relative or

13   employee of any attorney or counsel of party connected
     with the action, nor am I financially interested in the

14   action.

15          The foregoing certification of this
     transcript does not apply to any reproduction of the

16   same by any means unless under the direct control
     and/or direction of the certifying reporter.

17
            IN WITNESS WHEREOF, I have hereunto set my

18   hand this 5th day of June, 2019.

19

20

21

22          _____
            Dina Orlansky-Sosnow

23          Notary Public-State of Florida
            Commission No.:  GG 045000

24          Commission Expiration:  12/16/2020

25
```

1                              ERRATA SHEET

2    DO NOT WRITE ON THE TRANSCRIPT ~ ENTER CHANGES ON THIS
                              PAGE
3
     IN RE:  Shehan Wijesinah vs. Bluegreen Vacations, INC.
4    WITNESS NAME:  Jan Kostyun
     DATE TAKEN:  June 5, 2019
5
     Page No. Line No.                    Change Reason
6

7

8

9

10

11

12

13

14

15

16

17           Under penalties of perjury, I declare that I have
     read the foregoing document and that the facts stated
18   in it are true.

19

20   _____                 _____

21        DATE                             JAN KOSTYUN

22

23

24

25

1                      <u>WITNESS NOTIFICATION LETTER</u>

2     June 5, 2019

3

      Mr. Jan Kostyun
4     C/O Ms. Andrea Nathan, Esq.
      STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON,
5     P.A.
      Museum Tower, Suite 2200
6     150 West Flagler Street
      Miami, Florida 33130

7

8
      In Re:  Shehan Wijesinah vs. Bluegreen Vacations, INC.
9     Deposition taken on:  June 5, 2019

10         The transcript of the above proceeding is now
      available for your review.
11
           Please call to schedule an appointment between the
12    hours of 9:00 a.m. and 4:00 p.m., Monday through
      Friday, at Capitale Reporting, LLC.
13
           Please complete your review within a reasonable
14    amount of time.

15

16

17    Sincerely,

18    Dina Orlansky-Sosnow, Court Reporter
      Capitale Reporting, LLC.
19    1181 Northeast 176th Terrace
      North Miami Beach, Florida 33162
20    (917) 200-6222

21

22

23

24

25

DEPOSITION OF JAN KOSTYUN

1

## 0

**045000** [2] - 148:22, 149:23

## 1

**1** [7] - 4:5, 6:9, 6:12, 68:13, 73:15, 73:24, 149:7
**1/2** [2] - 58:17, 59:22
**10** [5] - 15:14, 46:17, 58:17, 59:22, 61:1
**10-25-2018** [2] - 83:10, 83:19
**10-29-18** [1] - 97:23
**10.5** [1] - 61:12
**100** [3] - 20:9, 109:15, 131:12
**100,000** [1] - 131:1
**106** [1] - 50:10
**11** [5] - 15:10, 15:16, 18:3, 90:14, 90:25
**11,073** [1] - 89:4
**11,095** [1] - 89:16
**11-03** [1] - 88:7
**111** [1] - 50:23
**112** [1] - 50:10
**115** [2] - 121:14, 125:1
**1181** [1] - 151:19
**12** [3] - 18:5, 18:16, 120:7
**12/16/2020** [2] - 148:22, 149:24
**120** [1] - 2:11
**1200** [1] - 2:7
**123** [2] - 125:18, 129:14
**13** [1] - 18:5
**14** [1] - 19:6
**140** [1] - 3:5
**1400** [1] - 2:4
**147** [1] - 149:7
**148** [1] - 3:8
**149** [1] - 3:9
**15,774** [1] - 87:4
**150** [5] - 1:19, 2:18, 2:22, 3:10, 151:6
**151** [1] - 3:11
**16** [6] - 56:22, 56:25, 57:1, 64:13, 68:5
**16,808** [3] - 81:15, 81:19, 82:5
**176th** [1] - 151:19
**18,000** [2] - 48:10, 49:7
**1950** [1] - 2:7
**1976** [1] - 136:23
**1:19-cv-20073** [1] - 1:2

## 2

**2** [6] - 4:7, 8:14, 8:23, 15:10, 68:13, 73:15
**2,600** [3] - 62:18, 62:19, 64:4
**2.5** [4] - 46:2, 46:15, 47:13, 47:23
**20** [2] - 47:5, 67:10
**20a** [2] - 140:3, 140:7
**20(a)** [2] - 28:10, 28:12
**20,000** [1] - 104:1
**20,774** [1] - 68:4
**200-6222** [1] - 151:20
**2000's** [3] - 137:6, 137:20, 137:22
**2010** [2] - 137:23, 138:21
**2013** [2] - 129:17, 129:20
**2018** [3] - 19:10, 118:7, 118:22, 125:21, 130:2, 130:6, 131:23
**2018-1029** [1] - 88:7
**2019** [11] - 1:15, 4:6, 4:8, 5:1, 118:7, 118:16, 148:15, 149:18, 150:4, 151:2, 151:9
**22** [1] - 45:22
**2200** [4] - 1:19, 2:17, 2:22, 151:5
**230** [8] - 56:23, 57:2, 57:11, 59:9, 60:5, 61:24, 64:15, 90:7
**231)343-6911** [1] - 87:2
**24** [3] - 4:6, 6:6, 46:1
**24,000** [1] - 123:12
**24,969** [9] - 60:1, 71:12, 93:1, 93:9, 99:3, 101:3, 117:3, 118:15, 145:18
**24th** [1] - 6:9
**25** [3] - 7:24, 137:5, 139:13
**26,715** [1] - 87:8
**28** [2] - 28:11, 118:7
**29** [1] - 66:3
**2:20** [2] - 1:16, 147:15

## 3

**3** [8] - 4:8, 4:9, 6:7, 49:24, 49:25, 50:2, 50:9, 52:6
**3,235** [5] - 68:4, 68:16, 73:8, 74:8, 74:13
**30** [2] - 7:24, 47:5
**304** [2] - 88:20, 97:22
**304)614-4925** [2] - 88:12, 97:9
**305)790-5546** [1] - 98:21
**31** [1] - 75:1
**3235** [1] - 74:22
**33130** [4] - 1:20, 2:18, 2:23, 151:6
**33131** [1] - 2:8
**33162** [1] - 151:19
**33301** [2] - 2:4, 2:11
**34** [3] - 79:8, 79:13, 81:12
**37** [3] - 38:19, 39:14, 145:1
**39** [1] - 103:5
**3rd** [1] - 8:14

## 4

**4** [4] - 4:10, 51:23, 52:1, 52:4
**40** [1] - 48:8
**401** [1] - 2:4
**41,423** [1] - 82:13
**48** [2] - 45:22, 48:3
**4:00** [1] - 151:12

## 5

**5** [7] - 1:15, 3:4, 5:1, 118:16, 150:4, 151:2, 151:9
**5,000** [1] - 109:12
**50** [3] - 4:9, 11:15, 118:2
**509** [3] - 82:12, 83:3, 83:20
**509)391-0706** [3] - 81:2, 81:13, 88:9
**509-391-0706** [1] - 80:5
**515** [1] - 2:11
**52** [1] - 4:10
**5th** [2] - 148:14, 149:18

## 6

**6** [3] - 4:6, 57:1, 64:14
**66** [4] - 64:25, 90:9, 90:23, 90:24

## 7

**7** [1] - 64:14
**71** [1] - 66:7
**73** [2] - 68:2, 73:6

## 8

**8** [1] - 4:8
**8,807** [1] - 89:12
**81** [1] - 94:10
**81,092** [2] - 90:14, 91:1
**813)713-2108** [1] - 89:9
**82** [1] - 79:17
**85** [1] - 80:3
**88** [9] - 79:15, 79:18, 79:22, 80:1, 80:3, 93:15, 95:20, 102:12, 143:22

## 9

**9** [2] - 118:7, 118:22
**9,314** [1] - 88:23
**917** [1] - 151:20
**94** [2] - 91:18, 94:22
**95** [1] - 98:19
**96** [1] - 99:13
**97** [3] - 101:1, 144:25, 145:16
**98** [2] - 127:7, 127:14
**9:00** [1] - 151:12
**9:30** [1] - 1:16

## A

**a.m** [1] - 151:12
**abilities** [1] - 38:20
**ability** [3] - 55:11, 55:15, 135:12
**able** [19] - 6:5, 39:2, 40:8, 41:12, 70:14, 70:19, 72:1, 104:15, 105:25, 106:24, 110:4, 112:2, 122:7, 123:21, 124:6, 124:12, 129:16, 135:13, 138:9
**absolutely** [1] - 84:11
**access** [5] - 30:1, 30:4, 105:4, 105:9, 105:16, 108:19, 115:16, 115:18, 115:19, 115:20, 115:21, 115:22, 133:8, 136:1, 136:2
**accessed** [1] - 25:21
**according** [2] - 51:8, 56:22
**account** [2] - 13:2, 13:4
**accumulated** [2] - 15:6, 15:8
**accuracy** [5] - 67:24,

67:25, 79:5, 133:19, 134:20
**accurate** [4] - 116:15, 130:20, 134:19, 136:9
**accurately** [1] - 85:6
**act** [1] - 27:1
**action** [16] - 10:10, 26:17, 75:5, 112:14, 112:19, 113:7, 113:9, 113:13, 113:21, 114:9, 114:11, 129:24, 139:24, 142:4, 149:13, 149:14
**activities** [1] - 139:22
**activity** [9] - 16:1, 16:3, 16:4, 18:24, 41:4, 41:9, 41:19, 134:15, 134:18
**actual** [22] - 15:25, 16:4, 21:8, 22:1, 22:20, 23:24, 36:1, 36:8, 37:20, 41:9, 47:21, 55:23, 56:5, 59:11, 61:10, 68:25, 99:6, 104:5, 104:11, 113:9, 119:18, 141:5
**add** [4] - 31:23, 35:7, 50:15, 98:6
**added** [3] - 9:6, 9:13, 9:19
**additional** [6] - 31:24, 62:1, 63:9, 107:5, 111:11, 145:1
**additions** [1] - 9:9
**address** [20] - 19:4, 43:16, 68:5, 68:10, 68:11, 68:12, 68:13, 68:15, 68:19, 68:21, 70:1, 73:11, 73:15, 73:17, 73:24, 74:18, 107:16, 123:14
**addressed** [3] - 18:7, 139:23, 145:21
**addresses** [11] - 68:6, 68:14, 68:17, 70:3, 73:7, 73:18, 73:21, 74:9, 74:14, 103:22, 145:10
**addressing** [1] - 85:24
**adequate** [1] - 105:15
**adjusts** [1] - 40:13
**administrator** [6] - 112:14, 112:19, 113:1, 113:14, 113:21, 114:9
**administrators** [1] - 113:10
**advancements** [1] -

138:15
**affect** [1] - 140:5
**affected** [2] - 17:1, 102:8
**aforementioned** [2] - 148:8, 149:6
**afternoon** [1] - 139:7
**afterwards** [1] - 132:15
**agent** [66] - 12:19, 12:20, 12:21, 12:22, 12:25, 13:6, 13:9, 13:11, 15:20, 16:23, 17:16, 17:25, 19:12, 19:15, 19:20, 19:22, 20:1, 21:13, 21:14, 21:23, 26:15, 26:23, 31:10, 31:17, 32:1, 34:9, 34:12, 34:15, 34:18, 34:21, 34:24, 35:2, 35:10, 37:5, 37:8, 37:20, 38:6, 40:8, 48:4, 50:14, 54:3, 54:7, 55:9, 56:9, 56:14, 75:5, 75:12, 75:16, 75:20, 76:19, 78:10, 78:15, 78:22, 83:2, 83:17, 84:7, 87:21, 88:1, 92:24, 93:4, 95:24, 99:8, 139:24, 141:11, 142:14
**agent's** [3] - 26:17, 32:13, 88:17
**agents** [25] - 20:5, 31:12, 31:13, 31:16, 34:4, 34:7, 38:3, 40:10, 40:16, 40:20, 40:22, 41:18, 45:25, 48:8, 52:10, 55:22, 76:7, 79:5, 92:4, 92:20, 94:23, 101:19, 101:23, 102:5
**ago** [4] - 5:17, 108:20, 109:9, 118:19
**agree** [10] - 18:22, 24:11, 25:14, 29:5, 52:12, 52:15, 78:24, 100:12, 118:17, 129:25
**agreed** [2] - 113:19, 114:6
**agreeing** [1] - 113:22
**ahead** [3] - 55:4, 71:16, 81:16
**air** [1] - 37:23
**alert** [1] - 37:13
**Alexander** [1] - 137:1
**algorithm** [2] - 42:9,

42:12
**ALHADEFF** [4] - 1:18, 2:16, 2:21, 151:4
**alive** [1] - 103:4
**allow** [4] - 21:2, 30:22, 104:10, 105:3
**allowed** [3] - 21:1, 30:21, 49:19
**allows** [4] - 49:11, 56:14, 61:4, 104:11
**almost** [1] - 138:22
**AM** [1] - 1:16
**AMENDED** [1] - 4:7
**amended** [15] - 6:7, 8:19, 9:1, 9:4, 9:6, 9:14, 9:21, 9:25, 10:5, 10:9, 10:16, 15:11, 19:6, 56:22, 90:9
**amendment** [1] - 86:17
**amount** [6] - 40:25, 41:1, 48:3, 48:6, 49:15, 151:14
**analysis** [92] - 33:12, 33:13, 33:24, 34:5, 35:15, 35:16, 36:13, 36:24, 42:1, 42:4, 42:13, 42:14, 42:16, 44:14, 44:16, 44:17, 44:21, 45:23, 52:17, 52:18, 52:25, 53:2, 53:3, 53:7, 53:8, 53:11, 53:15, 53:17, 53:20, 53:23, 53:25, 54:5, 56:21, 58:17, 58:20, 59:2, 59:11, 59:19, 61:9, 62:2, 66:13, 66:16, 66:22, 66:24, 67:17, 68:25, 69:10, 69:12, 69:16, 69:19, 70:6, 70:9, 70:11, 70:21, 70:24, 71:7, 71:8, 71:24, 72:11, 72:19, 72:25, 73:2, 76:4, 85:4, 85:11, 88:3, 94:8, 94:18, 94:20, 97:18, 99:22, 100:9, 101:21, 103:1, 103:10, 104:2, 104:7, 104:14, 106:8, 107:7, 107:9, 107:19, 108:8, 108:10, 111:25, 112:1, 113:6, 116:19, 117:7, 117:12, 133:12, 135:15
**analyze** [3] - 103:24,

109:10, 109:13
**analyzed** [2] - 58:10, 69:3
**analyzing** [2] - 110:23, 133:4
**Andrea** [2] - 2:19, 151:4
**anomalies** [1] - 74:7
**answer** [40] - 18:23, 19:12, 20:15, 26:22, 30:23, 38:3, 42:15, 43:1, 43:6, 43:8, 43:9, 46:8, 46:12, 48:5, 55:14, 63:5, 64:1, 66:23, 71:20, 76:14, 76:24, 77:3, 77:18, 77:19, 87:5, 89:13, 93:19, 93:23, 93:25, 94:11, 94:16, 100:8, 102:9, 102:10, 114:11, 130:17, 132:1, 134:25, 135:5, 135:6
**answered** [29] - 33:18, 33:20, 36:14, 36:25, 37:4, 37:24, 75:15, 77:8, 77:11, 82:9, 82:23, 84:19, 86:7, 86:22, 87:15, 87:17, 87:20, 88:13, 89:4, 89:16, 93:3, 93:10, 94:5, 96:4, 96:10, 96:18, 100:15, 100:22, 124:16
**answering** [10] - 22:2, 27:21, 33:21, 34:21, 37:25, 47:21, 78:17, 78:19, 82:9, 83:22
**answers** [2] - 36:9, 37:20
**anytime** [1] - 129:5
**anyway** [1] - 112:18
**appear** [3] - 87:7, 88:21, 119:1
**APPEARANCES** [1] - 2:1
**appeared** [7] - 60:2, 83:9, 92:2, 92:18, 100:7, 147:7, 148:9
**append** [24] - 114:19, 115:1, 115:6, 115:9, 115:13, 117:20, 117:21, 124:11, 132:20, 133:8, 133:12, 133:16, 133:23, 134:3, 134:4, 134:7, 134:8, 134:9, 134:13, 134:21, 135:4, 135:9, 135:13,

136:11
**appends** [1] - 132:24
**application** [1] - 21:8
**applications** [1] - 44:9
**applied** [1] - 133:25
**applies** [2] - 17:2, 122:8
**apply** [7] - 18:11, 122:1, 122:4, 133:15, 135:6, 136:10, 149:15
**applying** [2] - 105:1, 108:19
**appointment** [1] - 151:11
**approval** [5] - 31:13, 32:13, 41:4, 56:5, 140:5
**approve** [13] - 13:7, 17:14, 17:20, 26:23, 31:10, 31:19, 32:2, 32:9, 48:7, 50:15, 55:17, 55:23, 141:12
**approved** [19] - 11:25, 12:22, 19:15, 19:24, 20:1, 20:6, 20:8, 20:9, 33:7, 50:24, 51:1, 52:7, 52:11, 56:8, 91:20, 114:6, 140:18, 140:20, 142:9
**approving** [2] - 12:19, 55:10
**architecture** [2] - 24:14, 24:20
**archived** [1] - 51:2
**area** [1] - 137:10
**areas** [1] - 127:18
**arena** [1] - 137:12
**arrived** [1] - 101:15
**ascertainability** [4] - 11:3, 11:6, 56:19, 103:10
**ascertaining** [2] - 108:13, 108:14
**aspect** [4] - 17:1, 32:12, 111:3, 116:4
**associate** [1] - 100:16
**associated** [28] - 13:2, 13:5, 35:17, 92:4, 92:12, 92:19, 96:9, 100:14, 103:22, 106:4, 106:6, 107:15, 107:16, 107:17, 107:23, 110:15, 125:15, 125:20, 139:22, 142:17, 144:8, 144:12, 144:18, 146:2, 146:9,

146:18, 146:23
**associations** [1] - 112:16
**assume** [4] - 20:12, 49:1, 49:18, 119:17
**assumption** [6] - 24:18, 76:10, 76:18, 86:5, 86:8, 91:9
**AT&T** [9] - 120:14, 122:1, 122:6, 123:12, 123:15, 123:17, 126:25, 131:2, 131:13
**ATDS** [7] - 38:21, 39:1, 39:7, 39:10, 39:18, 39:20, 43:25
**ATDSs** [2] - 39:24, 44:1
**attempt** [1] - 114:4
**attempted** [3] - 102:20, 102:24, 115:4
**attempting** [2] - 42:20, 43:10
**attended** [1] - 7:1
**attorney** [2] - 149:12, 149:13
**audible** [2] - 37:13, 37:16
**audio** [1] - 147:9
**augmentation** [2] - 63:9, 63:10
**authority** [1] - 148:7
**authorized** [1] - 149:6
**autodialing** [1] - 51:2
**automated** [4] - 14:17, 34:1, 44:14, 44:16
**automatic** [1] - 142:6
**availability** [1] - 40:8
**available** [18] - 38:3, 38:7, 40:11, 40:16, 55:1, 58:11, 75:8, 97:4, 98:7, 106:1, 106:17, 106:25, 119:20, 124:19, 126:7, 144:22, 145:7, 151:10
**Avenue** [1] - 2:7
**avenues** [1] - 124:24
**average** [3] - 40:12, 46:13, 47:4
**Avia** [2] - 54:14
**aware** [28] - 39:19, 39:21, 39:22, 44:11, 53:9, 53:19, 54:9, 94:14, 94:19, 107:4, 111:23, 115:11, 115:15, 119:5, 119:8, 122:9, 123:4, 123:8, 123:9,

133:15, 134:14,
134:17, 135:3,
135:25, 136:10,
142:23, 143:5,
143:10

## B

back-end [15] - 24:9,
24:10, 24:12, 25:14,
26:1, 26:5, 26:20,
26:25, 32:14, 33:9,
43:11, 140:14,
140:21, 140:22
background [4] -
10:13, 23:11,
136:14, 136:16
backup [1] - 10:14
bad [1] - 70:1
base [6] - 91:24,
91:25, 113:3,
121:17, 134:11,
137:2
based [38] - 16:22,
22:25, 25:16, 25:18,
25:24, 31:3, 31:6,
38:11, 40:8, 40:14,
40:24, 61:20, 61:22,
63:6, 63:12, 67:4,
67:19, 69:23, 70:15,
76:3, 83:17, 95:8,
95:11, 96:7, 97:3,
98:7, 101:18,
117:25, 124:3,
125:12, 126:16,
126:17, 126:20,
127:8, 129:15,
130:18, 131:15,
135:21
basing [2] - 24:14,
38:16
basis [2] - 92:22,
134:2
batch [29] - 103:21,
104:7, 104:23,
105:23, 106:10,
106:13, 106:19,
106:22, 107:7,
107:9, 107:12,
108:19, 108:23,
109:3, 109:18,
109:20, 109:24,
110:11, 110:19,
111:5, 111:23,
112:7, 112:11,
114:19, 114:21,
124:7, 124:11,
124:12, 132:24
Bates [2] - 50:10,
50:23

bathroom [2] - 41:2,
114:13
Beach [1] - 151:19
became [1] - 137:3
become [1] - 38:7
becomes [1] - 67:15
beginning [1] - 67:9
Behalf [2] - 2:2, 2:15
behalf [5] - 1:5, 19:10,
49:16, 143:8, 143:13
BEHALF [1] - 1:14
believes [1] - 76:8
Bell [4] - 136:22,
136:23, 137:1, 137:3
belong [1] - 27:9
best [4] - 9:8, 10:2,
22:18, 92:21
between [32] - 5:19,
5:22, 5:24, 26:3,
27:14, 33:5, 40:5,
43:13, 45:10, 57:21,
61:5, 70:3, 71:3,
79:2, 79:10, 79:20,
80:24, 83:5, 83:15,
84:22, 86:13, 92:11,
95:12, 98:15,
104:12, 111:11,
112:16, 116:1,
135:24, 137:4,
140:19, 151:11
beyond [2] - 55:23,
107:5
big [1] - 127:4
billion [1] - 97:12
billions [3] - 97:2,
97:6, 97:15
Bird [1] - 51:13
bird [8] - 12:12, 23:7,
24:16, 28:2, 30:18,
31:3, 51:6, 55:25
bird's [2] - 27:12,
32:16
birds [1] - 25:16
bit [7] - 10:14, 32:6,
104:22, 106:15,
109:25, 110:23,
138:10
blank [1] - 68:22
BLUEGREEN [1] -
1:10
Bluegreen [13] - 14:6,
19:10, 19:15, 49:17,
63:16, 64:23, 65:16,
65:23, 143:2, 150:3,
151:8
Bluegreen's [1] -
57:11
borrow [1] - 27:25
borrowed [1] - 28:2
bottom [6] - 18:4,

18:16, 57:2, 72:10,
102:11, 144:25
Boulevard [2] - 2:4,
2:11
Braman [3] - 10:10,
10:18, 10:24
break [9] - 41:2, 55:4,
55:6, 89:23, 90:3,
90:16, 114:13,
114:15, 138:25
Brickell [1] - 2:7
Brief [1] - 10:23
bring [1] - 47:2
broad [6] - 24:17,
100:19, 103:12,
112:23, 113:23,
127:16
broadly [1] - 100:6
building [1] - 136:19
built [6] - 24:20, 25:2,
27:19, 27:22, 53:25,
69:2
burdensome [3] -
121:10, 122:21,
122:24
business [12] - 49:8,
49:21, 68:15, 80:19,
105:10, 121:23,
121:24, 122:7,
122:18, 123:19,
130:19, 136:19
busy [9] - 34:15, 38:1,
47:22, 80:6, 80:13,
82:15, 83:17, 84:5,
84:19
button [16] - 13:7,
13:8, 17:5, 17:14,
26:23, 31:11, 32:2,
32:9, 33:7, 49:3,
50:15, 55:24, 140:5,
141:12, 141:13,
142:9
BY [8] - 2:5, 2:9, 2:12,
2:19, 2:24, 5:9, 90:5,
139:6

## C

C/O [1] - 151:4
campaign [11] - 12:17,
16:5, 17:7, 17:16,
18:8, 33:2, 83:13,
91:8, 98:23, 100:6,
141:23
campaigns [4] -
12:14, 12:15, 14:10,
99:17
Canada [2] - 137:24,
138:2
cancel [1] - 50:16

cannot [1] - 67:23
capabilities [5] -
39:17, 40:4, 42:3,
135:9, 135:14
capability [7] - 38:15,
39:6, 54:15, 54:16,
54:19, 105:2, 111:24
capacities [1] - 137:20
capacity [4] - 28:17,
28:22, 29:1, 29:2
Capitale [2] - 151:12,
151:18
care [1] - 123:20
carrier [11] - 122:9,
123:5, 124:5,
124:18, 125:19,
125:24, 126:20,
127:9, 127:21,
129:5, 132:12
carrier's [1] - 130:18
carriers [37] - 119:5,
119:9, 119:10,
121:5, 121:9,
121:11, 121:18,
121:25, 123:11,
124:4, 124:6,
124:12, 124:23,
125:3, 126:7,
126:18, 126:21,
127:4, 127:17,
127:23, 128:11,
128:15, 128:16,
128:24, 129:9,
129:16, 130:5,
130:10, 130:15,
130:19, 130:22,
130:23, 131:22,
132:3, 132:10,
138:14
case [47] - 5:14, 6:3,
7:17, 7:23, 10:10,
11:8, 11:12, 11:18,
11:20, 13:21, 14:10,
14:24, 16:5, 16:7,
16:13, 17:2, 22:10,
56:2, 56:18, 58:8,
67:16, 73:22, 76:12,
85:17, 86:15, 97:17,
112:25, 113:23,
116:1, 116:19,
117:22, 118:5,
119:13, 120:4,
120:5, 120:8,
127:18, 136:23,
139:21, 140:6,
142:11, 142:19,
143:3, 144:3, 144:6,
144:10, 144:16
CASE [1] - 1:2
cases [25] - 7:21, 7:22,

7:24, 48:20, 53:9,
53:23, 65:24, 72:25,
73:3, 73:5, 75:19,
105:11, 111:24,
112:1, 113:5, 119:7,
122:14, 126:14,
128:3, 128:5,
128:23, 133:5,
137:17, 138:10,
138:12
caused [2] - 35:11,
132:17
causes [1] - 88:14
cell [9] - 44:3, 45:8,
45:10, 45:12, 46:4,
46:10, 46:11, 46:25,
47:5
cellphone [1] - 127:4
Cellular [2] - 121:1,
127:9
cellular [11] - 21:11,
43:15, 43:20, 44:13,
44:20, 44:24,
116:21, 127:13,
132:6, 132:10,
137:10
certain [5] - 54:6,
136:4, 136:7, 136:8,
144:18
certainly [16] - 61:16,
72:1, 97:4, 97:6,
106:7, 121:21,
123:9, 125:24,
126:8, 129:6,
130:19, 131:15,
132:2, 132:8,
132:11, 133:3
certainty [5] - 67:21,
119:25, 120:1,
130:9, 144:17
Certificate [2] - 3:8,
3:9
certification [4] - 8:18,
58:14, 118:9, 149:15
certify [4] - 148:7,
149:5, 149:9, 149:12
certifying [1] - 149:16
cetera [2] - 36:10,
47:22
chain [1] - 63:4
chance [1] - 55:19
Change [1] - 150:5
change [1] - 100:2
changed [1] - 67:7
changes [1] - 10:15
CHANGES [1] - 150:2
characteristics [1] -
52:15
characterize [1] -
124:9

**chart** [21] - 81:12, 82:12, 82:17, 83:4, 85:18, 86:18, 86:22, 87:1, 87:9, 88:21, 89:18, 92:6, 92:10, 93:6, 93:15, 96:15, 97:11, 102:11, 143:21, 143:22, 143:24
**check** [8] - 69:5, 69:15, 70:6, 70:8, 80:20, 80:21, 94:3, 104:14
**checked** [1] - 61:7
**checking** [2] - 69:13, 72:16
**Choice** [14] - 15:6, 15:8, 57:12, 63:7, 63:15, 64:16, 64:19, 64:22, 65:1, 66:9, 67:22, 91:8, 98:22, 100:6
**choosing** [1] - 96:11
**chose** [2] - 19:20, 96:25
**cite** [1] - 15:11
**cited** [2] - 18:3, 18:4
**city** [3] - 73:15, 74:19, 74:23
**claims** [2] - 30:17, 31:2
**clarity** [1] - 57:20
**class** [52] - 8:18, 56:19, 58:13, 58:18, 59:23, 60:1, 61:2, 61:6, 62:20, 69:19, 75:23, 75:24, 78:17, 78:23, 90:11, 93:1, 93:20, 99:4, 99:23, 100:1, 100:11, 100:19, 101:3, 101:9, 103:10, 103:15, 103:18, 103:20, 106:2, 108:13, 108:15, 112:14, 112:19, 112:25, 113:7, 113:9, 113:13, 113:17, 113:21, 113:25, 114:9, 117:3, 117:21, 118:5, 118:8, 118:12, 118:15, 118:18, 119:1, 129:23, 129:24, 145:18
**class-action** [7] - 112:14, 112:19, 113:7, 113:9, 113:13, 113:21,

114:9
**classifying** [1] - 43:24
**clear** [1] - 8:16
**click** [4] - 19:15, 81:21, 140:4, 142:8
**clicked** [2] - 17:5, 17:20
**clicker** [82] - 12:18, 12:20, 12:22, 12:24, 13:6, 13:9, 13:11, 16:23, 17:15, 17:24, 17:25, 19:12, 19:15, 19:20, 19:22, 20:1, 20:5, 26:15, 26:17, 26:23, 31:13, 31:16, 31:17, 32:1, 34:4, 34:7, 34:9, 34:12, 34:15, 34:18, 34:21, 34:24, 35:2, 35:10, 40:20, 40:22, 41:18, 45:25, 48:4, 55:9, 55:21, 56:14, 57:8, 57:15, 71:2, 71:3, 71:13, 75:9, 79:10, 79:20, 80:5, 80:23, 83:5, 84:21, 85:7, 85:20, 86:23, 87:18, 91:21, 92:3, 92:8, 92:11, 92:17, 93:2, 94:1, 94:17, 98:15, 98:21, 99:4, 100:14, 101:16, 101:18, 102:14, 102:16, 102:17, 102:23, 139:24, 141:11, 142:14, 144:2, 144:9, 144:22
**clicking** [5] - 17:14, 31:10, 33:7, 41:20, 55:23
**clicks** [5] - 13:7, 13:8, 26:23, 48:14, 48:18
**client** [1] - 57:25
**CLKR_2018-1022-1027** [1] - 81:6
**CLKR_2018-1029-1103** [1] - 88:22
**code** [11] - 27:6, 27:10, 73:16, 74:20, 74:24, 82:2, 82:4, 95:15, 95:24, 100:15, 100:17
**codes** [4] - 70:4, 79:3, 95:12, 95:13
**collect** [1] - 135:12
**collected** [2] - 132:14, 135:11
**column** [3] - 68:17, 81:25, 82:1
**columns** [1] - 68:12

**combination** [1] - 96:7
**combinations** [10] - 97:3, 97:13, 97:16, 97:19, 98:2, 98:4, 98:7, 99:4, 99:18
**combine** [2] - 60:5, 84:20
**combined** [5] - 57:16, 60:8, 74:6, 127:12, 137:4
**combines** [2] - 52:9, 52:13
**combining** [1] - 71:1
**comfortable** [3] - 24:17, 27:21, 31:5
**commenced** [1] - 149:10
**comment** [1] - 130:8
**Commission** [4] - 148:22, 148:22, 149:23, 149:24
**common** [9] - 27:13, 49:10, 86:9, 86:10, 129:4, 129:12, 129:13, 146:5, 146:8
**communicate** [3] - 20:23, 21:10, 33:5
**communicated** [1] - 7:8
**communication** [2] - 137:11, 140:19
**communications** [2] - 7:12, 117:10
**companies** [6] - 121:21, 136:17, 136:18, 136:21, 137:4, 138:18
**company** [3] - 136:25, 137:24, 138:20
**compare** [1] - 61:4
**compared** [5] - 58:21, 59:25, 60:3, 85:5, 91:12
**comparing** [3] - 91:11, 97:14, 99:15
**comparison** [4] - 30:21, 48:2, 61:5, 101:16
**comparisons** [5] - 43:13, 43:20, 72:2, 104:12, 112:2
**complaint** [1] - 129:24
**complete** [2] - 63:25, 151:13
**completed** [5] - 76:22, 99:7, 105:21, 147:2, 149:11
**completely** [1] - 127:20
**complex** [3] - 71:4,

105:3, 109:19
**compliance** [2] - 52:7, 143:18
**component** [6] - 23:6, 24:2, 24:3, 25:15, 25:18, 26:1
**components** [6] - 21:5, 21:7, 22:9, 26:3, 27:25, 28:3
**computer** [9] - 14:16, 23:9, 24:14, 24:19, 25:22, 34:2, 35:17, 104:9, 136:14
**computerized** [10] - 44:21, 52:25, 53:2, 53:6, 53:8, 53:11, 53:14, 53:20, 53:24, 54:21
**concept** [1] - 44:15
**concerned** [1] - 65:4
**concluded** [1] - 147:15
**conclusion** [6] - 45:25, 64:7, 80:23, 92:15, 101:15, 134:12
**concrete** [2] - 93:14, 95:18
**condition** [1] - 83:18
**conducted** [5] - 59:2, 59:12, 69:1, 70:11, 133:11
**conducting** [3] - 56:21, 106:13, 108:7
**conducts** [1] - 35:14
**configurable** [1] - 13:3
**configured** [1] - 78:13
**confirmed** [2] - 102:12, 102:14
**conflicting** [4] - 85:9, 99:18, 100:3, 100:5
**conflicts** [3] - 95:12, 123:11, 126:2
**confused** [2] - 46:9, 48:1
**conjunction** [1] - 109:4
**connect** [1] - 43:10
**connected** [25] - 15:20, 21:4, 38:4, 75:25, 76:15, 76:19, 76:21, 77:2, 77:6, 77:9, 77:11, 77:24, 77:25, 78:2, 78:6, 78:9, 78:20, 78:21, 78:23, 79:7, 83:1, 83:19, 83:22, 86:3, 149:13
**connecting** [1] - 15:20

**connection** [4] - 26:12, 85:6, 120:8, 135:24
**connections** [1] - 22:14
**consider** [4] - 22:21, 41:6, 96:16, 141:5
**considered** [3] - 96:21, 115:21, 121:20
**considering** [1] - 141:5
**consist** [1] - 90:13
**consisting** [1] - 91:1
**consultant** [2] - 137:8, 137:22
**consumer** [3] - 75:12, 76:20, 80:12
**contact** [3] - 48:22, 66:8, 67:13
**contacted** [1] - 29:22
**contacts** [1] - 45:13
**contain** [1] - 64:15
**contained** [2] - 73:9, 75:25
**containing** [2] - 56:23, 57:2
**contains** [1] - 101:3
**content** [2] - 143:16, 145:19
**context** [1] - 20:12
**continue** [1] - 51:1
**continues** [1] - 36:6
**contract** [2] - 58:6, 104:10
**contracted** [1] - 105:19
**control** [3] - 81:14, 87:2, 149:16
**control-F** [2] - 81:14, 87:2
**conversation** [1] - 95:17
**conversations** [1] - 111:10
**copied** [1] - 11:18
**copy** [5] - 6:4, 10:9, 49:25, 50:12, 51:24
**core** [1] - 40:7
**corporate** [1] - 15:12
**correct** [160] - 5:15, 5:16, 7:2, 7:17, 7:18, 8:3, 8:9, 8:10, 8:20, 8:21, 9:7, 9:22, 10:1, 10:18, 10:19, 11:1, 11:4, 11:5, 11:21, 13:19, 14:1, 14:2, 14:24, 15:21, 15:22, 16:9, 16:15, 16:16, 17:23, 18:9, 18:20,

21:23, 22:3, 22:17, 24:4, 24:12, 25:22, 29:7, 31:7, 33:10, 33:11, 34:10, 34:11, 34:13, 34:14, 34:16, 34:17, 34:19, 34:20, 34:23, 35:1, 35:4, 35:5, 35:9, 35:10, 36:2, 36:10, 36:11, 38:13, 40:2, 40:18, 40:19, 43:15, 44:1, 44:2, 45:4, 46:2, 46:3, 49:20, 56:12, 56:19, 56:24, 58:15, 58:19, 58:20, 60:19, 63:22, 64:8, 65:6, 66:25, 67:3, 67:17, 68:24, 69:8, 69:21, 70:7, 70:12, 70:24, 73:12, 73:25, 76:16, 76:17, 76:20, 77:25, 78:1, 78:4, 79:11, 79:21, 80:9, 80:10, 80:13, 80:14, 82:17, 82:18, 85:11, 86:4, 87:4, 87:10, 88:17, 88:18, 89:1, 90:7, 93:24, 94:13, 94:19, 95:15, 96:4, 96:12, 97:7, 97:25, 100:11, 102:13, 108:5, 108:22, 111:2, 111:20, 112:12, 114:20, 115:3, 116:3, 116:13, 116:16, 118:19, 118:23, 119:2, 119:25, 120:10, 121:6, 121:7, 121:12, 122:2, 122:22, 124:2, 126:12, 126:18, 127:1, 127:10, 129:10, 129:11, 130:2, 131:20, 131:21, 134:5, 136:6, 136:15, 142:24, 143:25, 144:1, 144:4, 149:8
**corrections** [1] - 86:18
**correctly** [11] - 7:15, 7:25, 73:13, 87:21, 92:16, 93:17, 95:16, 109:23, 119:11, 133:18, 133:24
**correspond** [1] - 146:14
**corresponding** [2] - 94:16, 140:25
**corrupted** [1] - 69:25

**cost** [1] - 58:12
**counsel** [22] - 6:20, 7:12, 50:7, 51:24, 57:9, 57:11, 57:15, 62:4, 62:5, 62:19, 65:5, 65:7, 65:10, 65:12, 65:13, 65:14, 117:8, 117:10, 128:6, 149:12, 149:13
**counts** [1] - 128:12
**COUNTY** [2] - 148:3, 149:3
**couple** [3] - 9:16, 55:8, 124:17
**course** [1] - 122:18
**COURT** [1] - 1:1
**Court** [2] - 149:5, 151:18
**court** [4] - 8:2, 8:8, 39:23, 84:16
**cover** [1] - 129:17
**coverage** [2] - 127:9, 132:3
**coverages** [1] - 127:17
**covers** [1] - 54:25
**cramp** [1] - 90:17
**create** [1] - 97:1
**created** [2] - 73:3, 102:23
**creating** [2] - 12:16, 96:15
**creation** [2] - 13:12, 33:1
**critical** [1] - 137:17
**Cross** [1] - 3:5
**CROSS** [1] - 139:5
**CROSS-EXAMINATION** [1] - 139:5
**CSV** [9] - 56:23, 57:2, 57:11, 60:4, 61:24, 62:1, 64:15, 90:7, 91:7
**current** [3] - 11:10, 66:20, 130:3
**custodian** [1] - 120:13
**custody** [1] - 63:4
**custom** [1] - 124:20
**customer** [6] - 67:5, 69:24, 70:2, 95:7, 95:11, 125:4
**customer's** [1] - 19:13
**customers** [3] - 29:11, 29:15, 67:13

# D

**DADE** [2] - 148:3,

149:3
**data** [84] - 58:13, 61:16, 61:18, 61:20, 62:3, 62:20, 62:23, 63:4, 63:9, 63:24, 64:3, 64:8, 66:4, 67:5, 68:12, 69:9, 69:20, 70:1, 71:23, 72:12, 85:4, 85:25, 86:2, 86:10, 86:11, 93:12, 96:7, 96:11, 97:3, 97:17, 98:7, 98:11, 98:14, 101:6, 101:11, 101:14, 103:15, 103:18, 103:20, 104:11, 104:12, 105:9, 105:16, 105:25, 106:3, 106:10, 106:17, 107:1, 109:4, 110:14, 112:3, 113:3, 113:16, 114:3, 115:21, 117:3, 117:21, 117:23, 118:15, 121:11, 122:10, 122:17, 122:22, 122:25, 123:5, 123:10, 125:13, 125:14, 126:6, 128:7, 129:16, 130:6, 130:10, 132:17, 133:20, 134:1, 134:2, 134:11, 134:12, 135:10, 135:12, 135:23, 141:19, 145:1
**database** [12] - 29:12, 29:16, 29:21, 29:24, 30:1, 30:5, 45:13, 45:15, 59:20, 60:10, 61:3, 72:2
**databases** [4] - 69:2, 110:4, 117:20, 136:1
**DATE** [2] - 150:4, 150:21
**date** [19] - 83:10, 107:16, 118:21, 126:15, 129:20, 129:22, 143:24, 144:2, 144:5, 144:18, 144:20, 144:24, 145:7, 145:12, 145:13, 145:23, 146:6, 146:9, 146:11
**DATED** [2] - 4:6, 4:8
**dated** [9] - 66:4, 66:10, 66:15, 67:2,

149:3
**dates** [1] - 126:15
**dating** [1] - 130:6
**de** [1] - 106:4
**De** [1] - 2:24
**de-duplication** [1] - 106:4
**De-Zayas** [1] - 2:24
**dead** [1] - 37:23
**deal** [1] - 135:8
**December** [2] - 129:17, 129:20
**decide** [1] - 106:9
**decided** [1] - 72:22
**decision** [1] - 98:9
**decisions** [2] - 39:23, 72:21, 73:4
**declare** [1] - 150:17
**deem** [1] - 72:15
**default** [1] - 13:2
**defendant** [6] - 7:13, 7:23, 11:24, 15:13, 143:8, 143:14
**Defendant** [2] - 1:11, 2:15
**defendant's** [1] - 8:17
**defense** [2] - 65:10, 65:13
**define** [3] - 23:4, 40:6, 123:25
**defined** [2] - 23:3, 140:15
**definite** [1] - 83:16
**definitely** [1] - 80:17
**definition** [12] - 20:11, 22:6, 22:16, 38:25, 39:18, 77:24, 78:2, 78:23, 99:23, 100:1, 100:11, 140:11
**demo** [6] - 12:7, 13:4, 13:16, 16:2, 23:8, 30:18
**demonstration** [1] - 30:25
**DEPOSITION** [3] - 1:14, 1:14, 5:1
**Deposition** [1] - 3:2
**deposition** [20] - 5:15, 5:23, 6:16, 6:19, 7:12, 7:15, 8:1, 12:3, 23:16, 50:10, 51:13, 108:21, 139:18, 139:23, 147:15, 149:7, 149:8, 149:9, 149:10, 151:9
**describe** [3] - 19:10, 20:4, 25:6
**described** [17] - 12:11, 17:6, 21:19, 33:1,

67:3, 67:7, 67:22, 67:24, 68:1
**dates** [1] - 126:15
**dating** [1] - 130:6
**de** [1] - 106:4
**De** [1] - 2:24
**de-duplication** [1] - 106:4
**De-Zayas** [1] - 2:24
**dead** [1] - 37:23
**deal** [1] - 135:8
**December** [2] - 129:17, 129:20
**decide** [1] - 106:9
**decided** [1] - 72:22
**decision** [1] - 98:9
**decisions** [2] - 39:23, 72:21, 73:4
**declare** [1] - 150:17
**deem** [1] - 72:15
**default** [1] - 13:2
**defendant** [6] - 7:13, 7:23, 11:24, 15:13, 143:8, 143:14
**Defendant** [2] - 1:11, 2:15

34:7, 36:8, 39:16, 51:6, 54:10, 80:3, 110:6, 110:21, 119:23, 126:3, 133:4, 134:10, 140:21
**describing** [2] - 21:19, 124:17
**description** [3] - 25:3, 132:22, 135:22
**DESCRIPTION** [1] - 4:4
**descriptions** [1] - 24:15
**designation** [2] - 77:19, 88:17
**designee** [1] - 15:13
**desired** [1] - 110:1
**desktop** [3] - 35:13, 35:22, 46:4
**desktops** [1] - 25:22
**detect** [1] - 21:2
**detected** [2] - 75:14, 78:18
**determination** [3] - 21:3, 75:18, 91:5
**determine** [14] - 33:18, 33:19, 34:24, 35:2, 59:2, 59:22, 60:25, 66:14, 116:12, 116:20, 124:24, 145:2, 146:14, 147:1
**determined** [6] - 78:13, 82:8, 82:25, 83:1, 129:23, 144:17
**determines** [2] - 36:13, 42:9
**determining** [2] - 79:6, 111:6
**developed** [2] - 27:18, 27:24
**dial** [13] - 19:16, 19:20, 20:11, 20:15, 22:16, 28:20, 34:10, 42:8, 46:7, 47:21, 49:11, 140:5, 140:10
**dialed** [10] - 18:15, 22:11, 29:23, 32:17, 32:19, 32:20, 35:11, 63:2, 140:2, 140:12, 142:20
**dialer** [23] - 29:20, 30:4, 38:12, 39:8, 39:20, 40:2, 40:6, 40:7, 41:7, 41:10, 41:22, 41:25, 42:18, 42:22, 42:24, 55:9, 79:3, 82:3, 87:25, 141:16, 141:17,

DEPOSITION OF JAN KOSTYUN

6

141:20, 141:25
**dialers** [7] - 39:3, 39:5, 39:23, 41:12, 42:13, 76:5, 77:14
**dialing** [79] - 18:8, 18:23, 18:24, 19:5, 22:2, 22:6, 22:21, 22:25, 23:5, 23:10, 23:13, 23:14, 23:17, 24:4, 24:9, 24:10, 24:12, 25:15, 25:25, 26:1, 26:6, 26:20, 26:25, 27:11, 27:16, 27:18, 27:20, 27:25, 29:25, 30:22, 32:14, 32:22, 32:23, 33:9, 33:14, 38:15, 38:20, 39:5, 39:16, 39:17, 40:4, 42:3, 42:6, 42:25, 43:11, 45:6, 50:22, 52:10, 52:14, 52:16, 52:20, 52:21, 52:24, 53:7, 53:10, 53:19, 53:21, 53:22, 53:24, 54:2, 54:4, 54:22, 140:14, 140:21, 140:22, 140:25, 141:2, 141:6, 141:8, 141:9, 141:13, 141:15, 141:18, 141:22, 141:23, 142:2
**difference** [4] - 41:5, 42:11, 45:9, 45:11
**differences** [4] - 40:5, 41:6, 41:8, 42:5
**different** [18] - 27:23, 33:22, 40:10, 44:18, 51:22, 55:21, 66:1, 103:13, 115:12, 115:15, 115:18, 124:17, 127:17, 127:20, 133:7, 135:3
**digit** [2] - 14:13, 140:4
**digits** [3] - 47:14, 48:13, 48:20
**dilemma** [1] - 72:3
**Dina** [4] - 1:24, 148:21, 149:22, 151:18
**DINA** [1] - 149:5
**direct** [1] - 149:16
**DIRECT** [1] - 5:8
**Direct** [1] - 3:4
**direction** [1] - 149:16
**directly** [4] - 64:7, 65:22, 114:22, 145:10
**directory** [1] - 57:12
**disagree** [1] - 52:12

**discard** [3] - 72:24, 73:5, 119:14
**disclaimer** [2] - 133:19, 133:22, 133:25, 134:6, 134:10
**disclaimers** [3] - 133:15, 133:24, 136:10
**disclose** [1] - 104:11
**disclosure** [2] - 110:11, 110:22
**disconnected** [1] - 82:10
**discovery** [1] - 146:23
**discrepancies** [6] - 79:10, 79:19, 85:24, 86:19, 89:7, 116:1
**discrepancy** [9] - 57:21, 80:11, 83:5, 84:3, 84:4, 84:13, 84:14, 89:19, 89:20
**discuss** [2] - 117:10, 121:4
**discussed** [16] - 12:8, 30:24, 32:11, 41:5, 44:22, 53:16, 67:4, 92:2, 111:4, 115:23, 132:5, 132:21, 140:8, 141:10, 142:5, 146:17
**discussing** [3] - 10:12, 79:23, 100:9
**Discussion** [1] - 131:9
**discussion** [10] - 23:15, 23:18, 24:13, 25:5, 30:19, 79:16, 93:18, 106:15, 122:5, 140:17
**discussions** [6] - 6:20, 23:8, 24:18, 31:3, 106:23, 109:24
**disposition** [54] - 57:9, 57:16, 58:21, 63:18, 71:2, 71:5, 75:3, 75:4, 75:7, 75:11, 76:14, 78:16, 79:3, 79:11, 79:20, 80:8, 83:6, 83:25, 84:18, 84:21, 84:24, 85:8, 86:4, 86:6, 88:15, 92:12, 92:25, 93:23, 94:5, 94:6, 94:15, 94:24, 95:6, 95:12, 95:15, 95:21, 95:24, 96:9, 97:14, 97:25, 99:16, 99:18, 100:15, 100:17, 100:24, 100:25, 144:5, 144:14,

144:19, 144:23, 145:11, 146:15
**dispositions** [6] - 71:4, 78:8, 91:10, 92:4, 94:11, 99:5
**dispute** [2] - 25:8, 47:6
**disqualified** [1] - 8:2
**distinct** [1] - 145:3
**distinction** [1] - 78:25
**distinguish** [4] - 83:15, 98:14, 101:12, 145:14
**DISTRICT** [2] - 1:1, 1:1
**DO** [1] - 150:2
**document** [3] - 50:11, 52:4, 150:17
**documentation** [1] - 59:15
**documented** [5] - 59:14, 61:12, 64:11, 118:6, 146:21
**documents** [1] - 143:11
**done** [7] - 6:24, 48:12, 49:17, 63:12, 76:4, 117:24, 146:14
**door** [1] - 70:16
**doubt** [1] - 49:8
**down** [2] - 32:5, 95:5
**downstream** [1] - 99:7
**dozen** [1] - 111:10
**draft** [1] - 117:11
**drafted** [1] - 11:12
**drew** [1] - 100:21
**drive** [2] - 86:10, 86:11
**drop** [1] - 95:5
**drop-down** [1] - 95:5
**drops** [2] - 119:7, 119:21
**duly** [3] - 5:7, 148:9, 149:6
**dumps** [1] - 77:21
**duplicate** [5] - 101:2, 101:4, 102:3, 106:2, 145:4
**duplication** [1] - 106:4
**during** [18] - 12:2, 12:9, 16:4, 23:8, 23:15, 30:18, 30:24, 38:8, 56:2, 56:5, 58:5, 109:11, 109:16, 115:22, 118:11, 125:9, 125:21, 137:12
**dynamically** [1] - 40:12

**E**

**e-mail** [2] - 73:17, 73:18
**e-mails** [1] - 111:11
**ear** [1] - 36:4
**earliest** [1] - 118:17
**early** [1] - 137:5
**easily** [1] - 69:5
**education** [2] - 132:19, 133:2
**effect** [2] - 29:18, 45:13
**effectively** [5] - 109:6, 109:20, 113:8, 141:24, 144:21
**efficient** [1] - 49:17
**eight** [2] - 10:8, 118:19
**EISENBAND** [1] - 2:10
**Eisenband** [1] - 2:12
**either** [11] - 17:2, 21:24, 31:15, 36:7, 47:17, 87:24, 91:16, 113:2, 116:13, 134:18, 141:12
**elimination** [1] - 106:5
**Elvis** [1] - 103:4
**employee** [1] - 149:13
**employees** [1] - 25:21
**encompass** [1] - 43:14
**end** [33] - 14:15, 21:9, 24:9, 24:10, 24:12, 25:7, 25:14, 26:1, 26:5, 26:20, 26:25, 32:14, 33:9, 42:25, 43:11, 75:9, 76:8, 76:22, 95:20, 140:14, 140:19, 140:21, 140:22, 140:25, 141:2, 141:7, 141:9, 141:15, 141:18, 142:2, 147:3, 147:5
**ended** [6] - 14:8, 32:3, 92:3, 93:1, 93:4, 93:9
**ends** [1] - 36:10
**engine** [6] - 22:25, 23:5, 23:10, 23:13, 23:17, 24:4
**ENTER** [1] - 150:2
**enter** [1] - 140:4
**entered** [2] - 67:8, 86:14
**entire** [5] - 57:23, 67:11, 91:14, 100:7, 100:19
**entirety** [1] - 58:4

**entities** [1] - 124:22
**entity** [3] - 123:19, 142:10, 143:1
**entries** [1] - 87:19
**entry** [1] - 85:6
**environment** [1] - 105:15
**equal** [2] - 98:8, 98:12
**equate** [2] - 39:7, 52:21
**equipment** [2] - 28:16, 126:22
**equivalent** [3] - 44:23, 141:2, 141:18
**Errata** [1] - 3:10
**ERRATA** [1] - 150:1
**error** [1] - 116:8
**errors** [1] - 88:2
**Esq** [6] - 2:5, 2:9, 2:12, 2:19, 2:24, 151:4
**essentially** [1] - 121:20
**establish** [2] - 24:1, 26:12
**established** [1] - 25:24
**estimate** [2] - 10:6, 107:8
**et** [2] - 36:10, 47:22
**evaluate** [1] - 96:11
**evaluating** [1] - 69:19
**event** [1] - 38:2
**eventually** [1] - 14:21
**evidence** [9] - 20:3, 25:4, 41:17, 59:21, 76:11, 78:15, 99:17, 105:10, 139:19
**exact** [4] - 60:16, 83:23, 93:16, 131:20
**exactly** [2] - 18:11, 118:9
**EXAMINATION** [2] - 5:8, 139:5
**Examination** [2] - 3:4, 3:5
**example** [13] - 48:7, 79:23, 80:4, 92:23, 93:11, 95:18, 96:15, 97:5, 98:20, 99:9, 122:2, 125:2, 135:19
**examples** [13] - 59:17, 79:18, 80:2, 87:22, 88:1, 92:1, 93:7, 93:8, 93:14, 93:21, 95:14, 99:10, 100:21
**Excel** [4] - 60:9, 61:5, 69:11, 71:13
**exchange** [2] - 62:9, 65:25

**exchanges** [1] - 139:17
**excuse** [1] - 145:9
**executing** [1] - 12:14
**exhibit** [1] - 50:9
**Exhibit** [12] - 6:9, 6:12, 8:14, 8:23, 15:10, 49:24, 49:25, 50:2, 50:9, 51:23, 52:1, 52:4
**EXHIBIT** [1] - 4:4
**EXHIBITS** [1] - 4:1
**exist** [6] - 31:2, 31:5, 69:8, 71:24, 124:22, 142:18
**existed** [1] - 61:8
**existence** [3] - 95:11, 100:2, 105:10
**existing** [1] - 28:3
**expect** [3] - 130:5, 131:16, 142:16
**expected** [1] - 66:18
**Experian** [12] - 113:2, 115:8, 133:7, 133:12, 133:16, 133:18, 133:22, 134:15, 134:21, 135:7, 135:19, 136:1
**experience** [17] - 41:11, 67:5, 67:12, 67:19, 69:23, 70:15, 70:18, 75:17, 76:3, 108:22, 108:23, 121:18, 124:4, 131:15, 133:3, 145:25, 146:5
**experience-based** [1] - 70:15
**experienced** [1] - 132:7
**EXPERT** [2] - 4:5, 4:7
**expert** [14] - 6:4, 6:21, 7:22, 8:2, 25:5, 72:25, 109:25, 112:14, 113:24, 136:13, 137:21, 138:10, 139:18, 146:17
**experts** [4] - 113:5, 113:11, 113:12, 133:5
**Expiration** [2] - 148:22, 149:24
**explain** [2] - 97:12, 104:21
**explained** [1] - 83:23
**exploratory** [1] - 108:9
**expressed** [1] - 114:3
**extent** [3] - 34:8, 117:9, 145:20

**external** [4] - 44:25, 45:1, 45:4, 104:12
**extreme** [1] - 137:15
**extremely** [1] - 137:15

## F

**facilities** [2] - 126:17, 127:8
**facilities-based** [2] - 126:17, 127:8
**facility** [1] - 126:20
**fact** [26] - 18:9, 18:13, 18:23, 29:6, 33:4, 41:19, 42:16, 58:17, 67:2, 67:16, 69:24, 75:25, 79:4, 96:16, 100:13, 100:18, 111:4, 121:23, 122:5, 139:20, 139:25, 142:18, 145:6, 145:11, 145:18, 146:22
**factor** [1] - 116:12
**factors** [4] - 64:9, 64:10, 70:4, 124:24
**facts** [1] - 150:17
**factual** [2] - 16:17, 16:21
**failed** [1] - 88:23
**failed/refused** [2] - 95:21, 95:23
**failing** [1] - 123:8
**fair** [2] - 9:24, 35:19
**fairly** [2] - 71:4, 71:7
**false** [1] - 51:11
**familiar** [4] - 64:11, 113:14, 113:15, 126:6
**far** [17] - 22:4, 41:9, 42:9, 65:4, 99:25, 105:1, 110:1, 116:14, 116:17, 121:24, 122:25, 123:1, 124:10, 124:18, 126:1, 130:1, 145:20
**fast** [1] - 48:15
**fax** [1] - 34:25
**FCC** [2] - 39:19, 39:21
**feature** [1] - 40:8
**fed** [1] - 113:6
**feed** [1] - 113:16
**few** [3] - 46:14, 49:20, 139:9
**field** [6] - 54:3, 68:19, 68:21, 73:24, 74:6, 75:7
**fifth** [1] - 127:8
**file** [25] - 17:19, 60:1,

60:6, 60:12, 60:18, 60:25, 67:22, 71:6, 78:16, 85:7, 85:8, 88:5, 90:12, 93:1, 94:1, 110:10, 110:21, 116:8, 134:15, 134:18, 141:19, 141:21, 144:19, 144:22, 144:23
**files** [76] - 15:1, 15:4, 56:23, 57:2, 57:6, 57:7, 57:8, 57:9, 57:11, 57:12, 57:14, 57:15, 57:16, 57:21, 57:22, 57:24, 58:2, 58:4, 58:8, 58:9, 58:15, 58:21, 58:22, 58:23, 59:3, 59:6, 59:8, 59:18, 60:4, 61:4, 61:8, 61:25, 62:1, 62:18, 63:13, 63:15, 63:20, 63:22, 64:5, 64:15, 65:1, 65:5, 65:8, 65:17, 66:9, 67:1, 69:5, 71:2, 71:6, 71:13, 72:13, 72:15, 73:8, 73:14, 73:20, 75:9, 80:25, 84:21, 90:7, 90:14, 90:25, 91:6, 91:8, 91:13, 91:14, 91:15, 116:1, 116:14, 116:21, 142:17, 142:18
**financially** [1] - 149:13
**findings** [2] - 84:15, 116:23
**fine** [1] - 50:8
**finger** [1] - 41:19
**finished** [1] - 138:22
**firm** [1] - 10:6
**first** [34] - 5:6, 26:17, 27:15, 27:18, 40:6, 52:8, 59:5, 68:17, 68:19, 68:22, 70:15, 73:14, 73:15, 73:25, 74:5, 74:9, 74:15, 81:5, 81:23, 87:3, 88:8, 88:11, 88:20, 89:10, 89:19, 89:20, 97:11, 108:17, 108:18, 108:25, 109:14, 109:21, 149:6
**fit** [1] - 140:10
**five** [7] - 10:7, 107:14, 110:5, 119:2, 127:12, 130:5, 138:6
**Flagler** [4] - 1:19,

2:18, 2:22, 151:6
**flaws** [1] - 85:13
**flexible** [1] - 130:4
**flip** [2] - 50:23, 64:25
**floating** [1] - 79:25
**FLORIDA** [3] - 1:1, 148:3, 149:3
**Florida** [13] - 1:20, 1:24, 2:4, 2:8, 2:11, 2:18, 2:23, 127:20, 148:21, 149:5, 149:23, 151:6, 151:19
**follow** [1] - 139:9
**follow-up** [1] - 139:9
**followed** [2] - 79:24, 124:25
**following** [1] - 143:21
**follows** [1] - 5:7
**foolproof** [1] - 76:5
**forefront** [1] - 122:6
**foregoing** [2] - 149:7, 149:15, 150:17
**foremost** [2] - 121:22, 136:24
**form** [18] - 16:25, 24:23, 27:22, 28:9, 28:24, 33:3, 34:6, 47:7, 62:22, 72:18, 73:1, 92:9, 96:5, 96:19, 99:24, 104:8, 105:6, 118:20
**formal** [2] - 106:14, 132:9
**format** [5] - 60:20, 60:21, 60:22, 73:13, 128:7
**Fort** [2] - 2:4, 2:11
**forth** [3] - 110:1, 111:12, 149:10
**forwarded** [2] - 77:17, 78:3
**forwarding** [2] - 77:5, 77:12
**foundation** [2] - 16:17, 16:22
**founded** [1] - 136:25
**four** [5] - 80:2, 95:14, 126:17, 127:4, 128:3
**fourth** [1] - 79:23
**frame** [2] - 71:25, 138:21
**frames** [1] - 125:15
**frequency** [1] - 40:13
**Friday** [1] - 151:12
**front** [11] - 8:15, 21:9, 81:7, 140:19, 140:25, 141:2, 141:7, 141:9, 141:15, 141:18,

142:2
**front-end** [7] - 140:25, 141:2, 141:7, 141:9, 141:15, 141:18, 142:2
**Frontier** [1] - 122:16
**full** [5] - 75:18, 110:10, 110:14, 110:21, 138:18
**full-file** [2] - 110:10, 110:21
**fully** [1] - 143:19
**function** [8] - 18:11, 22:1, 25:12, 34:1, 35:18, 40:17, 42:2, 54:21, 81:14, 84:8, 87:2
**functionality** [1] - 23:19
**functions** [6] - 20:24, 20:25, 21:2, 27:13, 44:23, 104:19

## G

**gaps** [1] - 132:3
**general** [7] - 33:14, 77:23, 123:2, 123:19, 124:5, 128:13, 135:7
**generalized** [3] - 126:15, 133:19, 135:18
**generally** [8] - 13:1, 33:11, 33:21, 68:24, 78:5, 114:3, 128:6, 141:19
**generate** [4] - 39:2, 39:4, 39:6, 91:10
**generated** [1] - 32:13
**generator** [2] - 28:19, 29:4
**geographic** [1] - 127:18
**GG** [2] - 148:22, 149:23
**given** [3] - 5:19, 51:17, 71:9
**goal** [2] - 145:15, 145:17
**Gold** [39] - 13:25, 14:3, 15:2, 16:7, 19:8, 20:2, 20:6, 25:21, 57:13, 57:24, 58:5, 58:6, 61:22, 61:24, 62:6, 63:2, 63:14, 63:16, 64:20, 64:22, 64:24, 65:1, 65:6, 65:9, 65:15, 80:15, 92:4, 93:4,

94:23, 101:19,
101:23, 102:5,
142:13, 142:24,
143:2, 143:5,
143:18, 147:7,
147:10
**Graham** [1] - 137:1
**great** [1] - 31:17
**group** [1] - 48:8
**GTE** [1] - 137:3
**guarantee** [2] -
119:19, 129:6
**guess** [2] - 127:14,
147:3
**gut** [2] - 84:23, 85:1
**guys** [3] - 57:22,
138:23, 139:3

## H

**hairs** [1] - 79:22
**half** [3] - 47:19,
111:10, 144:25
**hand** [8] - 8:13, 36:5,
49:23, 51:23, 72:5,
93:12, 148:14,
149:18
**handled** [3] - 56:9,
75:6, 99:7
**handles** [1] - 37:6
**handling** [5] - 12:21,
75:16, 78:11, 95:24,
99:8
**handout** [1] - 51:17
**hands** [1] - 92:3
**handset** [1] - 35:25
**handshake** [1] - 26:11
**hang** [3] - 82:6, 87:8,
87:13
**hanging** [1] - 22:2
**headset** [2] - 37:11,
37:12
**hear** [9] - 37:12,
37:22, 37:23, 37:24,
37:25, 38:8, 120:3,
120:6
**heard** [2] - 51:5, 120:2
**hearing** [1] - 47:21
**hears** [1] - 37:21
**held** [2] - 7:3, 131:9
**Henry** [1] - 19:7
**hereby** [1] - 149:5
**hereinabove** [2] -
149:10, 149:11
**hereunto** [1] - 149:17
**herself** [1] - 147:8
**hi** [1] - 139:8
**high** [11] - 21:7, 25:3,
25:11, 25:16, 39:1,
49:19, 59:25, 67:20,

71:7, 76:1, 127:6
**high-level** [2] - 25:11,
71:7
**higher** [2] - 41:13
**highest** [1] - 115:21
**HIRALDO** [17] - 2:3,
5:9, 50:6, 55:3,
57:20, 58:2, 81:3,
81:6, 89:23, 90:1,
90:5, 90:21, 114:13,
131:7, 138:22,
139:2, 147:13
**Hiraldo** [7] - 2:5, 2:9,
3:4, 5:13, 139:14,
142:23, 143:23
**historic** [2] - 125:8,
125:16
**historical** [2] - 121:6,
125:4
**hit** [2] - 82:11, 82:19
**hits** [2] - 32:2, 32:8
**hitting** [1] - 31:10
**hold** [3] - 6:17, 38:6,
38:8
**holding** [1] - 39:19
**home** [3] - 68:11,
68:14, 73:21
**Hotels** [4] - 15:6, 15:8,
57:12, 63:7
**hour** [1] - 111:15
**hours** [5] - 10:7, 10:8,
111:17, 139:11,
151:12
**house** [1] - 105:15
**housed** [1] - 27:6
**hu** [6] - 15:3, 22:8,
32:4, 36:17, 77:1,
83:11
**human** [4] - 22:11,
33:20, 36:1, 36:3,
36:8, 44:22, 75:15,
76:8, 83:2, 83:22,
142:3
**hundred** [7] - 27:23,
67:18, 67:21, 67:23,
67:25, 119:24, 120:1
**hundreds** [1] - 128:13

## I

**icon** [1] - 47:18
**idea** [6] - 11:16, 46:16,
46:18, 47:24, 49:14,
140:9
**ideas** [1] - 27:23
**identification** [18] -
6:13, 8:24, 50:3,
52:2, 85:5, 107:20,
108:1, 108:8, 110:8,
112:20, 113:2,

113:7, 113:9,
113:17, 113:20,
114:8, 132:5, 135:8
**identified** [15] - 70:20,
73:20, 74:8, 74:14,
74:23, 79:19, 81:11,
82:17, 85:18, 86:19,
86:22, 89:6, 98:22,
111:1, 118:14
**identifies** [2] - 101:10,
115:25
**identify** [8] - 70:14,
80:11, 95:10, 99:10,
103:21, 107:22,
123:13, 124:13
**identifying** [16] -
70:18, 73:8, 73:10,
83:12, 83:14, 85:9,
107:10, 110:12,
113:25, 115:2,
123:6, 127:24,
143:6, 144:21,
145:1, 145:15
**Ignacio** [1] - 2:9
**ignoring** [2] - 96:2,
96:6
**IJH** [1] - 2:7
**imagine** [1] - 138:9
**immediate** [1] - 73:3
**immediately** [4] -
32:17, 32:19, 32:24,
119:14
**impact** [2] - 99:22,
100:10
**implementation** [1] -
138:1
**implemented** [2] -
30:17, 31:2
**implication** [1] -
119:19
**implying** [1] - 100:15
**important** [2] - 72:16,
85:22, 87:16
**improve** [1] - 54:7
**IN** [2] - 149:17, 150:3
**inaccuracies** [5] -
114:1, 125:12,
132:16, 134:11,
136:8
**inaccuracy** [1] -
130:21
**inaccurate** [12] - 67:6,
67:10, 67:15,
112:15, 116:16,
116:18, 130:15,
131:3, 131:13,
131:17, 134:16,
134:19
**inaccurately** [1] - 67:8
**inactive** [3] - 91:8,

98:22, 100:6
**inappropriately** [1] -
30:8
**inbound** [1] - 21:1
**INC** [3] - 1:10, 150:3,
151:8
**Inc** [1] - 11:21
**include** [6] - 78:2,
84:12, 85:22, 96:22,
139:17, 146:11
**included** [15] - 9:25,
12:14, 19:3, 73:14,
83:3, 90:11, 91:9,
99:3, 99:5, 99:8,
100:1, 117:2,
117:15, 136:12,
147:9
**includes** [1] - 32:14
**including** [1] - 110:15
**inclusive** [1] - 149:7
**incoming** [3] - 37:8,
37:11, 37:14
**incomplete** [1] - 62:24
**inconsistencies** [19] -
69:23, 70:3, 71:3,
71:23, 79:2, 80:24,
84:22, 86:13, 91:25,
92:11, 93:21, 96:14,
98:9, 100:18,
100:20, 116:4,
116:6, 116:7, 116:8
**inconsistency** [5] -
92:22, 96:23, 96:24,
97:1, 97:5
**inconsistent** [1] - 97:8
**incorporate** [1] - 11:9
**incorrectly** [4] - 87:24,
87:25, 95:10, 101:14
**increases** [1] - 100:19
**independent** [3] -
60:11, 60:12, 133:11
**indeterminate** [2] -
126:1, 146:25
**INDEX** [2] - 3:1, 4:1
**indicated** [1] - 119:13
**indicating** [1] - 145:23
**indication** [1] - 102:22
**indicator** [1] - 37:10
**individual** [10] - 61:11,
72:12, 101:11,
110:12, 110:13,
110:15, 117:24,
117:25, 119:15,
120:11
**individualized** [2] -
66:17, 116:11
**individually** [1] - 1:5
**individuals** [5] - 49:3,
49:20, 107:23,
112:16, 135:25

**industry** [6] - 137:14,
138:4, 138:6, 138:8,
138:11, 138:17
**informally** [1] - 41:11
**information** [65] -
13:1, 18:12, 19:14,
51:11, 58:18, 59:1,
59:7, 59:18, 59:23,
61:1, 61:17, 62:8,
62:10, 62:20, 63:8,
63:11, 66:1, 66:9,
66:15, 67:14, 68:13,
70:1, 73:8, 73:10,
83:12, 85:9, 91:12,
96:25, 107:11,
107:16, 108:11,
110:13, 115:3,
116:2, 116:9,
116:15, 116:18,
119:6, 119:15,
119:18, 119:20,
120:15, 120:18,
120:21, 120:24,
121:2, 121:6, 123:7,
123:16, 124:8,
124:14, 125:8,
126:1, 127:24,
128:17, 129:9,
130:14, 130:20,
130:22, 132:6,
132:13, 132:14,
137:2, 144:22
**infrastructure** [1] -
135:10
**inherent** [1] - 95:9
**initial** [2] - 132:24,
137:13
**initiate** [12] - 16:8,
20:25, 22:7, 22:16,
26:14, 26:15, 27:3,
34:7, 36:4, 42:8,
54:4, 55:22
**initiated** [9] - 17:13,
20:19, 33:2, 141:8,
141:15, 141:23,
142:3, 142:8, 142:15
**initiates** [3] - 26:24,
54:3, 141:4
**initiating** [1] - 140:11
**initiation** [3] - 20:16,
20:17, 22:12
**initiator** [1] - 35:24
**input** [1] - 128:6
**inputs** [1] - 111:6
**inputted** [1] - 29:6
**inquiry** [1] - 66:17
**inserted** [3] - 32:21,
32:24, 140:23
**insertion** [1] - 142:6
**insight** [1] - 137:15

**inspect** [1] - 23:22
**inspected** [3] - 30:9, 30:16, 136:5
**inspecting** [1] - 23:23
**inspection** [5] - 7:1, 7:3, 7:7, 9:10, 12:10
**instance** [35] - 22:10, 30:4, 30:20, 41:11, 51:6, 70:8, 70:25, 71:1, 83:4, 85:16, 86:22, 87:3, 88:20, 89:3, 89:10, 89:14, 92:23, 94:3, 94:14, 94:19, 98:24, 99:11, 102:22, 108:25, 109:7, 109:11, 109:14, 114:6, 118:17, 118:25, 122:9, 123:4, 125:17, 127:18, 134:14
**instances** [18] - 23:17, 79:9, 93:5, 100:3, 100:5, 101:4, 102:2, 104:6, 110:10, 115:25, 117:2, 122:20, 128:9, 128:24, 129:2, 132:16, 134:17, 146:10
**instituted** [1] - 30:5
**intensely** [1] - 138:17
**intention** [1] - 75:13
**interacted** [1] - 41:18
**interaction** [4] - 18:14, 21:21, 95:10, 111:5
**interested** [9] - 80:9, 80:12, 84:18, 84:24, 86:6, 95:22, 95:25, 96:9, 149:13
**interesting** [1] - 69:18
**interface** [10] - 23:1, 25:18, 25:25, 26:20, 26:24, 37:10, 42:21, 140:20, 141:3, 141:10
**interfaces** [1] - 24:7
**interject** [1] - 61:23
**intermediate** [1] - 72:20
**intermingled** [1] - 30:7
**internal** [2] - 110:14, 132:11
**internals** [1] - 123:18
**interpret** [1] - 103:13
**interpreted** [4] - 51:21, 83:21, 83:22, 87:24
**interruption** [1] -

10:23
**introduce** [1] - 108:14
**introduced** [3] - 23:2, 44:15, 140:1
**introducing** [1] - 147:8
**invalid** [3] - 91:21, 94:24, 95:25
**invented** [1] - 137:1
**investigated** [1] - 146:20
**investigation** [3] - 116:11, 116:25, 146:13
**invite** [11] - 26:8, 26:15, 26:16, 26:18, 26:19, 27:3, 42:19, 42:22, 42:24, 44:4
**involve** [2] - 25:3, 66:19
**involved** [30] - 12:17, 21:6, 22:9, 23:12, 23:23, 37:6, 41:3, 64:10, 65:25, 70:13, 71:22, 97:17, 97:20, 105:1, 105:25, 106:7, 111:10, 112:18, 113:4, 113:24, 122:14, 126:14, 127:21, 127:22, 128:2, 132:23, 136:18, 137:25, 138:11, 138:17
**involvement** [4] - 34:8, 112:24, 128:4, 138:7
**involves** [2] - 39:1, 85:24
**isolated** [1] - 100:5
**issue** [20] - 11:20, 13:21, 15:24, 16:5, 16:9, 16:15, 16:19, 27:2, 28:15, 70:19, 70:20, 86:1, 100:10, 101:8, 122:20, 142:10, 142:14, 144:9, 145:10, 145:16
**issued** [10] - 5:22, 5:24, 6:15, 8:16, 8:19, 10:17, 10:25, 16:13, 128:8, 142:23
**issues** [7] - 10:20, 10:25, 11:3, 21:15, 135:19, 139:10, 145:5
**issuing** [2] - 121:5, 127:23
**itself** [1] - 146:10

## J

**J.A.N** [1] - 5:12
**JAN** [8] - 1:14, 3:2, 4:5, 4:8, 5:1, 5:4, 148:8, 150:21
**Jan** [3] - 5:12, 150:4, 151:3
**January** [1] - 118:7
**job** [2] - 25:13, 121:19
**jobs** [2] - 109:5, 111:5
**judgment** [2] - 72:21, 73:4
**jumbled** [2] - 90:18, 90:19
**jumping** [1] - 80:23
**June** [10] - 1:15, 5:1, 6:7, 8:14, 118:16, 148:15, 149:18, 150:4, 151:2, 151:9
**JUNE** [1] - 4:8

## K

**K.O.S.T.Y.U.N** [1] - 5:12
**keep** [4] - 72:5, 119:5, 119:9, 130:20
**keeping** [1] - 138:11
**keeps** [5] - 120:14, 120:17, 120:20, 120:23, 121:1
**key** [2] - 18:12, 42:5
**keyed** [1] - 14:21
**kind** [10] - 25:12, 32:3, 34:4, 61:4, 69:20, 72:21, 90:18, 95:9, 103:12, 132:9
**kindly** [1] - 5:10
**knowing** [1] - 73:5
**knowledge** [3] - 44:8, 116:10, 130:23
**KOSTYUN** [8] - 1:14, 3:2, 4:6, 4:8, 5:1, 5:4, 148:8, 150:21
**Kostyun** [7] - 5:12, 5:13, 81:8, 90:6, 139:7, 150:4, 151:3

## L

**labeled** [1] - 50:10
**Labs** [3] - 136:22, 136:23, 137:3
**landline** [1] - 117:2
**landlines** [1] - 117:15
**language** [1] - 24:6
**large** [7] - 93:21, 117:23, 123:8, 124:5, 124:6,

125:24, 130:10
**Large** [1] - 149:5
**largest** [1] - 137:24
**Las** [2] - 2:4, 2:11
**last** [25] - 5:22, 7:5, 7:6, 7:15, 7:25, 8:7, 50:14, 50:25, 61:19, 66:7, 68:2, 73:15, 73:25, 74:4, 74:6, 74:9, 74:15, 81:24, 82:1, 99:14, 108:21, 129:14, 138:3, 138:19
**late** [1] - 137:22
**latest** [3] - 118:25, 127:5, 138:13
**Lauderdale** [2] - 2:4, 2:11
**launches** [1] - 22:20
**LAW** [2] - 2:7, 2:10
**layman** [1] - 70:17
**lead** [72] - 15:1, 15:4, 56:23, 57:2, 57:6, 57:8, 57:11, 57:12, 57:16, 57:21, 57:22, 57:24, 58:4, 58:8, 58:9, 58:15, 58:18, 58:21, 58:23, 59:1, 59:3, 59:6, 59:7, 59:8, 59:17, 59:18, 59:23, 60:3, 60:5, 60:11, 61:1, 61:8, 62:8, 62:18, 62:20, 63:13, 63:15, 63:20, 63:22, 64:5, 64:15, 65:1, 65:5, 65:17, 66:4, 66:9, 66:14, 67:1, 67:22, 68:4, 68:12, 71:6, 73:14, 90:7, 90:14, 90:25, 91:1, 91:4, 91:5, 91:12, 91:15, 106:3, 106:6, 116:1, 116:8, 116:14, 116:21, 142:17, 142:18
**leads** [11] - 60:12, 63:6, 68:5, 68:9, 68:16, 71:5, 73:9, 74:8, 74:13, 74:22, 90:12
**learned** [1] - 130:21
**least** [7] - 12:15, 25:12, 110:9, 113:12, 122:15, 130:5, 138:17
**legal** [2] - 39:12, 39:14
**length** [3] - 40:12, 111:8, 143:23
**LETTER** [1] - 151:1
**Letter** [1] - 3:11

**level** [9] - 21:7, 25:3, 25:11, 25:16, 39:1, 59:25, 71:7, 115:21, 128:3
**levels** [5] - 115:15, 115:18, 121:24, 133:7, 135:4
**Lexis** [1] - 113:2
**LexisNexis** [13] - 110:7, 110:9, 110:18, 110:20, 111:21, 111:23, 112:10, 113:16, 114:17, 114:22, 125:14, 133:6, 136:2
**likelihood** [3] - 67:20, 76:1, 100:19
**likely** [1] - 145:20
**limit** [1] - 63:11
**limited** [1] - 25:17
**line** [5] - 21:3, 72:10, 81:15, 82:5, 87:4
**Line** [1] - 150:5
**link** [20] - 37:4, 82:23, 84:19, 86:7, 86:23, 87:15, 87:17, 87:20, 88:14, 89:4, 89:16, 93:3, 93:10, 94:5, 94:16, 96:4, 96:10, 96:18, 100:15, 100:22
**list** [16] - 12:17, 12:18, 13:13, 13:15, 14:9, 32:19, 41:23, 45:3, 48:22, 49:5, 61:2, 95:5, 107:13, 110:3, 110:5, 113:17
**listen** [10] - 34:9, 34:12, 34:15, 34:18, 34:21, 34:24, 35:2, 48:5, 55:11, 55:19
**listening** [3] - 35:25, 36:9, 46:7
**listens** [1] - 35:22
**lists** [4] - 14:20, 49:12, 124:13, 143:6
**literally** [1] - 97:2
**live** [5] - 75:20, 78:15, 78:22, 79:4, 84:7
**Livebox** [1] - 54:16
**LLC** [2] - 151:12, 151:18
**load** [1] - 45:5
**loaded** [3] - 44:25, 45:3
**log** [2] - 47:16, 48:21
**logic** [1] - 33:19, 75:17, 76:5
**logs** [3] - 145:25, 146:4, 146:11

**look** [26] - 8:13, 15:10, 28:10, 38:19, 52:6, 56:17, 64:13, 69:9, 69:22, 71:13, 75:1, 80:4, 80:22, 81:2, 87:1, 88:5, 88:8, 88:11, 88:19, 89:8, 90:9, 91:18, 98:19, 101:1, 103:5, 140:3
**looked** [6] - 62:1, 70:2, 88:10, 91:14, 97:9
**looking** [8] - 9:21, 61:15, 74:4, 81:6, 81:10, 84:9, 91:12, 125:16
**looks** [1] - 89:12
**lookups** [1] - 117:25
**lowest** [1] - 121:23
**lunch** [2] - 89:23, 90:3

## M

**MAC** [54] - 12:2, 12:5, 12:10, 12:15, 23:13, 24:2, 24:11, 24:21, 25:15, 25:19, 26:1, 26:14, 27:6, 27:10, 27:15, 27:19, 27:24, 28:4, 33:2, 33:23, 36:12, 36:19, 37:3, 38:2, 38:12, 38:14, 39:9, 39:25, 40:1, 40:3, 40:17, 41:7, 41:10, 41:14, 42:11, 42:14, 43:25, 45:2, 45:24, 50:19, 50:24, 52:9, 52:13, 52:19, 53:14, 53:16, 56:13, 139:20, 140:18, 141:7, 141:9, 142:3, 142:6
**machine** [10] - 33:21, 34:22, 34:25, 37:25, 78:17, 78:20, 82:6, 82:9, 87:8, 87:13
**magic** [1] - 135:25
**mail** [2] - 73:17, 73:18
**mails** [1] - 111:11
**maintain** [3] - 119:18, 122:17, 131:22
**maintained** [2] - 130:15, 130:22
**major** [5] - 123:4, 124:12, 130:5, 135:8, 137:9
**majority** [1] - 131:22
**man** [1] - 136:25
**manipulate** [2] - 103:15, 103:17

**manner** [1] - 54:10
**manual** [16] - 18:7, 18:14, 18:24, 19:4, 41:3, 41:19, 41:20, 48:15, 52:13, 53:5, 53:23, 54:2, 95:4, 95:8, 139:21, 139:22
**manually** [19] - 11:25, 14:12, 14:21, 17:19, 18:1, 18:22, 28:15, 29:23, 30:21, 42:8, 48:9, 48:10, 50:24, 52:7, 52:10, 71:10, 91:20, 140:11
**Manuel** [2] - 2:5, 5:13
**mark** [3] - 6:9, 8:14, 49:23
**marked** [4] - 6:12, 8:23, 50:2, 52:1
**market** [2] - 127:3, 127:13
**marketing** [1] - 51:20
**match** [2] - 39:18, 63:19
**material** [1] - 51:20
**materials** [1] - 6:22
**math** [1] - 48:12
**matter** [6] - 6:8, 10:18, 10:24, 11:7, 11:13, 144:13
**matters** [1] - 146:1
**MAY** [1] - 4:6
**mean** [18] - 16:3, 38:24, 48:9, 48:17, 54:1, 54:22, 63:10, 71:11, 72:4, 74:19, 82:7, 82:24, 95:3, 101:5, 103:17, 104:22, 115:2, 147:4
**meaning** [5] - 9:6, 22:1, 34:9, 47:11, 70:10
**means** [8] - 40:15, 76:19, 76:23, 82:8, 82:25, 95:4, 100:23, 149:16
**measure** [4] - 74:25, 111:14, 111:16, 111:18
**measurement** [2] - 128:19, 130:24
**mechanical** [1] - 141:24
**member** [1] - 119:1
**members** [8] - 56:19, 59:23, 103:11, 108:13, 108:14, 114:1, 118:12, 118:18
**memory** [1] - 6:5

**mention** [1] - 122:24
**mentioned** [2] - 9:16, 142:22
**message** [16] - 26:8, 26:15, 26:16, 26:19, 26:24, 27:1, 27:3, 32:12, 32:15, 32:22, 42:19, 42:23, 42:25, 44:4, 48:23
**messages** [2] - 21:16, 21:21
**methodology** [5] - 61:13, 69:6, 72:17, 113:25, 114:2
**Metro** [2] - 119:12, 120:13
**Miami** [6] - 1:20, 2:8, 2:18, 2:23, 151:6, 151:19
**Michael** [1] - 2:12
**MicroBilt** [7] - 115:5, 135:2, 135:4, 135:16, 135:20, 136:1, 136:11
**Microsoft** [1] - 60:23
**middle** [1] - 137:20
**might** [35] - 6:5, 14:19, 18:22, 22:9, 23:9, 36:4, 37:22, 37:23, 37:24, 37:25, 41:1, 44:8, 54:16, 59:19, 66:19, 74:4, 74:5, 90:21, 97:21, 98:6, 108:12, 108:14, 118:8, 124:18, 125:3, 125:17, 125:18, 127:20, 134:3, 135:19, 136:1, 136:12, 138:9
**MILLER** [4] - 1:18, 2:16, 2:21, 151:4
**million** [1] - 60:17
**milliseconds** [1] - 41:24
**mind** [1] - 113:7
**minute** [1] - 46:1
**misinterpreted** [1] - 76:6
**misleading** [1] - 84:16
**missing** [25] - 58:15, 58:18, 59:1, 59:3, 59:5, 59:6, 59:7, 59:17, 59:24, 61:2, 62:18, 62:20, 64:3, 64:5, 68:17, 71:5, 73:7, 73:21, 74:9, 74:14, 74:19, 74:23, 91:5, 91:12
**mistake** [1] - 51:16
**mistakes** [2] - 51:14,

61:14
**Mobile** [3] - 120:23, 125:25, 126:25
**mode** [7] - 49:9, 53:5, 53:21, 53:22, 53:24, 54:2, 112:8
**modern** [1] - 43:25
**Monday** [1] - 151:12
**money** [1] - 121:21
**monitor** [2] - 26:5, 33:14
**monitoring** [1] - 40:9
**monitors** [3] - 33:15, 33:17, 36:23
**month** [2] - 109:9, 125:21
**months** [6] - 5:17, 71:18, 108:20, 118:19, 119:2, 120:7
**morning** [1] - 5:10
**most** [8] - 40:15, 48:20, 54:25, 58:6, 129:16, 136:17, 145:19
**motion** [3] - 8:18, 58:14, 118:8
**motivation** [1] - 49:18
**Mountain** [38] - 13:25, 14:3, 15:2, 16:7, 19:8, 20:2, 20:6, 25:21, 57:13, 57:24, 58:5, 58:6, 61:22, 61:24, 62:6, 63:2, 63:14, 64:20, 64:22, 64:24, 65:1, 65:6, 65:9, 65:15, 80:15, 92:4, 93:4, 94:23, 101:19, 101:23, 102:5, 142:13, 142:24, 143:2, 143:5, 143:18, 147:7, 147:10
**movement** [1] - 137:16
**moving** [1] - 99:13
**MR** [16] - 5:9, 50:6, 55:3, 57:20, 58:2, 81:3, 81:6, 89:23, 90:1, 90:5, 90:21, 114:13, 131:7, 138:22, 139:2, 147:13
**MS** [30] - 10:22, 13:23, 16:25, 24:23, 28:9, 28:24, 33:3, 47:7, 50:5, 50:8, 57:23, 58:3, 61:22, 58:3, 61:22, 62:22, 72:18, 73:1, 81:4, 89:24, 90:20, 92:9, 96:5, 96:19, 99:24, 104:8, 105:6, 117:9, 118:20, 139:4, 139:6, 147:11
**Nathan** [3] - 2:19, 3:5, 151:4

104:8, 105:6, 117:9, 118:20, 139:4, 139:6, 147:11
**multiple** [22] - 22:9, 23:17, 65:25, 80:16, 85:16, 85:19, 86:2, 94:4, 100:14, 101:13, 101:20, 101:24, 102:2, 102:3, 102:7, 102:12, 102:14, 111:24, 132:16, 145:3, 145:6, 145:24
**Museum** [4] - 1:19, 2:17, 2:22, 151:5

## N

**name** [17] - 5:11, 5:13, 13:5, 19:13, 73:14, 73:15, 73:25, 74:5, 74:6, 90:12, 91:8, 120:12, 123:13, 143:6
**NAME** [1] - 150:4
**named** [1] - 136:25
**names** [6] - 54:13, 70:3, 74:10, 74:15, 103:22, 107:22
**narrow** [1] - 32:5
**NATHAN** [30] - 10:22, 13:23, 16:25, 24:23, 28:9, 28:24, 33:3, 47:7, 50:5, 50:8, 57:23, 58:3, 61:22, 62:22, 72:18, 73:1, 81:4, 89:24, 90:20, 92:9, 96:5, 96:19, 99:24, 104:8, 105:6, 117:9, 139:4, 139:6, 147:11
**Nathan** [3] - 2:19, 3:5, 151:4
**nationwide** [1] - 126:17, 126:20, 127:9
**natural** [1] - 134:12
**nature** [4] - 18:7, 19:4, 95:7, 122:4
**nearly** [1] - 68:5
**necessarily** [5] - 19:23, 39:7, 52:21, 74:1, 74:21
**necessary** [2] - 59:19, 70:11
**need** [4] - 19:2, 41:22, 72:7, 105:8
**needed** [9] - 14:12, 71:9, 71:21, 72:23, 104:19, 105:22,

DEPOSITION OF JAN KOSTYUN

11

110:17, 139:24
**neighborhood** [1] -
60:17
**network** [12] - 21:5,
21:7, 21:9, 21:11,
21:12, 21:22, 24:7,
26:12, 32:24, 42:21,
43:10, 140:23
**networks** [2] - 126:22,
126:24
**never** [23] - 8:1, 8:8,
55:19, 63:21, 64:1,
66:19, 66:23, 67:14,
67:17, 76:15, 78:10,
84:6, 84:8, 112:10,
114:10, 114:18,
114:21, 126:10,
126:11, 130:23,
135:20, 136:4, 147:8
**next** [12] - 37:2, 81:21,
82:11, 82:12, 82:19,
87:1, 87:6, 87:7,
88:5, 89:3, 89:8,
89:14
**night** [1] - 61:19
**NO** [1] - 1:2
**no-answer** [1] - 77:19
**nobody** [1] - 48:12
**noise** [1] - 13:23
**none** [1] - 67:25
**nonproductive** [1] -
49:9
**nontrivial** [2] - 131:16,
131:18
**normal** [2] - 37:19,
142:19
**normally** [1] - 142:21
**North** [1] - 151:19
**Northeast** [1] - 151:19
**NOT** [1] - 150:2
**Notary** [3] - 1:24,
148:21, 149:23
**note** [1] - 87:16
**noted** [1] - 92:10
**notes** [2] - 87:22,
149:8
**nothing** [5] - 9:24,
77:21, 117:23,
117:25, 134:4
**noticeable** [1] - 129:4
**notification** [1] - 37:16
**NOTIFICATION** [1] -
151:1
**NUMBER** [4] - 4:5,
4:7, 4:9, 4:10
**number** [140] - 10:6,
12:25, 13:2, 13:4,
13:5, 13:6, 13:10,
13:12, 13:15, 14:11,
14:20, 16:24, 17:4,

17:13, 18:14, 19:14,
19:23, 20:9, 20:24,
28:19, 29:4, 29:22,
31:19, 31:21, 32:15,
32:17, 32:18, 33:8,
33:21, 35:3, 35:11,
35:22, 40:9, 40:10,
41:2, 41:20, 46:23,
47:15, 47:19, 47:21,
48:7, 48:14, 48:18,
48:22, 48:23, 48:24,
49:6, 51:21, 59:3,
60:16, 67:6, 71:12,
73:14, 74:3, 74:7,
74:16, 75:19, 77:14,
77:16, 80:5, 80:16,
80:22, 81:10, 81:11,
81:15, 81:18, 81:22,
82:5, 82:12, 82:19,
83:3, 83:13, 83:20,
84:10, 87:2, 87:3,
87:7, 87:12, 88:8,
88:11, 88:19, 88:21,
89:3, 89:8, 89:11,
89:14, 92:13, 96:3,
96:17, 97:9, 97:10,
97:11, 97:13, 97:22,
98:20, 98:25, 100:2,
101:11, 103:13,
107:18, 107:24,
111:9, 113:4, 119:8,
123:24, 124:23,
125:5, 125:9,
125:18, 127:16,
127:19, 131:16,
131:18, 131:20,
134:15, 134:18,
137:12, 137:13,
138:1, 139:22,
139:23, 140:1,
140:4, 140:9,
140:12, 140:18,
140:20, 140:22,
141:6, 141:11,
141:14, 142:7,
143:7, 144:18,
144:19, 144:23,
145:13, 145:22,
146:10
**numbered** [1] - 149:7
**numbers** [120] - 12:18,
12:19, 13:18, 14:4,
14:7, 14:8, 14:13,
14:18, 14:22, 15:1,
15:3, 15:7, 15:19,
16:8, 17:7, 17:17,
17:18, 17:21, 17:23,
18:1, 18:17, 19:20,
19:22, 20:10, 28:5,
28:17, 28:20, 28:23,
29:1, 29:2, 29:3,

29:6, 29:11, 29:14,
30:2, 31:24, 33:1,
39:3, 39:4, 39:6,
41:21, 41:24, 44:25,
45:2, 45:3, 45:18,
45:20, 46:6, 47:12,
49:5, 49:11, 49:12,
60:1, 60:2, 61:7,
61:11, 63:1, 63:14,
63:18, 63:19, 66:8,
66:20, 73:23, 83:14,
85:17, 86:21, 91:14,
94:4, 97:20, 101:20,
101:24, 102:4,
102:13, 102:15,
102:19, 103:23,
103:24, 107:14,
107:15, 109:10,
109:13, 110:3,
110:16, 112:17,
114:22, 116:20,
116:21, 117:2,
117:24, 121:9,
122:11, 123:6,
123:7, 123:13,
123:14, 123:22,
123:23, 124:13,
124:14, 125:2,
125:15, 125:16,
127:4, 127:5, 128:9,
128:10, 129:3,
130:25, 131:6,
133:9, 135:24,
137:16, 137:17,
141:21, 141:25,
142:6, 142:20,
143:12

## O

**Oath** [1] - 3:8
**object** [1] - 117:9
**objection** [16] - 16:25,
24:23, 28:9, 28:24,
33:3, 47:7, 62:22,
72:18, 73:1, 92:9,
96:5, 96:19, 99:24,
104:8, 105:6, 118:20
**objectives** [1] - 110:1
**observation** [1] -
130:18
**observe** [4] - 12:5,
13:14, 16:10, 132:16
**observed** [8] - 12:9,
31:10, 74:4, 116:6,
126:4, 126:5,
126:11, 146:10
**observing** [1] - 76:11
**obtain** [1] - 115:22
**obtained** [1] - 143:12

**obtaining** [1] - 121:6
**obviously** [5] - 47:18,
53:4, 63:5, 71:6,
131:15
**occasion** [1] - 12:5
**occur** [12] - 13:10,
18:20, 19:11, 42:19,
42:25, 44:4, 45:7,
47:22, 80:15, 109:8,
122:13, 145:6
**occurred** [14] - 13:20,
15:23, 16:1, 16:2,
16:6, 19:1, 19:4,
19:17, 19:19, 43:4,
80:17, 86:11,
118:18, 124:10
**occurrence** [3] - 76:7,
88:23, 98:13
**occurrences** [1] -
85:20
**occurring** [2] - 18:12,
26:18
**occurs** [8] - 22:24,
26:3, 31:11, 32:1,
37:2, 37:7, 43:11,
77:18
**October** [4] - 118:7,
118:22, 130:2, 130:6
**OF** [12] - 1:1, 1:14,
1:14, 3:1, 4:1, 4:5,
4:7, 5:1, 148:3,
148:3, 149:3, 149:3
**offer** [2] - 107:4,
115:12
**offered** [5] - 23:14,
27:11, 27:20, 30:1,
135:4
**offerings** [2] - 31:4,
138:16
**offers** [1] - 133:8
**offhand** [5] - 120:16,
120:19, 120:22,
120:25, 121:3
**office** [1] - 105:18
**offices** [2] - 7:2, 7:3
**official** [1] - 148:14
**often** [6] - 11:9, 42:9,
65:25, 66:1, 125:14,
127:17
**Olas** [2] - 2:4, 2:11
**old** [1] - 67:10
**omitted** [1] - 92:7
**ON** [3] - 1:14, 150:2
**once** [11] - 32:1, 33:2,
33:16, 36:12, 70:13,
71:22, 92:19,
131:21, 140:17,
141:22, 145:12
**one** [70] - 8:17, 9:9,
9:21, 17:17, 17:20,

19:23, 20:9, 20:24,
22:18, 23:11, 26:18,
31:15, 32:11, 32:19,
36:7, 42:5, 43:7,
46:1, 47:17, 51:24,
56:17, 60:5, 60:23,
64:9, 70:22, 72:5,
72:9, 73:9, 81:4,
81:23, 84:10, 85:2,
85:7, 85:8, 85:19,
86:3, 86:21, 86:25,
87:14, 88:1, 88:10,
91:9, 93:20, 94:4,
97:25, 99:9, 99:12,
100:16, 109:21,
111:3, 113:12,
116:4, 116:13,
121:19, 121:23,
124:2, 124:21,
126:8, 126:10,
130:8, 130:10,
130:11, 130:12,
132:1, 137:8,
139:12, 141:24,
142:15, 146:15,
146:22
**ones** [5] - 11:10,
40:20, 55:1, 71:1,
92:18
**open** [1] - 32:3
**open-ended** [1] - 32:3
**opened** [1] - 70:16
**operate** [1] - 126:21
**operates** [5] - 12:6,
24:22, 50:20, 51:12,
54:9
**operations** [1] -
136:20
**opinion** [41] - 11:7,
16:13, 16:17, 16:21,
16:22, 17:2, 17:3,
38:11, 38:14, 39:9,
39:11, 39:12, 39:13,
39:14, 39:15, 40:1,
40:3, 40:22, 43:24,
51:7, 51:14, 58:12,
58:23, 59:5, 59:6,
75:22, 75:24, 85:2,
88:2, 93:14, 96:12,
98:8, 113:18, 114:3,
121:8, 121:17,
122:1, 135:7, 140:6,
140:16
**opinions** [8] - 8:8,
38:17, 43:14, 43:17,
43:18, 56:18, 58:16,
85:14
**opportunity** [1] -
132:15
**opposed** [2] - 42:7,

126:15
**opposition** [1] - 8:18
**option** [6] - 13:3, 19:21, 31:19, 31:23, 54:12, 56:1
**options** [3] - 31:20, 33:22, 124:17
**order** [11] - 14:11, 26:13, 39:19, 59:20, 62:2, 70:5, 70:8, 71:24, 75:18, 113:6, 141:20
**orders** [1] - 39:21
**original** [8] - 9:3, 9:7, 9:14, 9:25, 10:16, 22:12, 129:23, 129:24
**originally** [2] - 53:1, 63:7
**originated** [1] - 15:1
**originates** [1] - 21:24
**originating** [4] - 57:5, 64:16, 64:19, 64:20
**ORLANSKY** [1] - 149:5
**Orlansky** [4] - 1:24, 148:21, 149:22, 151:18
**ORLANSKY-SOSNOW** [1] - 149:5
**Orlansky-Sosnow** [4] - 1:24, 148:21, 149:22, 151:18
**OUT** [2] - 4:9, 4:10
**outbound** [1] - 19:9
**outcome** [3] - 126:9, 126:11, 126:12
**outlined** [1] - 59:16
**outputs** [1] - 111:6
**outside** [1] - 65:22
**overhead** [1] - 121:20
**overly** [1] - 121:10
**overriding** [1] - 116:12
**overstated** [1] - 145:20
**overwhelming** [1] - 122:3
**own** [12] - 69:5, 69:9, 69:12, 69:16, 70:6, 117:7, 124:8, 126:22, 126:23, 133:11
**owner** [3] - 66:21, 107:15, 107:17
**owners** [1] - 107:14

**P**

**P.A** [6] - 1:18, 2:3, 2:10, 2:17, 2:21,

151:5
**p.m** [1] - 151:12
**pace** [1] - 40:13
**pacing** [4] - 40:23, 42:6, 42:9, 42:12
**Page** [2] - 3:2, 150:5
**page** [20] - 15:10, 15:14, 15:16, 18:3, 18:5, 18:16, 19:6, 31:14, 45:22, 52:4, 52:6, 56:25, 57:1, 66:3, 75:1, 79:13, 81:12, 103:5, 118:2, 145:1
**PAGE** [2] - 4:4, 150:2
**pages** [4] - 11:17, 18:5, 64:14, 149:7
**paragraph** [41] - 28:10, 28:11, 28:12, 38:19, 39:14, 45:22, 48:3, 50:25, 52:8, 56:22, 56:25, 57:1, 64:13, 64:25, 66:7, 68:2, 73:6, 79:8, 79:14, 79:17, 90:9, 91:18, 93:15, 94:10, 94:22, 95:20, 98:19, 99:1, 99:13, 99:14, 101:1, 102:12, 103:5, 121:14, 125:1, 129:14, 139:13, 140:3, 143:22, 144:25, 145:16
**parameters** [1] - 40:14
**part** [29] - 12:7, 13:12, 13:16, 15:16, 18:13, 25:5, 26:5, 27:11, 28:13, 42:2, 45:6, 49:18, 58:12, 62:6, 62:9, 66:8, 80:1, 90:10, 91:19, 93:19, 94:1, 94:23, 98:20, 98:22, 104:10, 105:7, 121:8, 136:17, 146:23
**partial** [1] - 96:25
**partially** [1] - 91:25
**participate** [2] - 55:22, 56:14
**participated** [1] - 9:10
**particular** [4] - 70:25, 110:22, 127:16, 127:18
**particularly** [3] - 67:12, 125:16, 137:10
**parties** [2] - 65:25, 149:12
**parts** [1] - 133:8

**party** [2] - 142:16, 149:13
**passed** [3] - 32:19, 32:22, 33:8
**past** [6] - 39:22, 54:12, 105:12, 111:24, 113:13, 120:7
**paths** [1] - 66:1
**PCS** [2] - 119:12, 120:13
**penalties** [1] - 150:17
**penalty** [1] - 86:15
**people** [5] - 49:2, 49:11, 52:11, 67:14, 114:24
**per** [1] - 46:1
**percent** [14] - 11:15, 58:17, 59:22, 61:1, 61:12, 67:18, 67:21, 67:23, 67:25, 68:5, 119:24, 120:1, 127:7, 127:14
**percentage** [14] - 11:11, 19:25, 66:14, 74:13, 74:17, 74:22, 127:3, 127:6, 127:12, 128:17, 129:8, 130:13, 130:14, 131:5
**percentages** [3] - 127:20, 130:18, 131:14
**perform** [14] - 22:1, 33:22, 33:23, 34:4, 41:25, 42:3, 42:14, 53:21, 62:2, 66:13, 69:10, 70:16, 70:11, 70:21, 84:8, 87:1, 101:22, 103:9, 104:11, 104:19, 104:23, 105:14, 105:22, 107:7, 110:7, 112:19, 115:5, 115:8, 116:19, 117:19, 117:21, 124:5, 124:7
**performance** [1] - 132:20
**performed** [28] - 7:16, 47:13, 52:19, 54:5, 61:5, 66:23, 67:17, 69:19, 70:16, 85:11, 99:22, 101:22, 104:3, 104:7, 104:15, 104:19, 104:24, 107:12, 107:19, 111:25, 113:5, 113:20, 114:9, 114:21, 117:7, 117:13,

130:24, 135:15
**performing** [12] - 36:1, 69:12, 69:15, 70:23, 72:25, 106:18, 106:21, 107:9, 108:9, 108:18, 110:19, 113:1
**performs** [4] - 36:12, 36:24, 53:17, 141:4
**period** [10] - 118:5, 118:10, 118:11, 118:13, 119:4, 125:9, 129:23, 130:1, 130:4, 137:7
**periods** [1] - 129:15
**perjury** [2] - 86:15, 150:17
**permission** [2] - 30:6, 31:1
**permissions** [5] - 30:6, 30:13, 30:16, 30:19, 30:21
**person** [9] - 24:16, 32:8, 36:5, 37:24, 38:8, 38:9, 75:7, 75:20, 109:6
**personal** [1] - 104:9
**personally** [8] - 30:15, 63:3, 108:2, 126:4, 126:5, 126:11, 127:22, 148:8
**personnel** [2] - 106:16
**phone** [39] - 18:17, 19:14, 29:22, 29:24, 35:14, 35:22, 36:10, 37:19, 37:21, 37:22, 44:3, 44:6, 44:9, 44:10, 45:8, 45:10, 45:12, 45:21, 46:4, 46:5, 46:10, 46:11, 46:23, 46:25, 47:2, 47:5, 47:11, 53:4, 66:8, 76:25, 77:3, 77:4, 77:12, 77:20, 140:9, 143:7, 143:12, 144:23
**phones** [4] - 43:23, 44:1, 77:15, 138:14
**physical** [2] - 22:14, 41:3
**physically** [1] - 63:4
**pick** [1] - 46:10
**picked** [1] - 46:4
**piece** [5] - 20:23, 24:6, 24:8, 25:2, 25:6
**pieces** [1] - 116:17
**place** [21] - 14:1, 16:14, 16:18, 24:7, 25:11, 26:4, 26:13, 35:14, 41:13, 46:11,

47:5, 48:4, 48:9, 48:10, 48:19, 49:7, 49:9, 49:19, 55:18, 70:15, 149:10
**placed** [26] - 14:10, 20:16, 27:2, 28:15, 33:15, 33:17, 36:21, 38:6, 40:11, 40:14, 42:5, 42:7, 42:10, 42:17, 44:3, 45:24, 48:16, 48:21, 51:14, 63:6, 88:14, 97:10, 97:22, 102:4, 102:7, 144:13
**placement** [4] - 13:20, 15:23, 45:7, 53:18
**places** [3] - 25:7, 48:14, 48:18
**placing** [5] - 40:21, 45:25, 80:16, 101:20, 101:24
**plaintiff** [10] - 5:14, 7:17, 90:11, 112:13, 113:12, 143:2, 143:4, 147:2, 147:4, 147:9
**Plaintiff** [2] - 1:6, 2:2
**PLAINTIFF** [1] - 1:14
**plaintiff's** [10] - 65:5, 65:7, 65:10, 65:12, 65:14, 75:24, 99:3, 101:3, 113:24, 146:24
**plan** [4] - 49:22, 80:19, 119:16, 122:7
**Platform** [16] - 27:10, 28:4, 37:3, 38:2, 38:12, 38:14, 39:9, 39:25, 40:1, 40:3, 40:17, 41:7, 41:10, 41:14, 45:2, 53:16
**platform** [72] - 7:1, 9:11, 11:20, 11:25, 12:15, 16:18, 16:23, 17:11, 17:19, 19:11, 22:13, 22:23, 23:5, 23:13, 24:1, 24:2, 24:11, 24:21, 25:15, 25:19, 25:25, 26:2, 26:3, 27:7, 27:15, 27:18, 27:19, 27:20, 27:24, 28:1, 28:3, 28:22, 29:5, 33:2, 33:23, 34:1, 36:12, 36:19, 42:11, 42:14, 45:15, 45:19, 45:24, 50:20, 51:3, 51:11, 52:9, 52:13, 52:19, 53:14, 54:9, 54:16, 56:13, 102:23,

DEPOSITION OF JAN KOSTYUN

13

103:9, 104:20,
104:25, 106:21,
107:7, 109:8,
109:17, 109:23,
110:18, 112:4,
112:6, 112:7,
112:10, 114:17,
135:16, 141:7,
141:9, 142:3
**platforms** [9] - 52:24,
53:19, 54:11, 54:15,
54:18, 54:20, 54:22,
76:4, 136:6
**play** [1] - 70:19
**players** [1] - 137:9
**PM** [2] - 1:16, 147:15
**point** [22] - 6:2, 13:22,
14:11, 17:9, 17:12,
22:19, 23:18, 31:22,
31:24, 42:18, 42:20,
43:3, 44:3, 45:18,
45:19, 46:6, 69:18,
72:11, 87:23, 89:24,
112:25, 145:17
**pointing** [1] - 42:15
**pole** [1] - 121:24
**portability** [3] -
137:12, 137:13,
138:1
**ported** [2] - 134:15,
134:18
**ported-number** [2] -
134:15, 134:18
**portion** [2] - 30:12,
58:16
**possession** [1] -
65:17
**possibility** [3] - 80:18,
92:2, 95:9
**possible** [7] - 96:8,
97:16, 97:19,
102:25, 126:8,
126:11, 147:1
**possibly** [11] - 44:9,
67:8, 78:9, 97:7,
98:10, 104:16,
124:18, 124:19,
134:24, 146:20
**potential** [16] - 70:14,
83:16, 84:22, 86:12,
87:23, 89:6, 95:12,
96:13, 97:3, 99:2,
102:18, 102:21,
113:6, 113:25,
134:10, 145:18
**potentially** [1] - 75:6
**preapproved** [1] -
28:16
**predict** [2] - 40:8,
40:14

**predicted** [17] - 23:14,
27:11, 27:16, 27:20,
27:25, 30:22, 38:12,
38:15, 39:16, 39:17,
40:4, 42:3, 42:5,
52:16, 52:20, 53:7,
53:10
**predicting** [1] - 40:21
**prediction** [1] - 40:23
**predictive** [28] - 27:17,
30:4, 38:20, 39:3,
39:5, 39:8, 39:20,
39:23, 40:1, 40:6,
40:7, 41:7, 41:10,
41:12, 41:22, 41:25,
42:13, 42:18, 42:22,
42:24, 52:9, 52:13,
52:16, 141:16,
141:17, 141:20,
141:22
**preliminary** [2] -
103:8, 113:16
**prepare** [2] - 6:18,
10:4
**preparing** [4] - 7:11,
55:17, 56:21, 113:16
**present** [3] - 97:6,
97:18, 97:19
**presented** [13] -
12:18, 17:17, 17:21,
19:13, 19:24, 20:1,
20:7, 31:18, 40:24,
41:17, 97:5, 141:11,
141:25
**president** [1] - 19:7
**press** [2] - 49:4, 76:24
**presses** [1] - 50:15
**presumably** [1] -
101:9
**presumption** [1] -
29:20
**pretty** [3] - 54:25,
105:2, 137:2
**prevent** [2] - 30:7,
54:6
**preview** [1] - 53:21
**previous** [8] - 11:10,
12:24, 43:7, 43:8,
43:9, 122:14,
130:16, 135:6
**previously** [7] - 5:14,
9:17, 12:8, 17:18,
92:1, 92:7, 115:23
**PRINT** [2] - 4:9, 4:10
**printed** [1] - 90:21
**printout** [2] - 52:5,
104:5
**probability** [2] - 98:8,
98:12
**problem** [6] - 70:14,

97:5, 129:4, 129:12,
129:13, 130:19
**problems** [8] - 70:2,
72:11, 73:22, 87:23,
92:17, 108:14,
123:10, 132:17
**proceeding** [1] -
151:10
**PROCEEDINGS** [1] -
3:1
**process** [104] - 12:16,
14:17, 14:19, 14:23,
16:12, 18:7, 19:19,
20:22, 22:7, 22:10,
22:20, 24:9, 24:10,
24:12, 26:1, 26:6,
26:21, 26:25, 29:19,
31:9, 32:13, 32:14,
32:22, 32:23, 33:9,
33:13, 34:3, 41:22,
42:25, 43:11, 48:15,
50:22, 51:6, 55:9,
56:6, 58:1, 71:4,
72:22, 95:4, 103:21,
104:23, 105:1,
105:3, 105:5, 105:7,
105:21, 105:23,
106:8, 106:10,
106:13, 106:22,
107:12, 108:24,
109:18, 110:4,
110:8, 110:11,
110:12, 111:2,
112:11, 112:13,
112:19, 113:2,
113:7, 113:15,
113:20, 113:22,
114:8, 114:19,
114:21, 115:2,
115:4, 115:6, 115:9,
117:1, 117:20,
121:4, 123:15,
124:5, 124:7, 124:9,
124:19, 124:20,
127:23, 132:13,
132:14, 132:20,
132:23, 134:13,
137:25, 140:10,
140:14, 140:21,
140:23, 141:1,
141:3, 141:8,
141:10, 141:15,
141:18, 141:23,
142:2, 142:7
**processes** [4] - 23:11,
33:6, 109:20, 110:19
**processing** [3] -
109:25, 123:23,
135:23
**produce** [11] - 28:17,

57:22, 57:23, 59:20,
61:24, 72:11, 72:12,
104:16, 130:24,
143:6, 143:10
**produced** [11] - 61:21,
65:5, 91:15, 101:14,
102:18, 133:5,
144:3, 144:6,
144:10, 146:1,
146:22
**producing** [2] - 91:20,
94:24
**product** [16] - 23:14,
31:4, 59:11, 59:13,
69:13, 69:15, 72:6,
72:24, 75:10,
106:25, 133:13,
133:16, 133:23,
134:21, 136:11,
138:16
**production** [9] - 16:1,
16:3, 57:5, 59:10,
60:13, 61:19, 61:23,
65:22, 143:18
**productive** [2] - 40:15
**productivity** [1] - 54:8
**products** [7] - 27:16,
29:25, 115:12,
115:13, 133:17,
135:4, 135:20
**program** [5] - 23:9,
60:22, 60:23,
115:23, 123:21
**programs** [1] - 119:18
**progress** [33] - 33:12,
33:13, 33:23, 34:5,
35:15, 35:16, 36:13,
36:24, 41:25, 42:4,
42:13, 42:14, 42:16,
44:14, 44:16, 44:17,
44:21, 52:17, 52:18,
52:25, 53:2, 53:3,
53:7, 53:8, 53:11,
53:15, 53:17, 53:20,
53:22, 53:23, 53:25,
54:5, 54:21
**progressive** [1] -
53:22
**proof** [2] - 75:18,
105:8
**proper** [1] - 100:16
**proposed** [15] - 75:22,
75:24, 78:16, 90:11,
99:4, 99:23, 100:1,
100:11, 101:9,
106:2, 113:19,
113:25, 114:8,
117:3, 118:14
**protocol** [9] - 20:18,
20:20, 21:9, 21:15,

21:20, 22:14, 26:12,
27:3, 44:12
**prove** [1] - 121:10
**provide** [14] - 57:25,
105:8, 105:9,
105:11, 110:5,
110:12, 110:13,
112:15, 115:16,
122:18, 123:16,
124:15, 134:3,
135:13
**provided** [30] - 11:20,
15:2, 19:14, 22:13,
24:15, 25:4, 30:18,
31:7, 54:15, 57:24,
58:5, 58:7, 58:22,
62:4, 62:7, 63:7,
63:15, 63:20, 63:22,
64:22, 64:23, 65:1,
79:24, 103:19,
113:18, 116:9,
121:11, 122:10,
123:5, 128:10
**provides** [1] - 133:7
**providing** [3] - 107:13,
110:2, 128:6
**Public** [3] - 1:24,
148:21, 149:23
**public** [1] - 21:11
**Public-State** [2] -
148:21, 149:23
**pull** [2] - 81:3, 88:6
**punch** [9] - 13:9, 14:4,
14:7, 14:12, 18:1,
31:21, 48:20, 49:6,
49:12
**punched** [5] - 13:12,
16:8, 17:4, 17:8,
17:22
**punches** [2] - 35:21,
48:13
**punching** [9] - 13:14,
15:19, 16:24, 18:17,
46:6, 47:12, 47:14,
47:20, 48:10
**punching-in** [1] -
13:14
**punitive** [7] - 56:19,
58:18, 59:23, 61:2,
103:10, 118:11,
118:18
**pure** [1] - 85:4
**purely** [2] - 53:23,
54:2
**purpose** [2] - 121:5,
127:24
**purposes** [7] - 6:13,
8:24, 50:3, 52:2,
72:16, 96:12, 107:10
**put** [3] - 14:11, 25:1,

DEPOSITION OF JAN KOSTYUN

14

51:11
**putting** [1] - 70:22

## Q

**qualifications** [1] -
10:13
**qualified** [2] - 106:24,
146:21
**qualify** [4] - 24:13,
38:21, 55:16, 135:5
**queries** [2] - 59:20,
106:19
**questioned** [1] -
100:13
**questioning** [1] -
140:13
**questions** [6] - 55:8,
64:4, 85:25, 135:1,
139:9, 147:11
**queue** [5] - 32:15,
32:22, 33:1, 33:9,
50:15
**queues** [1] - 33:5
**quick** [4] - 6:24, 90:16,
114:13, 139:12
**quickly** [1] - 45:23
**quite** [6] - 105:1,
106:15, 109:19,
109:25, 110:23,
138:10
**quoting** [1] - 16:11

## R

**ran** [3] - 103:21,
109:20, 132:24
**random** [3] - 28:18,
28:19, 29:3
**rang** [3] - 77:20
**range** [2] - 104:1,
127:6
**ranges** [2] - 107:16,
125:22
**rare** [1] - 48:19
**rate** [3] - 40:11, 41:13,
130:21
**rather** [2] - 94:6,
122:21
**raw** [1] - 74:16
**RE** [1] - 150:3
**Re** [1] - 151:8
**reaching** [1] - 96:12
**Read** [1] - 3:11
**read** [4] - 30:12, 68:3,
90:13, 150:17
**reading** [2] - 38:11,
121:13
**ready** [1] - 46:25
**really** [3] - 24:14,

79:23, 130:8
**realm** [1] - 132:8
**Reason** [1] - 150:5
**reason** [14] - 19:3,
25:8, 47:6, 51:10,
58:23, 62:23, 65:20,
66:2, 82:2, 82:4,
86:8, 121:22,
143:17, 143:20
**reasonable** [2] -
71:24, 151:13
**reasons** [1] - 67:6
**rebutted** [1] - 113:13
**receive** [5] - 21:1,
106:12, 106:20,
107:2, 128:17
**received** [28] - 38:9,
48:23, 50:12, 57:14,
57:18, 58:3, 58:10,
59:9, 62:5, 63:24,
65:6, 65:8, 65:12,
65:13, 65:14, 84:5,
104:17, 111:7,
111:21, 112:5,
112:8, 123:11,
129:7, 129:9, 132:4,
132:18, 133:1
**receives** [1] - 32:23
**receiving** [2] - 76:22,
77:15
**recent** [2] - 45:13,
58:6
**recently** [2] - 50:12,
127:5
**recollection** [9] - 9:8,
10:2, 56:3, 56:10,
56:12, 68:18, 92:21,
97:24, 122:23
**reconcile** [2] - 18:25,
19:3
**record** [18] - 5:11,
8:16, 19:13, 20:6,
30:12, 69:7, 74:11,
75:5, 84:4, 88:15,
91:21, 94:15, 94:16,
99:15, 99:16,
102:23, 116:24,
131:9
**recorded** [3] - 95:16,
104:4, 145:4
**recording** [6] -
146:22, 146:23,
146:25, 147:1,
147:6, 147:8
**recordings** [2] -
146:18, 146:19
**records** [76] - 19:25,
37:4, 56:23, 57:2,
59:6, 60:2, 60:3,
60:5, 60:8, 61:6,

63:18, 64:15, 67:9,
68:4, 68:18, 69:4,
69:24, 74:3, 84:20,
85:5, 85:7, 85:20,
87:24, 88:3, 90:14,
91:1, 91:4, 92:7,
92:11, 92:12, 92:17,
93:1, 93:18, 93:21,
94:24, 98:16, 98:21,
99:5, 99:17, 99:19,
99:25, 100:7,
100:10, 100:14,
101:2, 101:3, 101:4,
101:6, 102:3,
102:15, 102:16,
102:17, 106:2,
106:3, 106:5, 106:6,
120:12, 125:4,
131:1, 131:2,
131:12, 131:23,
142:17, 144:3,
144:6, 144:9,
144:14, 145:3,
145:11, 145:12,
145:14, 145:19,
146:15, 146:16
**recreate** [4] - 72:6,
72:8, 72:23, 73:5
**redacted** [1] - 104:16
**refer** [4] - 34:2, 76:21,
110:10, 121:13
**reference** [5] - 90:25,
93:15, 93:16, 97:15,
121:25
**referred** [5] - 23:10,
24:3, 93:6, 115:20,
139:13
**referring** [10] - 17:24,
20:12, 28:13, 36:18,
52:9, 59:13, 92:6,
92:10, 94:12, 118:21
**refers** [1] - 29:3
**reflect** [3] - 75:3, 95:6,
96:23
**reflected** [12] - 87:9,
87:18, 88:25, 89:5,
89:18, 89:19, 95:16,
96:24, 99:6, 117:4,
140:7, 143:24
**reflecting** [1] - 102:18
**reflects** [1] - 85:6
**refresh** [1] - 6:5
**refused** [1] - 88:24
**regarding** [9] - 10:25,
16:14, 39:22,
106:21, 117:11,
133:23, 139:12,
139:15, 140:14
**regular** [2] - 76:6,
122:18

**reject** [10] - 13:7, 13:8,
17:20, 19:22, 31:19,
50:16, 55:17, 55:24,
141:12, 141:13
**rejected** [1] - 8:8
**rejecting** [1] - 55:10
**relate** [1] - 145:5
**related** [11] - 6:1, 6:22,
9:9, 10:20, 12:25,
84:25, 97:21, 111:1,
120:4, 132:5, 134:9
**relates** [1] - 103:19
**relating** [1] - 143:11
**relational** [1] - 61:3
**relationship** [2] - 49:2,
98:15
**relative** [1] - 149:12
**relatively** [1] - 48:15
**reliability** [3] - 72:16,
85:25, 86:2
**reliable** [1] - 114:4
**rely** [1] - 92:14
**relying** [1] - 65:21
**remain** [3] - 7:19, 8:5,
8:11
**remains** [1] - 17:3
**remember** [6] - 73:13,
92:16, 93:17, 94:9,
119:11, 120:8
**remind** [1] - 140:15
**removed** [1] - 10:3
**rep** [1] - 147:10
**repeat** [1] - 29:13
**rephrase** [3] - 35:19,
38:18, 44:19
**reply** [1] - 123:9
**REPORT** [2] - 4:5, 4:7
**report** [108] - 5:24, 6:4,
6:6, 6:7, 6:10, 6:21,
6:23, 6:24, 8:14,
8:15, 8:19, 9:2, 9:3,
9:4, 9:7, 9:14, 9:20,
9:21, 9:25, 10:1,
10:5, 10:9, 10:16,
10:17, 10:20, 10:25,
11:8, 11:11, 11:12,
11:18, 12:12, 15:11,
18:3, 19:6, 28:7,
28:14, 38:11, 38:19,
43:13, 43:16, 45:22,
56:22, 56:23, 59:14,
59:16, 64:11, 66:3,
68:2, 71:25, 72:14,
75:2, 79:9, 79:20,
80:5, 80:8, 80:23,
81:7, 81:12, 82:1,
83:5, 83:6, 84:12,
84:15, 85:22, 85:23,
86:14, 87:17, 87:18,
88:25, 89:5, 89:6,

89:15, 90:10, 91:19,
92:8, 93:16, 93:24,
94:10, 94:15, 94:17,
96:13, 96:22, 97:14,
98:9, 100:24,
100:25, 103:7,
104:4, 115:25,
117:4, 118:2, 121:4,
121:14, 126:16,
129:15, 136:13,
139:10, 139:14,
139:18, 140:3,
143:22, 146:18,
149:7
**reported** [5] - 62:24,
73:23, 96:14, 116:5,
145:24
**Reported** [1] - 1:22
**Reporter** [3] - 3:9,
149:5, 151:18
**reporter** [1] - 149:16
**Reporting** [2] -
151:12, 151:18
**reports** [15] - 5:22,
6:15, 8:17, 11:10,
75:3, 75:4, 75:11,
79:10, 79:11, 86:23,
90:18, 101:16,
101:19, 108:5,
117:11
**repository** [2] - 17:8,
107:1
**represent** [8] - 5:14,
47:4, 52:5, 57:10,
78:9, 102:16,
102:17, 145:3
**representation** [2] -
61:6, 93:20
**representations** [1] -
31:6
**representative** [5] -
12:13, 105:19,
106:9, 119:12, 147:7
**representatives** [2] -
109:4, 142:13
**represents** [4] - 76:14,
91:7, 101:13, 118:13
**reproduce** [1] - 59:20
**reproduced** [1] - 69:4
**reproduction** [1] -
149:15
**request** [3] - 114:25,
117:8, 126:9
**requested** [2] - 123:1,
128:7
**requesting** [1] -
110:22
**require** [5] - 39:12,
66:16, 69:20, 105:8,
123:22

**required** [7] - 22:14, 69:22, 70:24, 71:14, 71:25, 143:5, 143:10
**requirement** [1] - 39:2
**requires** [2] - 71:6, 105:1
**requiring** [1] - 124:19
**research** [1] - 136:24
**respect** [15] - 16:18, 22:23, 45:11, 56:18, 100:10, 111:1, 111:21, 112:6, 112:9, 115:11, 118:4, 126:5, 132:19, 135:16, 146:15
**respond** [4] - 122:7, 125:4, 128:15, 128:25
**responding** [1] - 121:19
**response** [9] - 19:8, 122:10, 122:17, 122:21, 122:23, 123:5, 125:17, 128:18, 129:6
**responses** [3] - 123:20, 128:22, 142:22
**result** [54] - 26:18, 33:15, 33:17, 36:23, 36:24, 37:4, 58:20, 61:9, 61:11, 65:9, 65:14, 68:25, 78:17, 79:2, 80:2, 80:6, 82:14, 82:16, 82:22, 83:17, 84:19, 86:7, 87:20, 88:13, 89:11, 89:12, 89:15, 89:16, 91:21, 92:3, 93:2, 93:8, 93:19, 93:23, 93:25, 95:6, 95:13, 95:14, 95:20, 95:22, 96:8, 96:20, 97:18, 99:15, 99:18, 100:16, 100:22, 102:3, 112:1, 121:11, 141:19, 142:8
**resulted** [3] - 72:13, 96:3, 96:17
**results** [43] - 33:8, 48:25, 59:14, 59:16, 59:19, 62:24, 69:17, 71:3, 72:11, 72:20, 73:3, 74:4, 74:12, 74:25, 75:5, 75:8, 84:22, 85:9, 86:3, 86:11, 86:12, 92:18, 94:6, 94:21, 95:9,

96:24, 97:3, 97:7, 104:2, 104:9, 104:17, 110:24, 112:2, 112:16, 114:1, 114:23, 116:23, 116:24, 117:12, 117:14, 133:4, 146:24
**retain** [1] - 129:16
**retained** [2] - 7:22, 11:24
**retention** [1] - 129:15
**retrieve** [3] - 110:10, 123:21, 123:23
**return** [1] - 107:14
**returned** [6] - 54:7, 82:2, 106:11, 108:11, 116:2, 123:10
**returning** [1] - 107:23
**reverse** [23] - 114:19, 115:1, 115:6, 115:9, 115:13, 117:20, 117:21, 132:20, 133:8, 133:12, 133:16, 133:23, 134:3, 134:4, 134:7, 134:8, 134:9, 134:13, 134:21, 135:4, 135:9, 135:13, 136:11
**reverse-append** [23] - 114:19, 115:1, 115:6, 115:9, 115:13, 117:20, 117:21, 132:20, 133:8, 133:12, 133:16, 133:23, 134:3, 134:4, 134:7, 134:8, 134:9, 134:13, 134:21, 135:4, 135:9, 135:13, 136:11
**review** [9] - 6:23, 6:25, 31:18, 41:1, 41:20, 101:18, 128:22, 151:10, 151:13
**reviewed** [14] - 6:21, 9:17, 54:11, 56:23, 57:6, 65:4, 90:7, 91:4, 92:6, 114:23, 136:5, 144:14, 146:5
**reviewing** [6] - 9:20, 48:21, 48:22, 55:10, 114:23, 138:12
**reviews** [1] - 13:6
**ring** [6] - 33:16, 34:12, 35:23, 36:9, 77:14, 77:15
**ring-back** [1] - 34:12

**ringing** [2] - 37:21, 37:22
**ringless** [2] - 11:1, 138:15
**rings** [1] - 77:13
**robust** [1] - 61:4
**Rogers** [1] - 137:23
**rollout** [1] - 137:13
**roughly** [10] - 7:24, 10:7, 46:1, 109:12, 109:15, 118:24, 127:14, 137:5, 137:23, 138:21
**row** [3] - 81:18, 87:8, 89:12
**Row** [3] - 88:23, 89:4, 89:16
**rows** [1] - 83:15
**run** [2] - 41:23, 109:19
**Ryan** [4] - 15:12, 18:6, 139:18, 139:23
**Ryan's** [2] - 15:15, 139:12

---

## S

**sale** [2] - 80:9, 84:1
**sale/no** [1] - 84:24
**sale/not** [4] - 84:18, 95:21, 95:25, 96:9
**sales** [1] - 106:15
**sample** [1] - 105:11
**samples** [1] - 117:16
**sampling** [2] - 116:25, 117:1
**sat** [4] - 13:17, 16:7, 17:4, 17:22
**save** [2] - 72:22, 73:4
**saved** [4] - 59:18, 61:10, 69:3, 72:20
**saw** [6] - 6:24, 16:2, 119:11, 133:25, 134:6
**scenario** [7] - 35:15, 36:20, 77:10, 96:1, 98:3, 126:3, 126:14
**scenarios** [1] - 36:7
**Schaevitz** [6] - 10:10, 10:17, 10:24, 11:7, 11:13, 11:17
**schedule** [1] - 151:11
**scheme** [1] - 30:6
**schemes** [2] - 30:16, 31:1
**science** [2] - 83:24, 136:14
**scratch** [1] - 27:24
**screen** [3] - 12:24, 31:18, 37:9
**seal** [1] - 148:14

**Seavers** [1] - 19:7
**second** [15] - 10:21, 47:19, 50:25, 52:8, 68:17, 68:21, 68:23, 80:5, 81:11, 109:7, 109:11, 109:17, 119:15, 121:14, 131:7
**seconds** [8] - 46:2, 46:14, 46:15, 46:17, 47:5, 47:13, 47:23, 138:6
**section** [6] - 28:14, 43:22, 50:13, 85:23, 103:6, 145:17
**sections** [3] - 10:12, 11:6, 11:9
**see** [37] - 15:13, 16:1, 18:18, 36:9, 38:22, 50:13, 50:17, 61:7, 64:17, 65:2, 66:5, 66:11, 68:7, 81:15, 81:17, 81:21, 82:12, 82:19, 84:9, 87:7, 88:20, 88:23, 89:10, 90:15, 91:2, 91:22, 93:16, 94:3, 95:1, 99:20, 108:10, 108:12, 118:6, 125:6, 129:18, 146:8, 146:20
**seeing** [4] - 12:20, 66:20, 68:20, 69:16
**seem** [1] - 135:11
**sees** [3] - 12:25, 48:13, 48:18
**select** [4] - 95:5, 105:25, 141:12, 141:13
**selected** [1] - 117:16
**selection** [3] - 75:7, 95:8, 141:24
**semi** [1] - 127:9
**send** [2] - 57:10, 123:12
**sending** [1] - 121:8
**sense** [2] - 86:9, 86:10
**sent** [9] - 18:15, 21:21, 32:15, 57:9, 76:7, 125:3, 129:5, 140:22, 143:13
**sentence** [7] - 50:14, 50:25, 52:8, 99:14, 121:15, 129:14
**sentences** [1] - 68:3
**separate** [1] - 30:14
**sequence** [1] - 51:2
**sequential** [3] - 28:18, 28:19, 29:4
**served** [1] - 143:1

**server** [5] - 26:14, 44:25, 45:4, 45:5, 60:23
**servers** [3] - 27:9, 29:12, 29:16
**service** [6] - 35:3, 119:21, 124:15, 127:4, 127:13
**serviced** [1] - 123:15
**services** [2] - 103:19, 137:11
**session** [2] - 20:17, 20:19
**session-initiated** [1] - 20:19
**session-initiation** [1] - 20:17
**set** [10] - 13:4, 30:6, 30:13, 57:14, 109:5, 110:14, 123:21, 149:10, 149:11, 149:17
**setting** [2] - 111:5, 132:24
**setup** [5] - 12:13, 77:4, 77:5, 77:17, 79:3
**seven** [1] - 52:4
**seven-page** [1] - 52:4
**several** [3] - 12:13, 93:18, 139:11
**share** [2] - 23:13, 51:23
**shared** [2] - 23:19, 27:14
**shares** [1] - 27:10
**Sheet** [1] - 3:10
**SHEET** [1] - 150:1
**SHEHAN** [1] - 1:5
**Shehan** [2] - 150:3, 151:8
**Sherry** [2] - 15:12, 139:12
**short** [4] - 12:2, 24:15, 24:18, 55:6
**shortcomings** [1] - 114:2
**shortest** [1] - 119:4
**shorthand** [1] - 149:8
**show** [5] - 45:9, 50:6, 75:11, 81:4, 96:25
**showed** [1] - 30:20
**showing** [2] - 104:6
**shows** [2] - 86:6, 100:4
**sic** [1] - 131:12
**sign** [1] - 114:10
**signal** [2] - 34:16, 84:5
**signaling** [7] - 21:6, 21:17, 21:20, 21:24,

22:24, 26:2, 26:4
**signals** [1] - 21:3
**signed** [1] - 114:7
**significant** [6] - 30:6, 30:10, 30:13, 30:16, 66:17, 129:20
**significants** [1] - 118:1
**similar** [7] - 18:4, 97:21, 110:20, 124:7, 124:10, 125:25, 130:16
**similarly** [1] - 15:4
**simple** [1] - 81:14
**simply** [8] - 16:11, 41:23, 48:6, 50:14, 62:24, 69:10, 77:13, 146:6
**Sincerely** [1] - 151:17
**single** [6] - 20:6, 20:8, 57:17, 100:14, 101:13, 145:4
**SIP** [27] - 21:8, 21:13, 21:14, 21:15, 21:17, 21:20, 21:23, 21:24, 22:13, 22:24, 26:2, 26:4, 26:8, 26:11, 27:3, 42:19, 42:22, 42:24, 44:4, 44:5, 44:7, 44:10, 44:11
**sit** [7] - 14:3, 14:6, 49:4, 85:10, 86:17, 93:13, 138:8
**site** [1] - 105:14
**sits** [2] - 27:8, 35:21
**SITTERSON** [4] - 1:18, 2:17, 2:21, 151:4
**sitting** [1] - 15:18
**situated** [1] - 1:5
**six** [1] - 71:18
**skill** [19] - 69:20, 69:22, 70:10, 70:13, 70:24, 71:9, 71:14, 71:22, 72:1, 104:18, 104:22, 105:5, 105:22, 105:24, 106:7, 110:17, 110:22, 110:23, 110:25
**skills** [7] - 71:7, 71:19, 71:20, 71:21, 72:7, 110:20, 110:25
**skip** [1] - 135:14
**skip-tracing** [1] - 135:14
**slower** [1] - 41:21
**smaller** [2] - 121:9, 121:25
**smart** [11] - 29:21, 29:24, 43:22, 43:25,

44:6, 44:9, 44:10, 45:12, 45:20, 138:13, 140:9
**Snyder** [2] - 6:23, 6:24
**Snyder's** [3] - 43:14, 43:16, 43:18
**software** [12] - 20:22, 20:23, 23:24, 24:6, 24:8, 24:16, 25:2, 25:6, 35:18, 75:17, 136:15, 136:19
**someone** [2] - 14:3, 36:9
**sorry** [18] - 10:14, 10:22, 13:23, 13:24, 16:20, 29:13, 50:6, 55:16, 65:13, 71:15, 79:13, 81:22, 81:25, 87:11, 88:11, 90:22, 104:21, 147:6
**sort** [1] - 103:9
**Sosnow** [4] - 1:24, 148:21, 149:22, 151:18
**SOSNOW** [1] - 149:5
**sounded** [1] - 147:9
**sounds** [5] - 37:17, 37:18, 51:20, 53:12, 118:24
**source** [3] - 57:5, 104:13, 118:9
**sources** [5] - 112:3, 114:3, 135:11, 135:13, 143:11
**SOUTHERN** [1] - 1:1
**speaking** [3] - 37:24, 114:17, 147:10
**special** [2] - 123:23, 135:25
**specialized** [16] - 69:20, 70:10, 70:24, 71:9, 71:14, 71:19, 71:20, 71:21, 72:7, 104:18, 104:22, 105:22, 105:24, 106:7, 110:17, 124:19
**specific** [30] - 14:9, 24:5, 29:12, 29:15, 29:17, 36:15, 51:19, 69:3, 70:8, 99:25, 103:14, 111:9, 112:21, 120:5, 123:19, 125:14, 125:21, 126:15, 127:21, 128:12, 129:3, 130:17, 131:14, 132:18, 133:21, 134:4, 134:8, 144:19, 146:7

**specifically** [12] - 62:12, 63:21, 64:1, 73:23, 103:25, 122:15, 123:18, 133:16, 134:9, 136:11, 139:17, 142:14
**specifics** [3] - 15:9, 122:3, 124:3
**specify** [1] - 68:14
**speed** [1] - 40:24
**spell** [1] - 5:10
**split** [1] - 79:22
**spoken** [2] - 7:8, 7:13
**Sprint** [5] - 120:20, 122:6, 125:3, 125:25, 126:25
**SQL** [5] - 60:10, 60:18, 60:23, 60:25, 61:3
**stale** [9] - 66:4, 66:10, 66:15, 67:2, 67:3, 67:7, 67:22, 67:24, 68:1
**stale-dated** [1] - 66:4
**stamp** [5] - 145:7, 145:9, 146:6, 146:12, 146:13
**stamps** [4] - 144:8, 144:12, 146:1, 146:9
**stand** [1] - 85:10
**standard** [7] - 115:19, 123:21, 124:18, 141:16, 141:17, 146:4, 146:8
**standpoint** [3] - 32:1, 32:8, 57:5
**start** [3] - 42:23, 81:25, 118:21
**started** [1] - 136:22
**starting** [1] - 12:17
**starts** [3] - 15:14, 79:16, 103:7
**state** [10] - 5:10, 45:23, 73:16, 74:19, 74:23, 91:19, 94:23, 98:20, 125:2, 144:25
**State** [4] - 1:24, 148:21, 149:5, 149:23
**STATE** [2] - 148:3, 149:3
**statement** [5] - 51:9, 51:19, 52:12, 100:12, 135:18
**states** [1] - 58:12
**STATES** [1] - 1:1
**station** [1] - 19:12
**status** [4] - 38:6, 38:8, 40:9, 137:17
**statutory** [2] - 38:25,

39:18
**stay** [1] - 52:6
**STEARNS** [4] - 1:18, 2:16, 2:21, 151:4
**Stenographically** [1] - 1:22
**stenotype** [1] - 149:7
**step** [2] - 22:24, 38:18
**still** [7] - 7:19, 73:25, 77:6, 78:21, 103:4, 122:8, 136:23
**stop** [2] - 10:21, 131:7
**stopping** [1] - 89:24
**store** [8] - 28:4, 28:19, 28:23, 29:1, 29:2, 29:6, 29:14, 132:12
**stored** [6] - 29:21, 29:24, 30:2, 45:4, 45:14, 45:16
**stores** [1] - 29:10
**strategic** [1] - 137:25
**Street** [4] - 1:19, 2:18, 2:22, 151:6
**strike** [5] - 9:2, 29:9, 75:23, 98:25
**strong** [1] - 137:15
**subfunction** [1] - 21:14
**submitted** [1] - 114:24
**submitting** [1] - 114:22
**subpoena** [17] - 62:6, 65:9, 65:15, 122:10, 123:5, 123:12, 123:20, 126:6, 126:9, 128:8, 129:5, 131:1, 131:12, 142:23, 143:1, 143:9, 143:19
**subpoenas** [10] - 121:5, 121:19, 122:7, 122:16, 123:9, 127:23, 128:11, 128:18, 128:22, 128:25
**subscriber** [27] - 107:20, 107:25, 108:10, 110:8, 115:3, 119:6, 119:7, 119:14, 119:21, 120:14, 120:17, 120:20, 120:23, 121:2, 121:6, 123:7, 123:8, 124:8, 124:13, 125:19, 127:24, 130:6, 130:14, 130:20, 131:1, 131:12, 131:23
**subscriber-user** [1] -

115:3
**subscriber/user** [4] - 113:1, 113:19, 114:8, 132:6
**subscribers** [1] - 123:14
**subsequent** [4] - 8:19, 96:2, 96:17, 109:20
**subset** [3] - 11:24, 103:20, 105:25
**substance** [1] - 140:6
**substantial** [1] - 9:18
**substantive** [1] - 9:16
**sufficient** [1] - 38:21
**Suite** [7] - 1:19, 2:4, 2:7, 2:11, 2:17, 2:22, 151:5
**suite** [1] - 106:25
**summary** [1] - 79:18
**supervised** [3] - 109:1, 109:6, 109:16
**supervision** [1] - 109:3
**support** [6] - 8:17, 18:23, 58:13, 93:14, 136:19, 139:20
**supporting** [2] - 59:15, 59:21
**suspect** [2] - 62:23, 132:2
**swiping** [3] - 47:15, 47:18, 140:9
**switch** [1] - 21:11
**switching** [1] - 126:23
**sworn** [4] - 5:7, 86:14, 148:9, 149:6
**Syniverse** [3] - 137:8, 137:19, 137:21
**system** [42] - 11:25, 12:6, 12:10, 14:12, 14:16, 23:12, 24:20, 25:10, 28:16, 32:9, 33:14, 34:19, 36:14, 36:16, 36:18, 37:6, 38:21, 39:2, 40:7, 41:18, 42:2, 43:9, 43:25, 45:6, 45:10, 51:8, 54:6, 56:1, 61:3, 75:14, 76:7, 77:21, 78:12, 79:6, 81:24, 82:8, 91:20, 102:18, 139:20, 139:21, 140:2, 140:18
**systems** [9] - 39:5, 39:17, 52:24, 54:23, 126:23, 132:12, 133:6, 136:19

# T

**T-Mobile** [3] - 120:23, 125:25, 126:25
**table** [7] - 45:13, 79:24, 79:25, 85:6, 87:22, 95:14, 95:19
**tables** [1] - 90:19
**tag** [1] - 25:1
**TAKEN** [2] - 1:14, 150:4
**talks** [3] - 43:22, 66:3, 94:10
**target** [1] - 143:6
**TCM** [3] - 7:1, 9:10, 19:11
**TCN** [51] - 4:9, 4:10, 7:2, 7:9, 11:21, 11:25, 12:13, 17:19, 22:13, 22:23, 23:5, 23:14, 24:1, 24:3, 24:11, 25:2, 25:4, 26:14, 27:9, 27:11, 27:20, 28:15, 29:10, 29:14, 29:19, 30:1, 30:17, 31:1, 31:6, 45:5, 45:10, 45:14, 45:19, 51:10, 75:14, 76:4, 78:12, 79:3, 79:6, 82:2, 82:8, 83:17, 83:21, 86:7, 87:25, 91:20, 95:14, 102:18, 102:23, 139:20
**TCN's** [1] - 52:5
**TCPA** [4] - 7:17, 7:23, 52:7, 138:10
**technical** [5] - 31:25, 39:15, 106:16, 107:1, 137:2
**technician** [1] - 51:19
**technological** [1] - 32:8
**Technologies** [1] - 137:8
**technologies** [1] - 9:17
**technology** [9] - 16:14, 41:16, 44:10, 49:11, 49:16, 53:7, 53:10, 138:12, 138:15
**telecom** [4] - 137:9, 138:17, 138:18, 138:19
**telecommunication** [1] - 138:5
**telecommunications** [6] - 122:16, 136:15, 136:17, 136:24,

138:4, 138:8
**telephone** [162] - 12:25, 13:5, 13:10, 13:11, 13:15, 13:18, 14:4, 14:7, 14:8, 14:13, 14:18, 14:20, 14:25, 16:8, 16:9, 16:24, 17:4, 17:13, 17:17, 17:18, 17:21, 17:23, 18:1, 18:14, 19:19, 20:13, 20:16, 20:23, 20:25, 21:1, 21:11, 27:1, 28:4, 28:17, 29:6, 29:10, 29:14, 30:2, 31:21, 32:14, 32:17, 33:1, 33:8, 35:3, 35:11, 35:22, 36:3, 36:5, 39:3, 39:4, 39:6, 41:21, 41:23, 42:21, 43:10, 44:13, 44:20, 44:24, 44:25, 45:2, 45:3, 45:8, 45:16, 45:18, 45:20, 46:6, 47:12, 48:10, 48:14, 48:15, 48:18, 48:22, 48:23, 49:5, 49:6, 55:12, 59:25, 60:2, 61:7, 61:11, 63:1, 63:18, 63:19, 66:20, 67:13, 73:14, 75:10, 75:11, 80:16, 80:22, 81:11, 82:4, 82:12, 82:19, 84:9, 85:17, 86:21, 87:7, 87:17, 92:13, 97:13, 98:20, 98:25, 101:11, 101:20, 101:24, 102:4, 102:13, 102:15, 103:22, 107:13, 107:15, 107:18, 107:24, 109:10, 109:13, 110:3, 110:15, 112:17, 116:20, 116:21, 117:2, 117:24, 119:5, 119:8, 121:9, 121:20, 122:11, 123:6, 123:13, 123:14, 123:22, 123:23, 124:13, 124:14, 125:2, 125:5, 125:8, 125:15, 125:18, 127:19, 135:24, 137:1, 137:10, 137:16, 137:24, 140:1, 140:9, 140:17, 140:22, 141:6, 141:11,

141:21, 141:25, 142:6, 142:7, 142:20, 143:7, 143:12, 145:13, 145:22, 146:24
**telephones** [3] - 43:15, 43:21, 132:6
**ten** [6] - 14:13, 47:14, 48:13, 48:20, 49:12, 140:4
**ten-digit** [2] - 14:13, 140:4
**tens** [2] - 99:18, 128:13
**term** [4] - 58:5, 75:8, 76:21, 140:15
**terminated** [1] - 77:18
**terminates** [2] - 21:24, 119:15
**terminology** [5] - 18:11, 18:21, 31:12, 107:25, 114:7
**terms** [6] - 7:11, 19:9, 23:2, 70:23, 107:21, 145:15
**Terrace** [1] - 151:19
**test** [4] - 61:13, 69:6, 71:8, 108:19
**tested** [7] - 46:19, 47:9, 47:24, 49:15, 134:20, 135:20, 136:5
**testified** [3] - 5:7, 28:2, 55:25
**testify** [1] - 149:6
**testifying** [2] - 15:25, 120:11
**testimony** [7] - 5:19, 8:1, 8:7, 15:11, 15:15, 16:11, 18:3, 18:4, 18:6, 18:13, 18:16, 18:25, 19:7, 23:7, 25:9, 25:17, 27:12, 29:18, 30:3, 32:16, 32:25, 33:4, 38:5, 51:5, 56:4, 56:7, 56:11, 78:19, 90:6, 94:2, 114:18, 119:12, 120:2, 120:3, 120:6, 139:13, 139:15
**testing** [3] - 70:15, 133:12, 135:15
**text** [1] - 48:23
**THE** [2] - 1:14, 150:2
**themselves** [1] - 35:10
**therefore** [1] - 66:9
**Thereupon** [1] - 5:3
**they've** [1] - 135:10
**third** [2] - 15:16,

121:15
**THIS** [1] - 150:2
**thorough** [1] - 116:25
**thousand** [1] - 93:18
**thousands** [11] - 76:13, 78:8, 87:19, 99:19, 101:4, 121:9, 122:11, 123:6, 128:14, 135:12, 145:21
**three** [4] - 5:17, 107:8, 108:16, 128:3
**tied** [2] - 84:18, 86:6
**TLO** [3] - 115:20, 115:22
**today** [15] - 5:20, 5:23, 9:20, 31:16, 50:11, 69:7, 85:10, 86:17, 93:13, 118:16, 119:2, 130:7, 138:8, 139:15, 140:13
**today's** [2] - 6:18, 7:11
**together** [2] - 57:17, 74:6
**tone** [9] - 33:16, 34:10, 34:13, 35:23, 36:9, 38:1, 46:7, 47:22
**took** [9] - 5:23, 7:16, 48:4, 60:2, 61:7, 71:18, 72:1, 103:20, 108:21
**tool** [1] - 60:24
**top** [3] - 15:17, 18:5, 45:22
**total** [4] - 60:13, 70:18, 90:14, 111:13
**totally** [1] - 24:17
**touched** [1] - 10:20, 10:25
**touches** [1] - 48:24
**touching** [1] - 47:18
**tout** [1] - 135:12
**Tower** [4] - 1:19, 2:17, 2:22, 151:5
**tracing** [1] - 135:14
**tradition** [1] - 47:11
**traditional** [9] - 35:13, 44:11, 44:13, 44:20, 44:24, 45:7, 45:10, 45:12, 47:12
**training** [15] - 106:12, 106:14, 106:20, 106:24, 107:3, 107:5, 111:7, 111:22, 112:5, 112:8, 132:4, 132:9, 132:19, 132:23, 133:2
**transcript** [2] - 149:15,

151:10
**TRANSCRIPT** [1] - 150:2
**transcription** [1] - 149:8
**transferred** [15] - 12:20, 37:7, 75:15, 75:20, 78:10, 78:14, 78:22, 79:4, 83:2, 83:16, 84:6, 87:21, 87:25, 92:20, 92:24
**transferring** [1] - 22:2
**transfers** [1] - 37:5
**translated** [1] - 93:2
**transmitted** [2] - 143:7, 143:13
**TransUnion** [43] - 103:6, 103:9, 103:16, 103:19, 103:21, 103:24, 104:6, 104:10, 104:12, 104:17, 104:20, 104:24, 104:25, 105:17, 105:20, 105:23, 106:9, 106:12, 106:21, 107:6, 108:8, 108:12, 108:16, 108:17, 108:22, 108:25, 109:8, 110:21, 111:1, 113:3, 115:11, 116:2, 116:9, 116:15, 117:19, 124:8, 124:10, 125:13, 132:22, 132:25, 133:6, 136:2
**trick** [1] - 72:4
**true** [5] - 7:19, 8:5, 8:11, 149:8, 150:18
**truth** [1] - 149:6
**trying** [7] - 21:10, 40:14, 44:18, 45:9, 48:2, 79:22, 112:15
**turn** [3] - 118:2, 139:3, 143:21
**two** [25] - 8:16, 12:15, 23:2, 26:3, 27:14, 30:7, 30:14, 31:20, 33:5, 68:2, 68:12, 80:24, 83:14, 85:7, 97:10, 97:22, 98:4, 98:15, 107:8, 108:16, 108:20, 110:9, 111:17, 122:15, 123:3
**type** [20] - 6:3, 29:21, 52:23, 52:24, 60:20, 66:21, 106:10,

106:20, 107:2,
107:10, 108:10,
111:22, 112:5,
113:5, 114:10,
116:10, 123:22,
135:10, 146:4
**typed** [1] - 13:17
**types** [7] - 52:20, 54:6,
54:22, 106:17,
106:18, 110:20,
128:7
**typical** [2] - 47:10,
56:9
**typically** [9] - 21:10,
35:16, 41:12, 41:21,
46:14, 48:24, 66:21,
72:24, 112:13
**typing** [1] - 17:13

## U

**uh-hu** [6] - 15:3, 22:8,
32:4, 36:17, 77:1,
83:11
**ultimately** [1] - 27:2
**unable** [1] - 69:7
**unanswered** [1] -
77:17
**unattended** [1] - 55:1
**unclear** [2] - 61:25,
68:6
**Under** [1] - 150:17
**under** [6] - 50:13,
50:24, 52:6, 86:15,
93:15, 149:16
**undergo** [1] - 123:15
**undersigned** [1] -
148:7
**understood** [10] -
12:3, 16:12, 59:9,
62:9, 78:5, 91:17,
110:2, 119:17,
132:11, 141:20
**unique** [1] - 137:15
**UNITED** [1] - 1:1
**universe** [3] - 63:20,
91:15, 100:7
**unknown** [9] - 66:8,
68:5, 68:6, 68:10,
68:11, 68:19, 68:22,
73:24, 74:18
**unless** [1] - 149:16
**unlikely** [1] - 23:25
**unlimited** [2] - 77:14,
77:16
**unreliable** [3] - 58:14,
58:24, 64:8
**up** [30] - 9:23, 13:4,
14:9, 14:16, 22:2,
46:4, 46:10, 62:18,

63:19, 71:13, 81:3,
82:6, 87:8, 87:13,
88:6, 90:19, 92:3,
93:1, 93:4, 93:9,
107:14, 109:5,
110:5, 111:5,
123:21, 132:24,
137:5, 137:22,
138:11, 139:9
**update** [1] - 67:14
**updated** [2] - 12:12,
132:15
**upload** [8] - 14:19,
104:23, 105:23,
106:13, 106:22,
107:7, 124:7, 124:12
**uploaded** [7] - 17:18,
29:11, 29:15, 45:19,
45:20, 141:19,
141:22
**uploading** [2] - 14:17,
58:1
**US** [2] - 121:1, 127:9
**usage** [4] - 44:5, 44:7,
44:11, 106:18
**useful** [1] - 108:12
**user** [8] - 21:13,
21:14, 21:23,
107:20, 108:1,
108:10, 110:8, 115:3
**user/subscriber** [3] -
108:7, 112:11,
112:20
**users** [2] - 109:5,
110:5
**uses** [7] - 26:11,
35:13, 42:6, 48:17,
53:4, 60:22, 60:24
**utilized** [2] - 11:24,
49:16

## V

**VACATIONS** [1] - 1:10
**Vacations** [2] - 150:3,
151:8
**valid** [2] - 100:20,
105:8
**validity** [1] - 134:1
**valuable** [2] - 132:8,
132:9
**value** [12] - 73:24,
93:2, 93:9, 93:19,
93:23, 93:25, 95:5,
95:14, 95:20, 95:22,
97:25, 98:10
**values** [9] - 79:2,
91:21, 92:3, 93:8,
94:25, 96:7, 99:16,
101:6

**variables** [3] - 40:10,
41:3, 123:24
**variations** [1] - 127:15
**various** [4] - 20:24,
70:4, 135:11, 137:19
**vendor** [4] - 11:23,
13:25, 65:22, 108:11
**vendors** [1] - 135:8
**verify** [1] - 105:15
**Verizon** [9] - 120:17,
122:1, 122:5,
124:23, 125:3,
125:17, 126:7,
126:25, 137:4
**Veronica** [1] - 2:24
**version** [4] - 60:7,
61:5, 104:16, 131:24
**versus** [5] - 10:10,
10:17, 30:22, 33:20,
41:10
**vetting** [7] - 105:3,
105:5, 105:7,
105:21, 111:2,
115:22, 132:23
**via** [3] - 16:23, 32:15,
48:23
**viewed** [1] - 63:4
**violation** [1] - 101:10
**virtually** [1] - 113:23
**visit** [2] - 105:14,
105:17
**visual** [1] - 37:13
**voice** [1] - 147:6
**voicemail** [9] - 34:18,
77:5, 77:13, 77:16,
78:4, 78:8, 78:14,
78:20, 138:15
**voicemails** [2] - 11:1,
78:3
**volume** [3] - 41:13,
49:19, 117:23
**vs** [3] - 10:24, 150:3,
151:8

## W

**wait** [1] - 46:11
**waiting** [2] - 38:6, 46:7
**wants** [2] - 13:6, 13:7
**ways** [2] - 51:22,
103:13
**wealth** [1] - 139:19
**WEAVER** [4] - 1:18,
2:16, 2:21, 151:4
**web** [10] - 22:25,
25:18, 25:24, 26:19,
26:24, 37:9, 117:25,
140:19, 141:3,
141:10
**web-based** [4] -

22:25, 25:18, 25:24,
117:25
**website** [2] - 51:12,
52:5
**WEBSITE** [2] - 4:9,
4:10
**Wednesday** [2] - 1:15,
7:6
**week** [1] - 7:5
**WEISSLER** [4] - 1:18,
2:16, 2:21, 151:4
**West** [4] - 1:19, 2:18,
2:22, 151:6
**whatsoever** [2] -
106:20, 112:24
**WHEREOF** [1] -
149:17
**whole** [1] - 149:6
**Wijesinah** [2] - 150:3,
151:8
**WIJESINAH** [1] - 1:5
**wireless** [7] - 98:22,
126:17, 127:3,
127:8, 137:14,
137:24, 138:14
**Wireless** [2] - 127:1,
137:23
**wishes** [1] - 27:2
**witness** [4] - 5:6,
137:21, 148:8, 149:6
**WITNESS** [4] - 148:14,
149:17, 150:4, 151:1
**word** [4] - 20:11,
22:16, 76:18, 134:7
**words** [3] - 62:15,
64:2, 134:8
**works** [7] - 21:20,
25:6, 29:20, 31:15,
50:13, 50:22, 51:4
**world** [4] - 135:23,
135:24, 136:25,
137:9
**WRITE** [1] - 150:2
**written** [1] - 51:18

## Y

**year** [2] - 123:3,
125:21
**years** [2] - 67:10,
137:5
**yourself** [4] - 30:9,
30:15, 70:9, 109:2

## Z

**Zayas** [1] - 2:24
**ZIP** [3] - 73:16, 74:19,
74:24
**zip** [1] - 70:3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:19-cv-20073

SHEHAN WIJESINHA, individually and
on behalf of all others similarly situated

      Plaintiff,

v.

BLUEGREEN VACATIONS, INC.,

      Defendant.

# Expert Report by Jan Kostyun dated
# May 24, 2019



PLAINTIFF'S
EXHIBIT

1

6-5-19

# TABLE OF CONTENTS

INTRODUCTION AND SCOPE OF OPINION.............................................................................3

RELEVANT EXPERIENCE ....................................................................................................4

COMPENSATION .................................................................................................................8

DOCUMENTS REVIEWED.....................................................................................................8

METHODOLOGY .................................................................................................................9

RESERVATION OF RIGHT TO AMEND ................................................................................10

SUMMARY OF OPINIONS ..................................................................................................10

DISCUSSION OF OPINIONS ...............................................................................................12

    I.    The TCN Manually Approved Calling System ............................................................12

        A.    The TCN System Cannot Produce Numbers to Be Called Using a Random
            or Sequential Number Generator and Requires Human Intervention .................12

        B.    The TCN Manually Approved Calling System Lacks the Technical
            Internals Required for Predictive Dialing..........................................................19

        C.    The TCN System's Manual Limits Are Consistent with the Call Volume
            in the Discovery Record .....................................................................................21

        D.    Classifying the TCN Manually Approved Calling System as an ATDS
            Would Make all Modern Smartphones ATDSs...................................................23

    II.    Documents Produced in the Litigation Cannot Be Used to Reliably Identify Call
      Recipients ....................................................................................................................25

        A.    The Choice Lead Files ...........................................................................................26

            1.    Missing Lead Data ......................................................................................27

            2.    Staledated Lead Data ..................................................................................28

        B.    Clicker Records.......................................................................................................29

        C.    Disposition Records .................................................................................................29

            1.    Source of the Disposition Records and Values............................................29

            2.    Conflicts between Clicker Records' Results Values and
               Disposition Records' Disposition Values .....................................................31

Case 1:19-cv-20073-CMA   Document 71-2   Entered on FLSD Docket 06/07/2019   Page 172 of
336
. Case 1:19-cv-20073-CMA   Document 68-1   Entered on FLSD Docket 05/30/2019   Page 3 of 75

3.   Barriers to Resolving these Conflicts on a Class-Wide Basis ..................33

4.   Additional Conflicts between the Clicker Records and Disposition
     Records ...........................................................................................35

5.   Duplicate records .............................................................................36

III.  Barriers to Identifying Historical Users or Subscribers ....................................37

A.   TransUnion ...............................................................................................38

B.   Other Public Identification Services and Skip Tracing...........................41

C.   Name Directories .....................................................................................48

D.   Reliability of Subscriber Information from Carriers ...............................48

1.   Barriers to Identifying Numbers Assigned to Particular Carriers..............48

2.   Carriers' Retention of Records ..........................................................53

3.   Prepaid Cell Phone Services .............................................................55

4.   Cell Phone Number Reassignment ....................................................55

5.   Authorized User Identification .........................................................57

E.   Confirmation of My Opinions from Other Sources................................58

EXHIBIT A – JAN KOSTYUN CV.....................................................................61

EXHIBIT B – LEXISNEXIS DISCLAIMER ........................................................72

EXHIBIT C – MICROBILT DISCLAIMER .........................................................73

EXHIBIT D – PARTIAL LIST OF OCCURRENCES OF LEXISNEXIS DISCLAIMER .........74

Case 1:19-cv-20073-CMA   Document 71-2   Entered on FLSD Docket 06/07/2019   Page 173 of
336
Case 1:19-cv-20073-CMA   Document 68-1   Entered on FLSD Docket 05/30/2019   Page 4 of 75

## INTRODUCTION AND SCOPE OF OPINION

1.       In this case, Plaintiff Shehan Wijesinha has brought a putative class action against

Defendant Bluegreen Vacations ("Defendant" or "Bluegreen") under the Telephone Consumer

Protection Act, 47 U.S.C. § 227 ("TCPA"). First Amended Class Action Complaint ("FAC"),

Docket Entry 13, at ¶ 1.

2.       Plaintiff Wijesinha alleges that "[o]n or about December 11, 2018, Defendant

called Plaintiff's cellular telephone number ending in 7557 ('7557 Number')." FAC at ¶ 24.

3.       Plaintiff has moved to certify a class defined as "All individuals within the United

States (i) who were sent an outbound call; (ii) which call was connected; (iii) to a cellular

telephone number obtained by Defendant as a lead from Choice Hotels International, Inc., which

was designated as a 'Choice Inact CP Wireless' campaign lead; (iv) promoting Defendant's

vacation packages; (v) placed by Gold Mountain Communications, LLC on behalf of Defendant

using the TCN 'Manual Dial Only' system; (vi) from October 9, 2018 through January 28,

2019."

4.       I understand the following based on Plaintiff's assertions and the discovery

record: Defendant received lists of marketing *leads* from Choice Hotels International, Inc.,

including names and contact information for members of Choice Hotels' loyalty program (Ryan

Dep. 43:6-10). Defendant employed Gold Mountain Communications LLC ("Gold Mountain"),

to perform marketing campaigns using a manual dialer, including placing calls to prospective

customers based on the leads from Choice Hotels (Ryan Dep. 43:1-14). The marketing campaign

in this case was known as the "Choice Inact CP Wireless" campaign.[1] Gold Mountain placed the

calls for the Choice Inact CP Wireless campaign using the 'Manual Dial Only' system provided

---

[1] Declaration of Ignacio J. Hiraldo Regarding Class Data at ¶¶ 11-12; also Motion for Class Certification p. 2

Case 1:19-cv-20073-CMA   Document 71-2   Entered on FLSD Docket 06/07/2019   Page 174 of
336
Case 1:19-cv-20073-CMA   Document 68-1   Entered on FLSD Docket 05/30/2019   Page 5 of 75

by TCN.[2] It was also revealed in the deposition by TCN's corporate representative that the system used by Gold Mountain is a subset of the TCN Manual Dial Only system referred to as the Manually Approved Calling System. And Gold Mountain has produced records relevant to the calls placed in the Choice Inact CP Wireless campaign, including Disposition files that purportedly identify calls handled by Gold Mountain's agents ("Disposition Reports")[3], and activity files referred to in Plaintiff's Motion for Class Certification as "Calls Attempted Reports" that reflect calls attempted by the TCN dialing system ("Clicker Records").[4]

5.     I have been engaged by Bluegreen through its counsel to provide opinions on the TCN Manually Approved Calling System, the accuracy and value of the call data and associated lead records, the feasibility of accurately determining the cellular telephone numbers that were called, and the users or subscribers associated with those numbers when called.

## RELEVANT EXPERIENCE

6.     I am an independent technology consultant with more than 35 years of experience in telecommunications, enterprise architecture, and information technologies. I received a Bachelor of Science degree *magna cum laude* in Mathematics and a Master of Science degree in Computer Science from Union College in 1976. I have been employed by major telecommunications companies, including Bell Telephone Laboratories, GTE, Verizon, and Syniverse Technologies. I also have been engaged as a consultant on various telecommunications issues by telecommunications companies and regulatory authorities, including Rogers Wireless (the largest wireless carrier in Canada), CRC (the national telecommunications regulatory agency of Colombia), and Syniverse Technologies (a worldwide

---

[2] See About TCN, at https://www.tcn.com/about-tcn/ last visited 5/14/2019

[3] Declaration of Ignacio J. Hiraldo Regarding Class Data at ¶ 6

[4] Declaration of Ignacio J. Hiraldo Regarding Class Data at ¶ 5

leader in telecommunications services). I have worked in software development, database technology, and enterprise architecture. I have worked for more than 15 years providing consulting services, software development, and data analysis in the field of telephone number portability. This experience covers landline, wireless, and intermodal (landline-to-wireless or wireless-to-landline) number portability, as well as telephone number pooling. I have played lead roles in the technical and organizational processes of porting landline numbers in the U.S. as well as wireless numbers in the U.S., Canada, and Colombia.

7.      As a software architect for Bell Telephone Labs, GTE, Verizon, and Syniverse, I developed expertise in areas such as landline and wireless number provisioning, including the end-to-end process of establishing service for an initial subscriber; landline and wireless order-entry, including the collection of subscriber contact information; initial implementation of the National Do Not Call registry; technical experience with telecom features such as voice calling, SMS messaging, fax transmissions, voicemail, auto dialer and Interactive Voice Response Unit (IVRU) technology, and switching implementations; and a wide variety of telecommunications industry standards.

8.      I also have extensive experience in database methodologies, data analysis, and data mining. My experience with database technologies includes hierarchical, network, and relational database models and implementations. I have instructed working professionals on the use of database programming, support, and internal architecture, and have developed database training courses. I am proficient with advanced database modeling, optimization and query techniques, as well as the development of database software applications. I have personally performed database queries and data analysis against hundreds of data stores, including but not limited to Internal and National Do Not Call lists, Wireless Block identifiers, Number Portability

5

transaction lists and telephone call records produced by both wireless carriers and businesses involved in dialing campaigns.

9.      I have extensive experience with call center operations and various dialing systems, including those used for inbound and outbound calling campaigns. In my tenure with GTE/Verizon, I performed early research with Intel-based Computer Telephony Interfaces (CTI), including text-to-speech translation and automated dialing interfaces. I have worked closely with IVRU engineers and application architects to develop programmatic interfaces used for inbound and outbound calling. I have worked closely with call center personnel at telecom businesses such as GTE, Verizon, Syniverse and Rogers Wireless while supporting Customer Relations Management (CRM) applications that include interfaces to inbound and outbound dialing systems. I have analyzed dialing systems and features from vendors such as Avaya, LiveVox, CallFire, RingCentral, Cisco, Five9, GTE, Txtwire Technologies, Stratics Networks and InfoLink Technologies. I have been retained to provide opinions regarding Automatic Telephone Dialing System (ATDS) capabilities in various litigated cases, including *Lutman v. Harvard Collection Services, Couser v. Cucamonga Valley Medical, Williams v. Bluestem, Schaevitz v. Braman Hyundai, Garcia v. Target, Diaz-Lebel v. Target, Eisenband v. Schumacher Automotive, Green-Mobley v. Capital One Auto Finance, Thomas v. Peterson's Harley Davidson, Carpenter v. World Omni Financial*, and *Scherkanowski v. Bluegreen Vacations*, among others.

10.      For the past ten years I have worked as a consultant and expert witness on cases covering TCPA issues, state-specific consumer issues such as the Washington Automatic Dialing and Announcing Device statute, and issues including patents, software copyrights, trade secrets, software value determination, vandalism, and sabotage of application programs. I have testified

6

in deposition and in court. My opinions have never been stricken or rejected, and have been cited in support of denial of class certification in two TCPA cases.

11.    A copy of my curriculum vitae is attached hereto as Exhibit A.

12.    I have not authored any publications in the past 10 years.

13.    In the past eight years, I have been qualified as an expert in federal courts and Florida state courts. I have been retained to provide deposition testimony as an expert for both Defendants and Plaintiffs in the following matters: *Shamblin v. Obama for Am.*, No. 8:13-cv-2428 (M.D. Fla.); *Cunningham v. Health Insurance Innovations*, No. 8:18-cv-00919 (M.D. Fla.); *Schaevitz v. Braman Hyundai*, No. 1:17-cv-23890 (S.D. Fla.); *Thomas v. Peterson's Harley Davidson*, No. 0:18-cv-61723 (S.D. Fla.); *Eisenband v. Schumacher Auto.*, No. 9:18-cv-80911 (S.D. Fla.); *Berman v. Freedom Fin.*, No. 4:18-cv-01060 (N.D. Cal.); *Diaz-Lebel v. Target*, No. 0:17-cv-05110 (D. Minn.); *Garcia v. Target*, No. 1:16-cv-2574 (D. Minn.); *Jackson v. Palm Beach Credit Adjusters*, No. 9:18-cv-80124 (S.D. Fla.); *Williams v. Bluestem*, No. 8:17-cv-1971 (M.D. Fla.); *Wilson v. Badcock*, No. 8:17-cv-02739 (M.D. Fla.); *Scherkanowski v. Bluegreen Vacations*, No. 1:18-cv-00301 (D. N.H.); *Green-Mobley v. Capital One Auto Finance*, No. 3:17-cv-764 (S.D. Fla.); *Carpenter v. World Omni Fin.*, No. 01-18-0000-6972 (A.A.A.); *Buja v. Novation Capital, LLC.*, No. 9:15-cv-81002 (S.D. Fla.); *Kalmbach v. Nat. Rifle Ass'n of Am. and InfoCision, Inc.* No. 2:17-cv-00399 (W.D. Wash.); *Goins v. Walmart and Palmer Recovery Attorneys*, No. 6:17-cv-00654 (M.D. Fla.); *Reyes v. BCA Fin. Servs.*, No. 1:16-cv-24077 (S.D. Fla.); *Jacobs v. Quicken Loans Inc.*, No. 15-cv-81386 (S.D. Fla.); *Cook v. Palmer Reifler & Assocs.*, No. 3:16-cv-00673 (M.D. Fla.); *Ameranth v. Six Continents Hotels*, No. 09-CV-3819 (Ga. Super. Ct. Dekalb Cnty.); *Couser v. Cucamonga Valley Med. Grp.*, No. 5:14-cv-01528 (C.D. Cal.); *Couser v. Dish One Satellite*, No. 5:15-cv-02218 (C.D. Cal.); *Datamaxx Applied*

7

*Techs. v. Comp. Projects of Ill.*, No. 4:09-cv-435 (N.D. Fla.); *Comprehensive Health Care Sys. of the Palm Beaches v. M3 USA Corp.*, No. 16-cv-80967 (S.D. Fla.); *Lutman v. Harvard Collection Servs.*, No. 2:15-cv- 257 (M.D. Fla.); *Moricz v. Google*, No. 10-CV-01240-RSL (W.D. Wash.); *Nece v. Quicken Loans Inc.*, No. 8:16-cv-02605 (M.D. Fla.); *PCS4Less v. Go Mobile*, No. 09-380-CZ (Mich. Cir. Ct. Washtenaw Cnty.); *Preman v. Pollo Operations*, No. 6:16-cv-00443 (M.D. Fla.); *Resource Acquisition & Mgmt. Servs. v. Mathews*, No. 09-CA 14536 (Fla. Cir. Ct. Hillsborough Cnty.); and *Florida v. Poole*, No. 09-CF-016786 (Fla. Cir. Ct. Hillsborough Cnty.).

## COMPENSATION

14. I am being compensated at the rate of $350 per hour for my study and analysis in this case, as well as $300 per hour for travel and $400 per hour for testimony. My compensation is not dependent on the outcome of this matter.

### DOCUMENTS REVIEWED

15. In forming my opinions, I have reviewed various documents; Class Action Complaint, *Shehan Wijesinha v. Bluegreen Vacations*, D.E. 1; the First Amended Complaint, DE ___; Order Granting Renewed Joint Motion to Enter Confidentiality Stipulation, D.E. 35; wav file of call recording to Plaintiff; Order for Partial Summary Judgment in *Marshall v. CBE Group*; *Glasser v. Grand Vacations*, 341 F. Supp.3d 1305; TCN TCPA-Manual Dial Only System product description; TCN Compliance Suite brochure; Default Call result Map for TCN dialer; Plaintiff's Motion for Class Certification and its exhibits; Choice Inactive CP Wireless.xlsx; Deposition Transcript of Louis James Russo and exhibits; Deposition Transcript of Sherry Ryan and exhibits; Deposition Transcript of Henry Seevers and exhibits; Deposition Transcript of Shehan Wijesinha and exhibits; 41 csv files from TCN's dialing system, represented as "Calls Attempted Reports"; 64 disposition csv files from Gold Mountain, represented as "Disposition Reports"; 230 csv files containing lead records, originating from Choice; TCN Confidential

Docs, received from I. Hiraldo, 5/15/2019; Vacation Package Marketing Agreement between Gold Mountain Communications and Bluegreen Vacations Unlimited, 12/28/2017; Subpoena for Deposition issued to TCN and Subpoena Rider; Objection to 30(b)(6) Deposition Subpoena & Designation Under Same (from TCN); Supplemental Objection & Response to Narrowed Subpoena (From TCN).

16.     I also regularly research and follow developments in the telecommunications industry. I review significant FCC orders; review TCPA cases and rulings; communicate with former telecommunications associates; review opinions set forth by other TCPA experts; communicate with vendors who provide TCPA-related data services; review of industry blogs and user groups; and research statistics and trends related to the telecommunications industry. This ongoing review and research has also informed and supported my opinions.

## METHODOLOGY

17.     My methodology in producing my opinions is based on my business and technical experience in telecommunications, my experience as an expert in other TCPA-related cases, my education and training, and my review of documents relevant to this case, as cited throughout this report. Based on my experience and that review, I developed hypotheses regarding the manual vs. automatic nature of the TCN dialing system, the value and accuracy of the lead files and call records, the challenges with identifying the historic wireless status of telephone numbers called, and the challenges with identifying their associated users and subscribers. I have tested my hypotheses and reached conclusions using a combination of related documentation, training, research, and experience. My methodology and techniques were similar to the techniques that I used during my career as a telecommunications system architect. I have analyzed the results to form the opinions in this report.

## RESERVATION OF RIGHT TO AMEND

18.     I understand discovery is still ongoing, and that this report is being submitted to address issues raised by Plaintiff's Motion for Class Certification. Final transcripts of certain fact depositions are not yet available. For example, I listened to the deposition of TCN's Chief Technology Officer, Jesse Bird by teleconference on May 23, 2019, but no copy of that transcript is yet available. Nor has Plaintiff disclosed any expert. I therefore reserve the right to offer additional opinions and to amend this report based on information received after its date.

## SUMMARY OF OPINIONS

19.     Based on my methodology, including analysis and review of case-related materials, it is my opinion that:

A.     All calls at issue were placed with the TCN Manually Approved Calling System, which is equipment that does not have the capacity to produce telephone numbers to be called, using a random or sequential number generator, to store such numbers, or to dial such numbers. The TCN Manually Approved Calling System also requires distinct human intervention to dial each and every telephone number.

B.     Any interpretation that characterizes the TCN Manually Approved Calling System as an ATDS would make all smartphones ATDSs.

C.     The Choice Lead Files provided to Bluegreen are inaccurate, incomplete, and cannot be used to reliably identify call recipients.

D.     The Clicker Records produced by the TCN dialing system, and Disposition Records produced through Gold Mountain's agents cannot provide an accurate representation of the calls placed during Defendant's marketing campaign.

10

Case 1:19-cv-20073-CMA   Document 68-1   Entered on FLSD Docket 05/30/2019   Page 12 of 75

E.   If a set of telephone numbers could be itemized to which alleged calls were placed, there are tremendous barriers to accurately identifying the users or subscribers associated with those numbers at the date of said calls.

Case 1:19-cv-20073-CMA   Document 71-2   Entered on FLSD Docket 06/07/2019   Page 182 of
336
Case 1:19-cv-20073-CMA   Document 68-1   Entered on FLSD Docket 05/30/2019   Page 13 of 75

## DISCUSSION OF OPINIONS

**I.      The TCN Manually Approved Calling System**

20.      All calls at issue were placed with the TCN Manually Approved Calling System,

which is equipment that does not have the capacity to produce telephone numbers to be called

using a random or sequential number generator, to store such numbers, or to dial such numbers.

The TCN Manually Approved Calling System also requires human intervention to dial each and

every telephone number.

**A.   The TCN System Cannot Produce Numbers to Be Called Using a Random or
Sequential Number Generator and Requires Human Intervention**

21.      The discovery record thus far establishes that the TCN Manually Approved

Calling System cannot generate numbers, that manual intervention is required to make each call,

and that a Gold Mountain "clicker agent" manually selected each telephone number to be dialed.

For example, Bluegreen's Senior Marketing Manager of Vendor relations and Special Projects

Sherry Ryan testified:

| | |
|---|---|
| Q. | Does Bluegreen have an understanding with respect to how the technology— |
| A. | Yes. |
| Q. | —that was used by— |
| A. | I know— |
| Q. | Yeah. Just, yeah, bear with me. How the technology that was used by Gold Mountain to make the calls that are at issue in this case works? |
| A. | A minor understanding, yes. |
| Q. | Okay. What is Bluegreen's understanding? |
| A. | That's a human initiated click con—clicker contact. |
| Q. | What does that mean? |
| A. | It's that somebody's actually physically dialing a phone and then connecting it to an agent. |
| Q. | When you say physically dialing a phone, what do you mean by that? |
| A. | They're dialing a number and then they connect that to the agent. |

12

Q.       So somebody's sitting there punching the numbers and then when the call is
         connected, they're connecting it to an agent; is that correct?

A.       Correct.

Q.       Okay. Did you, Ms. Ryan, ever personally observe the process that you've just
         described to me during any of your visits?

A.       I believe I saw the initiator once in May.

Q.       In May of 2018?

A.       Uh-huh.

Q.       The e-mail communications that we've received indicate that the—well, strike
         that. Do you know the name of the platform that was used to place the call at
         issue in the case?

A.       I do.

Q.       Is it TCN?

A.       It is.

Q.       Okay. When did Gold Mountain first start using the TCN platform to make
         outbound calls on behalf of Bluegreen?

A.       January 2018.

Ryan Dep. 39:6-40:20.

22.      Ryan also testified that Bluegreen required Gold Mountain to use a manual dial

platform:

Q.       All right, but as far as Bluegreen knows, pursuant to their—the agreement
         between the companies, Gold Mountain was supposed to be placing outbound
         calls using the TCN platform for Bluegreen?

A.       Bluegreen requires Gold Mountain to manual—use a manual dial platform—

Q.       Uh-huh.

A.       —in which to dial customers.

Ryan Dep. 42:17-24.

23.      Ryan also testified that Bluegreen understood that Gold Mountain used a manual

dialer and human intervention was required for every call made:

Q.       Okay. Do you see there in the second paragraph, last sentence, it says, "The
         vendor uses a manual dial only system which has no present or potential
         capacity to autodial, for random or sequential number generation, or for

13

|   | | predictive dialing. Human intervention is required on every call made"; do you see that? |
|---|---|---|
| A. | | Yes. |
| Q. | | Okay. Is that true? |
| A. | | That is our understanding from Gold Mountain. |
| Q. | | That's based on what Gold Mountain told Bluegreen? |
| A. | | Correct. |
| Q. | | Okay. "Human intervention is required on every call made", what does that mean? |

MS. NATHAN:      Objection to form.

THE WITNESS:      Am I supposed to say something?

BY MR. HIRALDO:

| Q. | | Yes. What does human— |
|---|---|---|
| A. | | It means that a person is dialing the phone and then a different person is actually selling or making the offer to the customer. |
| Q. | | Okay, and when you say a person is dialing the phone, you're saying that— |
| A. | | Manually dialing. |
| Q. | | —somebody is punching in the phone numbers? |
| A. | | Somebody else is manually dialing the phone, yes. |

Ryan Dep. 91:17 – 92:17.

24.      Ryan also testified that Bluegreen's marketing agreement with Gold Mountain required the use of "a phone in which they dial manually":

| Q. | | "Independent Contractor agrees to make manually dialed outbound telemarketing calls from a manual dialer", and then in parentheses it says, "(as defined by applicable law)." What is a manual dialer? |
|---|---|---|

MS. NATHAN:      Objection to form.

THE WITNESS:      It's that they have to manually dial a phone call.

BY MR. HIRALDO:

| Q. | | Okay. Why did Bluegreen use the term manual dialer and not just telephone in this contract? |
|---|---|---|
| A. | | That would be a question for counsel. |
| Q. | | Do you know what the difference is between a manual dialer and just a regular telephone? |
| A. | | Well, I know what a manual dial is. It means dial manually. |

14

> Q.      Okay. I guess what I'm trying to understand is what's -- if the purpose of this
> was to have Gold Mountain use—well, strike that. As you sit here today, do
> you know what a manual dialer is as defined in this contract?
>
> A.      It's a manual dial platform. It's a phone in which they dial manually.
>
> Q.      Okay. So is it just a regular telephone?
>
> A.      It's a phone that does not have any auto dial features.

Ryan Dep. 94:11-95:11.

25.     The President of Gold Mountain, Henry Seevers, testified that he had observed

that the TCN platform requires a human person to review a record of a name and phone number

and then click to dial:

> Q.      Have you personally observed someone using the TCN platform for the
> placement of an outbound call?
>
> A.      Yes.
>
> Q.      Okay. How many times?
>
> A.      I don't know. Maybe a few times.
>
> Q.      You described earlier when describing the LiveVox platform a clicker agent.
> Do you recall that?
>
> A.      Yes.
>
> Q.      Does the TCN platform have a similar setup where a clicker agent is used?
>
> A.      Yes.
>
> Q.      So in terms of the outbound calls that were being made on behalf of Bluegreen
> in 2018, describe to me how those calls would occur using a TCN platform.
>
> A.      Okay. The clicker agent station would be presented a record with the
> customer's name and phone number and any other information provided by
> Bluegreen and the clicker agent would click approved to dial.

Seevers Dep. 41:11-42:3.

26.     Seevers also testified that Gold Mountain never even discussed a predictive

dialing function with TCN, only a manual campaign:

> Q.      Does the TCN product that Gold Mountain used in 2018 have a predictive
> dialing function?
>
> A.      I don't know that for certain. We only talked to TCN about the manual only
> campaign.

Seevers Deposition 47:22-25.

27.     Seevers testified that Gold Mountain has never used any function other than the human clicking function that he described with the TCN platform:

> Q.     Has Gold Mountain ever used any other function besides the clicking function that you described when using the TCN platform?
>
> A.     We have not.

Seevers Dep. 48:1-3.

28.     Seevers testified that Gold Mountain has never used or had access to any form of predictive dialer from TCN:

> Q.     Has Gold Mountain ever used the TCN standard predictive dialer system for any purpose?
>
> A.     We have never.
>
> Q.     Does it have access to the TCN standard predictive dialer system in any way?
>
> MR. KEMP-GERSTEL:     Objection to form.
>
> THE WITNESS:     Not that I'm aware of, no, we do not or did not.

Seevers Deposition 83:23-84:5.

29.     Seevers testified that Gold Mountain complied with the Bluegreen marketing agreement that required it to use a manual dialer:

> Q.     That states, "Independent contractor shall only contact consumers on Bluegreen lead lists in performing the telemarketing program; exclusively use a manual dialer in all its outbound telephonic contacts with consumers and not engage in any text messaging in connection with this agreement." Do you see that?
>
> A.     I do.
>
> Q.     Did Gold Mountain comply with its obligations in that paragraph?
>
> A.     We did.
>
> Q.     And was there any portion of this paragraph that authorized Gold Mountain to use an auto dialer?
>
> A.     No.
>
> Q.     And did Gold Mountain use an auto dialer to place any calls pursuant to this contract?
>
> A.     No.

16

Seevers Deposition 94:11-95:1.

30.     Seevers further testified that under the Bluegreen marketing agreement, Gold

Mountain was never authorized to use an autodialer:

> Q.     And under subsection 2(a) on the first page 15 of the document it states, "Independent contractor agrees to make manually dialed outbound telemarketing calls from a manual dialer to consumers on the Bluegreen lead list, defined below, to make a ChoiceHotel International offer and to solicit the sale of the Bluegreen's discount vacation packages described on Schedule 1 annexed hereto." Do you see that?
>
> A.     I do.
>
> Q.     Was Gold Mountain authorized to use an auto dialer pursuant to this provision of the contract?
>
> A.     No.

Seevers Deposition 93:14-25.

31.     Plaintiff's own Motion for Class Certification, when defining the class that he

wishes the court to certify, even describes the calls at issue as those "placed by Gold Mountain

Communications, LLC on behalf of Defendant using the *TCN 'Manual Dial Only' system*"

(Plaintiff's Motion for Class Certification, p. 2, emphasis added).

32.     Several documents produced by TCN also confirm that the Manual Dial Only

system is, in fact, a manual dialing system, that it does not have any number generation

capabilities, and that it has no predictive dialing capabilities. For instance:

> a.     *FccRulesLetterJuly152015.pdf—included as part of TCN's subpoena response*: This letter, addressed to TCN's customers, states that in September, 2013, TCN implemented a Manual Dial Only Account System, with the following specifications: (1) "When using the Manual Dial Only Account, there is no present or potential capacity to auto-dial. Customers do not have ability to program auto-dialing because there is no

17

application program interface (API) or development environment available to customers for this purpose. Auto-dialing is therefore not a programmable feature. Customers cannot add new functionality to TCN's Manual Dial Only Account platform at all as an API enabling new functionality is not available. This includes, but is not limited to, the ability to make a manual system an auto dialer."; (2) "When using the Manual Dial Only Account, human intervention is required on every call via either a click or by pressing ten digits."; (3) "When using the Manual Dial Only Account, there is no present or potential capacity for random or sequential number generation."; and (4) "When using the Manual Dial Only Account, there is no present or potential capacity for predictive dialing".

b.   *KB-TCPA-ManualDialOnlySystem-110319-1029-26.pdf—included as part of TCN's subpoena response*. This document describes the Permissions Scheme Separation technique used by TCN that prevents users of its "Manual Dial Only System" from using any features or capabilities of its "Standard Predictive Dialer System." This document also provides screen shots of the "Manual Dial Only System," depicting the "Dial" button that system users must manually click in order to dial each individual telephone number.

c.   *TCPA_Summary_SLICK.pdf—included as part of TCN's subpoena response*. This document provides a TCPA summary, including the following specifications: (1) "There is no present or potential capacity to

18

auto-dial. Customers do not have ability to program auto-dialing because there is no application program interface (API) or development environment available to customers. Auto-dialing is therefore not a programmable feature. Customers cannot add new functionality to TCN's platform at all as an API enabling new functionality is not available. This includes, but is not limited to, the ability to make a manual system an auto dialer"; (2) "Human intervention is required on every call via either a click or by pressing ten digits."; (3) "There is no present or potential capacity for random or sequential number generation."; and (4) "There is no present or potential capacity for predictive dialing".

## B. The TCN Manually Approved Calling System Lacks the Technical Internals Required for Predictive Dialing

33.     Predictive dialing abilities are not sufficient for system to qualify as an ATDS, but plaintiffs in cases involving disputes about whether a system qualifies as an ATDS often point to predictive dialing features to argue that they qualify as ATDSs. For example, many popular systems with predictive dialing systems do not have the capacity to produce numbers to be called using a random or sequential number generator. And many dialers with predictive capabilities also require human intervention.

34.     But not only does TCN's Manually Approved Calling System lack the ability to produce numbers to be called using a random or sequential number generator and require human intervention, but it also does not even provide predictive dialing functionality. Based on my experience with various dialing system, TCN's Manually Approved Calling System possesses none of the technical internals that are required for predictive dialing.

35.     The following definition of predictive dialing appears on techopedia, an independent online IT Education site that is not affiliated with any specific  dialing vendors: "Predictive callers are programmed to predict when human callers can pick up calls by measuring the number of available agents, lines, average handle time and certain other factors to adjust the outbound calls. They use statistical algorithms to reduce the time that agents spend waiting between conversations, also reducing the occurrence of someone answering when no agents are available."[5]

36.     One of the key characteristics of predictive dialing is the use of *call pacing*, a technique that dynamically adjusts the speed and frequency at which calls are placed, based on a number of factors including agent availability, the number of available telephone lines, the length of each phone conversation. The TCN Manually Approved Calling System provides none of this functionality: there is no automated call pacing—the speed and cadence of placing calls is based solely on the clicking action used by the clicker agent as each number is manually dialed; there is no feature that can be used to predict when agents are available—agents simply receive calls from the TCN dialer once they are answered, without any prediction of when they will be available. Instead, with the TCN Manually Approved Calling System, the dialing speed is completely controlled by the clicker agents, as they manually select each number to dial. The absence of predictive functionality in the TCN Manually Approved Calling System has confirmed by my review of TCN's product documentation, as well as the testimony of TCN's Chief Technology Officer, Jesse Bird.

---

[5] See *Definition – What does Predictive Dialer mean?*, at https://www.techopedia.com/definition/4328/predictive-dialer (last visited 5/23/2019)

20

C. **The TCN System's Manual Limits Are Consistent with the Call Volume in the Discovery Record**

37.     Plaintiff implies that TCN's Manual Dial Only System has the characteristics of an ATDS, apparently based on the volume of calls processed through Gold Mountain's call center.

38.     Plaintiff questioned Gold Mountain's Seevers regarding the volume of calls that were processed by Gold Mountain's call center, implying that somehow Gold Mountain's staff could not have handled that volume, and that some level of automation must have been present:

| | |
|---|---|
| Q. | Based on the call log that we've been provided, we analyzed a week in December of 2018 and came up with an average of about 17,321 total outbound calls per day. Does that sound accurate to you? |
| A. | I can't say if it sounds accurate. It sounds possible. |
| Q. | So it's possible that in December of 2018, on average 17,000 plus calls were being made per day; is that correct? |
| A. | That's possible, yes. |
| Q. | Okay. And that was being done by approximately 60 agents? |
| A. | Approximately, yes. |
| Q. | That was being done by 60 agents during a ten- to 11-hour workday; is that correct? |
| A. | Yes. |
| Q. | Do you know roughly how many calls that works out to per agent per day, I'm sorry, per shift? |
| A. | No, I don't. I could do the math but, no. |
| Q. | Do you know—do you have any idea of on average how many outbound calls each of these agents were placing per day? |
| A. | Uh, no, I don't. |
| Q. | Is there any record of that number of outbound calls that was occurring during that time frame? |
| A. | Yes, I'm sure there is. |

Seevers Dep. 39:14-40:15.

39.     Seevers later testified as follows about the staffing of each shift:

Q.      All right. Mr. Seever, the shifts, I may not -- I think I'm unclear on this. The two six-and-a-half-hour shifts, six- or six-and-a-half-hour shifts, how many agents were working per shift?

A.      Again, estimated maybe as many as 40 on the early shift and 20 or 25 on the afternoon shift.

Seevers Dep. 40:25-41:5.

40.     A key question seems to be whether Gold Mountain's staff could have processed over 17,000 calls in a single day without automated dialing.

41.     From the Seevers testimony, Gold Mountain operated two shifts of 6 1/2 hours per shift, per day, with approximately 40 agents on the early shift, and 20-25 agents on the second shift.

42.     Plaintiff's counsel represented that over 17,000 calls per day were placed during a given week in December, 2018. In fact, on December 11, 2018—the date that Plaintiff received his alleged call—there were 18,915 calls reported in the Clicker Records. Even with only one available clicker agent, over a period of 13 hours across both shifts, it would require clicking on 1,455 calls per hour. That corresponds to manually clicking just over 24 calls per minute, or roughly one call every 2.5 seconds—a feat that seems to be inarguably attainable.

43.     The next issue would be whether Gold Mountain's agents had the available bandwidth to handle all the calls for that day. Keep in mind that the 18,915 calls reported on 12/11/2018 represent the total calls that were clicked and dialed—not the calls that were presented to Gold Mountain's agents for processing.

44.     Out of the 18,915 calls that were clicked and dialed, 3,110 of those calls had a Result value of "Answered Linkcall"—indicating the calls that TCN analyzed as answered, and transferred to a live Gold Mountain agent for processing. The remaining calls included Result values of "Answered Hangup", "Answered Linkcall Abandoned", "Failed Refused", "Busy",

"Invalid", "No Answer", or "Machine Hangup" – none of which included calls that were completed, or calls that would be transferred to a Gold Mountain agent. It was also confirmed in the Bird deposition testimony that only calls with a result value of "Answered Linkcall" should be transferred to an agent for handling.

45.    The 3,110 calls that were transferred to a Gold Mountain agent average out to 260 calls per hour, using a conservative estimate of 12 productive hours in a workday. With 60 agents on first shift, and 20-25 agents on second shift, the average coverage over the course of the day was at least 40 agents. For 40 agents to cover 260 calls per hour, each agent would need to handle 6.5 calls per hour.

46.    And if 6.5 calls per hour (or more than nine minutes per call) seems like too much of a load for Gold Mountain's agents to handle, it should be noted that roughly 80 percent of all calls are recorded with a Disposition of "No Sale – Not Interested", indicating that at least 4 out of 5 calls did not require discussion of the entire marketing script.

47.    Clearly, based on the volumes explained here, there would have been no need for any automated dialing for Gold Mountain to handle the volume of calls that was reported.

**D. Classifying the TCN Manually Approved Calling System as an ATDS Would Make all Modern Smartphones ATDSs**

48.    Any interpretation that characterizes the TCN Manually Approved Calling System as an ATDS would make all modern smartphones ATDSs.

49.    During the early 1980s, "brick" cell phone models were just emerging on the marketplace and could do no more than place and receive calls, with talk times limited to 30 minutes or less and price tags as high as four thousand dollars.[6] Also during the 1980s, one of the

---

[6] Looking back on 40 years of the cell phone at https://newatlas.com/mobile-pnone-40-year-anniversary-photos/25677/ last visited May 29, 2018.

world's most powerful computers was the Cray-2 Supercomputer. The Cray-2 could perform an estimated 1.9 Gigaflops of processing, and cost approximately $16 million.[7] The Cray-2 also occupied sixteen square feet of floor space, plus room for cooling equipment, power generators and other equipment.[8] By comparison, the Samsung Galaxy S6, already since upgraded several times to newer models, can perform an estimated 34.8 Gigaflops of processing,[9] sold new for a few hundred dollars, and occupies approximately fifteen square inches of desk space. Of course, today's smartphones have features that were barely a blip on the radar in the age of 1980s computers and cell phones, including high-definition photography and video, wireless uploading and downloading of a myriad of data content, GPS-based applications such as navigation, access to email—the list goes on. And, it is currently estimated that there are well over 200 million smartphone users in the U.S.[10]

50.    If Plaintiff's contention—that the calls at issue were placed by an ATDS—is accepted, then the same argument would sweep all modern smartphones under the category of an ATDS.

51.    The TCN Manually Approved Calling System requires a human to view each individual telephone number, and click a "Call" icon/button to place each call. This manual dialing method is identical to the method used by hundreds of millions of smartphone users in the U.S. each day, in order to place billions of wireless calls.

---

[7]    *Supercomputer    vs.    your    computer    in    bang-for-buck    battle*    at https://www.theregister.co.uk/2012/03/08/supercomputing_vs_home_usage/ last visited Mar. 1, 2019.

[8]    The    Cray-2    Series    of    Computer    Systems    at http://www.craysupercomputers.com/downloads/Cray2/Cray2_Brochure001.pdf last visited Mar. 1, 2019.

[9]    *Processing Power Compared* at https://pages.experts-exchange.com/processing-power-compared last visited Mar. 1, 2019.

[10]    Number of smartphone users in the United States from 2010 to 2022    at    https://www.statista.com/statistics/201182/forecast-of-smartphone-users-in-the-us/ last visited Mar. 1, 2019.

Case 1:19-cv-20073-CMA   Document 71-2   Entered on FLSD Docket 06/07/2019   Page 195 of
326
Case 1:19-cv-20073-CMA   Document 68-1   Entered on FLSD Docket 05/30/2019   Page 26 of 75

52.    A smartphone user routinely views a list of telephone numbers, which are collected as *recent* inbound or outbound calls, in his or her call log. With a simple touch of an entry in the call log, the Android smartphone user can view the contact information, and click the call icon to place a call—just as Gold Mountain's clicker agent clicked a "Call" button for each call placed in Defendant's campaign. And if it is argued that the Android user's calling requires two clicks, Android provides a "Swipe to call feature" (which is enabled by default) that allows the Android user to view a list of telephone numbers or contact data, and call that number by simply swiping their finger across the entry – performing the same single selection of the "Call" button used by one of Gold Mountain's clicker agents.

53.    Similarly, iPhone users can view a list of telephone numbers or contact data on their "Recents" call log. By tapping the info icon on the right side of an entry, the details of the call can be displayed. Or by simply tapping the telephone number itself, the iPhone users can place a call to that number—in the same manner that the Gold Mountain clicker agent views a telephone number and clicks a "Call" button to manually place a call.

54.    And when discussing the possibility of including smartphones under the ATDS umbrella, the *ACA International v. FCC* Decision stated that "Those sorts of anomalous outcomes are bottomed in an unreasonable, and impermissible, interpretation of the statute's reach. The TCPA cannot reasonably be read to render every smartphone an ATDS subject to the Act's restrictions, such that every smartphone user violates federal law whenever she makes a call or sends a text message without advance consent." (885 F.3d 687).

**II.    Documents Produced in the Litigation Cannot Be Used to Reliably Identify Call Recipients**

55.    There are three major files at play in this case:

a. *Choice Lead Files*: The "Choice Lead Files" are records of telephone numbers and associated names and addresses of Choice customers that were provided to Bluegreen. The data from these files, including the telephone numbers, was transmitted to Bluegreen and, in turn, Gold Mountain, to place the alleged calls here.

b. *Clicker Records*: These are records of the calls attempted by the TCN Manually Approved Calling System for Gold Mountain's marketing campaign. The Clicker Records include the telephone number dialed and the result of the attempted call produced by TCN, but no other lead information.

c. *Disposition Record*: These are subset of the Clicker Records, and include those calls deemed answered by TCN and passed to a live Gold Mountain agent for processing. The Disposition Records include the telephone number dialed, and the disposition of the call as recorded by the human agent. Plaintiff has selected a subset of the Disposition Records to define his proposed class.

## A. The Choice Lead Files

56. The Choice Lead files are inaccurate, incomplete, and cannot be used to reliably identify call recipients for two principal reasons: first, many have no lead data; and, second, many may be staledated.

57. Gold Mountain produced Choice Lead files as contacts used in the calls it placed regarding Bluegreen. The calls that Plaintiff has included in his proposed class were made to the leads for the "GMT_CHOICE_CPWireless_WinBack_manual" Choice Lead file prefix, which consist of 11 files and a total of 81,092 lead records.

26

58.     Plaintiff's proposed class is comprised 24,969 call records ("24,969 call records"), which is a subset of the Disposition Records. Plaintiff chose this subset of records based on a specific set of telephone numbers—those that appeared as leads in the "GMT_CHOICE_CPWireless_WinBack_manual" files, which were all designated as part of the "Choice Inact CP Wireless" campaign. This set of lead files, and its associated campaign, included Plaintiff's lead record.

### 1.     Missing Lead Data

59.     When I compared the telephone numbers that appear in Plaintiff's proposed class of 24,969 call records with the Choice Lead files, there are more than 2,600—or roughly 10.5 percent—of Plaintiff's 24,969 call records that have no matching lead name or address for the telephone number called.

60.     The table below provides just a few examples of calls found in Plaintiff's 24,969 call records, to telephone numbers for which no lead data exists:

| Phone Number | CEH Campaign Name | CEH AM ID | CEH Unique Record ID | Call Date | Disposition |
|---|---|---|---|---|---|
| 3168825662 | Choice Inact CP Wireless | 36460962 | 49221498 | 10/18/2018 | Not Qualified - Age |
| 3168825662 | Choice Inact CP Wireless | 36460962 | 49221498 | 10/19/2019 | Not Qualified – Age |
|  |  |  |  |  |  |
| 4102185721 | Choice Inact CP Wireless | 37240869 | 49223540 | 10/18/2018 | No Answer |
|  |  |  |  |  |  |
| 3148535534 | Choice Inact CP Wireless | 37247978 | 49223772 | 10/26/2018 | Not Qualified - Income |

61.     For each of the sample telephone numbers above, I performed searches of TransUnion's database. Those search results returned several potential names and addresses, but none of the names returned by TransUnion are found in the Choice Hotels lead files, regardless of telephone number.

### 2.    Staledated Lead Data

62.    I understand that Choice provided leads to Bluegreen, and that Bluegreen provided the Choice Leads to Gold Mountain. I also understand that the Choice Leads originate with Choice Hotels Privileges program, which has been in place since 1998, and that the lead information relating to customer's phone numbers and other contact information is supplied and maintained by those Choice Privilege members. I also understand that if any of those Choice Privileges members were to stay in a Choice Hotel without updating any outdated phone numbers or other contact information, it would cause that outdated information to be transmitted in the Choice Lead files to Bluegreen. Some unknown part of the phone numbers and contact information in the Choice Lead files may therefore be staledated.

63.    As described above, the Choice lead data is supplied and maintained by Choice's loyalty members, and can date back as far as 20 years ago. This introduces the likelihood that the customer data in those lead files was originally entered as inaccurate or incomplete, has been updated over time with such flaws, or has become stale over time due to lack of updates to reflect changes to customer names and addresses.

64.    One such example of incomplete customer information is found in Plaintiff's proposed class of 24,969 call records. After eliminating the 2,600+ records described above with missing leads, and eliminating duplicate records, there are 20,774 distinct Choice lead records that match Plaintiff's class. Within these 20,774 lead records, 3,235 leads—nearly 16%—have an address of 'UNKNOWN'. But is unclear why they have unknown addresses.

65.    The missing lead records to which calls were allegedly placed, and the incomplete and stale nature of the remaining lead records provides a preview to the challenges that will have to be overcome in order to accurately identify potential class members.

Case 1:19-cv-20073-CMA   Document 71-2   Entered on FLSD Docket 06/07/2019   Page 199 of
336
Case 1:19-cv-20073-CMA   Document 68-1   Entered on FLSD Docket 05/30/2019   Page 30 of 75

## B. Clicker Records

66.      Clicker Records produced by the TCN dialing system, and Disposition Records produced through Gold Mountain's agents cannot provide an accurate representation of the calls placed during Defendant's marketing campaign.

67.      The raw call data from TCN's dialer was produced by Gold Mountain in a folder titled "HCI Reports Sent to Bluegreen." The HCI term used in the folder name generally refers to *Human Call Initiator*, when used in reference to dialing systems.

68.      Each of the files in this folder begins with the prefix "CLKR," for "Clicker Records." As explained above, ¶ 55.b, the Clicker Records are the records that the TCN dialer produces each time a clicker agent manually clicks on a telephone number, in order to have the TCN system dial that individual telephone number. Each of the Clicker Records includes the telephone number dialed, the CH campaign name, two identifier fields that were provided as part of the CH lead file, the call date, and a result field. The result field contains a unique status result of each call, and differentiates (at a high level), calls that were answered by the calling party and transferred to a Gold Mountain agent, versus calls that were not completed or disconnected by the dialing system and never transferred to a Gold Mountain agent.

69.      The Clicker Records include the telephone number dialed and a result value for the attempted call but no names or contact information.

## C. Disposition Records

### 1.      Source of the Disposition Records and Values

70.      The Gold Mountain subpoena produced 64 "Disposition" files under a folder titled "Disposition Reports Sent to Bluegreen." These records are intended to represent calls that were placed and subsequently connected to one of Gold Mountain's agents for processing. The records in the Disposition Records have the same data columns as the Clicker Records, with the

Case 1:19-cv-20073-CMA   Document 71-2   Entered on FLSD Docket 06/07/2019   Page 200 of
336
Case 1:19-cv-20073-CMA   Document 68-1   Entered on FLSD Docket 05/30/2019   Page 31 of 75

exception that each Disposition Record carries a Disposition column, in place of the Result column that appears in the Clicker Records.

71.     The Disposition column provides the status of the Gold Mountain agent's interaction with the called party—identifying if a sale was made, if the called party did not qualify for the campaign, if the called party scheduled a callback, etc. The critical difference is that the disposition values in the Disposition Record have been manually generated by a Gold Mountain agent—based on the results of their attempted phone call with the called party, while the Result value in the Clicker Records is automatically generated by the TCN Manually Approved Calling System—based on TCN's mechanized interpretation of the call feedback that is detected on the line. Within these files are 24,969 call records with the campaign designation of "Choice Inact CP Wireless," which comprise plaintiff's class of alleged call violations.[11]

72.     Although Plaintiff proposes a class that includes "connected" calls, the 24,969 call records must be analyzed to determine, if possible, which of the alleged calls were actually connected. At first glance, there are numerous values in the Disposition column that appear to represent calls that were never connected. For example, there are thousands of calls with Dispositions of "No Answer" that represent calls that were never actually connected. There are also thousands of calls with Dispositions of "Voicemail" that could possibly represent calls that were connected, but should never have been transferred to an agent for handling. These calls would potentially require manual investigation—to determine whether individual calls were properly routed and connected.

---

[11] Motion for Class Certification p. 6

Case 1:19-cv-20073-CMA   Document 71-2   Entered on FLSD Docket 06/07/2019   Page 201 of
336
Case 1:19-cv-20073-CMA   Document 68-1   Entered on FLSD Docket 05/30/2019   Page 32 of 75

## 2. Conflicts between Clicker Records' Results Values and Disposition Records' Disposition Values

73.     Perhaps the most glaring problems with the Plaintiff's proposed call data are conflicts between the Clicker Records' result values (automatically provided by TCN's dialing system) and the Disposition Records' disposition values (manually provided by Gold Mountain's agents) for the same call records.

74.     I was able to load Plaintiff's 24,969 Disposition records into a Microsoft SQL database, and merge each of those records with the corresponding call record from TCN's Clicker Records. This produced a set of 24,969 call records that include both Disposition and Result values with result/disposition combinations.

75.     Some of the result/disposition combinations provide conflicting evidence, resulting in the inability to determine if a call was actually connected. For example, according to the Clicker Records from TCN, the only calls that should have been transferred to a Gold Mountain agent, and thus the only calls that should appear in Plaintiff's 24,969 Disposition Records, are those with a Clicker Record result value of "Answered Linkcall," which indicates that the TCN dialing system detected that a live person answered the call and that call was transferred to a Gold Mountain agent. But there are result/disposition combinations in my merged call records data showing that some calls resulted in Disposition Records when the Clicker Record result was something other than "Answered Linkcall."

76.     In the following table of examples, telephone number 304-614-4925 was reported with the Clicker Record result value of "Failed Refused," indicating that the call was not connected by the TCN Manually Approved Calling System, and that no call should have been transferred to a Gold Mountain agent. But a corresponding call is found in the Disposition file

31

for this call, indicating that the call was transferred to a Gold Mountain agent, and that agent recorded a disposition value of "No Sale-Not Interested."

77.     The second row displays telephone number 509-391-0706 with a Clicker Record result value of "Busy"—clearly indicating that a call should not have been connected. But the Disposition Record includes a disposition value of "No Sale-Not Interested," indicating that a Gold Mountain agent received the call, apparently spoke with a party, was unable to make a sale, and recorded the noted disposition.

78.     The third example shows telephone number 813-713-2108 with a Clicker Record result value of "No Answer," again clearly indicating that a call should not have been connected. But once again, the Disposition Record disposition value of "No Sale-Not Interested" indicates that a Gold Mountain agent received the call, apparently spoke with a party, was unable to make a sale, and recorded the noted disposition.

79.     And the fourth example, with telephone number 231-343-6911, reports a Clicker Record result value of "Machine Hangup"—indicating that the TCN Manually Approved Calling System detected an answering machine, and disconnected the call without transferring it to an agent. But the Disposition Record disposition value of "No Sale-Not Interested" indicates that a Gold Mountain agent received the call, apparently spoke with a party, was unable to make a sale, and recorded the noted disposition.

| Phone | Campaign | AM ID | Unique Rec ID | Call Date | Result | Disposition |
|---|---|---|---|---|---|---|
| 3046144925 | Choice Inact CP Wireless | 12707828 | 49216857 | 10/29/2018 | Failed Refused | No Sale - Not Interested |
| 5093910706 | Choice Inact CP Wireless | 36920101 | 49222233 | 10/25/2018 | Busy | No Sale - Not Interested |
| 8137132108 | Choice Inact CP Wireless | 20760089 | 49217529 | 10/29/2018 | No Answer | No Sale - Not Interested |

| 2313436911 | Choice Inact CP Wireless | 37258614 | 49224078 | 10/25/2018 | Machine Hangup | No Sale - Not Interested |

80.     In these and other example call records, it is unclear whether any of the following occurred: (1) the TCN Manually Approved Calling System recorded an incorrect result value; (2) the TCN Manually Approved Calling System incorrectly transferred the subject call to a Gold Mountain agent; (3) a Gold Mountain agent was able to access a call record that should not have been transferred; or (4) a Gold Mountain agent recorded an incorrect disposition value on a transferred Disposition Record.

### 3.     Barriers to Resolving these Conflicts on a Class-Wide Basis

81.     These possible scenarios mean that, at a minimum, a subset of Plaintiff's 24,969 call records must be manually analyzed, including review of associated call recording (if available) to determine whether or not completed calls were made for the subject records. It is also my experience that call recordings are often difficult or impossible to analyze with definitive results, due to poor sound quality or incomplete recordings, and that even a manual investigation and analysis may not provide an objective outcome as to the question of whether or not a given call was completed.

82.     The inadequacy of call recordings and available evidence to determine whether or not completed calls were made is illustrated in the subject case by the call recording to Plaintiff's telephone number. That recording, which was supplied as part of Gold Mountain's subpoena production, lasts nine seconds, and the only voice that can be heard on the recording is that of Gold Mountain's agent. There is no evidence on the recording that the agent spoke with Plaintiff, there is no audio of Plaintiff speaking, and it is not even clear from the recording whether a call was actually completed.

Case 1:19-cv-20073-CMA   Document 71-2   Entered on FLSD Docket 06/07/2019   Page 204 of
336
Case 1:19-cv-20073-CMA   Document 68-1   Entered on FLSD Docket 05/30/2019   Page 35 of 75

83.     And further evidence exists that even a manual investigation of call history can be inconclusive, based on Plaintiff's deposition testimony ("Wijesinha Deposition") regarding the call. At one point, after hearing the recording that included only the Gold Mountain agent's voice, Plaintiff agreed that the recording sounded correct:

> (Recording played) Choice Hotels from Bluegreen Vacations on a recorded line. How are you doing today?
>
> Hi. Good morning, Shehan. This is Jamie Lowery, calling on behalf of Choice Hotels from Bluegreen Vacations on a recorded line. How are you doing today?
>
> BY MS. NATHAN:
>
> Q.     Does that recording reflect your recollection of the phone call that you received?
>
> A.     It sounds about right.

Wijesinha Dep. 18:8-18.

84.     But Plaintiff was also confused about the content of the call, later relaying that he thought there might have been more to the conversation, and also that he may have hung up after hearing the agent's introduction:

> Q.     But nowhere on the actual recording do they 15 mention that they were selling timeshares; is that correct?
>
> A.     I don't know if she proceeded from that point, but based on what she said there she did not, but I believe the conversation was a little bit longer than that, but I'm not sure.
>
> Q.     Did you hear yourself respond to the lady on the phone at all?
>
> A.     No.
>
> Q.     Do you believe it's possible you just hung up the phone and said nothing to the woman?
>
> A.     It's very possible.

Wijesinha Dep. 19:14 – 20:1.

85.     The existence of call records with conflicting Clicker Record result values and Disposition Record disposition values makes both suspect as to their accuracy. Even for calls

Case 1:19-cv-20073-CMA   Document 71-2   Entered on FLSD Docket 06/07/2019   Page 205 of
336
Case 1:19-cv-20073-CMA   Document 68-1   Entered on FLSD Docket 05/30/2019   Page 36 of 75

that do not have conflicting result/disposition combinations and appear to otherwise be normal,
the TCN Manually Approved Calling System could be producing invalid Clicker Record result
values; the Gold Mountain agents could be producing Disposition Records with invalid
disposition values; or both. For example, if a given call's Call Record indicates a result value of
"Answered Linkcall," and a Disposition Record indicates a disposition value of "No Sale - Not
Interested" (which represents the status of more than 92% of Plaintiff's proposed class), the
discrepancies identified above raise the prospect that the process that generated those results are
fundamentally flawed and unreliable.

### 4. Additional Conflicts between the Clicker Records and Disposition Records

86.     Additional data analysis reveals that there are some call records in TCN's Clicker
Records that should have been passed to Gold Mountain agents and recorded in Gold Mountain's
Disposition file, but do not exist there. For example, telephone number 305-790-5546 appears in
the Clicker Records, and is identified as part of the "Choice Inact CP Wireless" campaign. The
Clicker Record reports that it was called on 1/23/2019, with a result value of "Answered
Linkcall," indicating that the call should have been transferred to a Gold Mountain agent, and
have a corresponding record in Plaintiff's file of 24,969 call records from the Choice Lead Files.
However, there is no call record and no corresponding Disposition found in Plaintiff's file for
305-790-5546—indicating that Plaintiff's class of call records may also be under-inclusive, and
further questioning the accuracy of TCN's Clicker Records, Gold Mountain's Disposition
Records, or both.

87.     And the suspect nature of the TCN's Clicker Records and Gold Mountain's
Disposition Records is further confirmed by analysis that I performed comparing the overall call
records produced in response to the Gold Mountain Subpoena, which included all calling

campaigns, beyond the "Choice CP Inact Wireless" campaign in which Plaintiff Wijesinha was included. When comparing the Call Record result values to the Disposition Record disposition values for call records from all campaigns, I found evidence of conflicting result/disposition combinations for tens of thousands of call records.

### 5. Duplicate records

88. Plaintiff's class of 24,969 call records also contains thousands of instances of duplicate records. For example, telephone number 201-492-7771 appears twice in Plaintiff's file, with the exact same values for all data fields: the same campaign name, the same ID values, the same date of 12/26/2018, and the same disposition value of "No Sale–Not Interested." Duplicate records also exist for telephone number 980-322-5258 called on 12/26/2018 with a disposition value of "No Sale–Not Interested"; telephone number 972-567-7367 called on 12/26/2018 with a disposition value of "Not Qualified–Income"; telephone number 972-750-1612 called on 12/28/2018 with a disposition value of "No Answer"; telephone number 956-483-0425 called on 12/26/2018 with a disposition value of "Wrong Number"; and the list goes on. And without any additional identifying data, such as a call time, there is no way to determine if these records represent multiple distinct calls, or a single call that's has been recorded in duplicate. Many of the examples, such as those above with a Disposition of "No Sale–Not Interested", "Wrong Number", or "Not Qualified-Income" would not seem to support the idea that multiple calls were placed resulting in duplicate dispositions. For example, a call resulting in a "Wrong Number" disposition value would not logically be followed by another call to the same number. Neither would a call that resulted in a Disposition of "Not Qualified–Income" warrant another call to that same number. With the current data as produced by Gold Mountain, Plaintiff's 24,969 call records are grossly overstated due to these duplicates, and further questions the validity of the call records.

Case 1:19-cv-20073-CMA   Document 71-2   Entered on FLSD Docket 06/07/2019   Page 207 of
336
Case 1:19-cv-20073-CMA   Document 68-1   Entered on FLSD Docket 05/30/2019   Page 38 of 75

## III.   Barriers to Identifying Historical Users or Subscribers

89.   For at least the 10.5 percent of Plaintiff's proposed class for which the Choice Lead files contain no matching lead name or address, it would then be necessary to accurately identify the users or subscribers associated with those numbers at the time of the alleged calls. This is an even more challenging task.

90.   Some cell phone accounts may have only one subscriber, who is also the sole user, but several other possibilities exist. For example, the subscriber may not be a user of the cell number at all, and there may be multiple authorized users of the number and one or more of the authorized users may not be the subscriber. This often occurs in the context of business plans (where a corporation or entity is the subscriber of a number with one or more different users) or family plans (where a single family member is the subscriber of an account with several different numbers used by other family members). Given these and other issues, as well as the lack of a single publicly-available database, directory, or other source to accurately identify historic subscribers and users of cell phone numbers as of particular historic dates, it is my opinion that any attempt to accurately and reliably determine the historic subscriber of a given cell phone number as of the date of a particular call will require obtaining and analyzing records and information from third-party sources, including, among other sources, cell phone providers and subscribers. Those sources will, in my opinion, vary from number to number, depending on various factors such as the date of the call and the cell phone carrier for the number at issue. For similar reasons, it is also my opinion that the historic users or subscribers of particular cell phone numbers as of a particular date cannot be accurately and reliably identified without obtaining information from, among other sources, the subscribers or users themselves.

### A. TransUnion

91.     It has previously been discussed that there are significant shortcomings with the data in the lead files that were used to place the alleged calls by Gold Mountain. For example, in paragraph 60 above, it was described that more than 2,600—or roughly 10.5 %—of Plaintiff's 24,969 call records have no matching lead for the telephone number called. It was also described in paragraphs 63-64 above, that the Choice lead data is prone to being incomplete and inaccurate, such as the 16% rate of unknown addresses that were found. The lead data from Choice Hotels would thus be insufficient to accurately identify all subscribers to whom the alleged calls were placed.

92.     Plaintiff may propose that other vendors who provide skip-tracing services, such as LexisNexis, TransUnion or others, may be used to augment the data in the lead files, by providing additional identification of subscribers associated with the telephone numbers at issue. It has already been described at length that there are significant issues with using such data vendors, due to their inherent inaccuracies, their lack of being able to identify associated subscribers at specific historic dates of calls, their inability to identify authorized users associated with telephone numbers, and the proprietary nature of their data sources and techniques used for identification.

93.     It is also apparent that using an alternate data vendor, such as LexisNexis or TransUnion, in conjunction with the data provided in the Choice Hotels lead files will introduce additional conflicts and questions as to the proper and correct ownership of any given telephone number at any given historic dates of calls. If another data vendor provides a name associated with a telephone number that is different than the name specified in the Choice Hotels lead file, that discrepancy must be resolved, and would again introduce the need for individualized investigation.

38

94.     For example, as already described, I was able to compare Plaintiff's 24,969 call records with the Choice Hotel lead records. After eliminating all of the duplicate call records, there were 20,770 call records from Plaintiff's list that had matching leads in the Choice Hotels lead files.

95.     The telephone numbers for those 20,770 call records were submitted to TransUnion for a batch append process. The TransUnion batch append identifies up to five names and addresses for each telephone number, as well as a date range associated with each name/address combination. The data returned from the TransUnion batch append revealed that there were more than 6,500 name and address combinations returned from TransUnion that did not match the name and address in the Choice lead files for the telephone number and its associated call date—*a discrepancy between the two data sources of more than 31 percent.*

96.     In this example, telephone number 951-970-9031 appears in Plaintiff's proposed class of 24,969 call records, with a call date of 12/6/2018. When combined with the lead record from Choice Hotels for the given number, the following subscriber information results:

| Number | First | Last | Address | City | ST | Call Date |
|---|---|---|---|---|---|---|
| 9519709031 | Kenneth | Eberts | 30090 Del Rey Rd | Temecula | CA | 12/6/2018 |

TransUnion returned a single name associated with 951-970-9031, with a date range that covers the timeframe of the call to that number. The TransUnion name and address bear no similarity at all to the name and address from the Choice lead data:

| Number | First | Last | Address | City | ST | FirstSeen | LastSeen |
|---|---|---|---|---|---|---|---|
| 9519709031 | D**** | M***** | 12** **** *** | San Angelo | TX | 1/31/2015 | 5/14/2019 |

97.     The TransUnion process also returned more than 1300 telephone numbers (6.3 percent of the total numbers provided) with no associated names or addresses–indicating that, at

Case 1:19-cv-20073-CMA   Document 71-2   Entered on FLSD Docket 06/07/2019   Page 210 of
336
Case 1:19-cv-20073-CMA   Document 68-1   Entered on FLSD Docket 05/30/2019   Page 41 of 75

a minimum, some combination of the TransUnion data and the Choice Hotels lead information would have to be used.

98.     Another trait of TransUnion's identification data is that, for telephone numbers with multiple names there are overlapping date ranges, indicating that multiple potential subscribers are associated with the same telephone number at the same date. This issue makes these records effectively unusable, because there is no other data or indication of the correct subscriber. From the data returned from TransUnion for Plaintiff's call records, there are more than 13,000 records with at least two names returned. Out of these records, more than 7,300 of the records report different last names. And within those records with different last names, nearly 1,200 have overlapping dates. And additional analysis would surely reveal more overlapping dates, since there are some 1,500 records with all five names, 1,800 records with four names, and 3,500 records with three names. The mere existence of these additional 7,000 telephone numbers with three, four or five names means that there is the potential for thousands of additional conflicting date scenarios.

99.     In this example, telephone number 757-277-8231 appears in Plaintiff's proposed class of 24,969 call records, with a call date of 10/30/2018. When combined with the lead record from Choice Hotels for the given number, the following subscriber information results:

| Number | First | Last | Address | City | ST | Call Date |
|---|---|---|---|---|---|---|
| 7572778231 | Gregory | S***** | 2400 * ***** ** | Wilmington | DE | 10/30/2018 |

TransUnion returned two names associated with 757-277-8231, with overlapping dates that both cover the timeframe of the call to that number:

| Number | First | Last | Address | City | ST | FirstSeen | LastSeen |
|---|---|---|---|---|---|---|---|
| 7572778231 | P****** | M**** | 21* ******* *** | Suffolk | VA | 1/31/2010 | 5/14/2019 |
| 7572778231 | I**** | P****** | 4450 S Hualapai Way | Las Vegas | NV | 1/31/2018 | 5/14/2019 |

40

Case 1:19-cv-20073-CMA Document 71-2 Entered on FLSD Docket 06/07/2019 Page 211 of
336
Case 1:19-cv-20073-CMA Document 68-1 Entered on FLSD Docket 05/30/2019 Page 42 of 75

100.    It is clear from this example that there are three distinct names associated with

telephone number 757-277-8231 at the date of the call, with no apparent connection among them

names, and no available data or evidence to assist in discerning which, if any, of the three names

was the subscriber or authorized user of the number on 10/30/2018. And further comparison of

the TransUnion data results with the Choice Hotels lead information will reveal that hundreds if

not thousands of conflicting scenarios exist.

101.    It should be sufficiently clear that there are no reliable resources that would

provide an administratively feasible method for identification of users or subscribers, as of the

historic date(s) of alleged calls based on a set of phone numbers. And it should also be

sufficiently clear that any such exercise would require a detailed, individualized inquiry to

produce any reliable results.

### B.  Other Public Identification Services and Skip Tracing

102.    In my experience, TCPA plaintiffs often suggest they can identify individual cell

phone subscribers using public or pay identification services or skip tracing. There are a myriad

of publicly available databases that purport to perform reverse phone number lookups and

provide subscriber—not user—information like name and address, and there are a number of

vendors who provide varying levels of commercial data lookups, usually via Application

Program Interfaces ("APIs"). Based on my research and my business and expert experience, it is

my opinion that these services cannot reliably and accurately identify historic cell phone

subscribers because each service is subject to significant limitations and errors.

A.    These services are data aggregators. As a result, the reliability of these

services is entirely dependent on the reliability of their source data. Many

free, web-based services do not identify their data sources, and so it is not

possible to evaluate their accuracy. Issues such as errors in data entry,

Case 1:19-cv-20073-CMA   Document 71-2   Entered on FLSD Docket 06/07/2019   Page 212 of
336
Case 1:19-cv-20073-CMA   Document 68-1   Entered on FLSD Docket 05/30/2019   Page 43 of 75

number reassignment, and out-of-date data multiply these inaccuracies. Data from public records is typically available only with current values, and without the historical records that would be required to identify a subscriber at a given point in time in the past when alleged messages were sent. This is the case for all publicly available data sources of which I am aware, such as web-based reverse number lookups. As a result, these services cannot assist in identifying historic subscribers.

B.  Commercial databases, such as LexisNexis, that offer paid searches to businesses, advertise historical searches of their public record information. However, those data providers must aggregate that data themselves over time in order to store and produce historical results, leading to inaccuracies. LexisNexis even carries the following disclaimer on its website, specifically addressing these limitations: "Due to the nature of the origin of public record information, the public records and commercially available data sources used in reports *may contain errors*. Source data is sometimes reported or *entered inaccurately*, processed poorly or *incorrectly*, and is generally *not free from defect*. This product or service aggregates and reports data, as provided by the public records and commercially available data sources, and is not the source of the data, nor is it a comprehensive compilation of the data. *Before relying on any data, it should be independently verified*."[12] A partial image of the LexisNexis disclaimer is attached as Exhibit B. Upon deeper inspection of

---

[12] *See* WorldCompliance Data, LexisNexis (emphasis added),
https://risk.lexisnexis.com/products/worldcompliance-data.

LexisNexis' various web pages, it is evident that they feel the need to provide ample publication of their disclaimer. My recent search of their websites revealed that the LexisNexis accuracy disclaimer appears in some form on more than *thirty-five (35)* different web locations, including services that cover insurance claims, health records, motor vehicle records, compliance data, and most notably—*public records*—and search results indicate that the disclaimer appears on dozens more locations that I did not verify. *See* Exhibit D. LexisNexis even provides a whitepaper offering services to improve the accuracy of their customers' data records — including phone numbers, names and addresses — but includes their standard disclaimer warning that data provided by LexisNexis is prone to errors.[13] It is also quite telling to find the *accuracy disclaimer* on LexisNexis' *Phone Finder* service, which purports to provide customer identity data based on phone number searches.[14] And the accuracy disclaimer that LexisNexis carries on their website is not unique among commercial skip-tracing and public record identification vendors, including well-known vendors such as MicroBilt, Experian and TransUnion. MicroBilt's accuracy disclaimer highlights some of the same pitfalls that LexisNexis and I have both raised: "Public Record Information provided to User from or through MicroBilt is derived solely

---

[13] *White Paper – A Business Case for Fixing Provider Data Issues*, LexisNexis (2014), available at http://techhubly.com/lexisnexis-resources/files/A%20Business%20Case%20for%20Fixing%20Provider%20Data%20Issues_WPNXR5062-0.pdf.

[14] *Phone* Finder, LexisNexis, https://risk.lexisnexis.com/products/phone-finder.

from public records, which may not be 100 percent (100%) accurate or complete . . . *Public Record Information contained herein should not be used in legal proceedings* . . . Be aware that *Information is obtained and managed by fallible sources* and that for the Fee charged, MicroBilt does not guarantee or insure the accuracy, completeness, timeliness, depth or continuation of Information."[15] Experian and TransUnion also carry their own disclaimers in which they do not warrant the correctness or accuracy of information, products and services.

C.    In past cases, I have analyzed subscriber information by comparing results from LexisNexis against six web-based reverse number services, and a seventh, API-based service. In many cases, the subscriber names returned by these identification services varied significantly — however, in numerous examples, many of the seven search services produced common subscriber results, but *none of the seven services returned the same subscriber name identified by LexisNexis.* These variations are likely the result of differing source data, errors in data entry, variations in historic data, and other issues, but add doubt to the reliability of services such as those provided by LexisNexis.

D.    As an additional test of LexisNexis' accuracy, I recently requested a full file disclosure of *all* information that LexisNexis carries on my personal

---

[15] *User Agreement*, MicroBilt (emphasis added), http://www.microbilt.com/user-agreement. A partial image of the MicroBilt disclaimer is attached as Exhibit C.

identity.[16] LexisNexis provided me with a comprehensive 470-page report, dated November 21, 2018. The report included a section titled "Phone Records," with the following description: "This section contains phone listings. The first and last seen dates correspond to the time periods when the source published the record, and *not necessarily to the time period with which you had the phone number.*" The report provided several phone numbers for which I have been the subscriber. However, absent from the report were *any* wireless phone numbers that I have used. The report did not list my current, primary wireless number, for which I've been the sole authorized user since 2005. This primary number is also prominently displayed on my publicly-available business website, and has appeared there for nearly four years.[17] The full file disclosure also did not list a prepaid wireless phone that I have used for the past seven months. For my phone numbers that it did list, each number was listed on multiple records from multiple data sources that included conflicting dates, and many of the dates provided (*first seen* and *last seen* dates) did not match the actual dates that I was the subscriber for those numbers – in some cases  being off by a number of years..

E.     To further test the accuracy of reverse-lookup services, I recently performed a web-based reverse phone search using my daughter-in-law's cell phone number. I am familiar with her number, and I know she has

---

[16] *Access Your Full File Disclosure*, LexisNexis,
https://personalreports.lexisnexis.com/access_your_full_file_disclosure.jsp.

been the subscriber of the cell phone service to which that number is assigned and that she has been the sole user of that cell phone number for the past 11 years. Several search sites provided no results at all. Using the search site spokeo.com, the phone number was found, and I paid a small fee to receive the report that should have returned my daughter-in-law's name and address. The results of the search instead indicated that the current owner is Duane Darling, and included the names Gerald Darling and Nic Darling as previous owners, all at the same address in Virginia. Duane Darling is not the name of my daughter-in-law or anyone in her immediate family, and she has lived in Connecticut for the past nine years. I also performed the same search using an API-based service from searchbug.com, and the results indicated Gerald Darling as the owner at the same Virginia address as provided by spokeo.com.

F.   In *Goins v. Walmart and Palmer Recovery Attorneys*—for which I provided an expert rebuttal report in support of the defendants—the plaintiff's expert claimed that she processed the telephone number belonging to the plaintiff, using LexisNexis as her vendor, and that this process identified the number as belonging to Ms. Amber Goins. In reality, when Goins' expert provided Plaintiff Goins' telephone number to LexisNexis, the results that were returned included only the names "LaShante McCall," "Kenia Ayala" and "Lesley Goins." The purported identification by LexisNexis was faulty in many ways: Plaintiff Amber

---

[17] See archived version of http://jankostyun.com/contact-info/ captured by archive.org on  April 7, 2015, at https://web.archive.org/web/20150407033904/http://jankostyun.com/contact-info/

Case 1:19-cv-20073-CMA   Document 71-2   Entered on FLSD Docket 06/07/2019   Page 217 of
326
Case 1:19-cv-20073-CMA   Document 68-1   Entered on FLSD Docket 05/30/2019   Page 48 of 75

Goins was never identified by LexisNexis as being associated in any way to the subject telephone number; in identifying Lesley Goins' association with the subject phone number, LexisNexis provided no data or indication that connected Lesley Goins to Plaintiff Amber Goins; in identifying Lesley Goins' association with the subject telephone number, LexisNexis did not provide a date range that covered the relevant time period of the call(s) at issue; once Goins' expert received the information from LexisNexis regarding Leslie Goins, she deviated from her documented methodology, and performed a manual, individualized investigation against other data sources in an attempt to connect Amber Goins with Lesley Goins, and therefore connect Amber Goins with the subject telephone number. And when questioned at deposition, Goins' expert even suggested that she might ask the plaintiff's counsel to help determine the relationship between Lesley Goins and Amber Goins. This example clearly shows how the usage of skip-tracing vendors such as LexisNexis to correlate phone numbers to users or subscribers has been unsuccessful, and further exhibits the need for individualized inquiries to provide accurate user identification.

G.   In another prior case for which I was engaged as an expert, the defendant utilized a verification service provided by Neustar that provides information on the connection between a name and phone number.[18] The defendant provided Neustar with the name of one of the defendant's

---

[18] *See Contact Compliance Risk*, Neustar, https://www.risk.neustar/compliance-intelligence/tcpa.

account holders, along with the phone number that the defendant believed

was associated with that account holder. Neustar's verification service

returned a result to the defendant that the number was still in service, and

that there was a positive match between the phone number and the account

holder name that was provided. However, carrier records subsequently

revealed that the account holder had actually disconnected that phone

number several months before the verification was performed. This

example demonstrates that even services provided by a respected telecom

vendor such as Neustar can be unreliable.

### C. Name Directories

103.    Caller Name ("CNAM") is a service coupled with caller ID that displays a name
associated with the calling phone number on the phone receiving the call. Some plaintiffs may
assert that the CNAM database is a reliable source for subscriber data. In my opinion, it is not.

The CNAM database exists for both landline and cellular phone numbers, but its content (like

other public subscriber databases) is quite limited. Major phone carriers do not have incentives

for keeping the CNAM database accurate and up-to-date. This is because there is little demand
from customers to provide this service, and carrier participation in updating the CNAM database
is voluntary and chargeable to the carrier. Furthermore, the CNAM database, like many of the

other public data sources, only provides current subscriber information, and there is no known

historical version as would be required to identify a subscriber at a given point in time in the past

when any of the calls were allegedly placed.

### D. Reliability of Subscriber Information from Carriers

#### 1.    Barriers to Identifying Numbers Assigned to Particular Carriers

104.    While cell phone carriers are a source of historic subscriber information for a

48

given cell phone number, there were many carriers during the most recent proposed class period from October 9, 2018 through January 28, 2019 as well as in the four years preceding the filing of the FAC in February 2019. Some of those carriers either no longer exist or have been combined with others, and their historic subscriber records (assuming they still exist) do not always accurately identify historical cell phone subscribers. Cell phone carriers have limited capabilities and varying standards for collecting and maintaining information on subscribers. When a customer initially contracts for cell phone service, the carrier's main objective in collecting subscriber identification is for the purposes of collecting payment. This may immediately result in limited or inaccurate customer information being recorded on the subscriber's account. Customers might intentionally provide inaccurate contact information, or subscriber information might be incorrectly recorded via data entry. Since cell phones are not tied to a physical location, there are limitations in verifying that the address provided by the subscriber is accurate. Even if the customer data initially collected and recorded is accurate, changes to that data are common, due to actions like subscribers moving to a new address or changing names, but neglecting to report these to the carrier.

105. In order to procure accurate, historical subscriber identification from carriers via subpoena, it is necessary to identify which subset of telephone numbers should be sent to each individual carrier for identification. Further, in order to subpoena cell phone carriers in an attempt to identify subscribers as of some prior date, one must first identify the specific cell phone carrier that provided service to the given telephone number at the historical time of alleged calls. While there are resources available to identify the current cell phone carrier for a telephone number or block of numbers, I am not aware of any such services that can accurately identify historical cell phone carriers.

106.   Plaintiff or Plaintiff's expert might propose sending all telephone numbers to all carriers via subpoena, without regard to historical carrier ownership based on the dates of the calls. I find this solution impractical and unreliable for several reasons. Sending thousands of telephone numbers to smaller carriers would prove overly burdensome for them, and could very well result in no data being provided by such carriers. Sending the same fully-inclusive list of numbers to all carriers will also undoubtedly result in conflicting data results, which would be effectively impossible to resolve. For example, if all telephone numbers are sent to all carriers, Verizon and Sprint might both respond with historic customer records for that same telephone number. Those responses might identify different subscribers, or what appears to be the same subscriber with different service dates, different addresses, or variations in other key information. There would be no way, short of performing a manual investigation of all conflicting telephone numbers, to reliably determine which carrier's information (if either) was correct.

107.   Plaintiff, or Plaintiff's expert is likely to be unaware (or unconcerned) that the carrier ownership of numbers can change due to porting. In fact, the ported-number data that can be downloaded by vendors to track changes in wireless status due to number porting does not provide any identification of carrier changes as part of that porting activity. For example, any telephone number identified as a wireless number at the date it was allegedly called, might have been serviced by Verizon Wireless at the time of that call, but incorrectly identified as serviced by T-Mobile (based on current ownership due to porting) when attempting to generate a subpoena for that number.

108.   The historical carrier ownership of telephone numbers can also change on a larger scale due to Number Pooling. Introduced at the same time as Number Portability, carriers are

required to participate in Number Pooling, where large blocks of telephone numbers, usually in multiples of 1000 numbers, are donated from the control of one carrier to another. Similar to the number portability scenario, a telephone number that was owned at some point in the past by Verizon Wireless might now be owned by T-Mobile, due to donation of the block containing that number to T-Mobile from Verizon. Without a resource to identify the historical carrier ownership of numbers, a current lookup of the carrier that owns a telephone number would not accurately identify the correct carrier who owned that number at a given date in the past.

109.     In order to identify historic wireless subscribers, the carrier subpoena process is also hampered by the vast number of wireless carriers and the volatility of carrier ownership of telephone numbers over time.

110.     According to the FCC's Fact Sheet from its Communications Marketplace Report, there are four facilities-based nationwide wireless carriers (AT&T, Sprint, T-Mobile and Verizon Wireless) [19], as well a fifth facilities-based wireless carrier with semi-nationwide coverage (U.S. Cellular).[20] The FCC Fact Sheet also reports that there are dozens of other regional facilities-based wireless carriers. In addition, the FCC also reports that there are virtually countless wireless resellers (also known as Mobile Virtual Network Operators, or MVNOs), as it states that "The Commission is not able to provide an exact figure of the number of MVNOs that currently offer services" and "Estimates of the number of MVNOs operating in the United States vary considerably. Many MVNOs are privately-held companies that do not publicly report financial or subscriber data."[21] Wikipedia documents that there are more than 60 facilities-based wireless

---

[19] Facilities-based wireless carriers are those carriers who own and operate their own wireless networks and related equipment.

[20] See *FCC Fact Sheet*, dated November 21, 2018, ¶ 6, available at https://docs.fcc.gov/public/attachments/DOC-355217A1.pdf (last visited 3/26/2019)

[21] See *FCC Fact Sheet* ¶ 7, footnote 16.

Case 1:19-cv-20073-CMA   Document 71-2   Entered on FLSD Docket 06/07/2019   Page 222 of
336
Case 1:19-cv-20073-CMA   Document 68-1   Entered on FLSD Docket 05/30/2019   Page 53 of 75

carriers[22] and well over 100 MVNOs[23] – all of whom are potential carriers responsible for the wireless service of telephone numbers to which calls may have been placed.

111.    Plaintiffs may argue that a large percentage of potential class members can be identified by concentrating their subpoenas on the largest wireless carriers, who control a large market share of wireless subscribers. However, many of the lesser-known or even unknown carriers each have significant subscribership that would potentially exclude untold class members if those carriers were ignored. For just a few examples: U.S. Cellular services over 5 million wireless subscribers; Shenandoah Telecommunications (Shentel) and Cellular South (C Spire) each have over one million subscribers; wireless reseller Consumer Cellular has 3 million subscribers[24]; and MetroPCS (now known as Metro by T-Mobile), is estimated to serve 18 million subscribers.[25]

112.    The wireless industry is also infamous for the ever-changing landscape of wireless carriers. A significant number of carriers – particularly resellers and regional carriers, close their doors each year, or become the objects of mergers or acquisitions.[26] Based on this high volume of churn, it is likely that many of the wireless numbers that received alleged calls during the relevant time period were owned and serviced by carriers who are no longer in

---

[22] *List of United States wireless communications service providers* at https://en.wikipedia.org/wiki/List_of_United_States_wireless_communications_service_providers (last visited 3/26/2019)

[23] *List of United States mobile virtual network operators* at https://en.wikipedia.org/wiki/List_of_United_States_mobile_virtual_network_operators (last visited 3/26/2019)

[24] *Consumer Cellular Commemorates Three Millionth Customer by Gifting Three Million Dollars* at https://www.einnews.com/pr_news/464481279/consumer-cellular-commemorates-three-millionth-customer-by-gifting-three-million-dollars (last visited 3/26/2019)

[25] *Metro by T-Mobile: Everything you need to know* at https://www.androidauthority.com/metro-by-t-mobile-2-908138/ (last visited 3/25/2019)

[26] See, for example, *10 years of consolidation in wireless: The rise of Verizon, AT&T, T-Mobile and Sprint* at https://www.fiercewireless.com/special-report/10-years-consolidation-wireless-rise-verizon-at-t-t-mobile-and-sprint (last visited 3/24/2019)

business. Once again, there is no service or database that I am aware of that would allow for the identification of the carrier of record for those numbers at the historical date of alleged calls. And if any of those carriers could be identified, the fact that they are no longer in business would certainly prevent some or all of the requests to identify subscribers from being fulfilled.

113.   Besides the need to identify the correct carrier for given telephone numbers as of historical dates, there are still significant reasons why the subscriber identification provided via subpoena would be highly suspect. It has already been discussed that many wireless carriers who provided service to customers during the relevant period are no longer in business, and as such would be unable to identify any subscriber-related data. Carriers who are still active have their own set of limitations related to providing accurate, historical subscriber information.

### 2.   Carriers' Retention of Records

114.   Retrieving individual customer usage information (*e.g.*, call detail records and audit trails of texts) directly from wireless carriers potentially could assist in the identification of historic subscribers for that number. Through review and analysis of these records on an account-by-account basis, it may be possible to identify subscribers of individual cell phone numbers. This laborious analysis would, however, be incomplete and inaccurate. This is because the retention requirements for such types of records among carriers are much less stringent than for landline carriers, and vary widely in the industry. For example, the U.S. Department of Justice reported that Verizon retains subscriber information for three to five years; T-Mobile for five years; and Sprint, Nextel, and Virgin as an "[u]nlimited" period.[27] For AT&T/Cingular, the DOJ reported that retention duration "[d]epends on length of service." Additionally, the DOJ

---

[27] *Cell Phone Location Tracking Request Response – Cell Phone Company Data Retention Chart*, Am. Civil Liberties Union, https://www.aclu.org/cell-phone-location-tracking-request-response-cell-phone-company-data-retention-chart (last visited Mar. 4, 2019).

reported call detail records are retained for one year by Verizon, five years for T-Mobile post-paid customers, two years for T-Mobile pre-paid customers, as few as five years for AT&T, and 18 to 24 months for Sprint. More recent reports, such as one from the Massachusetts ACLU in 2014, indicate that those retention periods can be even shorter — with Sprint's retention of subscriber data reported as 18 months, and Verizon's retention reported simply as "more than one year."[28] Also with respect to data retention, Verizon's privacy policy states that "Personally identifiable and other sensitive records are retained only as long as reasonably necessary for business, accounting, tax or legal purposes"[29], indicating that subscriber data is essentially stored no longer than is absolutely necessary. Based on these retention periods, most carriers do not retain data long enough to cover records dating back to December 2013.

115.   As expert for the defendants in the case of *Goins v. Walmart and Palmer Recovery Attorneys*, No. 6:17-cv-00654 (M.D. Fla.), I was recently provided with the results of a subpoena issued to wireless carrier MetroPCS. In that subpoena, MetroPCS was asked to identify the subscriber of the named plaintiff's phone number, as well as any communication or documentation concerning named plaintiff Amber Goins during the relevant time period, January 1, 2017 through December 31, 2017. Of the documents produced by MetroPCS in response to the subpoena, there were none that identified Amber Goins as a subscriber or user associated with Goins' own phone number during the relevant period, and there were none that identified any communication or any other interaction between MetroPCS and Amber Goins during the relevant period. In this example, the wireless carrier was unable to identify its own subscriber who reportedly had service during a time period that was as recent as only four months prior to

---

[28] *How Long Does My Phone Company Store My Data? How Easily Will It Give My Info Up To The Cops?*, PrivacySOS (Feb. 9, 2014), https://privacysos.org/blog/how-long-does-my-phone-company-store-my-data-how-easily-will-it-give-my-info-up-to-the-cops/ .

the subpoena – further demonstrating the unlikely prospect of reliably identifying historical subscribers/users for the relevant timeframe in the instant case.

### 3.  Prepaid Cell Phone Services

116.  Prepaid cell phones (often called "burner phones") create yet another layer of complexity in attempting to identify historic subscribers. Prepaid cell phones are available to customers from many sources—traditional cell phone carriers, department stores, convenience stores, online retailers such as Amazon, and online auction sites like Ebay, among others. This wide variety of sellers makes collection of subscriber information less uniform, and further reduces the reliability of any data that is collected by and potentially available from them. There is no requirement at the federal level for purchasers to provide any verification of name, address or other contact information. A federal bill was introduced in 2010 to institute an identification requirement for the purchase of prepaid mobile devices, but has never been passed into law.[30] More recently, a similar bill was introduced to Congress in 2016, and also never enacted.[31] As there is no requirement that prepaid cell phone carriers obtain and maintain subscriber identification data, the process of identifying individual, historic subscribers of prepaid cell phone services would likely be impossible.

### 4.  Cell Phone Number Reassignment

117.  The generic process used in the mobile industry for deactivation and recycling cell phone numbers creates additional problems with the accuracy of historic subscriber data related to a number. Based on my experience in the provisioning of mobile service, the deactivation process typically follows this pattern:  (1) a subscriber chooses to cancel service

---

[29] *Privacy Policy*, Verizon Wireless, http://www.verizon.com/about/privacy/full-privacy-policy.

[30] Pre-Paid Mobile Device Identification Act, S. 3427, 111th Cong. (2010).

[31] Closing the Pre-Paid Mobile Device Security Gap Act of 2016, H.R. 4886, 114th Cong. (206).

with an existing provider, and chooses not to port their number to a new provider; (2) the service provider cancels service and adds the phone number to a deactivation list; (3) phone numbers stay inactive for a prescribed number of days, depending on the carrier, before they are recycled and assigned to a new subscriber; and (4) after the deactivation period, the number can be reassigned to a new subscriber.[32] Typically, the carrier or service provider will update its internal records to indicate the change of subscribership for the reassigned number. However, many of the downstream data sources that have been previously discussed have a high probability of carrying outdated subscriber data. Public data sources like those used in reverse lookup services, private data sources such as those used by vendors like LexisNexis, the CNAM database, and even the National Do Not Call registry all face the likelihood of including outdated subscriber data due to this reassignment process. And further supporting the idea that subscribers cannot be accurately identified based on phone numbers, including those limitations based on number reassignment, FCC Chairman Ajit Pai himself has opined that "no authoritative database … exists to 'track all disconnected or reassigned telephone numbers' or 'link[] all consumer names with their telephone numbers'."[33] And in making that statement, Chairman Pai referred to documentation from Richard Fruchterman, the Associate General Counsel of industry data leader Neustar.[34]

---

[32] According to Federal guidelines, disconnected numbers must be made available for reassignment in 90 days or less, but there is no minimum timeframe, indicating that carriers may reassign numbers in as little as one or two days. *See* 47 C.F.R. § 52.15.

[33] *DISSENTING STATEMENT OF COMMISSIONER AJIT PAI Re: In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, WC Docket No. 07-135.

[34] *Id.* (citing Letter from Richard L. Fruchterman, Associate General Counsel to Neustar, to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278, at 1 (Feb. 5, 2015)).

### 5.      Authorized User Identification

118.     The complex, number-by-number process of attempting to reliably and accurately identify the historic subscriber associated with a cell phone number as of the date of alleged message(s) does not even begin to address the identification of cell phone users. Because the subscriber and authorized user of a cell phone number are not necessarily the same person, identifying the subscriber does not mean the user has been or can be identified. Many cell phone accounts have more than one user. For example, businesses often have a single account and a single cell phone number that is shared by several employees, or multiple numbers used by multiple employees. Families often have a single cell phone account and a single cell phone number shared by different family members, or multiple numbers that are used by multiple family members, but billed under a single subscriber name. Sometimes, individuals in a single "family plan" are not related and may not have the same surname. As a result, even if it were possible to use carrier records to identify a number as belonging to an individual family plan, a core family unit (*i.e.*, parents and children, or even grandparents, parents, and children) would

not serve as a proxy for all potential users of that number. Typically, none of this user information is recorded in cell phone provider records.

119.     For example, in the case of *Wilson v. Badcock*, No. 8:17-cv-02739 (M.D. Fla.), for which I was engaged as an expert, named plaintiff Victoria Wilson testified that she is the user of the cell phone number that allegedly received calls from the defendant. But Wilson's Grandmother, with whom she lives, pays for that phone service. Subscriber records produced in that case confirmed that: Wilson's Grandmother (Colleen Powell) is the subscriber of the number at issue; there is no indication that anyone other than Wilson's Grandmother is associated with the account; the subscriber name on the account of Colleen Powell bears no similarity to plaintiff Victoria Wilson's name; and the subscriber records report a subscriber address that does not

match the residential address that Wilson described during her testimony as being shared with her Grandmother. This example clearly describes the common occurrence in which both authorized user names and/or addresses are not associated with their own phone number.

120.    It would also be foolish to dismiss the effect that scenarios such as family plans have on the issue of user identification, since research has estimated that as many as 75 percent of wireless subscribers are on discounted, multi-line family plans.[35]

121.    As a result, in my opinion, there is no way to reliably and accurately attempt to identify the historic user(s) of a given cell phone number as of a particular date without, at a minimum, first obtaining information from the subscriber(s) and user(s) of that number as of the date of the alleged call(s). And, given that the multiple user scenario I have described might be combined with other scenarios, like a prepaid cell phone, even this level of number-by-number analysis may be insufficient to identify subscriber and user(s) for a given number at the time of the alleged message(s). In any case, it is my opinion that there is no class-wide solution available to accurately identify subscribers and users of cell phone numbers as of the historic date(s) of alleged message(s), and at best, an individualized, account-by-account investigation will be necessary to achieve that identification.

E.  Confirmation of My Opinions from Other Sources

122.    The opinions that I have set forth regarding the lack of reliability in the historic identification of wireless status of phone numbers, the erroneous nature of identifying historic users and subscribers associated with those numbers, and the pitfalls associated with using third-

---

[35] Andy Vuong, *Wireless subscribers are finding breaking up is hard to do*, The Denver Post (Sept. 14, 2012, 4:50 PM), https://www.denverpost.com/2012/09/14/wireless-subscribers-are-finding-breaking-up-is-hard-to-do/.

party vendors for historic identification, are also supported by the opinions of other reputable experts, as well as reasoning documented in prior court rulings.

123.    For example, in *Sherman v. Yahoo*, No. 3:13-cv-00041 (S.D. Cal.), the court found that records from a cell phone provider and the use of reverse-lookup services failed to demonstrate "an administratively feasible method of identifying the putative class members" *Id.* D.E. 191 at 12 (S.D. Cal. Sept. 23, 2015) (order denying class certification).

124.    When ruling in *Jacobs v. Quicken Loans*, No. 9:15-cv-81386 (S.D. Fla.), the court stated: "As explained by Defendant's expert, Jan Kostyun, there is no public database of cell phone subscribers, and private services are often inaccurate and incomplete. (Kostyn [sic] Report ¶¶ 14-15, DE 136-1.) Additionally, even if a carrier-by-carrier investigation was undertaken, it still would not ensure accuracy. (*Id.* at ¶¶ 16-19.)" *Id.*, D.E. 167 at 7 (S.D. Fla. Oct. 19, 2017) (order denying class certification).

125.    And in its decision to deny class certification in *Wilson v. Badcock*, No. 8:17-cv-02739 (M.D. Fla.), the court similarly remarked that "According to Defendant's expert, there is no public database of cell phone subscribers and private services are often inaccurate and incomplete, and even a carrier-by-carrier investigation would not ensure accuracy." *Id.*, D.E. 102 at 6 (M.D. Fla. Dec. 19, 2018) (order denying class certification). Also in *Wilson*, the court refers to plaintiff's expert's proposal in that case to use "reverse directory database vendors and subpoenas to cell phone carriers to identify those persons whom Defendant called" and states that her proposal "suffers several mechanical shortcomings." *Id.* at 5-6. The court further refers to Wilson's expert's proposal to identify cell phone subscribers by stating "Plaintiff's expert claims this is possible, though one of her chief sources is the *unobservable, proprietary "black box" techniques of LexisNexis.*" *Id.* at 6 (emphasis added).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and this declaration was executed on this 24th day of May, 2019 at Burlington, CT.

_____
Jan Kostyun

# Exhibit A – Jan Kostyun CV



Jan Kostyun has over 35 years of experience in computer systems and software development, enterprise architecture, and telecommunications including extensive experience in the wireless industry.  Mr. Kostyun has broad telecom experience in both wireless and wireline disciplines. His wireless experience includes wireless telecommunications standards, text messaging, voice and voicemail internals, and in-depth experience with the end-to-end cellular provisioning process.  His wireline/landline experience includes development of software systems to support business operations and provisioning of landline services, including overall architectural knowledge of the wireline business. Mr. Kostyun is also recognized as an industry expert in the field of Local Number Portability (LNP) and the process of customer movement between cellular carriers, as well as significant experience in landline number portability and number pooling.   He also has a wide range of experience in database technologies as well as data analysis. Mr. Kostyun has held senior technical positions with Bell Telephone Laboratories, Exxon-USA, GTE and Verizon, as well as consulting positions with Informatics, Syniverse Technologies, BusinessEdge Solutions/EMC and eComp Consultants.

His experience encompasses successful assignments in implementing eCommerce, Business Intelligence & Telecommunications systems in the U.S. and Canada, as well as a collaborative effort with the National Regulatory Agency of Colombia.

Mr. Kostyun's extensive experience has enabled him to provide expert opinions, reports and analysis in legal matters covering trade secret misappropriation, copyright infringement, software financial valuation and damage assessment, patent infringement, and litigation involving the Telephone Consumer Protection Act (TCPA).

**Professional Experience:**

**2012 to present**   *Independent Consultant*                                    *Middletown, NJ*

Technology consulting, including
- Expert witness representing defendant under civil case alleging violation of Telephone Consumer Protection Act (TCPA). Extensive review and critique of plaintiff's expert witness reports; data analysis and research of very large call-record databases, alleged call violations and ported telephone numbers; and ATDS evaluation. Preparation of expert report in support of defendant, contributing to denial of class certification and judgment in favor of defendants.
- Expert consultant representing defendant in civil case alleging violation of TCPA.

61

Provided analysis and report of plaintiff telephone numbers, porting activity and subscriber information.

- Expert consultant representing defendant under class action complaint alleging violation of TCPA involving text messaging/SMS activity. Provided analysis and report of CTIA/Wireless Industry best practices for short code messaging campaigns.
- In class action TCPA case, served as expert to provide ATDS evaluation, analysis of express consent and TCPA applicability of contested texts and voice calls.
- In class action TCPA matter, developed expert report addressing the feasibility and technical aspects of identifying users/subscribers of cell phones. Also developed expert report rebutting opposing expert's data analysis and subscriber identification, contributing to denial of class certification and exclusion of Plaintiff's expert report.
- Expert witness in class action TCPA complaint, providing in-depth analysis of National and internal Do Not Call (DNC) records and very large volume call record files, and critical assessment of opposing expert's data analysis.
- In class action TCPA case, developed expert report addressing the feasibility and technical aspects of identifying users/subscribers of fax telephone numbers. Also developed expert report rebutting opposing expert's opinions regarding successful completion of fax transmissions and identification of fax recipients.
- In class action TCPA matter, developed expert report addressing the feasibility and technical aspects of identifying users/subscribers of cell phones and residential landlines.
- In class action TCPA matter, developed expert rebuttal report challenging opposing expert's data analysis results of alleged DNC and wrong number calls, and addressing technical aspects of identifying users/subscribers of cell phones.
- In class action TCPA matter, performed extensive analysis of high-volume call data records against internal and national DNC files.
- In class action TCPA case, analyzed call data records, performed testing and analysis of defendant's telephone calling system and provided opinions addressing defendant's alleged use of an ATDS for telemarketing purposes.
- In class action TCPA case, developed expert rebuttal report challenging opposing expert's data analysis methodology, and addressed technical aspects of identifying users/subscribers of cell phones.
- In class action TCPA matter, developed expert rebuttal report challenging opposing expert's data analysis results of alleged DNC violations, and addressed technical aspects of identifying users/subscribers of cell phones.
- In class action TCPA matter, developed expert rebuttal report challenging opposing expert's data analysis results of alleged DNC violations, reliability of opposing expert's data vendors, and addressed technical aspects of identifying users/subscribers of cell phones.
- In class action matter involving the Washington Automatic Dialing and Announcing Device (WADAD) statute, provided expert analysis and support regarding carrier records, carrier subpoena responses, and identification of wireless/landline subscribers and calls within specific geographic boundaries.
- In class action TCPA case, rebutted opposing expert's analysis of wrong number designations, and class member identification, contributing to denial of class

Case 1:19-cv-20073-CMA   Document 71-2   Entered on FLSD Docket 06/07/2019   Page 233 of
336
Case 1:19-cv-20073-CMA   Document 68-1   Entered on FLSD Docket 05/30/2019   Page 64 of 75

certification.

- In multiple class action matters, provided analysis of Defendant's dialing equipment and opinions addressing the capacity store or produce telephone numbers to be called, using a random or sequential number generator, as well as the capability to dial telephone numbers without human intervention.

| | | |
|---|---|---|
| **2009 to 2011** | **Senior Consultant** | |
| | ***eComp Consultants*** | ***Tampa, FL*** |

Provided consulting on design and development of software products and wireless technology.   Provided technology consulting and expert support for enterprise architecture, software engineering and telecommunications in the areas of:

- Patent portfolio evaluation, market valuation, and prior art analysis.
- Patent litigation consulting for information technology in telecommunications, wireless and enterprise architecture for validity/invalidity and infringement/non-infringement analysis.
- Software contract analysis for disputes involving custom software, software copyright and trade secret infringement, and software valuation.
- Functional analysis, Source Code reviews, Damage Assessment analysis and software tampering evaluation.

| | | |
|---|---|---|
| **2009 to 2010** | ***Independent Consultant*** | ***Tampa, FL*** |

Collaborated with Value Partners Management Consulting firm in preparation of proposal to the Colombian National Regulatory Agency for implementation of Wireless Number Portability across Colombia.

| | | |
|---|---|---|
| **Prior experience** | **Senior Consultant** | |
| | ***BusinessEdge Solutions/EMC*** | ***Toronto, Ontario, Canada*** |

Provided strategic and tactical guidance to Rogers Wireless, Canada's largest wireless carrier in the successful, on-schedule implementation of Canadian wireless number portability.

- Developed detailed specifications for Rogers' internal business applications interface to the Syniverse/Telcordia Service Management Gateway (SMG) for communication of wireless port requests & responses to wireless and wireline trading partners.
- Served as Rogers' representative to several industry-level committees, including SMG Defect Management and SMG Testing, acting as liaison between Rogers and all Canadian carriers. Developed detailed specifications for acceptance and regression testing of SMG for entire Canadian industry.
- Provided integration expertise to Rogers' application development, network administration, system testing, production support, and program management team
- Provided in-depth knowledge of Telcordia SMG interface, Canadian portability standards (CWNPG and CLOG), Wireless to Wireline (WPR to LSR) translation requirements, and post-implementation data analysis to determine customer porting trends and roadblocks.

### Senior Consultant
*Syniverse Technologies*                                                    *Tampa, FL*

Served as development specialist & subject matter expert during implementation of U.S. Wireless Number Portability (WNP). Designed the reporting data warehouse and client billing processes which support Syniverse's WNP & ICC Clearinghouse product offerings.

- Provided significant expertise in the technical internals, database design and API requirements of Telcordia's SMG platform; WNP WICIS Industry standards; InterCarrier Communications (ICC) Process; Service Order Administration (SOA)/NPAC interaction; and Tekelec LSMS database access.
- Subject matter consultant to other Syniverse WNP product offerings, including Pre-port Validation, Fallout Management, Wireline Porting and PortFlow Management. Responsible for interaction and consulting with Sales, Business Development, Training and Production Support organizations.
- In-depth experience with Cellular Provisioning, GSM/CDMA technologies, SIM Card provisioning

### Software Engineer
*Verizon Communications*                                                    *Tampa, FL*

Served as Enterprise Integration Architect for Local Number Portability (LNP) and Telephone Number Pooling (TNP) projects. Responsible for development of enterprise-level architecture and system integration of 38 major applications in order to develop and deploy Wireline LNP and Number Pooling capabilities for the entire former-GTE operating area.

- Managed technical team of 30+ individual project architects, including interaction with program management, functional owners, development teams, system testers and production support personnel.
- Coordinated retail and wholesale ordering, provisioning, billing and service assurance business functionality.
- Developed significant expertise in number portability network element systems (Telcordia's LSMS and SOA), including low-level knowledge and direct access to LSMS internal databases.
- Directly responsible for the successful national deployment of LNP/TNP in GTE/Verizon West. Maintained close working relationship with Network Engineering's TN Administrator, assisting with LSMS extracts for reconciliation processes, TNP block donation and block allocation processing, and creative use of LNP capabilities for special customer requests.

### Senior Advisory Systems Engineer
*GTE Telephone Operations*                                                  *Tampa, FL*

Provided extensive systems development work as enterprise architect and development team project manager.

- Developed technical specifications for numerous systems across GTE Telephone Operations, primarily within the Customer Contact and Operations domains. Technical specifications established the hardware, software and network architecture with emphasis on a distributed, UNIX-based, client/server

64

environment.
- Established corporate standards for Relational DBMS products, including interaction with Oracle and Informix vendors
- Established corporate standards for UNIX hardware and operating system platforms, including interaction with SUN, HP and IBM vendors.
- Managed application development for TCOM, a distributed, IBM-based bulk mail processing application
- Application technical lead for Central Office personnel dispatch and work allocation application.

**Senior Database Analyst**
*Exxon Company, USA*                                                        *Houston, TX*

Provided database analysis and database administration in large-scale IBM environment, specializing in project team support, implementation of DB2/SQL and use of IBM utilities, IBM Dialog Management Services.

**Senior Database Analyst**
*Ford Aerospace*                                                              *Houston, TX*

Served as key member of application team for NASA contractor responsible for Shuttle Simulator Reconfiguration System.  Responsibilities included data analysis and database design, and application lead.

**Senior Consultant**
*Informatics, Inc.*                                                            *Houston, TX*

Consulted for major oil & gas and technology clients, offering application conversions, development of new systems, and application optimization.  Conducted international technical training classes in IBM IMS DB/DC, IBM Utilities and IBM Internals

**Senior Systems Analyst**
*GTE Data Services*                                                           *Tampa, FL*

Served as project lead and technical advisor for development of IBM/IMS-based customer billing application and IBM/CICS online order-entry application.  Specialized in deployment of mini-computer office-automation systems.

**Technical Lead**
*Bell Telephone Laboratories*                                               *Piscataway, NJ*

Application lead for development of IBM/IMS-based Inventory Management system implemented across entire Bell System.

### Education:

B.S. Mathematics – Magna Cum Laude                          Union College, Schenectady, NY
M.S. Computer Science                                              Union College, Schenectady, NY

| Wireless Communications | 7 years | Syniverse/Telcordia Service Management Gateway (SMG), Canadian portability standards (CWNPG and CLOG), Wireless to Wireline (WPR to LSR) translation, Wireless Number Portability (WNP) & WICIS Industry standards, InterCarrier Communications (ICC), Service Order Administration (SOA)/NPAC,; and Tekelec LSMS database, Wireline Porting and PortFlow Management, Provisioning, GSM/CDMA technologies, SIM Card Provisioning |
| Telecommunications | 25 years | Local Number Portability (LNP), Telephone Number Pooling (TNP), Telcordia's LSMS and SOA, Customer Contact, Provisioning & Operations, eCommerce applications |
| Database Technology | 30 years | IBM IMS Database/Data Communication; DB2/SQL database design, Performance Optimization, Query Specialist; Informix; ORACLE; Logical Data Modeling; MS Access |
| Software Engineering | 20 years | Enterprise integration, Order Entry/CRM, Trouble Management, Provisioning, Customer Billing, Work Allocation/Work Management, Inventory Management |

**Tools & Platforms**

| Languages and tools: | IBM Assembler, FORTRAN, COBOL, C, C++, JAVA, Visual Basic, IMS DB/DC, CICS, DB2/SQL, Informix, Oracle, MS Access/SQL, HTML, MS Office, WordPress |
| Platforms: | IBM Mainframe/370, IBM 4300, IBM 9700, IBM RS/6000, HP 9000, Sun SPARC, Windows-based PC |
| Operating Systems: | IBM MVS, IBM DOS/VSE, AIX, HP-UX, UNIX, Solaris, MS-DOS, Windows |

**Professional:**

Published article in *Computerworld*, 9/24/84: "IBM ISPF dialog manager: More than meets the eye"

**Case Experience:**

*Alex Jacobs et. al. v Quicken Loans, Inc.*

| Jurisdiction: | U.S. District Court, Southern District of Florida |
| Client: | Quicken Loans, Inc. as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Developed expert report addressing the feasibility and technical aspects of identifying users/subscribers of cell phones. Also developed expert report rebutting opposing expert's data analysis and subscriber identification, contributing to denial of class certification and exclusion of Plaintiff's expert report. |
| Represented by: | Goodwin Procter LLP |

*Amber Goins et. al. v Walmart and Palmer Recovery*

| Jurisdiction: | U.S. District Court, Middle District of Florida |
| Client: | Walmart and Palmer Recovery as defendants |

Case 1:19-cv-20073-CMA   Document 71-2   Entered on FLSD Docket 06/07/2019   Page 237 of
336
Case 1:19-cv-20073-CMA   Document 68-1   Entered on FLSD Docket 05/30/2019   Page 68 of 75

| | |
|---|---|
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Developed expert report rebutting opposing expert's data analysis, historic wireless identification and subscriber identification. |
| Represented by: | Shepard, Smith, Kohlmyer & Hand, P.A. / Sheppard, Mullin, Richter & Hampton, LLP |

### Ameranth v Six Continents Hotels

| | |
|---|---|
| Jurisdiction: | Superior Court of DeKalb County, State of Georgia |
| Client: | Six Continents as defendant in complaint for web advertising misuse and trade secret infringement of web-based concierge application |
| Nature of Case: | Web Advertising Analysis and Intellectual Property Litigation |
| Nature of Engagement: | Consulting expert analyzing web-based advertising practices, user interfaces, and development models; provided expertise in web marketing, online advertising, and eCommerce technology development standards, design and architecture |
| Represented by: | Alston & Bird |

### Carrie Couser et. al. v Cucamonga Valley Medical Group, Inc.

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Central District of California |
| Client: | Cucamonga Valley Medical Group, Inc. as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Served as expert to provide ATDS evaluation, analysis of express consent and TCPA applicability of contested texts and voice calls |
| Represented by: | Schmid & Voiles |

### Carrie Couser et. al. v Dish One Satellite, LLC

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Central District of California |
| Client: | Dish One, as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Served as expert to provide in-depth analysis of National and Internal Do Not Call (DNC) records and very large volume call record files, and critical assessment of opposing expert's data analysis. |
| Represented by: | Benesch, Friedlander, Coplan & Aronoff LLP |

### Comprehensive Health Care Systems of the Palm Beaches et. al. v M3 USA Corporation

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Southern District of Florida, West Palm Beach Division |
| Client: | M3 USA Corp., as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Developed expert report addressing the feasibility and technical aspects of identifying users/subscribers of fax telephone numbers. Also developed expert report rebutting opposing expert's opinions regarding successful completion of fax transmissions and identification of fax recipients. Provided deposition testimony. |
| Represented by: | Sheppard Mullin Richter & Hampton LLP |

### Datamaxx Applied Technologies v Computer Projects of Illinois, Inc.

| | |
|---|---|
| Jurisdiction: | United States District Court, Northern District of Florida |

| | |
|---|---|
| Client: | Datamaxx as plaintiff |
| Nature of Case: | Software Copyright Infringement |
| Engagement: | Prepared expert report assessing infringement of plaintiff's software copyrights, utilizing Abstraction-Filtration-Comparison test. Provided deposition testimony. |
| Represented by: | Pennington, Moore, Wilkinson, Bell & Dunbar, P.A. |

### *Derrick Thomas et. al. v Peterson's Harley Davidson*

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Southern District of Florida |
| Client: | Peterson's, as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Provided expert report rebutting opposing expert's proposed methodology for identifying historic wireless status and historic users/subscribers of telephone numbers, and opposing expert's consent analysis. Also produced expert report addressing the dialing system used by Defendant for text message campaigns, and its capacity to perform as an ATDS. |
| Represented by: | Robert L. Switkes & Associates, P.A. |

### Eileen Nece et. al. v Quicken Loans, Inc.

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Middle District of Florida |
| Client: | Quicken Loans, Inc. as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Developed expert report addressing the feasibility and technical aspects of identifying users/subscribers of cell phones and residential landlines. |
| Represented by: | Goodwin Procter LLP |

## Estrellita Reyes et. al. v BCA Financial Services, Inc.

| | |
|---|---|
| Jurisdiction: | United States District Court, Southern District of Florida |
| Client: | BCA Financial Services as defendants |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Developed expert rebuttal report challenging opposing expert's data analysis methodology, and addressing technical aspects of identifying users/subscribers of cell phones. Provided deposition testimony. |
| Represented by: | Shepard, Smith, Kohlmyer & Hand, P.A. |

### Israel Garcia et. al. v Target Corporation

| | |
|---|---|
| Jurisdiction: | U.S. District Court, District of Minnesota |
| Client: | Target, as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Provided affirmative report addressing the roadblocks to identifying historic wireless subscribers, as well as the challenges to identifying historic users and subscribers of telephone numbers. Also produced an expert report rebutting opposing expert's analysis of Defendant's dialing system. |
| Represented by: | Barnes & Thornburg  LLP |

Case 1:19-cv-20073-CMA   Document 71-2   Entered on FLSD Docket 06/07/2019   Page 239 of
336
Case 1:19-cv-20073-CMA   Document 68-1   Entered on FLSD Docket 05/30/2019   Page 70 of 75

### *Jerry Eisenband et. al. v Schumacher Automotive, Inc.*

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Southern District of Florida |
| Client: | Schumacher, as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Provided expert analysis of Plaintiff's expert report, and analysis of systems used to send alleged SMS text messages. |
| Represented by: | Kurkin Forehand Brandes LLP |

### *John Scherkanowski v Bluegreen Vacations*

| | |
|---|---|
| Jurisdiction: | U.S. District Court, District of New Hampshire |
| Client: | Bluegreen, as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Developed expert report analyzing Defendant's dialing system, it's capacity to store or produce telephone numbers using a random or sequential number generator, its capacity to place calls without human intervention, and the use an artificial or prerecorded voice. |
| Represented by: | Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A. |

### *Kevin Buja et. al. v Novation Capital LLC, et. al.*

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Southern District of Florida, West Palm Beach Division |
| Client: | Novation, as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Developed expert rebuttal report challenging opposing expert's data analysis results of alleged DNC violations, and addressing technical aspects of identifying users/subscribers of cell phones. Provided deposition testimony. |
| Represented by: | Vedder Price, P.C. |

### *Lori Shamblin et. al. v Obama for America et. al.*

| | |
|---|---|
| Jurisdiction: | United States District Court, Middle District of Florida, Tampa Division |
| Client: | Obama for America and DNC Services Corp. as defendants |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Extensive review and critique of plaintiff's expert witness reports; data analysis and research of very large call-record databases, alleged call violations and ported telephone numbers; and ATDS evaluation. Preparation of expert report in support of defendant, contributing to denial of class certification and judgment in favor of defendants. |
| Represented by: | Perkins Coie LLP |

### *Mark Preman et. al. v Pollo Operations*

| | |
|---|---|
| Jurisdiction: | United States District Court, Middle District of Florida, Orlando Division |
| Client: | Pollo Operations as defendants |

| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Pre-trial review of text messaging procedures and data flow analysis. Provided expert report evaluating adherence to CTIA/Wireless Industry best practices for short code messaging campaigns. |
| Represented by: | Akerman LLP |

### Michael Lutman v Harvard Collection Services

| Jurisdiction: | United States District Court, Middle District of Florida, Ft Myers Division |
| Client: | Harvard Collection Services as defendants |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Provided expert analysis of plaintiff telephone numbers, porting activity, subscriber information, and ATDS evaluation. |
| Represented by: | Wilson Elser Moskowitz Edelman & Dicker LLP |

### Moricz v Google

| Jurisdiction: | United States District Court, Western District of Washington at Seattle |
| Client: | Michael Moricz as plaintiff |
| Nature of Case: | Patent infringement of search engine software capabilities |
| Engagement: | Provided technical research into history, evolution and current state of web-based search engine design and functionality. Development of claim construction report. |
| Represented by: | Schwabe, Williamson & Wyatt, P.C. |

### PCS4Less v Go Mobile

| Jurisdiction: | State of Michigan, Circuit Court for Washtenaw County |
| Client: | Go Mobile as defendant |
| Nature of Case: | Copyright / Trade Secret on unlocking GSM/CDMA cell phone devices |
| Engagement: | Provided expert analysis of cell phone unlocking methods. |
| Represented by: | Gray Robinson |

### Resource Acquisition and Management Services v Mathews

| Jurisdiction: | State of Florida, Circuit Court for Hillsborough County |
| Client: | Resource Acquisition and Management Services, Inc. as plaintiff |
| Nature of Case: | Breach of Contract and Conversion of disputed property including application source code |
| Engagement: | Provided expert report assessing the value of application source code. Provided deposition testimony. |
| Represented by: | Rocke, McLean and Sbar, P.A. |

### Sara Diaz-Lebel et. al. v TD Bank and Target Corporation

| Jurisdiction: | U.S. District Court, District of Minnesota |
| Client: | Target, as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Developed expert report rebutting opposing expert's analysis of call records. Also provided analysis of Defendant's dialing system as it relates to TCPA's definition of an ATDS, as well as describing the |

|                    |                                                                 |
|--------------------|-----------------------------------------------------------------|
|                    | restrictions to accurately ascertaining class members based on historic call data. |
| Represented by:    | Barnes & Thornburg  LLP                                          |

### State of Florida v Poole

| | |
|---|---|
| Jurisdiction: | State of Florida, Circuit Criminal Court for Hillsborough County |
| Client: | Poole as defendant |
| Nature of Case: | Criminal complaint involving damage of application components |
| Engagement: | Provided expert analysis and court testimony regarding the feasibility of performing a forensic analysis of hardware and software components. Provided court testimony. |
| Represented by: | Pawuk and Pawuk, P.A. |

### Thomas Cook v Palmer, Reifler & Associates and WALMART

| | |
|---|---|
| Jurisdiction: | United States District Court, Middle District of Florida |
| Client: | PRA as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Developed expert rebuttal report challenging opposing expert's data analysis, and addressing technical aspects of identifying users/subscribers of cell phones. Provided deposition testimony. |
| Represented by: | Shepard, Smith, Kohlmyer & Hand, P.A. |

### Victoria Wilson v Badcock Home Furniture

| | |
|---|---|
| Jurisdiction: | United States District Court, Middle District of Florida |
| Client: | Badcock as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Developed expert rebuttal report challenging opposing expert's data analysis  and methodology for  identifying users/subscribers of cell phones, contributing to denial of class certification. Provided deposition testimony. |
| Represented by: | Johnson & Cassidy, P.A. |

### Waddell Williams v Bluestem Brands

| | |
|---|---|
| Jurisdiction: | United States District Court, Middle District of Florida |
| Client: | Bluestem Brands as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Developed expert report analyzing Defendant's dialing platform and its characteristics related to Automated Telephone Dialing Systems |
| Represented by: | Faegre Baker Daniels, LLP |

Case 1:19-cv-20073-CMA   Document 71-2   Entered on FLSD Docket 06/07/2019   Page 242 of
336
Case 1:19-cv-20073-CMA   Document 68-1   Entered on FLSD Docket 05/30/2019   Page 73 of 75

# Exhibit B – LexisNexis Disclaimer



*You must have a permissible use to search these sources. Laws applicable to use of this product include the Drivers' Privacy Protection Act and related state laws (DPPA) and the Gramm-Leach-Bliley Act (GLBA). The data regulated by the DPPA and the GLBA may be used only for the permissible uses, e.g., litigation, fraud detection, etc., that you select from a list prior to searching. By selecting a permissible use prior to searching, you are certifying that the data returned to you will be used only for that purpose. The data provided to you by use of this product may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment or other purposes identified under the Fair Credit Reporting Act (FCRA).

Due to the nature of the origin of public record information, the public records and commercially available data sources used in reports may contain errors. Source data is sometimes reported or entered inaccurately, processed poorly or incorrectly, and is generally not free from defect. This product or service aggregates and reports data, as provided by the public records and commercially available data sources, and is not the source of the data, nor is it a comprehensive compilation of the data. Before relying on any data, it should be independently verified. For Secretary of State documents, the data is for information purposes only and is not an official record. Certified copies may be obtained from that individual state's Department of State. The LexisNexis SmartLinx report will be provided within certain search and privacy parameters and is subject to LexisNexis General Terms and Conditions located at **www.lexisnexis.com/terms/general.aspx**. Other restrictions may apply.

*For more information or assistance with your LexisNexis public records research contact your LexisNexis®representative or call*

888.253.3901

LexisNexis, Lexis Advance, LexID, the LexID logo, LexisNexis SmartLinx, SmartLinx and the Knowledge Burst logo are registered trademarks and FOCUS is a trademark of Reed Elsevier Properties Inc., used under license. Other products or services may be trademarks or registered trademarks of their respective companies. © 2016 LexisNexis. BMH00736-0 1116



www.microbilt.com/ser-agreet

# Exhibit C – MicroBilt Disclaimer

## User Agreement

**THIS USER AGREEMENT** ("Agreement") is entered into as of the "Effective Date" (defined below) by and between MicroBilt Corporation, ("MicroBilt") a Delaware corporation with its principal place of business at 1640 Airport Rd., Suite 115, Kennesaw, GA 30144 and the party electronically accepting the within terms and conditions, ("User").

A.  **User Agrees to:**

2.  Acknowledge that: Public Record Information provided to User from or through MicroBilt is derived solely from public records, which may not be 100 percent (100%) accurate or complete. User should consult state and federal laws, including the FCRA, before using Public Record Information in making business decisions based on the results. Neither we, nor the data Repositories, or our other vendors or suppliers, are liable for claims or damages arising from the use of Public Record Information, beyond the cost of the particular search performed and report obtained by User. Because misidentifications may occur when trying to identify a particular person, based solely upon name and other identifiers, extreme care must be exercised in the review and use of the Public Record Information contained herein. Public Record Information contained herein should not be used in legal proceedings; rather, it is recommended that User obtain the original public record document from the relevant jurisdiction for the purpose of legal proceedings.

14.  Be aware that Information is obtained and managed by fallible sources and that for the Fee charged, MicroBilt does not guarantee or insure the accuracy, completeness, timeliness, depth or continuation of Information.

73

# Exhibit D – Partial List of Occurrences of LexisNexis Disclaimer

https://risk.lexisnexis.com/products/worldcompliance-data
https://risk.lexisnexis.com/products/property-data-report
https://www.lexisnexis.com/en-us/products/public-records.page
https://risk.lexisnexis.com/products/data-prefill
https://risk.lexisnexis.com/products/provider-data-masterfile
https://www.lexisnexis.com/pdf/public-records/Public-Records-Relationship-Identifier-on-Lexis-Advance.pdf
https://risk.lexisnexis.com/products/carrier-discovery
https://www.lexisnexis.com/en-us/privacy/bridger-privacy-info.page
https://risk.lexisnexis.com/products/motor-vehicle-records
https://risk.lexisnexis.com/products/claims-discovery
https://risk.lexisnexis.com/products/patient-data-masterfile
https://risk.lexisnexis.com/products/claims-datafill
https://risk.lexisnexis.com/products/providerpoint
https://risk.lexisnexis.com/products/contact-score
https://risk.lexisnexis.com/products/clue-auto
http://techhubly.com/lexisnexis-resources/files/A%20Business%20Case%20for%20Fixing%20Provider%20Data%20Issues_WP NXR5062-0.pdf
https://risk.lexisnexis.com/products/worldcompliance-data
https://www.lexisnexis.com/risk/downloads/assets/provider-data-masterfile.pdf
https://risk.lexisnexis.com/products/campaign-analyzer
https://risk.lexisnexis.com/products/clue-property
https://risk.lexisnexis.com/products/national-credit-file
https://risk.lexisnexis.com/products/small-business-credit-report-with-sbfe-data
https://risk.lexisnexis.com/products/attract
https://www.lexisnexis.com/pdf/public-records/Differences-that-Deliver-Public-Records-on-Lexis-Advance-Snapshot.pdf
https://risk.lexisnexis.com/products/account-monitoring
https://www.ahip.org/wp-content/uploads/2016/06/Blue-Plan-Yields.pdf
http://top100-hospice-homehealth.com/Portals/7/docs/12195_Top-100-HAA-Infographic.pdf
https://risk.lexisnexis.com/products/attract-commercial
https://www.aba.com/Products/Endorsed/Documents/IID-Brochure-March2014.pdf
https://risk.lexisnexis.com/products/accurint-for-collections---contact-and-locate-workflow
https://risk.lexisnexis.com/products/accurint-for-collections-decisioning-workflow
https://risk.lexisnexis.com/products/accurint-for-healthcare
https://risk.lexisnexis.com/products/active-insights
https://risk.lexisnexis.com/products/phone-finder

74

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 1:19-cv-20073

SHEHAN WIJESINHA, individually and on
behalf of all others similarly situated

       Plaintiff,

v.

BLUEGREEN VACATIONS, INC.,

          Defendant.

# Amended and Supplemental Report by Jan Kostyun dated
# June 3, 2019



PLAINTIFF'S
EXHIBIT
2
6-5-19
tabbies

**TABLE OF CONTENTS**

INTRODUCTION AND SCOPE OF OPINION........................................................................1

RELEVANT EXPERIENCE........................................................................................2

COMPENSATION ........................................................................................6

DOCUMENTS REVIEWED ........................................................................................6

METHODOLOGY........................................................................................7

RESERVATION OF RIGHT TO AMEND ........................................................................8

SUMMARY OF OPINIONS........................................................................................8

DISCUSSION OF OPINIONS ........................................................................................9

    I.    The TCN Manually Approved Calling System ............................................9

        A.    The TCN System Cannot Produce Numbers to Be Called Using a Random or Sequential Number Generator and Requires Human Intervention...................9

        B.    The TCN Manually Approved Calling System Lacks the Technical Internals Required for Predictive Dialing .........................................................18

        C.    The TCN System's Manual Limits Are Consistent with the Call Volume in the Discovery Record...............................................................................20

        D.    A Live Demonstration of TCN's Dialing Platform Confirmed All of the Manual Characteristics that have Been Discussed ...........................................23

        E.    Classifying the TCN Manually Approved Calling System as an ATDS Would Make all Modern Smartphones ATDSs ................................................25

    II.    Documents Produced in the Litigation Cannot Be Used to Reliably Identify Call Recipients ........................................................................................27

        A.    The Choice Lead Files .........................................................................27

            1.    Missing Lead Data...............................................................28

            2.    Staledated Lead Data..........................................................29

        B.    Clicker Records........................................................................30

        C.    Disposition Records .................................................................31

            1.    Source of the Disposition Records and Values .......................31

  2.  Conflicts between Clicker Records' Results Values and
    Disposition Records' Disposition Values .................................................... 32

  3.  Barriers to Resolving these Conflicts on a Class-Wide Basis .................. 34

  4.  Additional Conflicts between the Clicker Records and Disposition
    Records ................................................................................................................ 36

  5.  Duplicate records ........................................................................................... 37

III. Barriers to Identifying Historical Users or Subscribers ................................................ 38

  A.  TransUnion .............................................................................................................. 39

  B.  Other Public Identification Services and Skip Tracing ......................................... 42

  C.  Name Directories ..................................................................................................... 49

  D.  Reliability of Subscriber Information from Carriers ............................................... 50

    1.  Barriers to Identifying Numbers Assigned to Particular Carriers ............. 50

    2.  Carriers' Retention of Records .................................................................... 54

    3.  Prepaid Cell Phone Services ........................................................................ 56

    4.  Cell Phone Number Reassignment .............................................................. 56

    5.  Authorized User Identification .................................................................... 58

  E.  Confirmation of My Opinions from Other Sources ............................................... 59

EXHIBIT A – JAN KOSTYUN CV ........................................................................................ 62

EXHIBIT B – LEXISNEXIS DISCLAIMER ......................................................................... 73

EXHIBIT C – MICROBILT DISCLAIMER .......................................................................... 74

EXHIBIT D – PARTIAL LIST OF OCCURRENCES OF LEXISNEXIS DISCLAIMER ......... 75

## INTRODUCTION AND SCOPE OF OPINION

1.      In this case, Plaintiff Shehan Wijesinha has brought a putative class action against Defendant Bluegreen Vacations ("Defendant" or "Bluegreen") under the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"). First Amended Class Action Complaint ("FAC"), Docket Entry 13, at ¶ 1.

2.      Plaintiff Wijesinha alleges that "[o]n or about December 11, 2018, Defendant called Plaintiff's cellular telephone number ending in 7557 ('7557 Number')." FAC at ¶ 24.

3.      Plaintiff has moved to certify a class defined as "All individuals within the United States (i) who were sent an outbound call; (ii) which call was connected; (iii) to a cellular telephone number obtained by Defendant as a lead from Choice Hotels International, Inc., which was designated as a 'Choice Inact CP Wireless' campaign lead; (iv) promoting Defendant's vacation packages; (v) placed by Gold Mountain Communications, LLC on behalf of Defendant using the TCN 'Manual Dial Only' system; (vi) from October 9, 2018 through January 28, 2019."

4.      I understand the following based on Plaintiff's assertions and the discovery record: Defendant received lists of marketing *leads* from Choice Hotels International, Inc., including names and contact information for members of Choice Hotels' loyalty program (Ryan Dep. 43:6-10). Defendant employed Gold Mountain Communications LLC ("Gold Mountain"), to perform marketing campaigns using a manual dialer, including placing calls to prospective customers based on the leads from Choice Hotels (Ryan Dep. 43:1-14). The marketing campaign in this case was known as the "Choice Inact CP Wireless" campaign.[1] Gold Mountain placed the calls for the Choice Inact CP Wireless campaign using a subset of the TCN Manual Dial Only

---

[1] Declaration of Ignacio J. Hiraldo Regarding Class Data at ¶¶ 11-12; also Motion for Class Certification p. 2

system referred to as the Manually Approved Calling System. And Gold Mountain has produced records relevant to the calls placed in the Choice Inact CP Wireless campaign, including Disposition files that purportedly identify calls handled by Gold Mountain's agents ("Disposition Reports")[2], and activity files referred to in Plaintiff's Motion for Class Certification as "Calls Attempted Reports" that reflect calls attempted by the TCN dialing system ("Clicker Records").[3]

5.     I have been engaged by Bluegreen through its counsel to provide opinions on the TCN Manually Approved Calling System, the accuracy and value of the call data and associated lead records, the feasibility of accurately determining the cellular telephone numbers that were called, and the users or subscribers associated with those numbers when called.

6.     I had previously submitted an expert report on these subjects dated May 24, 2019. Based on additional discovery and evidence that has surfaced since that time, I submit this amended and supplemental report.

## RELEVANT EXPERIENCE

7.     I am an independent technology consultant with more than 35 years of experience in telecommunications, enterprise architecture, and information technologies. I received a Bachelor of Science degree *magna cum laude* in Mathematics and a Master of Science degree in Computer Science from Union College in 1976. I have been employed by major telecommunications companies, including Bell Telephone Laboratories, GTE, Verizon, and Syniverse Technologies. I also have been engaged as a consultant on various telecommunications issues by telecommunications companies and regulatory authorities, including Rogers Wireless (the largest wireless carrier in Canada), CRC (the national telecommunications regulatory agency of Colombia), and Syniverse Technologies (a worldwide

---

[2] Declaration of Ignacio J. Hiraldo Regarding Class Data at ¶ 6

[3] Declaration of Ignacio J. Hiraldo Regarding Class Data at ¶ 5

leader in telecommunications services). I have worked in software development, database technology, and enterprise architecture. I have worked for more than 15 years providing consulting services, software development, and data analysis in the field of telephone number portability. This experience covers landline, wireless, and intermodal (landline-to-wireless or wireless-to-landline) number portability, as well as telephone number pooling. I have played lead roles in the technical and organizational processes of porting landline numbers in the U.S. as well as wireless numbers in the U.S., Canada, and Colombia.

8.     As a software architect for Bell Telephone Labs, GTE, Verizon, and Syniverse, I developed expertise in areas such as landline and wireless number provisioning, including the end-to-end process of establishing service for an initial subscriber; landline and wireless order-entry, including the collection of subscriber contact information; initial implementation of the National Do Not Call registry; technical experience with telecom features such as voice calling, SMS messaging, fax transmissions, voicemail, auto dialer and Interactive Voice Response Unit (IVRU) technology, and switching implementations; and a wide variety of telecommunications industry standards.

9.     I also have extensive experience in database methodologies, data analysis, and data mining. My experience with database technologies includes hierarchical, network, and relational database models and implementations. I have instructed working professionals on the use of database programming, support, and internal architecture, and have developed database training courses. I am proficient with advanced database modeling, optimization and query techniques, as well as the development of database software applications. I have personally performed database queries and data analysis against hundreds of data stores, including but not limited to Internal and National Do Not Call lists, Wireless Block identifiers, Number Portability

transaction lists and telephone call records produced by both wireless carriers and businesses involved in dialing campaigns.

10.    I have extensive experience with call center operations and various dialing systems, including those used for inbound and outbound calling campaigns. In my tenure with GTE/Verizon, I performed early research with Intel-based Computer Telephony Interfaces (CTI), including text-to-speech translation and automated dialing interfaces. I have worked closely with IVRU engineers and application architects to develop programmatic interfaces used for inbound and outbound calling. I have worked closely with call center personnel at telecom businesses such as GTE, Verizon, Syniverse and Rogers Wireless while supporting Customer Relations Management (CRM) applications that include interfaces to inbound and outbound dialing systems. I have analyzed dialing systems and features from vendors such as Avaya, LiveVox, CallFire, RingCentral, Cisco, Five9, GTE, Txtwire Technologies, iVision, Stratics Networks and InfoLink Technologies. I have been retained to provide opinions regarding Automatic Telephone Dialing System (ATDS) capabilities in various litigated cases, including *Lutman v. Harvard Collection Services, Couser v. Cucamonga Valley Medical, Williams v. Bluestem, Schaevitz v. Braman Hyundai, Garcia v. Target, Diaz-Lebel v. Target, Eisenband v. Schumacher Automotive, Green-Mobley v. Capital One Auto Finance, Thomas v. Peterson's Harley Davidson, Carpenter v. World Omni Financial,* and *Scherkanowski v. Bluegreen Vacations,* among others.

11.    For the past ten years I have worked as a consultant and expert witness on cases covering TCPA issues, state-specific consumer issues such as the Washington Automatic Dialing and Announcing Device statute, and issues including patents, software copyrights, trade secrets, software value determination, vandalism, and sabotage of application programs. I have testified

in deposition and in court. My opinions have never been stricken or rejected, and have been cited in support of denial of class certification in two TCPA cases.

12.     A copy of my curriculum vitae is attached hereto as Exhibit A.

13.     I have not authored any publications in the past 10 years.

14.     In the past eight years, I have been qualified as an expert in federal courts and Florida state courts. I have been retained to provide deposition testimony as an expert for both Defendants and Plaintiffs in the following matters: *Shamblin v. Obama for Am.*, No. 8:13-cv-2428 (M.D. Fla.); *Cunningham v. Health Insurance Innovations*, No. 8:18-cv-00919 (M.D. Fla.); *Schaevitz v. Braman Hyundai*, No. 1:17-cv-23890 (S.D. Fla.); *Thomas v. Peterson's Harley Davidson*, No. 0:18-cv-61723 (S.D. Fla.); *Eisenband v. Schumacher Auto.*, No. 9:18-cv-80911 (S.D. Fla.); *Berman v. Freedom Fin.*, No. 4:18-cv-01060 (N.D. Cal.); *Diaz-Lebel v. Target*, No. 0:17-cv-05110 (D. Minn.); *Garcia v. Target*, No. 1:16-cv-2574 (D. Minn.); *Jackson v. Palm Beach Credit Adjusters*, No. 9:18-cv-80124 (S.D. Fla.); *Williams v. Bluestem*, No. 8:17-cv-1971 (M.D. Fla.); *Wilson v. Badcock*, No. 8:17-cv-02739 (M.D. Fla.); *Scherkanowski v. Bluegreen Vacations*, No. 1:18-cv-00301 (D. N.H.); *Green-Mobley v. Capital One Auto Finance*, No. 3:17-cv-764 (S.D. Fla.); *Carpenter v. World Omni Fin.*, No. 01-18-0000-6972 (A.A.A.); *Buja v. Novation Capital, LLC.*, No. 9:15-cv-81002 (S.D. Fla.); *Kalmbach v. Nat. Rifle Ass'n of Am. and InfoCision, Inc.* No. 2:17-cv-00399 (W.D. Wash.); *Goins v. Walmart and Palmer Recovery Attorneys*, No. 6:17-cv-00654 (M.D. Fla.); *Reyes v. BCA Fin. Servs.*, No. 1:16-cv-24077 (S.D. Fla.); *Jacobs v. Quicken Loans Inc.*, No. 15-cv-81386 (S.D. Fla.); *Cook v. Palmer Reifler & Assocs.*, No. 3:16-cv-00673 (M.D. Fla.); *Ameranth v. Six Continents Hotels*, No. 09-CV-3819 (Ga. Super. Ct. Dekalb Cnty.); *Couser v. Cucamonga Valley Med. Grp.*, No. 5:14-cv-01528 (C.D. Cal.); *Couser v. Dish One Satellite*, No. 5:15-cv-02218 (C.D. Cal.); *Datamaxx Applied*

*Techs. v. Comp. Projects of Ill.*, No. 4:09-cv-435 (N.D. Fla.); *Comprehensive Health Care Sys. of the Palm Beaches v. M3 USA Corp.*, No. 16-cv-80967 (S.D. Fla.); *Lutman v. Harvard Collection Servs.*, No. 2:15-cv- 257 (M.D. Fla.); *Moricz v. Google*, No. 10-CV-01240-RSL (W.D. Wash.); *Nece v. Quicken Loans Inc.*, No. 8:16-cv-02605 (M.D. Fla.); *PCS4Less v. Go Mobile*, No. 09-380-CZ (Mich. Cir. Ct. Washtenaw Cnty.); *Preman v. Pollo Operations*, No. 6:16-cv-00443 (M.D. Fla.); *Resource Acquisition & Mgmt. Servs. v. Mathews*, No. 09-CA 14536 (Fla. Cir. Ct. Hillsborough Cnty.); and *Florida v. Poole*, No. 09-CF-016786 (Fla. Cir. Ct. Hillsborough Cnty.).

## COMPENSATION

15.    I am being compensated at the rate of $350 per hour for my study and analysis in this case, as well as $300 per hour for travel and $400 per hour for testimony. My compensation is not dependent on the outcome of this matter.

### DOCUMENTS REVIEWED

16.    In forming my opinions, I have reviewed various documents; Class Action Complaint, *Shehan Wijesinha v. Bluegreen Vacations*, D.E. 1; the First Amended Complaint, D.E. 13; Order Granting Renewed Joint Motion to Enter Confidentiality Stipulation, D.E. 35; wav file of call recording to Plaintiff; Order for Partial Summary Judgment in *Marshall v. CBE Group*; *Glasser v. Grand Vacations*, 341 F. Supp.3d 1305; TCN TCPA-Manual Dial Only System product description; TCN Compliance Suite brochure; Default Call result Map for TCN dialer; Plaintiff's Motion for Class Certification and its exhibits; Choice Inactive CP Wireless.xlsx; Deposition Transcript of Louis James Russo and exhibits; Deposition Transcript of Sherry Ryan and exhibits; Deposition Transcript of Henry Seevers and exhibits; Deposition Transcript of Shehan Wijesinha and exhibits; 41 csv files from TCN's dialing system, represented as "Calls Attempted Reports"; 64 disposition csv files from Gold Mountain, represented as "Disposition Reports"; 230 csv files containing lead records, originating from

6

Choice; TCN Confidential Docs, received from I. Hiraldo, 5/15/2019; Vacation Package Marketing Agreement between Gold Mountain Communications and Bluegreen Vacations Unlimited, 12/28/2017; Subpoena for Deposition issued to TCN and Subpoena Rider; Objection to 30(b)(6) Deposition Subpoena & Designation Under Same (from TCN); Supplemental Objection & Response to Narrowed Subpoena (From TCN); Deposition Transcript of Jesse Bird.

17.     I also regularly research and follow developments in the telecommunications industry. I review significant FCC orders; review TCPA cases and rulings; communicate with former telecommunications associates; review opinions set forth by other TCPA experts; communicate with vendors who provide TCPA-related data services; review of industry blogs and user groups; and research statistics and trends related to the telecommunications industry. This ongoing review and research has also informed and supported my opinions.

## METHODOLOGY

18.     My methodology in producing my opinions is based on my business and technical experience in telecommunications, my experience as an expert in other TCPA-related cases, my education and training, and my review of documents relevant to this case, as cited throughout this report. Based on my experience and that review, I developed hypotheses regarding the manual vs. automatic nature of the TCN dialing system, the value and accuracy of the lead files and call records, the challenges with identifying the historic wireless status of telephone numbers called, and the challenges with identifying their associated users and subscribers. I have tested my hypotheses and reached conclusions using a combination of related documentation, training, research, and experience. My methodology and techniques were similar to the techniques that I used during my career as a telecommunications system architect. I have analyzed the results to form the opinions in this report.

7

## RESERVATION OF RIGHT TO AMEND

19.    I understand discovery is still ongoing and Plaintiff has not yet disclosed any expert. I therefore reserve the right to offer additional opinions and to amend this report based on information received after its date.

## SUMMARY OF OPINIONS

20.    Based on my methodology, including analysis and review of case-related materials, it is my opinion that:

A.    All calls at issue were placed with the TCN Manually Approved Calling System, which is equipment that does not have the capacity to produce telephone numbers to be called, using a random or sequential number generator, to store such numbers, or to dial such numbers. The TCN Manually Approved Calling System also requires distinct human intervention to dial each and every telephone number.

B.    Any interpretation that characterizes the TCN Manually Approved Calling System as an ATDS would make all smartphones ATDSs.

C.    The Choice Lead Files provided to Bluegreen are inaccurate, incomplete, and cannot be used to reliably identify call recipients.

D.    The Clicker Records produced by the TCN dialing system, and Disposition Records produced through Gold Mountain's agents cannot provide an accurate representation of the calls placed during Defendant's marketing campaign.

E.    If a set of telephone numbers could be itemized to which alleged calls were placed, there are tremendous barriers to accurately identifying the users or subscribers associated with those numbers at the date of said calls.

8

# DISCUSSION OF OPINIONS

## I.    The TCN Manually Approved Calling System

21.    All calls at issue were placed with the TCN Manually Approved Calling System, which is equipment that does not have the capacity to produce telephone numbers to be called using a random or sequential number generator, to store such numbers, or to dial such numbers. The TCN Manually Approved Calling System also requires human intervention to dial each and every telephone number.

### A.    The TCN System Cannot Produce Numbers to Be Called Using a Random or Sequential Number Generator and Requires Human Intervention

22.    The discovery record thus far establishes that the TCN Manually Approved Calling System cannot generate numbers, that manual intervention is required to make each call, and that a Gold Mountain "clicker agent" manually selected each telephone number to be dialed.

23.    TCN's Chief Technology Officer Jesse Bird testified at deposition:

Q.    Just going to ask you some general questions about the MAC system. I know we've talked about it a lot today. Does it have the capacity to dial any telephone numbers that have not been manually clicked by the agent?

A.    It does not. (Bird Dep. 110:23 – 111:3)

Q.    Does the MAC system have the capacity to produce telephone numbers to be called in any way randomly or sequentially?

A.    It does not. (Bird Dep. 111:19 – 22)

Q.    What are the methods by which the telephone numbers to be dialed can be provided to the TCN, the MAC system? I know we talked about a list that needs to be uploaded. Are there any other ways that the telephone numbers can be provided to the system?

A.    Only via client-provided ways. So the client will either upload the number and/or the client -- or the agent can manually enter the number to dial via the input box.

Q.    So does the MAC system have the capacity to dial a phone number that has not been provided to it by the user or administrator?

9

A.   It does not. (Bird Dep. 111:5 – 18)

24.   The manual nature of the system was also made clear when Mr. Bird discussed the mechanics of the Manually Approved Calling (MAC) System versus other TCN products:

Q.   Mr. Bird, I want to talk a little bit more about the MAC system and how it differs from the other products that are offered by TCN. So first off, how is the MAC system different than preview dialing?

A.   The MAC system presents calls to agents and they are manually approved, but that call may go to a different agent than the one that approved it.

Q.   When you say, "manually approved," what do you mean by that?

A.   An agent has to literally approve every call.

Q.   How does that happen?

A.   The call record is presented to the agent and the agent can review it and then they can approve the call or they can cancel the call.

Q.   I guess I'm asking at a more basic level. Do they click a button that says, "Approve"?

A.   Generally speaking, yes. (Bird Dep. 32:21-34:16)

25.   Bluegreen's Senior Marketing Manager of Vendor relations and Special Projects Sherry Ryan similarly testified:

Q.   Does Bluegreen have an understanding with respect to how the technology—

A.   Yes.

Q.   —that was used by—

A.   I know—

Q.   Yeah. Just, yeah, bear with me. How the technology that was used by Gold Mountain to make the calls that are at issue in this case works?

A.   A minor understanding, yes.

Q.   Okay. What is Bluegreen's understanding?

A.   That's a human initiated click con—clicker contact.

10

Q.   What does that mean?

A.   It's that somebody's actually physically dialing a phone and then connecting it to an agent.

Q.   When you say physically dialing a phone, what do you mean by that?

A.   They're dialing a number and then they connect that to the agent.

Q.   So somebody's sitting there punching the numbers and then when the call is connected, they're connecting it to an agent; is that correct?

A.   Correct.

Q.   Okay. Did you, Ms. Ryan, ever personally observe the process that you've just described to me during any of your visits?

A.   I believe I saw the initiator once in May.

Q.   In May of 2018?

A.   Uh-huh.

Q.   The e-mail communications that we've received indicate that the—well, strike that. Do you know the name of the platform that was used to place the call at issue in the case?

A.   I do.

Q.   Is it TCN?

A.   It is.

Q.   Okay. When did Gold Mountain first start using the TCN platform to make outbound calls on behalf of Bluegreen?

A.   January 2018.

Ryan Dep. 39:6-40:20.

26.   Ryan also testified that Bluegreen required Gold Mountain to use a manual dial platform:

Q.   All right, but as far as Bluegreen knows, pursuant to their—the agreement between the companies, Gold Mountain was supposed to be placing outbound calls using the TCN platform for Bluegreen?

11

A.    Bluegreen requires Gold Mountain to manual—use a manual dial platform—

Q.    Uh-huh.

A.    —in which to dial customers.

Ryan Dep. 42:17-24.

27.    Ryan also testified that Bluegreen understood that Gold Mountain used a manual dialer and human intervention was required for every call made:

Q.    Okay. Do you see there in the second paragraph, last sentence, it says, "The vendor uses a manual dial only system which has no present or potential capacity to autodial, for random or sequential number generation, or for predictive dialing. Human intervention is required on every call made"; do you see that?

A.    Yes.

Q.    Okay. Is that true?

A.    That is our understanding from Gold Mountain.

Q.    That's based on what Gold Mountain told Bluegreen?

A.    Correct.

Q.    Okay. "Human intervention is required on every call made", what does that mean?

MS. NATHAN:    Objection to form.

THE WITNESS:    Am I supposed to say something?

BY MR. HIRALDO:

Q.    Yes. What does human—

A.    It means that a person is dialing the phone and then a different person is actually selling or making the offer to the customer.

Q.    Okay, and when you say a person is dialing the phone, you're saying that—

A.    Manually dialing.

Q.    —somebody is punching in the phone numbers?

12

> A.      Somebody else is manually dialing the phone, yes.

Ryan Dep. 91:17 – 92:17.

28.     Ryan also testified that Bluegreen's marketing agreement with Gold Mountain required the use of "a phone in which they dial manually":

> Q.      "Independent Contractor agrees to make manually dialed outbound telemarketing calls from a manual dialer", and then in parentheses it says, "(as defined by applicable law)." What is a manual dialer?

MS. NATHAN:          Objection to form.

THE WITNESS:        It's that they have to manually dial a phone call.

BY MR. HIRALDO:

> Q.      Okay. Why did Bluegreen use the term manual dialer and not just telephone in this contract?
>
> A.      That would be a question for counsel.
>
> Q.      Do you know what the difference is between a manual dialer and just a regular telephone?
>
> A.      Well, I know what a manual dial is. It means dial manually.
>
> Q.      Okay. I guess what I'm trying to understand is what's -- if the purpose of this was to have Gold Mountain use—well, strike that. As you sit here today, do you know what a manual dialer is as defined in this contract?
>
> A.      It's a manual dial platform. It's a phone in which they dial manually.
>
> Q.      Okay. So is it just a regular telephone?
>
> A.      It's a phone that does not have any auto dial features.

Ryan Dep. 94:11-95:11.

29.     The President of Gold Mountain, Henry Seevers, testified that he had observed that the TCN platform requires a human person to review a record of a name and phone number and then click to dial:

> Q.      Have you personally observed someone using the TCN platform for the placement of an outbound call?
>
> A.      Yes.

13

Q.    Okay. How many times?

A.    I don't know. Maybe a few times.

Q.    You described earlier when describing the LiveVox platform a clicker agent. Do you recall that?

A.    Yes.

Q.    Does the TCN platform have a similar setup where a clicker agent is used?

A.    Yes.

Q.    So in terms of the outbound calls that were being made on behalf of Bluegreen in 2018, describe to me how those calls would occur using a TCN platform.

A.    Okay. The clicker agent station would be presented a record with the customer's name and phone number and any other information provided by Bluegreen and the clicker agent would click approved to dial.

Seevers Dep. 41:11-42:3.

30.    Seevers also testified that Gold Mountain never even discussed a predictive dialing function with TCN, only a manual campaign:

Q.    Does the TCN product that Gold Mountain used in 2018 have a predictive dialing function?

A.    I don't know that for certain. We only talked to TCN about the manual only campaign.

Seevers Dep. 47:22-25.

31.    Seevers testified that Gold Mountain has never used any function other than the human clicking function that he described with the TCN platform:

Q.    Has Gold Mountain ever used any other function besides the clicking function that you described when using the TCN platform?

A.    We have not.

Seevers Dep. 48:1-3.

32.    Seevers testified that Gold Mountain has never used or had access to any form of predictive dialer from TCN:

14

> Q. Has Gold Mountain ever used the TCN standard predictive dialer system for any purpose?
>
> A. We have never.
>
> Q. Does it have access to the TCN standard predictive dialer system in any way?

MR. KEMP-GERSTEL: Objection to form.

THE WITNESS: Not that I'm aware of, no, we do not or did not.

Seevers Dep. 83:23-84:5.

33. Seevers testified that Gold Mountain complied with the Bluegreen marketing agreement that required it to use a manual dialer:

> Q. That states, "Independent contractor shall only contact consumers on Bluegreen lead lists in performing the telemarketing program; exclusively use a manual dialer in all its outbound telephonic contacts with consumers and not engage in any text messaging in connection with this agreement." Do you see that?
>
> A. I do.
>
> Q. Did Gold Mountain comply with its obligations in that paragraph?
>
> A. We did.
>
> Q. And was there any portion of this paragraph that authorized Gold Mountain to use an auto dialer?
>
> A. No.
>
> Q. And did Gold Mountain use an auto dialer to place any calls pursuant to this contract?
>
> A. No.

Seevers Dep. 94:11-95:1.

34. Seevers further testified that under the Bluegreen marketing agreement, Gold Mountain was never authorized to use an autodialer:

> Q. And under subsection 2(a) on the first page 15 of the document it states, "Independent contractor agrees to make manually dialed outbound

telemarketing calls from a manual dialer to consumers on the Bluegreen
lead list, defined below, to make a ChoiceHotel International offer and to
solicit the sale of the Bluegreen's discount vacation packages described on
Schedule 1 annexed hereto." Do you see that?

A.     I do.

Q.     Was Gold Mountain authorized to use an auto dialer pursuant to this
provision of the contract?

A.     No.

Seevers Dep. 93:14-25.

35.     Plaintiff's own Motion for Class Certification, when defining the class that he

wishes the court to certify, even describes the calls at issue as those "placed by Gold Mountain

Communications, LLC on behalf of Defendant using the *TCN 'Manual Dial Only' system*"

(Plaintiff's Motion for Class Certification, p. 2, emphasis added).

36.     Several documents produced by TCN also confirm that the Manual Dial Only

system (of which the Manually Approved Calling System is a subset) is, in fact, a manual dialing

system, that it does not have any number generation capabilities, and that it has no predictive

dialing capabilities. For instance:

    a.     *FccRulesLetterJuly152015.pdf—included as part of TCN's subpoena
response*: This letter, addressed to TCN's customers, states that in

September, 2013, TCN implemented a Manual Dial Only Account

System, with the following specifications: (1) "When using the Manual

Dial Only Account, there is no present or potential capacity to auto-dial.

Customers do not have ability to program auto-dialing because there is no

application program interface (API) or development environment

available to customers for this purpose. Auto-dialing is therefore not a

programmable feature. Customers cannot add new functionality to TCN's

16

Manual Dial Only Account platform at all as an API enabling new functionality is not available. This includes, but is not limited to, the ability to make a manual system an auto dialer."; (2) "When using the Manual Dial Only Account, human intervention is required on every call via either a click or by pressing ten digits."; (3) "When using the Manual Dial Only Account, there is no present or potential capacity for random or sequential number generation."; and (4) "When using the Manual Dial Only Account, there is no present or potential capacity for predictive dialing".

b.   *KB-TCPA-ManualDialOnlySystem-110319-1029-26.pdf—included as part of TCN's subpoena response*. This document describes the Permissions Scheme Separation technique used by TCN that prevents users of its "Manual Dial Only System" from using any features or capabilities of its "Standard Predictive Dialer System." This document also provides screen shots of the "Manual Dial Only System," depicting the "Dial" button that system users must manually click in order to dial each individual telephone number.

c.   *TCPA_Summary_SLICK.pdf—included as part of TCN's subpoena response*. This document provides a TCPA summary, including the following specifications: (1) "There is no present or potential capacity to auto-dial. Customers do not have ability to program auto-dialing because there is no application program interface (API) or development environment available to customers. Auto-dialing is therefore not a

programmable feature. Customers cannot add new functionality to TCN's platform at all as an API enabling new functionality is not available. This includes, but is not limited to, the ability to make a manual system an auto dialer"; (2) "Human intervention is required on every call via either a click or by pressing ten digits."; (3) "There is no present or potential capacity for random or sequential number generation."; and (4) "There is no present or potential capacity for predictive dialing".

**B.** **The TCN Manually Approved Calling System Lacks the Technical Internals Required for Predictive Dialing**

37. Predictive dialing abilities are not sufficient for a system to qualify as an ATDS, but plaintiffs in cases involving disputes about whether a system qualifies as an ATDS often point to predictive dialing features to argue that they qualify as ATDSs. For example, many popular systems with predictive dialing features do not have the capacity to produce numbers to be called using a random or sequential number generator. And many dialers with predictive capabilities also require human intervention.

38. But not only does TCN's Manually Approved Calling System lack the ability to produce numbers to be called using a random or sequential number generator and require human intervention, but it also does not even provide predictive dialing functionality. Indeed, TCN's Chief Technology Officer, Jesse Bird stated the following in his deposition:

> Q.   Is the manual approved calling platform a type of predictive dialing platform?
>
> A.   No.
>
> Q.   Does it combine any aspect of predictive dialing in order to achieve the outbound process that we've been discussing?
>
> A.   No.

18

Bird Dep. 58:12-18.

39.     Based on my experience with various dialing systems, TCN's Manually Approved Calling System possesses none of the technical internals that are required for predictive dialing.

40.     The following definition of predictive dialing appears on techopedia, an independent online IT Education site that is not affiliated with any specific dialing vendors: "Predictive callers are programmed to predict when human callers can pick up calls by measuring the number of available agents, lines, average handle time and certain other factors to adjust the outbound calls. They use statistical algorithms to reduce the time that agents spend waiting between conversations, also reducing the occurrence of someone answering when no agents are available."[4]

41.     One of the key characteristics of predictive dialing is the use of *call pacing*, a technique that dynamically adjusts the speed and frequency at which calls are placed, based on a number of factors including agent availability, the number of available telephone lines, the length of each phone conversation. The TCN Manually Approved Calling System provides none of this functionality: there is no automated call pacing—the speed and cadence of placing calls is based solely on the clicking action used by the clicker agent as each number is manually dialed; there is no feature that can be used to predict when agents are available—agents simply receive calls from the TCN dialer once they are answered, without any prediction of when they will be available. Instead, with the TCN Manually Approved Calling System, the dialing speed is completely controlled by the clicker agents, as they manually select each number to dial. The absence of predictive functionality in the TCN Manually Approved Calling System has been

_____

[4] See *Definition – What does Predictive Dialer mean?*, at https://www.techopedia.com/definition/4328/predictive-dialer (last visited 5/23/2019)

confirmed by my review of TCN's product documentation, as well as the testimony of TCN's Chief Technology Officer, Jesse Bird.

42.     When questioned about the Manually Approved Calling System's capability to pace the timing of calls – in ways similar to those used in predictive dialing - TCN's Bird testified:

> Q.     Does the MAC system have the capacity to pace the timing of calls based on the availability of the agents, the average list of calls or any other way?
>
> A.     The MAC system only generates calls when agents click them.
>
> Q.     So the answer to that would be no?
>
> A.     No. I mean, not -- so it paces in that it provides a queue for the agents to approve. It does not control how quickly or slowly the agents approve those calls. (Bird Dep. 111:23 – 112:7)

**C.     The TCN System's Manual Limits Are Consistent with the Call Volume in the Discovery Record**

43.     Plaintiff implies that TCN's Manual Dial Only System has the characteristics of an ATDS, apparently based on the volume of calls processed through Gold Mountain's call center.

44.     Plaintiff questioned Gold Mountain's Seevers regarding the volume of calls that were processed by Gold Mountain's call center, implying that somehow Gold Mountain's staff could not have handled that volume, and that some level of automation must have been present:

> Q.     Based on the call log that we've been provided, we analyzed a week in December of 2018 and came up with an average of about 17,321 total outbound calls per day. Does that sound accurate to you?
>
> A.     I can't say if it sounds accurate. It sounds possible.
>
> Q.     So it's possible that in December of 2018, on average 17,000 plus calls were being made per day; is that correct?
>
> A.     That's possible, yes.
>
> Q.     Okay. And that was being done by approximately 60 agents?

A.     Approximately, yes.

Q.     That was being done by 60 agents during a ten- to 11-hour workday; is that correct?

A.     Yes.

Q.     Do you know roughly how many calls that works out to per agent per day, I'm sorry, per shift?

A.     No, I don't. I could do the math but, no.

Q.     Do you know—do you have any idea of on average how many outbound calls each of these agents were placing per day?

A.     Uh, no, I don't.

Q.     Is there any record of that number of outbound calls that was occurring during that time frame?

A.     Yes, I'm sure there is.

Seevers Dep. 39:14-40:15.

45.     Seevers later testified as follows about the staffing of each shift:

Q.     All right. Mr. Seever, the shifts, I may not -- I think I'm unclear on this. The two six-and-a-half-hour shifts, six- or six-and-a-half-hour shifts, how many agents were working per shift?

A.     Again, estimated maybe as many as 40 on the early shift and 20 or 25 on the afternoon shift.

Seevers Dep. 40:25-41:5.

46.     A key question seems to be whether Gold Mountain's staff could have processed over 17,000 calls in a single day without automated dialing.

47.     From the Seevers testimony, Gold Mountain operated two shifts of 6 1/2 hours per shift, per day, with approximately 40 agents on the early shift, and 20-25 agents on the second shift.

48.     Plaintiff's counsel represented that over 17,000 calls per day were placed during a given week in December, 2018. In fact, on December 11, 2018—the date that Plaintiff received

his alleged call—there were 18,915 calls reported in the Clicker Records. Even with only one available clicker agent, over a period of 13 hours across both shifts, it would require clicking on 1,455 calls per hour. That corresponds to manually clicking just over 24 calls per minute, or roughly one call every 2.5 seconds—a feat that seems to be inarguably attainable.

49.     The next issue would be whether Gold Mountain's agents had the available bandwidth to handle all the calls for that day. Keep in mind that the 18,915 calls reported on 12/11/2018 represent the total calls that were clicked and dialed—not the calls that were presented to Gold Mountain's agents for processing.

50.     Out of the 18,915 calls that were clicked and dialed, 3,110 of those calls had a Result value of "Answered Linkcall"—indicating the calls that TCN analyzed as answered, and transferred to a live Gold Mountain agent for processing. The remaining calls included Result values of "Answered Hangup", "Answered Linkcall Abandoned", "Failed Refused", "Busy", "Invalid", "No Answer", or "Machine Hangup" – none of which included calls that were completed, or calls that would be transferred to a Gold Mountain agent. It was also confirmed in the Bird deposition testimony that only calls with a result value of "Answered Linkcall" should be transferred to an agent for handling.

51.     The 3,110 calls that were transferred to a Gold Mountain agent average out to 260 calls per hour, using a conservative estimate of 12 productive hours in a workday. With 60 agents on first shift, and 20-25 agents on second shift, the average coverage over the course of the day was at least 40 agents. For 40 agents to cover 260 calls per hour, each agent would need to handle 6.5 calls per hour.

52.     And if 6.5 calls per hour (or more than nine minutes per call) seems like too much of a load for Gold Mountain's agents to handle, it should be noted that roughly 80 percent of all

calls are recorded with a Disposition of "No Sale – Not Interested", indicating that at least 4 out of 5 calls did not require discussion of the entire marketing script.

53.     Clearly, based on the volumes explained here, there would have been no need for any automated dialing for Gold Mountain to handle the volume of calls that was reported.

### D.     A Live Demonstration of TCN's Dialing Platform Confirmed All of the Manual Characteristics that have Been Discussed

54.     On May 29, 2019, I participated in a live demonstration of TCN's dialing platform, performed by TCN's Chief Technology Officer Jesse Bird. During that demonstration, Mr. Bird walked through sample dialing processes, and I was able to view his operation of various TCN screens that were required to set up and initiate, and complete various calling campaigns. The calling campaigns that were demonstrated included the Manually Approved Calling System, in which an approval agent (aka *clicker agent*) is presented with a telephone number along with related customer data, manually reviews the telephone number and related data, and then chooses to call or skip that number by manually pressing an *approve* or *reject* button. If *approve* was selected, the number is dialed, and when the TCN system determines that the call was answered, it is transferred to another agent who takes the call and handles it accordingly.

55.     It is my understanding, based on explanations from Mr. Bird, as well as evidence discussed earlier, that the calls at issue in this case were placed using the Manually Approved Calling System.

56.     By observing the sample dialing processes of the Manually Approved Calling System in the demonstration, I was able to confirm the following points that have been discussed regarding the dialing system used to place the calls at issue in this case:

A.      The Manually Approved Calling System is equipment that does not have the capacity to produce telephone numbers to be called, using a random or sequential number generator, to store such numbers, or to dial such numbers. During the demonstration, it was shown that the only telephone numbers that could be dialed using this system were those that were either manually entered into a calling list, or provided within a calling list that had been uploaded into the system. There was no evidence of the system's capability to generate random or sequential lists of numbers to be dialed.

B.      As each telephone number was presented to the approval agent, the Manually Approved Calling System required the *approve* button to be pressed to place a call, or the *reject* button to reject dialing of the current number.

C.      As the approval agent chose *approve* or *reject* for each telephone number presented, the next number from the customer's calling list was presented for the agent to review. The agent's action of reviewing the current number, and clicking the *approve/reject* button for each number represents the manual pacing of the calls placed in the dialing campaign. This manual pacing in no way resembles the programmed, algorithmic pacing used in predictive dialing, which determines the speed and frequency that calls are dialed, based on the prediction of agent availability.

D.      Several required manual actions were observed, including: creating or uploading calling lists; initiating the calling campaign; selecting the *approve* button for each call to be placed; or selecting the *reject* button for each call to be rejected.

24

**E.     Classifying the TCN Manually Approved Calling System as an ATDS Would Make all Modern Smartphones ATDSs**

57.     Any interpretation that characterizes the TCN Manually Approved Calling System as an ATDS would make all modern smartphones ATDSs.

58.     During the early 1980s, "brick" cell phone models were just emerging on the marketplace and could do no more than place and receive calls, with talk times limited to 30 minutes or less and price tags as high as four thousand dollars.[5] Also during the 1980s, one of the world's most powerful computers was the Cray-2 Supercomputer. The Cray-2 could perform an estimated 1.9 Gigaflops of processing, and cost approximately $16 million.[6] The Cray-2 also occupied sixteen square feet of floor space, plus room for cooling equipment, power generators and other equipment.[7] By comparison, the Samsung Galaxy S6, already since upgraded several times to newer models, can perform an estimated 34.8 Gigaflops of processing,[8] sold new for a few hundred dollars, and occupies approximately fifteen square inches of desk space. Of course, today's smartphones have features that were barely a blip on the radar in the age of 1980s computers and cell phones, including high-definition photography and video, wireless uploading and downloading of a myriad of data content, GPS-based applications such as navigation, access to email—the list goes on. And, it is currently estimated that there are well over 200 million smartphone users in the U.S.[9]

---

[5] Looking back on 40 years of the cell phone at https://newatlas.com/mobile-phone-40-year-anniversary-photos/25677/ last visited May 29, 2018.

[6] *Supercomputer vs. your computer in bang-for-buck battle* at https://www.theregister.co.uk/2012/03/08/supercomputing_vs_home_usage/ last visited Mar. 1, 2019.

[7] The Cray-2 Series of Computer Systems at http://www.craysupercomputers.com/downloads/Cray2/Cray2_Brochure001.pdf last visited Mar. 1, 2019.

[8] *Processing Power Compared* at https://pages.experts-exchange.com/processing-power-compared last visited Mar. 1, 2019.

[9] Number of smartphone users in the United States from 2010 to 2022 at https://www.statista.com/statistics/201182/forecast-of-smartphone-users-in-the-us/ last visited Mar. 1, 2019.

59.    If Plaintiff's contention—that the calls at issue were placed by an ATDS—is accepted, then the same argument would sweep all modern smartphones under the category of an ATDS.

60.    The TCN Manually Approved Calling System requires a human to view each individual telephone number, and click a "Call" icon/button to place each call. This manual dialing method is identical to the method used by hundreds of millions of smartphone users in the U.S. each day, in order to place billions of wireless calls.

61.    A smartphone user routinely views a list of telephone numbers, which are collected as *recent* inbound or outbound calls, in his or her call log. With a simple touch of an entry in the call log, the Android smartphone user can view the contact information, and click the call icon to place a call—just as Gold Mountain's clicker agent clicked a "Call" button for each call placed in Defendant's campaign. And if it is argued that the Android user's calling requires two clicks, Android provides a "Swipe to call feature" (which is enabled by default) that allows the Android user to view a list of telephone numbers or contact data, and call that number by simply swiping their finger across the entry – performing the same single selection of the "Call" button used by one of Gold Mountain's clicker agents.

62.    Similarly, iPhone users can view a list of telephone numbers or contact data on their "Recents" call log. By tapping the info icon on the right side of an entry, the details of the call can be displayed. Or by simply tapping the telephone number itself, the iPhone users can place a call to that number—in the same manner that the Gold Mountain clicker agent views a telephone number and clicks a "Call" button to manually place a call.

63.    And when discussing the possibility of including smartphones under the ATDS umbrella, the *ACA International v. FCC* Decision stated that "Those sorts of anomalous

26

outcomes are bottomed in an unreasonable, and impermissible, interpretation of the statute's reach. The TCPA cannot reasonably be read to render every smartphone an ATDS subject to the Act's restrictions, such that every smartphone user violates federal law whenever she makes a call or sends a text message without advance consent." (885 F.3d 687).

## II.    Documents Produced in the Litigation Cannot Be Used to Reliably Identify Call Recipients

64.    There are three major files at play in this case:

a.    *Choice Lead Files*: The "Choice Lead Files" are records of telephone numbers and associated names and addresses of Choice customers that were provided to Bluegreen. The data from these files, including the telephone numbers, was transmitted to Bluegreen and, in turn, Gold Mountain, to place the alleged calls here.

b.    *Clicker Records*: These are records of the calls attempted by the TCN Manually Approved Calling System for Gold Mountain's marketing campaign. The Clicker Records include the telephone number dialed and the result of the attempted call produced by TCN, but no other lead information.

c.    *Disposition Record*: These are a subset of the Clicker Records, and include those calls deemed answered by TCN and passed to a live Gold Mountain agent for processing. The Disposition Records include the telephone number dialed, and the disposition of the call as recorded by the human agent. Plaintiff has selected a subset of the Disposition Records to define his proposed class.

### A.    The Choice Lead Files

27

65.     The Choice Lead files are inaccurate, incomplete, and cannot be used to reliably identify call recipients for two principal reasons: first, many have no lead data; and, second, many may be staledated.

66.     Gold Mountain produced Choice Lead files as contacts used in the calls it placed regarding Bluegreen. The calls that Plaintiff has included in his proposed class were made to the leads for the "GMT_CHOICE_CPWireless_WinBack_manual" Choice Lead file prefix, which consist of 11 files and a total of 81,092 lead records.

67.     Plaintiff's proposed class is comprised 24,969 call records ("24,969 call records"), which is a subset of the Disposition Records. Plaintiff chose this subset of records based on a specific set of telephone numbers—those that appeared as leads in the "GMT_CHOICE_CPWireless_WinBack_manual" files, which were all designated as part of the "Choice Inact CP Wireless" campaign. This set of lead files, and its associated campaign, included Plaintiff's lead record.

### 1.     Missing Lead Data

68.     When I compared the telephone numbers that appear in Plaintiff's proposed class of 24,969 call records with the Choice Lead files, there are more than 2,600—or roughly 10.5 percent—of Plaintiff's 24,969 call records that have no matching lead name or address for the telephone number called.

69.     The table below provides just a few examples of calls found in Plaintiff's 24,969 call records, to telephone numbers for which no lead data exists:

28

| Phone Number | CEH Campaign Name | CEH AM ID | CEH Unique Record ID | Call Date | Disposition |
|---|---|---|---|---|---|
| 3168825662 | Choice Inact CP Wireless | 36460962 | 49221498 | 10/18/2018 | Not Qualified - Age |
| 3168825662 | Choice Inact CP Wireless | 36460962 | 49221498 | 10/19/2019 | Not Qualified – Age |
| | | | | | |
| 4102185721 | Choice Inact CP Wireless | 37240869 | 49223540 | 10/18/2018 | No Answer |
| | | | | | |
| 3148535534 | Choice Inact CP Wireless | 37247978 | 49223772 | 10/26/2018 | Not Qualified - Income |

70.     For each of the sample telephone numbers above, I performed searches of TransUnion's database. Those search results returned several potential names and addresses, but none of the names returned by TransUnion are found in the Choice Hotels lead files, regardless of telephone number.

### 2.     Staledated Lead Data

71.     I understand that Choice provided leads to Bluegreen, and that Bluegreen provided the Choice Leads to Gold Mountain. I also understand the Choice Leads originate with Choice Hotels Privileges program, which has been in place since 1998, and that the lead information relating to customer's phone numbers and other contact information is supplied and maintained by those Choice Privilege members. I also understand that if any of those Choice Privileges members were to stay in a Choice Hotel without updating any outdated phone numbers or other contact information, it would cause that outdated information to be transmitted in the Choice Lead files to Bluegreen. Some unknown part of the phone numbers and contact information in the Choice Lead files may therefore be staledated.

72.     As described above, the Choice lead data is supplied and maintained by Choice's loyalty members, and can date back as far as 20 years ago. This introduces the likelihood that the customer data in those lead files was originally entered as inaccurate or incomplete, has been updated over time with such flaws, or has become stale over time due to lack of updates to reflect changes to customer names and addresses.

29

73.     One such example of incomplete customer information is found in Plaintiff's proposed class of 24,969 call records. After eliminating the 2,600+ records described above with missing leads, and eliminating duplicate records, there are 20,774 distinct Choice lead records that match Plaintiff's class. Within these 20,774 lead records, 3,235 leads—nearly 16%—have an address of 'UNKNOWN'. But is unclear why they have unknown addresses.

74.     The missing lead records to which calls were allegedly placed, and the incomplete and stale nature of the remaining lead records provides a preview to the challenges that will have to be overcome in order to accurately identify potential class members.

**B.      Clicker Records**

75.     Clicker Records produced by the TCN dialing system, and Disposition Records produced through Gold Mountain's agents cannot provide an accurate representation of the calls placed during Defendant's marketing campaign.

76.     The raw call data from TCN's dialer was produced by Gold Mountain in a folder titled "HCI Reports Sent to Bluegreen." The HCI term used in the folder name generally refers to *Human Call Initiator*, when used in reference to dialing systems.

77.     Each of the files in this folder begins with the prefix "CLKR," for "Clicker Records." As explained above, ¶ 64.b, the Clicker Records are the records that the TCN dialer produces each time a clicker agent manually clicks on a telephone number, in order to have the TCN system dial that individual telephone number. Each of the Clicker Records includes the telephone number dialed, the CH campaign name, two identifier fields that were provided as part of the CH lead file, the call date, and a result field. The result field contains a unique status result of each call, and differentiates (at a high level), calls that were answered by the calling party and transferred to a Gold Mountain agent, versus calls that were not completed or disconnected by the dialing system and never transferred to a Gold Mountain agent.

78.     The Clicker Records include the telephone number dialed and a result value for the attempted call but no names or contact information.

### C.     Disposition Records

#### 1.     Source of the Disposition Records and Values

79.     The Gold Mountain subpoena produced 64 "Disposition" files under a folder titled "Disposition Reports Sent to Bluegreen." These records are intended to represent calls that were placed and subsequently connected to one of Gold Mountain's agents for processing. The records in the Disposition Records have the same data columns as the Clicker Records, with the exception that each Disposition Record carries a Disposition column, in place of the Result column that appears in the Clicker Records.

80.     The Disposition column provides the status of the Gold Mountain agent's interaction with the called party—identifying if a sale was made, if the called party did not qualify for the campaign, if the called party scheduled a callback, etc. The critical difference is that the disposition values in the Disposition Record have been manually generated by a Gold Mountain agent—based on the results of their attempted phone call with the called party, while the Result value in the Clicker Records is automatically generated by the TCN Manually Approved Calling System—based on TCN's mechanized interpretation of the call feedback that is detected on the line. Within these files are 24,969 call records with the campaign designation of "Choice Inact CP Wireless," which comprise plaintiff's class of alleged call violations.[10]

81.     Although Plaintiff proposes a class that includes "connected" calls, the 24,969 call records must be analyzed to determine, if possible, which of the alleged calls were actually connected. At first glance, there are numerous values in the Disposition column that appear to

---

[10] Motion for Class Certification p. 6

represent calls that were never connected. For example, there are thousands of calls with Dispositions of "No Answer" that represent calls that were never actually connected. There are also thousands of calls with Dispositions of "Voicemail" that could possibly represent calls that were connected, but should never have been transferred to an agent for handling. These calls would potentially require manual investigation—to determine whether individual calls were properly routed and connected.

### 2.   Conflicts between Clicker Records' Results Values and Disposition Records' Disposition Values

82.     Perhaps the most glaring problems with the Plaintiff's proposed call data are conflicts between the Clicker Records' result values (automatically provided by TCN's dialing system) and the Disposition Records' disposition values (manually provided by Gold Mountain's agents) for the same call records.

83.     I was able to load Plaintiff's 24,969 Disposition records into a Microsoft SQL database, and merge each of those records with the corresponding call record from TCN's Clicker Records. This produced a set of 24,969 call records that include both Disposition and Result values with result/disposition combinations.

84.     Some of the result/disposition combinations provide conflicting evidence, resulting in the inability to determine if a call was actually connected. For example, according to the Clicker Records from TCN, the only calls that should have been transferred to a Gold Mountain agent, and thus the only calls that should appear in Plaintiff's 24,969 Disposition Records, are those with a Clicker Record result value of "Answered Linkcall," which indicates that the TCN dialing system detected that a live person answered the call and that call was transferred to a Gold Mountain agent. But there are result/disposition combinations in my

merged call records data showing that some calls resulted in Disposition Records when the Clicker Record result was something other than "Answered Linkcall."

85.    In the following table of examples, telephone number 304-614-4925 was reported with the Clicker Record result value of "Failed Refused," indicating that the call was not connected by the TCN Manually Approved Calling System, and that no call should have been transferred to a Gold Mountain agent. But a corresponding call is found in the Disposition file for this call, indicating that the call was transferred to a Gold Mountain agent, and that agent recorded a disposition value of "No Sale-Not Interested."

86.    The second row displays telephone number 509-391-0706 with a Clicker Record result value of "Busy"—clearly indicating that a call should not have been connected. But the Disposition Record includes a disposition value of "No Sale-Not Interested," indicating that a Gold Mountain agent received the call, apparently spoke with a party, was unable to make a sale, and recorded the noted disposition.

87.    The third example shows telephone number 813-713-2108 with a Clicker Record result value of "No Answer," again clearly indicating that a call should not have been connected. But once again, the Disposition Record disposition value of "No Sale-Not Interested" indicates that a Gold Mountain agent received the call, apparently spoke with a party, was unable to make a sale, and recorded the noted disposition.

88.    And the fourth example, with telephone number 231-343-6911, reports a Clicker Record result value of "Machine Hangup"—indicating that the TCN Manually Approved Calling System detected an answering machine, and disconnected the call without transferring it to an agent. But the Disposition Record disposition value of "No Sale-Not Interested" indicates that a

Gold Mountain agent received the call, apparently spoke with a party, was unable to make a sale, and recorded the noted disposition.

| Phone | Campaign | AM ID | Unique Rec ID | Call Date | Result | Disposition |
|-------|----------|-------|---------------|-----------|--------|-------------|
| 3046144925 | Choice Inact CP Wireless | 12707828 | 49216857 | 10/29/2018 | Failed Refused | No Sale - Not Interested |
| 5093910706 | Choice Inact CP Wireless | 36920101 | 49222233 | 10/25/2018 | Busy | No Sale - Not Interested |
| 8137132108 | Choice Inact CP Wireless | 20760089 | 49217529 | 10/29/2018 | No Answer | No Sale - Not Interested |
| 2313436911 | Choice Inact CP Wireless | 37258614 | 49224078 | 10/25/2018 | Machine Hangup | No Sale - Not Interested |

89.     In these and other example call records, it is unclear whether any of the following occurred: (1) the TCN Manually Approved Calling System recorded an incorrect result value; (2) the TCN Manually Approved Calling System incorrectly transferred the subject call to a Gold Mountain agent; (3) a Gold Mountain agent was able to access a call record that should not have been transferred; or (4) a Gold Mountain agent recorded an incorrect disposition value on a transferred Disposition Record.

### 3.     Barriers to Resolving these Conflicts on a Class-Wide Basis

90.     These possible scenarios mean that, at a minimum, a subset of Plaintiff's 24,969 call records must be manually analyzed, including review of associated call recording (if available) to determine whether or not completed calls were made for the subject records. It is also my experience that call recordings are often difficult or impossible to analyze with definitive results, due to poor sound quality or incomplete recordings, and that even a manual investigation and analysis may not provide an objective outcome as to the question of whether or not a given call was completed.

91.     The inadequacy of call recordings and available evidence to determine whether or not completed calls were made is illustrated in the subject case by the call recording to Plaintiff's

telephone number. That recording, which was supplied as part of Gold Mountain's subpoena production, lasts nine seconds, and the only voice that can be heard on the recording is that of Gold Mountain's agent. There is no evidence on the recording that the agent spoke with Plaintiff, there is no audio of Plaintiff speaking, and it is not even clear from the recording whether a call was actually completed.

92.     And further evidence exists that even a manual investigation of call history can be inconclusive, based on Plaintiff's deposition testimony ("Wijesinha Deposition") regarding the call. At one point, after hearing the recording that included only the Gold Mountain agent's voice, Plaintiff agreed that the recording sounded correct:

> (Recording played) Choice Hotels from Bluegreen Vacations on a recorded line. How are you doing today?
>
> Hi. Good morning, Shehan. This is Jamie Lowery, calling on behalf of Choice Hotels from Bluegreen Vacations on a recorded line. How are you doing today?

**BY MS. NATHAN:**

> Q.     **Does that recording reflect your recollection of the phone call that you received?**
>
> A.     **It sounds about right.**

Wijesinha Dep. 18:8-18.

93.     But Plaintiff was also confused about the content of the call, later relaying that he thought there might have been more to the conversation, and also that he may have hung up after hearing the agent's introduction:

> Q.     But nowhere on the actual recording do they 15 mention that they were selling timeshares; is that correct?
>
> A.     I don't know if she proceeded from that point, but based on what she said there she did not, but I believe the conversation was a little bit longer than that, but I'm not sure.
>
> Q.     Did you hear yourself respond to the lady on the phone at all?

A.   No.

Q.   Do you believe it's possible you just hung up the phone and said nothing to the woman?

A.   It's very possible.

Wijesinha Dep. 19:14 – 20:1.

94.    The existence of call records with conflicting Clicker Record result values and Disposition Record disposition values makes both suspect as to their accuracy. Even for calls that do not have conflicting result/disposition combinations and appear to otherwise be normal, the TCN Manually Approved Calling System could be producing invalid Clicker Record result values; the Gold Mountain agents could be producing Disposition Records with invalid disposition values; or both. For example, if a given call's Call Record indicates a result value of "Answered Linkcall," and a Disposition Record indicates a disposition value of "No Sale - Not Interested" (which represents the status of more than 92% of Plaintiff's proposed class), the discrepancies identified above raise the prospect that the process that generated those results are fundamentally flawed and unreliable.

### 4.    Additional Conflicts between the Clicker Records and Disposition Records

95.    Additional data analysis reveals that there are some call records in TCN's Clicker Records that should have been passed to Gold Mountain agents and recorded in Gold Mountain's Disposition file, but do not exist there. For example, telephone number 305-790-5546 appears in the Clicker Records, and is identified as part of the "Choice Inact CP Wireless" campaign. The Clicker Record reports that it was called on 1/23/2019, with a result value of "Answered Linkcall," indicating that the call should have been transferred to a Gold Mountain agent, and have a corresponding record in Plaintiff's file of 24,969 call records from the Choice Lead Files. However, there is no call record and no corresponding Disposition found in Plaintiff's file for

305-790-5546—indicating that Plaintiff's class of call records may also be under-inclusive, and further questioning the accuracy of TCN's Clicker Records, Gold Mountain's Disposition Records, or both.

96.     And the suspect nature of the TCN's Clicker Records and Gold Mountain's Disposition Records is further confirmed by analysis that I performed comparing the overall call records produced in response to the Gold Mountain Subpoena, which included all calling campaigns, beyond the "Choice CP Inact Wireless" campaign in which Plaintiff Wijesinha was included. When comparing the Call Record result values to the Disposition Record disposition values for call records from all campaigns, I found evidence of conflicting result/disposition combinations for tens of thousands of call records.

### 5.     Duplicate records

97.     Plaintiff's class of 24,969 call records also contains thousands of instances of duplicate records. For example, telephone number 201-492-7771 appears twice in Plaintiff's file, with the exact same values for all data fields: the same campaign name, the same ID values, the same date of 12/26/2018, and the same disposition value of "No Sale–Not Interested." Duplicate records also exist for telephone number 980-322-5258 called on 12/26/2018 with a disposition value of "No Sale–Not  Interested"; telephone number 972-567-7367 called on 12/26/2018 with a disposition value of "Not Qualified–Income"; telephone number 972-750-1612 called on 12/28/2018 with a disposition value of "No Answer"; telephone number 956-483-0425 called on 12/26/2018 with a disposition value of "Wrong Number"; and the list goes on. And without any additional identifying data, such as a call time, there is no way to determine if these records represent multiple distinct calls, or a single call that's has been recorded in duplicate. Many of the examples, such as those above with a Disposition of "No Sale–Not Interested", "Wrong Number", or "Not Qualified-Income" would not seem to support the idea that multiple calls were

placed resulting in duplicate dispositions. For example, a call resulting in a "Wrong Number" disposition value would not logically be followed by another call to the same number. Neither would a call that resulted in a Disposition of "Not Qualified–Income" warrant another call to that same number. With the current data as produced by Gold Mountain, Plaintiff's 24,969 call records are grossly overstated due to these duplicates, and further questions the validity of the call records.

### III.   Barriers to Identifying Historical Users or Subscribers

98.     For at least the 10.5 percent of Plaintiff's proposed class for which the Choice Lead files contain no matching lead name or address, it would then be necessary to accurately identify the users or subscribers associated with those numbers at the time of the alleged calls. This is an even more challenging task.

99.     Some cell phone accounts may have only one subscriber, who is also the sole user, but several other possibilities exist. For example, the subscriber may not be a user of the cell number at all, and there may be multiple authorized users of the number and one or more of the authorized users may not be the subscriber. This often occurs in the context of business plans (where a corporation or entity is the subscriber of a number with one or more different users) or family plans (where a single family member is the subscriber of an account with several different numbers used by other family members). Given these and other issues, as well as the lack of a single publicly-available database, directory, or other source to accurately identify historic subscribers and users of cell phone numbers as of particular historic dates, it is my opinion that any attempt to accurately and reliably determine the historic subscriber of a given cell phone number as of the date of a particular call will require obtaining and analyzing records and information from third-party sources, including, among other sources, cell phone providers and subscribers. Those sources will, in my opinion, vary from number to number, depending on

various factors such as the date of the call and the cell phone carrier for the number at issue. For similar reasons, it is also my opinion that the historic users or subscribers of particular cell phone numbers as of a particular date cannot be accurately and reliably identified without obtaining information from, among other sources, the subscribers or users themselves.

**A.      TransUnion**

100.    It has previously been discussed that there are significant shortcomings with the data in the lead files that were used to place the alleged calls by Gold Mountain. For example, in paragraph 68 above, it was described that more than 2,600—or roughly 10.5 %—of Plaintiff's 24,969 call records have no matching lead for the telephone number called. It was also described in paragraphs 72-73 above, that the Choice lead data is prone to being incomplete and inaccurate, such as the 16% rate of unknown addresses that were found. The lead data from Choice Hotels would thus be insufficient to accurately identify all subscribers to whom the alleged calls were placed.

101.    Plaintiff may propose that other vendors who provide skip-tracing services, such as LexisNexis, TransUnion or others, may be used to augment the data in the lead files, by providing additional identification of subscribers associated with the telephone numbers at issue. It has already been described at length that there are significant issues with using such data vendors, due to their inherent inaccuracies, their lack of being able to identify associated subscribers at specific historic dates of calls, their inability to identify authorized users associated with telephone numbers, and the proprietary nature of their data sources and techniques used for identification.

102.    It is also apparent that using an alternate data vendor, such as LexisNexis or TransUnion, in conjunction with the data provided in the Choice Hotels lead files will introduce additional conflicts and questions as to the proper and correct ownership of any given telephone

number at any given historic dates of calls. If another data vendor provides a name associated with a telephone number that is different than the name specified in the Choice Hotels lead file, that discrepancy must be resolved, and would again introduce the need for individualized investigation.

103.    For example, as already described, I was able to compare Plaintiff's 24,969 call records with the Choice Hotel lead records. After eliminating all of the duplicate call records, there were 20,770 call records from Plaintiff's list that had matching leads in the Choice Hotels lead files.

104.    The telephone numbers for those 20,770 call records were submitted to TransUnion for a batch append process. The TransUnion batch append identifies up to five names and addresses for each telephone number, as well as a date range associated with each name/address combination. The data returned from the TransUnion batch append revealed that there were more than 6,500 name and address combinations returned from TransUnion that did not match the name and address in the Choice lead files for the telephone number and its associated call date—*a discrepancy between the two data sources of more than 31 percent.*

105.    In this example, telephone number 951-970-9031 appears in Plaintiff's proposed class of 24,969 call records, with a call date of 12/6/2018. When combined with the lead record from Choice Hotels for the given number, the following subscriber information results:

| Number | First | Last | Address | City | ST | Call Date |
|---|---|---|---|---|---|---|
| 9519709031 | Kenneth | ***** | 30090 ***** | Temecula | CA | 12/6/2018 |

TransUnion returned a single name associated with 951-970-9031, with a date range that covers the timeframe of the call to that number. The TransUnion name and address bear no similarity at all to the name and address from the Choice lead data:

| Number | First | Last | Address | City | ST | FirstSeen | LastSeen |
|---|---|---|---|---|---|---|---|
| 9519709031 | D**** | M***** | 12** **** *** | San Angelo | TX | 1/31/2015 | 5/14/2019 |

106.    The TransUnion process also returned more than 1300 telephone numbers (6.3 percent of the total numbers provided) with no associated names or addresses–indicating that, at a minimum, some combination of the TransUnion data and the Choice Hotels lead information would have to be used.

107.    Another trait of TransUnion's identification data is that, for telephone numbers with multiple names there are overlapping date ranges, indicating that multiple potential subscribers are associated with the same telephone number at the same date. This issue makes these records effectively unusable, because there is no other data or indication of the correct subscriber. From the data returned from TransUnion for Plaintiff's call records, there are more than 13,000 records with at least two names returned. Out of these records, more than 7,300 of the records report different last names. And within those records with different last names, nearly 1,200 have overlapping dates. And additional analysis would surely reveal more overlapping dates, since there are some 1,500 records with all five names, 1,800 records with four names, and 3,500 records with three names. The mere existence of these additional 7,000 telephone numbers with three, four or five names means that there is the potential for thousands of additional conflicting date scenarios.

108.    In this example, telephone number 757-277-8231 appears in Plaintiff's proposed class of 24,969 call records, with a call date of 10/30/2018. When combined with the lead record from Choice Hotels for the given number, the following subscriber information results:

| Number | First | Last | Address | City | ST | Call Date |
|---|---|---|---|---|---|---|
| 7572778231 | Gregory | S***** | 2400 * ***** ** | Wilmington | DE | 10/30/2018 |

41

TransUnion returned two names associated with 757-277-8231, with overlapping dates that both cover the timeframe of the call to that number:

| Number | First | Last | Address | City | ST | FirstSeen | LastSeen |
|---|---|---|---|---|---|---|---|
| 7572778231 | P****** | M**** | 21* ******* *** | Suffolk | VA | 1/31/2010 | 5/14/2019 |
| 7572778231 | I**** | P***** | 4450 ***** | Las Vegas | NV | 1/31/2018 | 5/14/2019 |

109.    It is clear from this example that there are three distinct names associated with telephone number 757-277-8231 at the date of the call, with no apparent connection among them names, and no available data or evidence to assist in discerning which, if any, of the three names was the subscriber or authorized user of the number on 10/30/2018. And further comparison of the TransUnion data results with the Choice Hotels lead information will reveal that hundreds if not thousands of conflicting scenarios exist.

110.    It should be sufficiently clear that there are no reliable resources that would provide an administratively feasible method for identification of users or subscribers, as of the historic date(s) of alleged calls based on a set of phone numbers. And it should also be sufficiently clear that any such exercise would require a detailed, individualized inquiry to produce any reliable results.

**B.    Other Public Identification Services and Skip Tracing**

111.    In my experience, TCPA plaintiffs often suggest they can identify individual cell phone subscribers using public or pay identification services or skip tracing. There are a myriad of publicly available databases that purport to perform reverse phone number lookups and provide subscriber—not user—information like name and address, and there are a number of vendors who provide varying levels of commercial data lookups, usually via Application Program Interfaces ("APIs"). Based on my research and my business and expert experience, it is my opinion that these services cannot reliably and accurately identify historic cell phone subscribers because each service is subject to significant limitations and errors.

A.    These services are data aggregators. As a result, the reliability of these services is entirely dependent on the reliability of their source data. Many free, web-based services do not identify their data sources, and so it is not possible to evaluate their accuracy. Issues such as errors in data entry, number reassignment, and out-of-date data multiply these inaccuracies. Data from public records is typically available only with current values, and without the historical records that would be required to identify a subscriber at a given point in time in the past when alleged messages were sent. This is the case for all publicly available data sources of which I am aware, such as web-based reverse number lookups. As a result, these services cannot assist in identifying historic subscribers.

B.    Commercial databases, such as LexisNexis, that offer paid searches to businesses, advertise historical searches of their public record information. However, those data providers must aggregate that data themselves over time in order to store and produce historical results, leading to inaccuracies. LexisNexis even carries the following disclaimer on its web-site, specifically addressing these limitations: "Due to the nature of the origin of public record information, the public records and commercially available data sources used in reports *may contain errors*. Source data is sometimes reported or *entered inaccurately*, processed poorly or *incorrectly*, and is generally *not free from defect*. This product or service aggregates and reports data, as provided by the public records and commercially available data sources, and is not the source of the data, nor

43

is it a comprehensive compilation of the data. *Before relying on any data, it should be independently verified.*"[11] A partial image of the LexisNexis disclaimer is attached as Exhibit B. Upon deeper inspection of LexisNexis' various web pages, it is evident that they feel the need to provide ample publication of their disclaimer. My recent search of their websites revealed that the LexisNexis accuracy disclaimer appears in some form on more than *thirty-five (35)* different web locations, including services that cover insurance claims, health records, motor vehicle records, compliance data, and most notably—*public records*—and search results indicate that the disclaimer appears on dozens more locations that I did not verify. *See* Exhibit D. LexisNexis even provides a whitepaper offering services to improve the accuracy of their customers' data records — including phone numbers, names and addresses — but includes their standard disclaimer warning that data provided by LexisNexis is prone to errors.[12] It is also quite telling to find the *accuracy disclaimer* on LexisNexis' *Phone Finder* service, which purports to provide customer identity data based on phone number searches.[13] And the accuracy disclaimer that LexisNexis carries on their website is not unique among commercial skip-tracing and public record identification vendors,

---

[11] *See* WorldCompliance Data, LexisNexis (emphasis added), https://risk.lexisnexis.com/products/worldcompliance-data.

[12] *White Paper – A Business Case for Fixing Provider Data Issues*, LexisNexis (2014), available at http://techhubly.com/lexisnexis-resources/files/A%20Business%20Case%20for%20Fixing%20Provider%20Data%20Issues_WPNXR5062-0.pdf.

[13] *Phone* Finder, LexisNexis, https://risk.lexisnexis.com/products/phone-finder.

including well-known vendors such as MicroBilt, Experian and TransUnion. MicroBilt's accuracy disclaimer highlights some of the same pitfalls that LexisNexis and I have both raised: "Public Record Information provided to User from or through MicroBilt is derived solely from public records, which may not be 100 percent (100%) accurate or complete . . . *Public Record Information contained herein should not be used in legal proceedings* . . . Be aware that *Information is obtained and managed by fallible sources* and that for the Fee charged, MicroBilt does not guarantee or insure the accuracy, completeness, timeliness, depth or continuation of Information."[14] Experian and TransUnion also carry their own disclaimers in which they do not warrant the correctness or accuracy of information, products and services.

C.    In past cases, I have analyzed subscriber information by comparing results from LexisNexis against six web-based reverse number services, and a seventh, API-based service. In many cases, the subscriber names returned by these identification services varied significantly — however, in numerous examples, many of the seven search services produced common subscriber results, but *none of the seven services returned the same subscriber name identified by LexisNexis.* These variations are likely the result of differing source data, errors in data entry, variations in historic data, and other issues, but add doubt to the reliability of services such as those provided by LexisNexis.

---

[14] *User Agreement*, MicroBilt (emphasis added),http://www.microbilt.com/user-agreement. A partial image of the MicroBilt disclaimer is attached as Exhibit C.

D.    As an additional test of LexisNexis' accuracy, I recently requested a full file disclosure of *all* information that LexisNexis carries on my personal identity.[15] LexisNexis provided me with a comprehensive 470-page report, dated November 21, 2018. The report included a section titled "Phone Records," with the following description: "This section contains phone listings. The first and last seen dates correspond to the time periods when the source published the record, and *not necessarily to the time period with which you had the phone number.*" The report provided several phone numbers for which I have been the subscriber. However, absent from the report were *any* wireless phone numbers that I have used. The report did not list my current, primary wireless number, for which I've been the sole authorized user since 2005. This primary number is also prominently displayed on my publicly-available business website, and has appeared there for nearly four years.[16] The full file disclosure also did not list a prepaid wireless phone that I have used for the past seven months. For my phone numbers that it did list, each number was listed on multiple records from multiple data sources that included conflicting dates, and many of the dates provided (*first seen* and *last seen* dates) did not match the actual dates that I was the subscriber for those numbers – in some cases  being off by a number of years..

---

[15] *Access Your Full File Disclosure*, LexisNexis, https://personalreports.lexisnexis.com/access_your_full_file_disclosure.jsp.

[16] See archived version of http://jankostyun.com/contact-info/  captured by archive.org on  April 7, 2015, at https://web.archive.org/web/20150407033904/http://jankostyun.com/contact-info/

E.  To further test the accuracy of reverse-lookup services, I recently performed a web-based reverse phone search using my daughter-in-law's cell phone number. I am familiar with her number, and I know she has been the subscriber of the cell phone service to which that number is assigned and that she has been the sole user of that cell phone number for the past 11 years. Several search sites provided no results at all. Using the search site spokeo.com, the phone number was found, and I paid a small fee to receive the report that should have returned my daughter-in-law's name and address. The results of the search instead indicated that the current owner is Duane Darling, and included the names Gerald Darling and Nic Darling as previous owners, all at the same address in Virginia. Duane Darling is not the name of my daughter-in-law or anyone in her immediate family, and she has lived in Connecticut for the past nine years.

I also performed the same search using an API-based service from searchbug.com, and the results indicated Gerald Darling as the owner at the same Virginia address as provided by spokeo.com.

F.  In *Goins v. Walmart and Palmer Recovery Attorneys*—for which I provided an expert rebuttal report in support of the defendants—the plaintiff's expert claimed that she processed the telephone number belonging to the plaintiff, using LexisNexis as her vendor, and that this process identified the number as belonging to Ms. Amber Goins. In reality, when Goins' expert provided Plaintiff Goins' telephone number to LexisNexis, the results that were returned included only the names

47

"LaShante McCall," "Kenia Ayala" and "Lesley Goins." The purported identification by LexisNexis was faulty in many ways: Plaintiff Amber Goins was never identified by LexisNexis as being associated in any way to the subject telephone number; in identifying Lesley Goins' association with the subject phone number, LexisNexis provided no data or indication that connected Lesley Goins to Plaintiff Amber Goins; in identifying Lesley Goins' association with the subject telephone number, LexisNexis did not provide a date range that covered the relevant time period of the call(s) at issue; once Goins' expert received the information from LexisNexis regarding Leslie Goins, she deviated from her documented methodology, and performed a manual, individualized investigation against other data sources in an attempt to connect Amber Goins with Lesley Goins, and therefore connect Amber Goins with the subject telephone number. And when questioned at deposition, Goins' expert even suggested that she might ask the plaintiff's counsel to help determine the relationship between Lesley Goins and Amber Goins. This example clearly shows how the usage of skip-tracing vendors such as LexisNexis to correlate phone numbers to users or subscribers has been unsuccessful, and further exhibits the need for individualized inquiries to provide accurate user identification.

G.   In another prior case for which I was engaged as an expert, the defendant utilized a verification service provided by Neustar that provides

information on the connection between a name and phone number.[17] The defendant provided Neustar with the name of one of the defendant's account holders, along with the phone number that the defendant believed was associated with that account holder. Neustar's verification service returned a result to the defendant that the number was still in service, and that there was a positive match between the phone number and the account holder name that was provided. However, carrier records subsequently revealed that the account holder had actually disconnected that phone number several months before the verification was performed. This example demonstrates that even services provided by a respected telecom vendor such as Neustar can be unreliable.

**C.      Name Directories**

112.    Caller Name ("CNAM") is a service coupled with caller ID that displays a name associated with the calling phone number on the phone receiving the call. Some plaintiffs may assert that the CNAM database is a reliable source for subscriber data. In my opinion, it is not. The CNAM database exists for both landline and cellular phone numbers, but its content (like other public subscriber databases) is quite limited. Major phone carriers do not have incentives for keeping the CNAM database accurate and up-to-date. This is because there is little demand from customers to provide this service, and carrier participation in updating the CNAM database is voluntary and chargeable to the carrier. Furthermore, the CNAM database, like many of the other public data sources, only provides current subscriber information, and there is no known

---

[17] *See Contact Compliance Risk*, Neustar, https://www.risk.neustar/compliance-intelligence/tcpa.

historical version as would be required to identify a subscriber at a given point in time in the past when any of the calls were allegedly placed.

**D.    Reliability of Subscriber Information from Carriers**

**1.    Barriers to Identifying Numbers Assigned to Particular Carriers**

113.    While cell phone carriers are a source of historic subscriber information for a given cell phone number, there were many carriers during the most recent proposed class period from October 9, 2018 through January 28, 2019 as well as in the four years preceding the filing of the FAC in February 2019. Some of those carriers either no longer exist or have been combined with others, and their historic subscriber records (assuming they still exist) do not always accurately identify historical cell phone subscribers. Cell phone carriers have limited capabilities and varying standards for collecting and maintaining information on subscribers. When a customer initially contracts for cell phone service, the carrier's main objective in collecting subscriber identification is for the purposes of collecting payment. This may immediately result in limited or inaccurate customer information being recorded on the subscriber's account. Customers might intentionally provide inaccurate contact information, or subscriber information might be incorrectly recorded via data entry. Since cell phones are not tied to a physical location, there are limitations in verifying that the address provided by the subscriber is accurate. Even if the customer data initially collected and recorded is accurate, changes to that data are common, due to actions like subscribers moving to a new address or changing names, but neglecting to report these to the carrier.

114.    In order to procure accurate, historical subscriber identification from carriers via subpoena, it is necessary to identify which subset of telephone numbers should be sent to each individual carrier for identification. Further, in order to subpoena cell phone carriers in an attempt to identify subscribers as of some prior date, one must first identify the specific cell

50

phone carrier that provided service to the given telephone number at the historical time of alleged calls. While there are resources available to identify the current cell phone carrier for a telephone number or block of numbers, I am not aware of any such services that can accurately identify historical cell phone carriers.

115.    Plaintiff or Plaintiff's expert might propose sending all telephone numbers to all carriers via subpoena, without regard to historical carrier ownership based on the dates of the calls. I find this solution impractical and unreliable for several reasons. Sending thousands of telephone numbers to smaller carriers would prove overly burdensome for them, and could very well result in no data being provided by such carriers. Sending the same fully-inclusive list of numbers to all carriers will also undoubtedly result in conflicting data results, which would be effectively impossible to resolve. For example, if all telephone numbers are sent to all carriers, Verizon and Sprint might both respond with historic customer records for that same telephone number. Those responses might identify different subscribers, or what appears to be the same subscriber with different service dates, different addresses, or variations in other key information. There would be no way, short of performing a manual investigation of all conflicting telephone numbers, to reliably determine which carrier's information (if either) was correct.

116.    Plaintiff, or Plaintiff's expert is likely to be unaware (or unconcerned) that the carrier ownership of numbers can change due to porting. In fact, the ported-number data that can be downloaded by vendors to track changes in wireless status due to number porting does not provide any identification of carrier changes as part of that porting activity. For example, any telephone number identified as a wireless number at the date it was allegedly called, might have been serviced by Verizon Wireless at the time of that call, but incorrectly identified as serviced

by T-Mobile (based on current ownership due to porting) when attempting to generate a subpoena for that number.

117.    The historical carrier ownership of telephone numbers can also change on a larger scale due to Number Pooling. Introduced at the same time as Number Portability, carriers are required to participate in Number Pooling, where large blocks of telephone numbers, usually in multiples of 1000 numbers, are donated from the control of one carrier to another. Similar to the number portability scenario, a telephone number that was owned at some point in the past by Verizon Wireless might now be owned by T-Mobile, due to donation of the block containing that number to T-Mobile from Verizon. Without a resource to identify the historical carrier ownership of numbers, a current lookup of the carrier that owns a telephone number would not accurately identify the correct carrier who owned that number at a given date in the past.

118.    In order to identify historic wireless subscribers, the carrier subpoena process is also hampered by the vast number of wireless carriers and the volatility of carrier ownership of telephone numbers over time.

119.    According to the FCC's Fact Sheet from its Communications Marketplace Report, there are four facilities-based nationwide wireless carriers (AT&T, Sprint, T-Mobile and Verizon Wireless) [18], as well a fifth facilities-based wireless carrier with semi-nationwide coverage (U.S. Cellular). [19] The FCC Fact Sheet also reports that there are dozens of other regional facilities-based wireless carriers. In addition, the FCC also reports that there are virtually countless wireless resellers (also known as Mobile Virtual Network Operators, or MVNOs), as it states that "The Commission is not able to provide an exact figure of the number of MVNOs that currently

---

[18] Facilities-based wireless carriers are those carriers who own and operate their own wireless networks and related equipment.

[19] See *FCC Fact Sheet*, dated November 21, 2018, ¶ 6, available at https://docs.fcc.gov/public/attachments/DOC-355217A1.pdf (last visited 3/26/2019)

offer services" and "Estimates of the number of MVNOs operating in the United States vary considerably. Many MVNOs are privately-held companies that do not publicly report financial or subscriber data."[20] Wikipedia documents that there are more than 60 facilities-based wireless carriers[21] and well over 100 MVNOs[22] – all of whom are potential carriers responsible for the wireless service of telephone numbers to which calls may have been placed.

120.    Plaintiffs may argue that a large percentage of potential class members can be identified by concentrating their subpoenas on the largest wireless carriers, who control a large market share of wireless subscribers. However, many of the lesser-known or even unknown carriers each have significant subscribership that would potentially exclude untold class members if those carriers were ignored. For just a few examples: U.S. Cellular services over 5 million wireless subscribers; Shenandoah Telecommunications (Shentel) and Cellular South (C Spire) each have over one million subscribers; wireless reseller Consumer Cellular has 3 million subscribers[23]; and MetroPCS (now known as Metro by T-Mobile), is estimated to serve 18 million subscribers.[24]

121.    The wireless industry is also infamous for the ever-changing landscape of wireless carriers. A significant number of carriers – particularly resellers and regional carriers,

---

[20] See *FCC Fact Sheet* ¶ 7, footnote 16.

[21] *List of United States wireless communications service providers* at
https://en.wikipedia.org/wiki/List_of_United_States_wireless_communications_service_providers (last visited 3/26/2019)

[22] *List of United States mobile virtual network operators* at
https://en.wikipedia.org/wiki/List_of_United_States_mobile_virtual_network_operators (last visited 3/26/2019)

[23] *Consumer Cellular Commemorates Three Millionth Customer by Gifting Three Million Dollars* at
https://www.einnews.com/pr_news/464481279/consumer-cellular-commemorates-three-millionth-customer-by-gifting-three-million-dollars (last visited 3/26/2019)

[24] *Metro by T-Mobile: Everything you need to know* at https://www.androidauthority.com/metro-by-t-mobile-2-908138/ (last visited 3/25/2019)

close their doors each year, or become the objects of mergers or acquisitions.[25] Based on this high volume of churn, it is likely that many of the wireless numbers that received alleged calls during the relevant time period were owned and serviced by carriers who are no longer in business. Once again, there is no service or database that I am aware of that would allow for the identification of the carrier of record for those numbers at the historical date of alleged calls. And if any of those carriers could be identified, the fact that they are no longer in business would certainly prevent some or all of the requests to identify subscribers from being fulfilled.

122.    Besides the need to identify the correct carrier for given telephone numbers as of historical dates, there are still significant reasons why the subscriber identification provided via subpoena would be highly suspect. It has already been discussed that many wireless carriers who provided service to customers during the relevant period are no longer in business, and as such would be unable to identify any subscriber-related data. Carriers who are still active have their own set of limitations related to providing accurate, historical subscriber information.

### 2.    Carriers' Retention of Records

123.    Retrieving individual customer usage information (*e.g.*, call detail records and audit trails of texts) directly from wireless carriers potentially could assist in the identification of historic subscribers for that number. Through review and analysis of these records on an account-by-account basis, it may be possible to identify subscribers of individual cell phone numbers. This laborious analysis would, however, be incomplete and inaccurate. This is because the retention requirements for such types of records among carriers are much less stringent than for landline carriers, and vary widely in the industry. For example, the U.S. Department of Justice reported that Verizon retains subscriber information for three to five years; T-Mobile for

---

[25] See, for example, *10 years of consolidation in wireless: The rise of Verizon, AT&T, T-Mobile and Sprint* at https://www.fiercewireless.com/special-report/10-years-consolidation-wireless-rise-verizon-at-t-t-mobile-and-sprint

five years; and Sprint, Nextel, and Virgin as an "[u]nlimited" period.[26] For AT&T/Cingular, the DOJ reported that retention duration "[d]epends on length of service."  Additionally, the DOJ reported call detail records are retained for one year by Verizon, five years for T-Mobile post-paid customers, two years for T-Mobile pre-paid customers, as few as five years for AT&T, and 18 to 24 months for Sprint. More recent reports, such as one from the Massachusetts ACLU in 2014, indicate that those retention periods can be even shorter — with Sprint's retention of subscriber data reported as 18 months, and Verizon's retention reported simply as "more than one year."[27] Also with respect to data retention, Verizon's privacy policy states that "Personally identifiable and other sensitive records are retained only as long as reasonably necessary for business, accounting, tax or legal purposes"[28], indicating that subscriber data is essentially stored no longer than is absolutely necessary. Based on these retention periods, most carriers do not retain data long enough to cover records dating back to December 2013.

124.    As expert for the defendants in the case of *Goins v. Walmart and Palmer Recovery Attorneys,* No. 6:17-cv-00654 (M.D. Fla.), I was recently provided with the results of a subpoena issued to wireless carrier MetroPCS. In that subpoena, MetroPCS was asked to identify the subscriber of the named plaintiff's phone number, as well as any communication or documentation concerning named plaintiff Amber Goins during the relevant time period, January 1, 2017 through December 31, 2017. Of the documents produced by MetroPCS in response to the subpoena, there were none that identified Amber Goins as a subscriber or user associated

---

(last visited 3/24/2019)

[26] *Cell Phone Location Tracking Request Response – Cell Phone Company Data Retention Chart,* Am. Civil Liberties Union, https://www.aclu.org/cell-phone-location-tracking-request-response-cell-phone-company-data-retention-chart (last visited Mar. 4, 2019).

[27] *How Long Does My Phone Company Store My Data? How Easily Will It Give My Info Up To The Cops?,* PrivacySOS (Feb. 9, 2014), https://privacysos.org/blog/how-long-does-my-phone-company-store-my-data-how-easily-will-it-give-my-info-up-to-the-cops/ .

with Goins' own phone number during the relevant period, and there were none that identified any communication or any other interaction between MetroPCS and Amber Goins during the relevant period. In this example, the wireless carrier was unable to identify its own subscriber who reportedly had service during a time period that was as recent as only four months prior to the subpoena – further demonstrating the unlikely prospect of reliably identifying historical subscribers/users for the relevant timeframe in the instant case.

### 3. Prepaid Cell Phone Services

125. Prepaid cell phones (often called "burner phones") create yet another layer of complexity in attempting to identify historic subscribers. Prepaid cell phones are available to customers from many sources—traditional cell phone carriers, department stores, convenience stores, online retailers such as Amazon, and online auction sites like Ebay, among others. This wide variety of sellers makes collection of subscriber information less uniform, and further reduces the reliability of any data that is collected by and potentially available from them. There is no requirement at the federal level for purchasers to provide any verification of name, address or other contact information. A federal bill was introduced in 2010 to institute an identification requirement for the purchase of prepaid mobile devices, but has never been passed into law.[29] More recently, a similar bill was introduced to Congress in 2016, and also never enacted.[30] As there is no requirement that prepaid cell phone carriers obtain and maintain subscriber identification data, the process of identifying individual, historic subscribers of prepaid cell phone services would likely be impossible.

### 4. Cell Phone Number Reassignment

---

[28] *Privacy Policy*, Verizon Wireless, http://www.verizon.com/about/privacy/full-privacy-policy.

[29] Pre-Paid Mobile Device Identification Act, S. 3427, 111th Cong. (2010).

[30] Closing the Pre-Paid Mobile Device Security Gap Act of 2016, H.R. 4886, 114th Cong. (206).

126.    The generic process used in the mobile industry for deactivation and recycling cell phone numbers creates additional problems with the accuracy of historic subscriber data related to a number. Based on my experience in the provisioning of mobile service, the deactivation process typically follows this pattern:  (1) a subscriber chooses to cancel service with an existing provider, and chooses not to port their number to a new provider; (2) the service provider cancels service and adds the phone number to a deactivation list; (3) phone numbers stay inactive for a prescribed number of days, depending on the carrier, before they are recycled and assigned to a new subscriber; and (4) after the deactivation period, the number can be reassigned to a new subscriber.[31] Typically, the carrier or service provider will update its internal records to indicate the change of subscribership for the reassigned number. However, many of the downstream data sources that have been previously discussed have a high probability of carrying outdated subscriber data. Public data sources like those used in reverse lookup services, private data sources such as those used by vendors like LexisNexis, the CNAM database, and even the National Do Not Call registry all face the likelihood of including outdated subscriber data due to this reassignment process. And further supporting the idea that subscribers cannot be accurately identified based on phone numbers, including those limitations based on number reassignment, FCC Chairman Ajit Pai himself has opined that "no authoritative database … exists to 'track all disconnected or reassigned telephone numbers' or 'link[] all consumer names with their telephone numbers'."[32] And in making that statement, Chairman Pai referred to

---

[31] According to Federal guidelines, disconnected numbers must be made available for reassignment  in 90 days or less, but there is no minimum timeframe, indicating that carriers may reassign numbers in as little as one or two days. *See* 47 C.F.R. § 52.15.

[32] *DISSENTING STATEMENT OF COMMISSIONER AJIT PAI Re: In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, WC Docket No. 07-135.

documentation from Richard Fruchterman, the Associate General Counsel of industry data leader Neustar.[33]

### 5. Authorized User Identification

127.     The complex, number-by-number process of attempting to reliably and accurately identify the historic subscriber associated with a cell phone number as of the date of alleged message(s) does not even begin to address the identification of cell phone users. Because the subscriber and authorized user of a cell phone number are not necessarily the same person, identifying the subscriber does not mean the user has been or can be identified. Many cell phone accounts have more than one user. For example, businesses often have a single account and a single cell phone number that is shared by several employees, or multiple numbers used by multiple employees. Families often have a single cell phone account and a single cell phone number shared by different family members, or multiple numbers that are used by multiple family members, but billed under a single subscriber name. Sometimes, individuals in a single "family plan" are not related and may not have the same surname. As a result, even if it were possible to use carrier records to identify a number as belonging to an individual family plan, a core family unit (*i.e.*, parents and children, or even grandparents, parents, and children) would not serve as a proxy for all potential users of that number. Typically, none of this user information is recorded in cell phone provider records.

128.     For example, in the case of *Wilson v. Badcock*, No. 8:17-cv-02739 (M.D. Fla.), for which I was engaged as an expert, named plaintiff Victoria Wilson testified that she is the user of the cell phone number that allegedly received calls from the defendant. But Wilson's Grandmother, with whom she lives, pays for that phone service. Subscriber records produced in

---

[33] *Id.* (citing Letter from Richard L. Fruchterman, Associate General Counsel to Neustar, to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278, at 1 (Feb. 5, 2015)).

that case confirmed that: Wilson's Grandmother (Colleen Powell) is the subscriber of the number at issue; there is no indication that anyone other than Wilson's Grandmother is associated with the account; the subscriber name on the account of Colleen Powell bears no similarity to plaintiff Victoria Wilson's name; and the subscriber records report a subscriber address that does not match the residential address that Wilson described during her testimony as being shared with her Grandmother. This example clearly describes the common occurrence in which both authorized user names and/or addresses are not associated with their own phone number.

129.    It would also be foolish to dismiss the effect that scenarios such as family plans have on the issue of user identification, since research has estimated that as many as 75 percent of wireless subscribers are on discounted, multi-line family plans.[34]

130.    As a result, in my opinion, there is no way to reliably and accurately attempt to identify the historic user(s) of a given cell phone number as of a particular date without, at a minimum, first obtaining information from the subscriber(s) and user(s) of that number as of the date of the alleged call(s). And, given that the multiple user scenario I have described might be combined with other scenarios, like a prepaid cell phone, even this level of number-by-number analysis may be insufficient to identify subscriber and user(s) for a given number at the time of the alleged message(s). In any case, it is my opinion that there is no class-wide solution available to accurately identify subscribers and users of cell phone numbers as of the historic date(s) of alleged message(s), and at best, an individualized, account-by-account investigation will be necessary to achieve that identification.

E.     **Confirmation of My Opinions from Other Sources**

---

[34] Andy Vuong, *Wireless subscribers are finding breaking up is hard to do*, The Denver Post (Sept. 14, 2012, 4:50 PM), https://www.denverpost.com/2012/09/14/wireless-subscribers-are-finding-breaking-up-is-hard-to-do/.

131.    The opinions that I have set forth regarding the lack of reliability in the historic identification of wireless status of phone numbers, the erroneous nature of identifying historic users and subscribers associated with those numbers, and the pitfalls associated with using third-party vendors for historic identification, are also supported by the opinions of other reputable experts, as well as reasoning documented in prior court rulings.

132.    For example, in *Sherman v. Yahoo*, No. 3:13-cv-00041 (S.D. Cal.), the court found that records from a cell phone provider and the use of reverse-lookup services failed to demonstrate "an administratively feasible method of identifying the putative class members" *Id.* D.E. 191 at 12 (S.D. Cal. Sept. 23, 2015) (order denying class certification).

133.    When ruling in *Jacobs v. Quicken Loans*, No. 9:15-cv-81386 (S.D. Fla.), the court stated: "As explained by Defendant's expert, Jan Kostyun, there is no public database of cell phone subscribers, and private services are often inaccurate and incomplete. (Kostyn [sic] Report ¶¶ 14-15, DE 136-1.) Additionally, even if a carrier-by-carrier investigation was undertaken, it still would not ensure accuracy. (*Id.* at ¶¶ 16-19.)" *Id.*, D.E. 167 at 7 (S.D. Fla. Oct. 19, 2017) (order denying class certification).

134.    And in its decision to deny class certification in *Wilson v. Badcock,* No. 8:17-cv-02739 (M.D. Fla.), the court similarly remarked that "According to Defendant's expert, there is no public database of cell phone subscribers and private services are often inaccurate and incomplete, and even a carrier-by-carrier investigation would not ensure accuracy." *Id.*, D.E. 102 at 6 (M.D. Fla. Dec. 19, 2018) (order denying class certification). Also in *Wilson*, the court refers to plaintiff's expert's proposal in that case to use "reverse directory database vendors and subpoenas to cell phone carriers to identify those persons whom Defendant called" and states that her proposal "suffers several mechanical shortcomings." *Id.* at 5-6. The court further refers

to Wilson's expert's proposal to identify cell phone subscribers by stating "Plaintiff's expert claims this is possible, though one of her chief sources is the *unobservable, proprietary "black box" techniques of LexisNexis.*" *Id.* at 6 (emphasis added).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and this declaration was executed on this $\underline{3^{rd}}$ day of June, 2019 at Burlington, CT.

Jan Kostyun

# Exhibit A – Jan Kostyun CV



Jan Kostyun has over 35 years of experience in computer systems and software development, enterprise architecture, and telecommunications including extensive experience in the wireless industry.   Mr. Kostyun has broad telecom experience in both wireless and wireline disciplines. His wireless experience includes wireless telecommunications standards, text messaging, voice and voicemail internals, and in-depth experience with the end-to-end cellular provisioning process.  His wireline/landline experience includes development of software systems to support business operations and provisioning of landline services, including overall architectural knowledge of the wireline business. Mr. Kostyun is also recognized as an industry expert in the field of Local Number Portability (LNP) and the process of customer movement between cellular carriers, as well as significant experience in landline number portability and number pooling.   He also has a wide range of experience in database technologies as well as data analysis. Mr. Kostyun has held senior technical positions with Bell Telephone Laboratories, Exxon-USA, GTE and Verizon, as well as consulting positions with Informatics, Syniverse Technologies, BusinessEdge Solutions/EMC and eComp Consultants.

His experience encompasses successful assignments in implementing eCommerce, Business Intelligence & Telecommunications systems in the U.S. and Canada, as well as a collaborative effort with the National Regulatory Agency of Colombia.

Mr. Kostyun's extensive experience has enabled him to provide expert opinions, reports and analysis in legal matters covering trade secret misappropriation, copyright infringement, software financial valuation and damage assessment, patent infringement, and litigation involving the Telephone Consumer Protection Act (TCPA).

## Professional Experience:

**2012 to present**    ***Independent Consultant***                                            ***Middletown, NJ***

Technology consulting, including
- Expert witness representing defendant under civil case alleging violation of Telephone Consumer Protection Act (TCPA). Extensive review and critique of plaintiff's expert witness reports; data analysis and research of very large call-record databases, alleged call violations and ported telephone numbers; and ATDS evaluation. Preparation of expert report in support of defendant, contributing to denial of class certification and judgment in favor of defendants.
- Expert consultant representing defendant in civil case alleging violation of TCPA. Provided analysis and report of plaintiff telephone numbers, porting activity and subscriber information.
- Expert consultant representing defendant under class action complaint alleging

violation of TCPA involving text messaging/SMS activity. Provided analysis and report of CTIA/Wireless Industry best practices for short code messaging campaigns.

- In class action TCPA case, served as expert to provide ATDS evaluation, analysis of express consent and TCPA applicability of contested texts and voice calls.
- In class action TCPA matter, developed expert report addressing the feasibility and technical aspects of identifying users/subscribers of cell phones. Also developed expert report rebutting opposing expert's data analysis and subscriber identification, contributing to denial of class certification and exclusion of Plaintiff's expert report.
- Expert witness in class action TCPA complaint, providing in-depth analysis of National and internal Do Not Call (DNC) records and very large volume call record files, and critical assessment of opposing expert's data analysis.
- In class action TCPA case, developed expert report addressing the feasibility and technical aspects of identifying users/subscribers of fax telephone numbers. Also developed expert report rebutting opposing expert's opinions regarding successful completion of fax transmissions and identification of fax recipients.
- In class action TCPA matter, developed expert report addressing the feasibility and technical aspects of identifying users/subscribers of cell phones and residential landlines.
- In class action TCPA matter, developed expert rebuttal report challenging opposing expert's data analysis results of alleged DNC and wrong number calls, and addressing technical aspects of identifying users/subscribers of cell phones.
- In class action TCPA matter, performed extensive analysis of high-volume call data records against internal and national DNC files.
- In class action TCPA case, analyzed call data records, performed testing and analysis of defendant's telephone calling system and provided opinions addressing defendant's alleged use of an ATDS for telemarketing purposes.
- In class action TCPA case, developed expert rebuttal report challenging opposing expert's data analysis methodology, and addressed technical aspects of identifying users/subscribers of cell phones.
- In class action TCPA matter, developed expert rebuttal report challenging opposing expert's data analysis results of alleged DNC violations, and addressed technical aspects of identifying users/subscribers of cell phones.
- In class action TCPA matter, developed expert rebuttal report challenging opposing expert's data analysis results of alleged DNC violations, reliability of opposing expert's data vendors, and addressed technical aspects of identifying users/subscribers of cell phones.
- In class action matter involving the Washington Automatic Dialing and Announcing Device (WADAD) statute, provided expert analysis and support regarding carrier records, carrier subpoena responses, and identification of wireless/landline subscribers and calls within specific geographic boundaries.
- In class action TCPA case, rebutted opposing expert's analysis of wrong number designations, and class member identification, contributing to denial of class certification.
- In multiple class action matters, provided analysis of Defendant's dialing equipment and opinions addressing the capacity store or produce telephone numbers to be called, using a random or sequential number generator, as well as the capability to dial telephone numbers without human intervention.

| 2009 to 2011 | **Senior Consultant** |
|---|---|
| | ***eComp Consultants*** |

*Tampa, FL*

Provided consulting on design and development of software products and wireless technology. Provided technology consulting and expert support for enterprise architecture, software engineering and telecommunications in the areas of:

- Patent portfolio evaluation, market valuation, and prior art analysis.
- Patent litigation consulting for information technology in telecommunications, wireless and enterprise architecture for validity/invalidity and infringement/non-infringement analysis.
- Software contract analysis for disputes involving custom software, software copyright and trade secret infringement, and software valuation.
- Functional analysis, Source Code reviews, Damage Assessment analysis and software tampering evaluation.

| 2009 to 2010 | ***Independent Consultant*** |
|---|---|

*Tampa, FL*

Collaborated with Value Partners Management Consulting firm in preparation of proposal to the Colombian National Regulatory Agency for implementation of Wireless Number Portability across Colombia.

| Prior experience | **Senior Consultant** |
|---|---|
| | ***BusinessEdge Solutions/EMC*** |

*Toronto, Ontario, Canada*

Provided strategic and tactical guidance to Rogers Wireless, Canada's largest wireless carrier, in the successful, on-schedule implementation of Canadian wireless number portability.

- Developed detailed specifications for Rogers' internal business applications interface to the Syniverse/Telcordia Service Management Gateway (SMG) for communication of wireless port requests & responses to wireless and wireline trading partners.
- Served as Rogers' representative to several industry-level committees, including SMG Defect Management and SMG Testing, acting as liaison between Rogers and all Canadian carriers. Developed detailed specifications for acceptance and regression testing of SMG for entire Canadian industry.
- Provided integration expertise to Rogers' application development, network administration, system testing, production support, and program management teams.
- Provided in-depth knowledge of Telcordia SMG interface, Canadian portability standards (CWNPG and CLOG), Wireless to Wireline (WPR to LSR) translation requirements, and post-implementation data analysis to determine customer porting trends and roadblocks.

**Senior Consultant**
***Syniverse Technologies***

*Tampa, FL*

Served as development specialist & subject matter expert during implementation of U.S. Wireless Number Portability (WNP). Designed the reporting data warehouse and client billing processes which support Syniverse's WNP & ICC Clearinghouse product offerings.

- Provided significant expertise in the technical internals, database design and API requirements of Telcordia's SMG platform; WNP WICIS Industry standards; InterCarrier Communications (ICC) Process; Service Order Administration (SOA)/NPAC interaction; and Tekelec LSMS database access.
- Subject matter consultant to other Syniverse WNP product offerings, including Pre-

port Validation, Fallout Management, Wireline Porting and PortFlow Management. Responsible for interaction and consulting with Sales, Business Development, Training and Production Support organizations.
- In-depth experience with Cellular Provisioning, GSM/CDMA technologies, SIM Card provisioning

**Software Engineer**
*Verizon Communications*                                                                 *Tampa, FL*

Served as Enterprise Integration Architect for Local Number Portability (LNP) and Telephone Number Pooling (TNP) projects. Responsible for development of enterprise-level architecture and system integration of 38 major applications in order to develop and deploy Wireline LNP and Number Pooling capabilities for the entire former-GTE operating area.

- Managed technical team of 30+ individual project architects, including interaction with program management, functional owners, development teams, system testers and production support personnel.
- Coordinated retail and wholesale ordering, provisioning, billing and service assurance business functionality.
- Developed significant expertise in number portability network element systems (Telcordia's LSMS and SOA), including low-level knowledge and direct access to LSMS internal databases.
- Directly responsible for the successful national deployment of LNP/TNP in GTE/Verizon West. Maintained close working relationship with Network Engineering's TN Administrator, assisting with LSMS extracts for reconciliation processes, TNP block donation and block allocation processing, and creative use of LNP capabilities for special customer requests.

**Senior Advisory Systems Engineer**
*GTE Telephone Operations*                                                                 *Tampa, FL*

Provided extensive systems development work as enterprise architect and development team project manager.

- Developed technical specifications for numerous systems across GTE Telephone Operations, primarily within the Customer Contact and Operations domains. Technical specifications established the hardware, software and network architecture with emphasis on a distributed, UNIX-based, client/server environment.
- Established corporate standards for Relational DBMS products, including interaction with Oracle and Informix vendors
- Established corporate standards for UNIX hardware and operating system platforms, including interaction with SUN, HP and IBM vendors.
- Managed application development for TCOM, a distributed, IBM-based bulk mail processing application
- Application technical lead for Central Office personnel dispatch and work allocation application.

65

**Senior Database Analyst**
*Exxon Company, USA*                                                      *Houston, TX*

Provided database analysis and database administration in large-scale IBM environment, specializing in project team support, implementation of DB2/SQL and use of IBM utilities, IBM Dialog Management Services.

**Senior Database Analyst**
*Ford Aerospace*                                                          *Houston, TX*

Served as key member of application team for NASA contractor responsible for Shuttle Simulator Reconfiguration System.  Responsibilities included data analysis and database design, and application lead.

**Senior Consultant**
*Informatics, Inc.*                                                       *Houston, TX*

Consulted for major oil & gas and technology clients, offering application conversions, development of new systems, and application optimization.  Conducted international technical training classes in IBM IMS DB/DC, IBM Utilities and IBM Internals

**Senior Systems Analyst**
*GTE Data Services*                                                       *Tampa, FL*

Served as project lead and technical advisor for development of IBM/IMS-based customer billing application and IBM/CICS online order-entry application.  Specialized in deployment of mini-computer office-automation systems.

**Technical Lead**
*Bell Telephone Laboratories*                                            *Piscataway, NJ*

Application lead for development of IBM/IMS-based Inventory Management system implemented across entire Bell System.

**Education:**

B.S. Mathematics – Magna Cum Laude                Union College, Schenectady, NY

M.S. Computer Science                             Union College, Schenectady, NY

| | | |
|---|---|---|
| **Wireless Communications** | 7 years | Syniverse/Telcordia Service Management Gateway (SMG), Canadian portability standards (CWNPG and CLOG), Wireless to Wireline (WPR to LSR) translation, Wireless Number Portability (WNP) & WICIS Industry standards, InterCarrier Communications (ICC), Service Order Administration (SOA)/NPAC,; and Tekelec LSMS database, Wireline Porting and PortFlow Management, Provisioning, GSM/CDMA technologies, SIM Card Provisioning |
| **Telecommunications** | 25 years | Local Number Portability (LNP), Telephone Number Pooling (TNP), Telcordia's LSMS and SOA, Customer Contact, Provisioning & Operations,  eCommerce applications |
| **Database Technology** | 30 years | IBM IMS Database/Data Communication; DB2/SQL database design, Performance Optimization, Query Specialist; Informix; |

| | | ORACLE; Logical Data Modeling; MS Access |
|---|---|---|
| Software Engineering | 20 years | Enterprise integration, Order Entry/CRM, Trouble Management, Provisioning, Customer Billing, Work Allocation/Work Management, Inventory Management |

**Tools & Platforms**

| | |
|---|---|
| Languages and tools: | IBM Assembler, FORTRAN, COBOL, C, C++, JAVA, Visual Basic, IMS DB/DC, CICS, DB2/SQL, Informix, Oracle, MS Access/SQL, HTML, MS Office, WordPress |
| Platforms: | IBM Mainframe/370, IBM 4300, IBM 9700, IBM RS/6000, HP 9000, Sun SPARC, Windows-based PC |
| Operating Systems: | IBM MVS, IBM DOS/VSE, AIX, HP-UX, UNIX, Solaris, MS-DOS, Windows |

| | |
|---|---|
| Professional: | Published article in *Computerworld*, 9/24/84: "IBM ISPF dialog manager: More than meets the eye" |

**Case Experience:**

*Alex Jacobs et. al. v Quicken Loans, Inc.*

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Southern District of Florida |
| Client: | Quicken Loans, Inc. as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Developed expert report addressing the feasibility and technical aspects of identifying users/subscribers of cell phones. Also developed expert report rebutting opposing expert's data analysis and subscriber identification, contributing to denial of class certification and exclusion of Plaintiff's expert report. |
| Represented by: | Goodwin Procter LLP |

*Amber Goins et. al. v Walmart and Palmer Recovery*

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Middle District of Florida |
| Client: | Walmart and Palmer Recovery as defendants |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Developed expert report rebutting opposing expert's data analysis, historic wireless identification and subscriber identification. |
| Represented by: | Shepard, Smith, Kohlmyer & Hand, P.A. / Sheppard, Mullin, Richter & Hampton, LLP |

*Ameranth v Six Continents Hotels*

| | |
|---|---|
| Jurisdiction: | Superior Court of DeKalb County, State of Georgia |
| Client: | Six Continents as defendant in complaint for web advertising misuse and trade secret infringement of web-based concierge application |
| Nature of Case: | Web Advertising Analysis and Intellectual Property Litigation |
| Nature of Engagement: | Consulting expert analyzing web-based advertising practices, user interfaces, and development models; provided expertise in web marketing, online advertising, and eCommerce technology development standards, design and architecture |

67

Represented by:          Alston & Bird

**Carrie Couser et. al. v Cucamonga Valley Medical Group, Inc.**
Jurisdiction:            U.S. District Court, Central District of California
Client:                  Cucamonga Valley Medical Group, Inc. as defendant
Nature of Case:          Telephone Consumer Protection Act (TCPA) violation
Nature of Engagement:    Served as expert to provide ATDS evaluation, analysis of express
                         consent and TCPA applicability of contested texts and voice calls
Represented by:          Schmid & Voiles

**Carrie Couser et. al. v Dish One Satellite, LLC**
Jurisdiction:            U.S. District Court, Central District of California
Client:                  Dish One, as defendant
Nature of Case:          Telephone Consumer Protection Act (TCPA) violation
Nature of Engagement:    Served as expert to provide in-depth analysis of National and internal
                         Do Not Call (DNC) records and very large volume call record files,
                         and critical assessment of opposing expert's data analysis.
Represented by:          Benesch, Friedlander, Coplan & Aronoff LLP

**Comprehensive Health Care Systems of the Palm Beaches et. al. v M3 USA Corporation**
Jurisdiction:            U.S. District Court, Southern District of Florida, West Palm Beach
                         Division
Client:                  M3 USA Corp., as defendant
Nature of Case:          Telephone Consumer Protection Act (TCPA) violation
Nature of Engagement:    Developed expert report addressing the feasibility and technical
                         aspects of identifying users/subscribers of fax telephone numbers. Also
                         developed expert report rebutting opposing expert's opinions regarding
                         successful completion of fax transmissions and identification of fax
                         recipients. Provided deposition testimony.
Represented by:          Sheppard Mullin Richter & Hampton LLP

**Datamaxx Applied Technologies v Computer Projects of Illinois, Inc.**
Jurisdiction:            United States District Court, Northern District of Florida
Client:                  Datamaxx as plaintiff
Nature of Case:          Software Copyright Infringement
Engagement:              Prepared expert report assessing infringement of plaintiff's software
                         copyrights, utilizing Abstraction-Filtration-Comparison test. Provided
                         deposition testimony.
Represented by:          Pennington, Moore, Wilkinson, Bell & Dunbar, P.A.

**Derrick Thomas et. al. v Peterson's Harley Davidson**
Jurisdiction:            U.S. District Court, Southern District of Florida
Client:                  Peterson's, as defendant
Nature of Case:          Telephone Consumer Protection Act (TCPA) violation
Nature of Engagement:    Provided expert report rebutting opposing expert's proposed
                         methodology for identifying historic wireless status and historic
                         users/subscribers of telephone numbers, and opposing expert's consent
                         analysis. Also produced expert report addressing the dialing system
                         used by Defendant for text message campaigns, and its capacity to
                         perform as an ATDS.
Represented by:          Robert L. Switkes & Associates, P.A.

68

**Eileen Nece et. al. v Quicken Loans, Inc.**

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Middle District of Florida |
| Client: | Quicken Loans, Inc. as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Developed expert report addressing the feasibility and technical aspects of identifying users/subscribers of cell phones and residential landlines. |
| Represented by: | Goodwin Procter LLP |

**Estrellita Reyes et. al. v BCA Financial Services, Inc.**

| | |
|---|---|
| Jurisdiction: | United States District Court, Southern District of Florida |
| Client: | BCA Financial Services as defendants |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Developed expert rebuttal report challenging opposing expert's data analysis methodology, and addressing technical aspects of identifying users/subscribers of cell phones. Provided deposition testimony. |
| Represented by: | Shepard, Smith, Kohlmyer & Hand, P.A. |

**Israel Garcia et. al. v Target Corporation**

| | |
|---|---|
| Jurisdiction: | U.S. District Court, District of Minnesota |
| Client: | Target, as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Provided affirmative report addressing the roadblocks to identifying historic wireless subscribers, as well as the challenges to identifying historic users and subscribers of telephone numbers. Also produced an expert report rebutting opposing expert's analysis of Defendant's dialing system. |
| Represented by: | Barnes & Thornburg  LLP |

*Jerry Eisenband et. al. v Schumacher Automotive, Inc.*

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Southern District of Florida |
| Client: | Schumacher, as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Provided expert analysis of Plaintiff's expert report, and analysis of systems used to send alleged SMS text messages. |
| Represented by: | Kurkin Forehand Brandes LLP |

*John Scherkanowski v Bluegreen Vacations*

| | |
|---|---|
| Jurisdiction: | U.S. District Court, District of New Hampshire |
| Client: | Bluegreen, as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Developed expert report analyzing Defendant's dialing system, it's capacity to store or produce telephone numbers using a random or sequential number generator, its capacity to place calls without human intervention, and the use an artificial or prerecorded voice. |
| Represented by: | Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A. |

***Kevin Buja et. al. v Novation Capital LLC, et. al.***

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Southern District of Florida, West Palm Beach Division |
| Client: | Novation, as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Developed expert rebuttal report challenging opposing expert's data analysis results of alleged DNC violations, and addressing technical aspects of identifying users/subscribers of cell phones. Provided deposition testimony. |
| Represented by: | Vedder Price, P.C. |

***Lori Shamblin et. al. v Obama for America et. al.***

| | |
|---|---|
| Jurisdiction: | United States District Court, Middle District of Florida, Tampa Division |
| Client: | Obama for America and DNC Services Corp. as defendants |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Extensive review and critique of plaintiff's expert witness reports; data analysis and research of very large call-record databases, alleged call violations and ported telephone numbers; and ATDS evaluation. Preparation of expert report in support of defendant, contributing to denial of class certification and judgment in favor of defendants. |
| Represented by: | Perkins Coie LLP |

***Mark Preman et. al. v Pollo Operations***

| | |
|---|---|
| Jurisdiction: | United States District Court, Middle District of Florida, Orlando Division |
| Client: | Pollo Operations as defendants |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Pre-trial review of text messaging procedures and data flow analysis. Provided expert report evaluating adherence to CTIA/Wireless Industry best practices for short code messaging campaigns. |
| Represented by: | Akerman LLP |

***Michael Lutman v Harvard Collection Services***

| | |
|---|---|
| Jurisdiction: | United States District Court, Middle District of Florida, Ft Myers Division |
| Client: | Harvard Collection Services as defendants |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Provided expert analysis of plaintiff telephone numbers, porting activity, subscriber information, and ATDS evaluation. |
| Represented by: | Wilson Elser Moskowitz Edelman & Dicker LLP |

***Moricz v Google***

| | |
|---|---|
| Jurisdiction: | United States District Court, Western District of Washington at Seattle |
| Client: | Michael Moricz as plaintiff |
| Nature of Case: | Patent infringement of search engine software capabilities |
| Engagement: | Provided technical research into history, evolution and current state of web-based search engine design and functionality. Development of claim construction report. |
| Represented by: | Schwabe, Williamson & Wyatt, P.C. |

### *PCS4Less v Go Mobile*

| | |
|---|---|
| Jurisdiction: | State of Michigan, Circuit Court for Washtenaw County |
| Client: | Go Mobile as defendant |
| Nature of Case: | Copyright / Trade Secret on unlocking GSM/CDMA cell phone devices |
| Engagement: | Provided expert analysis of cell phone unlocking methods. |
| Represented by: | Gray Robinson |

### *Resource Acquisition and Management Services v Mathews*

| | |
|---|---|
| Jurisdiction: | State of Florida, Circuit Court for Hillsborough County |
| Client: | Resource Acquisition and Management Services, Inc. as plaintiff |
| Nature of Case: | Breach of Contract and Conversion of disputed property including application source code |
| Engagement: | Provided expert report assessing the value of application source code. Provided deposition testimony. |
| Represented by: | Rocke, McLean and Sbar, P.A. |

### *Sara Diaz-Lebel et. al. v TD Bank and Target Corporation*

| | |
|---|---|
| Jurisdiction: | U.S. District Court, District of Minnesota |
| Client: | Target, as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Developed expert report rebutting opposing expert's analysis of call records. Also provided analysis of Defendant's dialing system as it relates to TCPA's definition of an ATDS, as well as describing the restrictions to accurately ascertaining class members based on historic call data. |
| Represented by: | Barnes & Thornburg LLP |

### *State of Florida v Poole*

| | |
|---|---|
| Jurisdiction: | State of Florida, Circuit Criminal Court for Hillsborough County |
| Client: | Poole as defendant |
| Nature of Case: | Criminal complaint involving damage of application components |
| Engagement: | Provided expert analysis and court testimony regarding the feasibility of performing a forensic analysis of hardware and software components. Provided court testimony. |
| Represented by: | Pawuk and Pawuk, P.A. |

### *Thomas Cook v Palmer, Reifler & Associates and WALMART*

| | |
|---|---|
| Jurisdiction: | United States District Court, Middle District of Florida |
| Client: | PRA as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Developed expert rebuttal report challenging opposing expert's data analysis, and addressing technical aspects of identifying users/subscribers of cell phones. Provided deposition testimony. |
| Represented by: | Shepard, Smith, Kohlmyer & Hand, P.A. |

### *Victoria Wilson v Badcock Home Furniture*

| | |
|---|---|
| Jurisdiction: | United States District Court, Middle District of Florida |
| Client: | Badcock as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |

| | |
|---|---|
| Engagement: | Developed expert rebuttal report challenging opposing expert's data analysis and methodology for identifying users/subscribers of cell phones, contributing to denial of class certification. Provided deposition testimony. |
| Represented by: | Johnson & Cassidy, P.A. |

### *Waddell Williams v Bluestem Brands*

| | |
|---|---|
| Jurisdiction: | United States District Court, Middle District of Florida |
| Client: | Bluestem Brands as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Developed expert report analyzing Defendant's dialing platform and its characteristics related to Automated Telephone Dialing Systems |
| Represented by: | Faegre Baker Daniels, LLP |

# Exhibit B – LexisNexis Disclaimer



*You must have a permissible use to search these sources. Laws applicable to use of this product include the Drivers' Privacy Protection Act and related state laws (DPPA) and the Gramm-Leach-Bliley Act (GLBA). The data regulated by the DPPA and the GLBA may be used only for the permissible uses, e.g., litigation, fraud detection, etc., that you select from a list prior to searching. By selecting a permissible use prior to searching, you are certifying that the data returned to you will be used only for that purpose. The data provided to you by use of this product may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment or other purposes identified under the Fair Credit Reporting Act (FCRA).

Due to the nature of the origin of public record information, the public records and commercially available data sources used in reports may contain errors. Source data is sometimes reported or entered inaccurately, processed poorly or incorrectly, and is generally not free from defect. This product or service aggregates and reports data, as provided by the public records and commercially available data sources, and is not the source of the data, nor is it a comprehensive compilation of the data. Before relying on any data, it should be independently verified. For Secretary of State documents, the data is for information purposes only and is not an official record. Certified copies may be obtained from that individual state's Department of State. The LexisNexis SmartLinx report will be provided within certain search and privacy parameters and is subject to LexisNexis General Terms and Conditions located at **www.lexisnexis.com/terms/general.aspx.** Other restrictions may apply.

*For more information or assistance with your LexisNexis public records research contact your LexisNexis® representative or call*

888.253.3901

LexisNexis, Lexis Advance, LexID, the LexID logo, LexisNexis SmartLinx, SmartLinx and the Knowledge Burst logo are registered trademarks and FOCUS is a trademark of Reed Elsevier Properties Inc., used under license. Other products or services may be trademarks or registered trademarks of their respective companies. © 2016 LexisNexis. BMH00736-0 1116.



www.microbilt.com/ser-agreet

# Exhibit C – MicroBilt Disclaimer

## User Agreement

**THIS USER AGREEMENT** ("Agreement") is entered into as of the "Effective Date" (defined below) by and between MicroBilt Corporation, ("MicroBilt") a Delaware corporation with its principal place of business at 1640 Airport Rd., Suite 115, Kennesaw, GA 30144 and the party electronically accepting the within terms and conditions, ("User").

- 
- 

     A. **User Agrees to:**

- 
- 

2. Acknowledge that: Public Record Information provided to User from or through MicroBilt is derived solely from public records, which may not be 100 percent (100%) accurate or complete. User should consult state and federal laws, including the FCRA, before using Public Record Information in making business decisions based on the results. Neither we, nor the data Repositories, or our other vendors or suppliers, are liable for claims or damages arising from the use of Public Record Information, beyond the cost of the particular search performed and report obtained by User. Because misidentifications may occur when trying to identify a particular person, based solely upon name and other identifiers, extreme care must be exercised in the review and use of the Public Record Information contained herein. Public Record Information contained herein should not be used in legal proceedings; rather, it is recommended that User obtain the original public record document from the relevant jurisdiction for the purpose of legal proceedings.

- 
- 

14. Be aware that Information is obtained and managed by fallible sources and that for the Fee charged, MicroBilt does not guarantee or insure the accuracy, completeness, timeliness, depth or continuation of Information.

# Exhibit D – Partial List of Occurrences of LexisNexis Disclaimer

https://risk.lexisnexis.com/products/worldcompliance-data
https://risk.lexisnexis.com/products/property-data-report
https://www.lexisnexis.com/en-us/products/public-records.page
https://risk.lexisnexis.com/products/data-prefill
https://risk.lexisnexis.com/products/provider-data-masterfile
https://www.lexisnexis.com/pdf/public-records/Public-Records-Relationship-Identifier-on-Lexis-Advance.pdf
https://risk.lexisnexis.com/products/carrier-discovery
https://www.lexisnexis.com/en-us/privacy/bridger-privacy-info.page
https://risk.lexisnexis.com/products/motor-vehicle-records
https://risk.lexisnexis.com/products/claims-discovery
https://risk.lexisnexis.com/products/patient-data-masterfile
https://risk.lexisnexis.com/products/claims-datafill
https://risk.lexisnexis.com/products/providerpoint
https://risk.lexisnexis.com/products/contact-score
https://risk.lexisnexis.com/products/clue-auto
http://techhubly.com/lexisnexis-resources/files/A%20Business%20Case%20for%20Fixing%20Provider%20Data%20Issues_WPNXR5062-0.pdf
https://risk.lexisnexis.com/products/worldcompliance-data
https://www.lexisnexis.com/risk/downloads/assets/provider-data-masterfile.pdf
https://risk.lexisnexis.com/products/campaign-analyzer
https://risk.lexisnexis.com/products/clue-property
https://risk.lexisnexis.com/products/national-credit-file
https://risk.lexisnexis.com/products/small-business-credit-report-with-sbfe-data
https://risk.lexisnexis.com/products/attract
https://www.lexisnexis.com/pdf/public-records/Differences-that-Deliver-Public-Records-on-Lexis-Advance-Snapshot.pdf
https://risk.lexisnexis.com/products/account-monitoring
https://www.ahip.org/wp-content/uploads/2016/06/Blue-Plan-Yields.pdf
http://top100-hospice-homehealth.com/Portals/7/docs/12195_Top-100-HAA-Infographic.pdf
https://risk.lexisnexis.com/products/attract-commercial
https://www.aba.com/Products/Endorsed/Documents/IID-Brochure-March2014.pdf
https://risk.lexisnexis.com/products/accurint-for-collections---contact-and-locate-workflow
https://risk.lexisnexis.com/products/accurint-for-collections-decisioning-workflow
https://risk.lexisnexis.com/products/accurint-for-healthcare
https://risk.lexisnexis.com/products/active-insights
https://risk.lexisnexis.com/products/phone-finder



Sign In

About TCN
(https://www.tcn.com/about-tcn/)

Contact Us
Search (/contact-us)

Request A Demo
(Https://Info.tcn.com/Request-A-Demo)

| Call Center Solutions | Services | Compliance Suite | Resources | Blog |



Manual Dialer

# Superior Manual Dialing Dramatically Increases your Productivity

## Increase Your Manual Dialing Performance Up to 10x

Unlike Preview campaigns which require agents to wait through No Answer calls and busy signals, Manually Approved Calling allows agent to be presented live answers only. While still requiring human interaction to initiate the call, your active agents spend less time waiting and more time speaking with your customers. Naturally, our built-in functionality allows your call center to maintain TCPA compliance (/compliance/) while not jeopardizing efficiency.

## How It Works

With TCN's Manually Approved Calling (MAC), a subset of agents can review and approve calls for other agents. During approval, agents are presented with 3rd party contact information in the same format that it will appear on the agent screen during the actual call, giving them the information they need to decide if the call should be approved. The agent then simply presses the "Approve" button to add it to the call queue or "Reject" to cancel the call.

## Add a Human Element to Manual Dialing

- Unified interface seamlessly switches between approving calls and taking calls.
- Manually approve phone numbers without the need for separate campaigns or initiatives (e.g. cell phones only).
- Agents see all account information available and not just phone number, providing a much better opportunity to quickly review each account in real-time.
- No calls are placed without an assigned agent first approving the specific call to be made.

## Compliance News

Apr 15, 2019

Top 3 Tech-Savvy Strategies for Call Center Quality Monitoring (https://www.tcn.com/top-3-tech-savvy-strategies-for-call-center-quality-monitoring/)

Read » (https://www.tcn.com/top-3-tech-savvy-strategies-for-call-center-quality-monitoring/)

Mar 08, 2019

TCPA Penalties List Round Up: Causes and Consequences (https://www.tcn.com/tcpa-penalties-list-round-up-causes-and-consequences/)

Read » (https://www.tcn.com/tcpa-penalties-list-round-up-causes-and-consequences/)

Feb 22, 2019

3 Differences Between TCPA Compliant and Non-compliant Calls (https://www.tcn.com/3-differences-between-tcpa-compliant-and-non-compliant-calls/)

Read » (https://www.tcn.com/3-differences-between-tcpa-compliant-and-non-compliant-calls/)

All Blogs (/blog)



PLAINTIFF'S EXHIBIT
3
6-5-19

000106



## Related Solutions

Compliance Suite (https://www.tcn.com/compliance/)

*With TCN's Manually Approved Calling our agents are able to have better context of each approved call, like account number and name.*

Request a Demo (http://info.tcn.com/request-a-demo) Click or call today for a free demo and let us help you transform your Contact Center.

## Gallery

(https://www.tcn.com/wp-content/uploads/2017/06/Approval-Dashboard.png)

(https://www.tcn.com/wp-content/uploads/2017/06/Manually-Approved-Calling.png)

# Call Center Solutions

By Channel (https://www.tcn.com/call-center-solutions/by-channel/)

Overview (https://www.tcn.com/call-center-solutions/overview/)

By Feature (https://www.tcn.com/call-solutions/by-feature/)

Interactive Voice Response (IVR) (https://www.tcn.com/call-center-solutions/ivr/)

By Industry (https://www.tcn.com/call-center-solutions/by-industry/)

Business Process Outsourcing (BPO) (https://www.tcn.com/call-center-solutions/business-process-outsourcing-bpo/)

By Specialization (https://www.tcn.com/call-center-solutions/by-specialization/)

Reporting & Analytics (https://www.tcn.com/call-center-solutions/reporting-and-analytics/)

Inbound (https://www.tcn.com/call-center-solutions/inbound/)

Outbound (https://www.tcn.com/call-center-solutions/outbound/)

True Blended (https://www.tcn.com/call-center-solutions/true-blended/)

Mobile SMS (https://www.tcn.com/call-center-solutions/mobile-sms/)

Email (https://www.tcn.com/call-center-solutions/email/)

Enterprise (https://www.tcn.com/call-center-solutions/enterprise/)

Interactive Voice Messaging (IVM) (https://www.tcn.com/call-center-solutions/ivm/)

Automatic Call Distribution (ACD) (https://www.tcn.com/call-center-solutions/acd/)

Call Recording Storage (https://www.tcn.com/call-center-solutions/call-recording-storage/)

Workforce Optimization and Engagement (https://www.tcn.com/call-center-solutions/workforce-optimization/)

Agent Gateway (https://www.tcn.com/call-center-solutions/agent-gateway/)

Predictive Dialer (https://www.tcn.com/call-center-solutions/predictive-dialer/)

Manual Dialer (https://www.tcn.com/call-center-solutions/manual-dialer/)

Auto Dialer (https://www.tcn.com/call-center-solutions/auto-dialer/)

Cell Phone Scrub (https://www.tcn.com/call-center-solutions/cell-phone-scrub/)

Voicemail Delivery (https://www.tcn.com/call-center-solutions/voicemail-delivery/)

Speech Analytics (https://www.tcn.com/call-center-solutions/speech-analytics/)

All Features (https://www.tcn.com/call-center-solutions/all-features/)

Collections / ARM (https://www.tcn.com/call-center-solutions/collections-arm/)

Contact Centers (https://www.tcn.com/call-center-solutions/contact-centers/)

Healthcare (https://www.tcn.com/call-center-solutions/healthcare/)

Newspapers (https://www.tcn.com/call-center-solutions/newspapers/)

Automotive (https://www.tcn.com/call-center-solutions/automotive/)

Notifications and Promotions (https://www.tcn.com/call-center-solutions/notifications-and-promotions/)

Surveys (https://www.tcn.com/call-center-solutions/surveys/)

Visually Impaired Agent Solutions (https://www.tcn.com/call-center-solutions/visually-impaired-agent-solutions/)

# About TCN

About TCN (https://www.tcn.com/about-tcn/)
Overview (https://www.tcn.com/about-tcn/)
Careers (https://www.tcn.com/about-tcn/careers/)
Management Team (https://www.tcn.com/about-tcn/management-team/)
Media Room (https://www.tcn.com/about-tcn/media-room/)
Partners (https://www.tcn.com/partners/)

Privacy Policy (https://www.tcn.com/privacy-policy/)

Copyright © 2019. All Rights Reserved.



Want to chat about TCN's
cloud contact center software? If
you have a question, don't be shy.

2


(https://www.tcn.com/)

About TCN
(https://www.tcn.com/about-tcn/)

Search

Contact Us
(/contact-us)

Request A Demo
(Https://info.tcn.com/Request-A-Demo)

Call Center Solutions          Services          Compliance Suite          Resources          Blog

# Ensure TCPA Compliance with Cloud-based Manual and Predictive Dialing



Aug 30, 2016

Posted in: Adam Dummar (https://www.tcn.com/adam-dummar/), Cloud Technology (https://www.tcn.com/cloud-technology/), Compliance (https://www.tcn.com/compliance/), Predictive Dialing (https://www.tcn.com/predictive-dialing/), TCPA (https://www.tcn.com/tcpa/)
Author: Adam Dummar

When the Telephone Consumer Protection Act (https://www.fcc.gov/news-events/blog/2014/03/25/tcpa-it-time-provide-clarity) (TCPA) was passed in 1991, the goal was to protect consumers' landlines from repeat calls from telemarketers and automated systems. Landlines have more or less gone extinct over the course of the past two decades, requiring the Federal Communications Commission (FCC) to update the TCPA accordingly.

As calling technology has changed, the TCPA (http://www.natlawreview.com/article/fcc-approves-new-tcpa-rules-telephone-consumer-protection-act) has evolved as well. New amendments in 2015 have enacted new rules and regulations that safeguard mobile phones against unwanted robocalls and spam SMS messages. While the rules weigh heavily in favor of the consumer, several new rulings are actually to the benefit of everyone, including the call centers tasked with contacting consumers.

These latest rulings place a positive spin on the situation. And it's not impossible for call centers and businesses of all sizes to adhere to the new amendments. Your call center need not slow down because of a worry about infractions and customer complaints.

With a reliable compliance suite (/compliance), you can ensure that call center agents keep to the TCPA regulations, as well as other laws and standards such as those found with the Consumer Financial Protection Bureau (http://www.consumerfinance.gov/) (CFPB). A robust compliance suite provides a number of features designed to meet all your call center needs, from inbound to outbound calling.

RECENT POSTS

TCN Announces Integration Partnership with Envision, Enhancing Its Cloud Contact Center Platform with Workforce Optimization (https://www.tcn.com/tcn-announces-integration-partnership-with-envision-enhancing-its-cloud-contact-center-platform-with-workforce-optimization/)

TCN Launches New Natural Language Compliance Tool for Its Comprehensive Cloud Contact Center Platform (https://www.tcn.com/tcn-launches-new-natural-language-compliance-tool-for-its-comprehensive-cloud-contact-center-platform/)

Meat And Potatoes: Jesse Bird CTO and Co-founder of TCN (https://www.tcn.com/meat-and-potatoes-jesse-bird-cto-and-co-founder-of-tcn/)

Top 3 Tech-Savvy Strategies for Call Center Quality Monitoring (https://www.tcn.com/top-3-tech-savvy-strategies-for-call-center-quality-monitoring/)

The Ultimate Blog for Using Call Center Metrics to Improve Agent Performance (https://www.tcn.com/how-to-use-call-center-metrics-to-improve-agent-performance/)

CATEGORIES

ACA (https://www.tcn.com/aca/)          (7)

000110

# Manually Approved Calling (MAC)

Auto, or predictive, dialing (http://electronics.howstuffworks.com/automatic-dialers.htm) is a common component of modern day call centers, as it allows the most number of calls to be placed within a set timeframe. Auto dialing is a continuous action, meaning that it's easy to call the wrong person, i.e., someone who's placed their name and number on the Do Not Call (https://www.fcc.gov/consumers/guides/stop-unwanted-calls-texts-and-faxes) list. Juxtaposed with Predictive Dialers (/call-center-solutions/predictive-dialer/), you ensure comprehensive options for your agents.

There are several ways to maintain the efficacy of auto dialing without fear of violating TCPA regulations. One of them is our Manually Approved Calling (MAC) feature. With it, you assign a group of agents to review and approve calls for other agents, thereby saving everyone time and money. Agents look at third-party contact information in the same format that it would appear on-screen during an actual call and decide whether to approve or reject the call. Approved calls continue to the auto dialing sequence while the others are archived.

## Cell Phone Scrub

Our "scrub" feature is almost self-explanatory. It quickly identifies and automatically cancels calls to mobile phones and ported numbers. The service not only ensures a clean calling list that meets TCPA regulations, but also keeps agents from the time-consuming task of manually deciphering which contact numbers are cell phones.

## Manual Dial Only

In certain situations, manual dial is the only way to go. Managers can turn the function on or off as needed. As the name indicates, Manual Dial Only requires a person to make a call. The agent must also enter in a 10-key verification code, adding in additional layer of security and compliance.

## Call Recording

Call centers record calls in order to protect themselves and the consumer. However, certain information, typically personally identifying information like credit cards and social security numbers, can't be saved.

Call centers once struggled to meet the regulation, but services like our Pause/Interrupt feature make it easy to guarantee customer privacy and stay in legal compliance. You simply record all conversations, pause or interrupt the call recording when the customer is sharing personally identifying information and manually edit out the data so that it's never heard during playback.

## IP Address Lock-Down

Privacy and security concerns (http://www.csoonline.com/article/3078815/security/risk-of-mobile-threats-and-privacy-concerns-grow.html) continue to mount in today's increasingly digitally reliant environment. Because of that, it's important to have measures in place to a) protect your agents and customers and b) guarantee adherence to regulations and security best practices.

One measure is TCN's IP Address Lock-Down. The service sets up parameters about where, when and how individuals can access information. While it should be used to layer in security and privacy at your main office, it can be used to protect offsite and satellite offices, too.

## A Compliance Suite that Grows with You

TCPA regulations will continue to change, so it's critical to have a tool that adapts to any situation. Our suite is that tool. Its automatic updates and ability to be customized to meet your unique needs will keep you within any guidelines the TCPA and CFPB endorse.

However, you will need to do more than invest in a robust software suite. It's an essential piece of the compliance puzzle, but you should never overlook the importance of education (http://www.infosectoday.com/Articles/Security_Awareness_Training.htm). It's through training your agents and giving them processes, resources and tools that you'll not only guarantee consumer privacy and compliance with government mandates, but also create a better call center environment and customer experience.

Adam Dummar (https://www.tcn.com/adam-dummar/)

Agent Efficiency (https://www.tcn.com/agent-efficiency/)

Australia (https://www.tcn.com/australia/)

Auto Dialing (https://www.tcn.com/auto-dialing/)

Auto Dialing (https://www.tcn.com/autodialing/)

Automotive (https://www.tcn.com/automotive/)

Blog (https://www.tcn.com/category-blog/)

Bryce Payne (https://www.tcn.com/bryce-payne/)

Business Intelligence (https://www.tcn.com/business-intelligence/)

business performance (https://www.tcn.com/business-performance/)

call center kpi (https://www.tcn.com/call-center-kpi/)

call center quality monitoring (https://www.tcn.com/call-center-quality-monitoring/)

Call Center Solutions (https://www.tcn.com/call-center-solutions/)

Call center technology (https://www.tcn.com/call-center-technology/)

Call Centers (https://www.tcn.com/call-centers/)

call recording (https://www.tcn.com/call-recording/)

Cloud Technology (https://www.tcn.com/cloud-technology/)

cloud-based (https://www.tcn.com/cloud-based/)

Collections (https://www.tcn.com/collections/)

Competitive Analytics (https://www.tcn.com/competitive-analytics/)

Compliance (https://www.tcn.com/compliance/)

Conferences (https://www.tcn.com/conferences/)

Customer Service (https://www.tcn.com/customer-service/)

Learn more about TCN's capabilities and how our cloud-based call center technology can help you address the ever-changing TCPA guidelines. Download our TCPA guidelines eBook (http://info.tcn.com/tcpa-compliance) for a deeper dive.

Tags: compliance (https://www.tcn.com/tag/compliance/), manual dialing (https://www.tcn.com/tag/manual-dialing/), predictive dialing (https://www.tcn.com/tag/predictive-dialing/), TCPA (https://www.tcn.com/tag/tcpa/)

TCN Announces Integration Partnership with The InterProse Corporation, Accounts Receivable and Debt Management Solutions Provider (https://www.tcn.com/tcn-announces-integration-partnership-with-the-interprose-corporation-accounts-receivable-and-debt-management-solutions-provider/)

Why Employee Engagement Is the Key to Staffing Your Contact Center (https://www.tcn.com/why-employee-engagement-is-the-key-to-staffing-your-contact-center/)



### About the Author: Adam Dummar

Adam Dummar manages new client implementation, testing of system updates, ensuring client satisfaction, and oversees new employee orientation and training within the Customer Service & Support department. His background in legal services involved debt collections compliance and management of security processes for sensitive data collection. He routinely travels to client sites and assists with setup and training for new accounts as well as troubleshooting and presenting new features to existing clients.

# Call Center Solutions

By Channel (https://www.tcn.com/call-center-solutions/by-channel/)

Overview (https://www.tcn.com/call-center-solutions/overview/)

Inbound (https://www.tcn.com/call-center-solutions/inbound/)

Outbound (https://www.tcn.com/call-center-solutions/outbound/)

True Blended (https://www.tcn.com/call-center-solutions/true-blended/)

Mobile SMS (https://www.tcn.com/call-

By Feature (https://www.tcn.com/call-center-solutions/by-feature/)

Interactive Voice Response (IVR) (https://www.tcn.com/call-center-solutions/ivr/)

Interactive Voice Messaging (IVM) (https://www.tcn.com/call-center-solutions/ivm/)

Automatic Call Distribution (ACD) (https://www.tcn.com/call-center-solutions/acd/)

Call Recording Storage (https://www.tcn.com/call-center-solutions/call-recording-storage/)

Workforce Optimization and Engagement (https://www.tcn.com/call-center-solutions/workforce-optimization/)

By Industry (https://www.tcn.com/call-center-solutions/by-industry/)

Business Process Outsourcing (BPO) (https://www.tcn.com/call-center-solutions/business-process-outsourcing-bpo/)

Collections / ARM (https://www.tcn.com/call-center-solutions/collections-arm/)

Contact Centers (https://www.tcn.com/call-center-solutions/contact-centers/)

Healthcare (https://www.tcn.com/call-center-solutions/healthcare/)

Newspapers (https://www.tcn.com/call-center-solutions/newspapers/)

By Specialization (https://www.tcn.com/call-center-solutions/by-specialization/)

Reporting & Analytics (https://www.tcn.com/call-center-solutions/reporting-and-analytics/)

Notifications and Promotions (https://www.tcn.com/call-center-solutions/notifications-and-promotions/)

Surveys (https://www.tcn.com/call-center-solutions/surveys/)

Visually Impaired Agent Solutions (https://www.tcn.com/call-center-solutions/visually-impaired-agent-solutions/)

Sign In



tcn
(https://www.tcn.com/)

**About TCN (https://www.tcn.com/about-tcn/)**

Search **Contact Us (/contact-us)**

**Request A Demo (Https://Info.Tcn.Com/Request-A-Demo)**

Call Center Solutions          Services          Compliance Suite          Resources          Blog

# Is Manually Approved Calling the Key to TCPA Compliance?



Sep 16, 2016

Posted In: Call Center Solutions (https://www.tcn.com/call-center-solutions/), Call Centers (https://www.tcn.com/call-centers/), Cloud Technology (https://www.tcn.com/cloud-technology/), Compliance (https://www.tcn.com/compliance/), Manually Approved Calling (https://www.tcn.com/manually-approved-calling/), Predictive Dialing (https://www.tcn.com/predictive-dialing/), TCPA (https://www.tcn.com/tcpa/)

Author: Adam Dummar

With the electoral season in full swing, people hesitate to answer a call from an unknown number. Will they be asked for an opinion? Prompted to take a survey? Solicited for a donation?

This is just one of many scenarios that consumers take to the Federal Communications Commission (FCC) and the umbrella of the Telephone Consumer Protection Act (TCPA) to file complaints. "Surely," they think, "these organizations are violating guidelines."

Some might be. Others, however, are not, as recent rulings in the federal courts prove. The CBE Group and Stellar Recovery (http://www.insidearm.com/daily/collection-laws-regulations/stellar-recovery-livevox-win-major-tcpa-victory/) have both won cases in which automated dialers were purportedly used.

### RECENT POSTS

TCN Announces Integration Partnership with Envision, Enhancing Its Cloud Contact Center Platform with Workforce Optimization (https://www.tcn.com/tcn-announces-integration-partnership-with-envision-enhancing-its-cloud-contact-center-platform-with-workforce-optimization/)

How Cloud Contact Center Solutions Revolutionize Outbound Billing (https://www.tcn.com/how-cloud-contact-center-solutions-revolutionize-outbound-billing/)

TCN Launches New Natural Language Compliance Tool for Its Comprehensive Cloud Contact Center Platform (https://www.tcn.com/tcn-launches-new-natural-language-compliance-tool-for-its-comprehensive-cloud-contact-center-platform/)

The 3 Overlooked Call Center KPIs for Quality and Productivity (https://www.tcn.com/the-3-

...ality-

Want to chat about TCN's cloud contact center software? If you have a question, don't be shy.        a

PLAINTIFF'S EXHIBIT
4
6-5-19

Both companies employ technology with auto-dialing capabilities, but the calls under question were made with a manual dialing system. Because of that, the court ruled the manual calls did not fall under the TCPA's definition of an Automatic Telephone Dialing System (ATDS). The calls were not automated nor did they rely on AI; rather, they required the input of a human contact center representative.

Thus, the two organizations won their days in court. But the rulings leave many others with questions about the use of automatic and manual dialing features and how they affect TCPA compliance. Read on for a refresher on Manual Dial TCPA compliance (/call-center-solutions/manual-dialer/) and how the latest cloud-based call center technology can help you stay in good standing with customers and industry regulations.

# What is Automatic Dialing?

An Automatic Telephone Dialing System (ATDS) comprises two activities. First, it stores data, usually on a server, and surfaces telephone numbers to be called via random number generators and algorithms. Second, it dials the numbers.

An ATDS runs into compliance issues because it doesn't always weed out cell phone numbers, nor does it necessarily detect when it's reached an answering machine or voice mail. It also runs aground of the FCC's very broad definition (https://www.fenwick.com/publications/pages/fcc-issues-controversial-tcpa-order-further-expanding-definition-of-autodialer.aspx) of what constitutes an ATDS, perhaps explaining the rise in claims the past few years.

# What is Predictive Dialing?

Predictive dialing is largely synonymous with ATDS. It does have some minute differences, such as an ability to differentiate between numbers belonging to people and ones belonging to fax machines. It also dials generated numbers, either randomly or from calling lists, without any human intervention.

As a result, it often butts against the TCPA's expansive definition of an autodialer, which Commissioner Ajit Pai explains via an analogy (http://www.kleinmoynihan.com/fcc-digs-in-its-heels-on-tcpa-autodialer-definition/).

*No one would say that a one-gallon bucket has the 'potential or suitability for holding, storing, or accommodating' two gallons of water just because it could be modified to hold two gallons. Nor would anyone argue that Lambeau Field in Green Bay, Wisconsin, which can seat 80,000 people, has the capacity (i.e., the potential or suitability,') to seat all 104,000 Green Bay residents just because it could be modified to have that much seating.*

His analogy is laughable, but CBE Group's and Stellar Recovery's lawsuits hinged on it. The two companies have autodialing capabilities, giving them the 'capacity' to automate calls without the intervention of a human being. They were able to win their cases by proving that the auto-dialer feature was off while contacting the plaintiffs, therefore negating 'potential.'

# What is Manual Dialing?

Manual dialing requires an interaction from a human being prior to a call being made. That is, a human, usually a call center representative, dials numbers and talks with people or leaves a message on a machine or voice mail.

The process is can be time consuming – a call center agent essentially goes through the organization's customer directory and dials one number at a time. They might speak with a person, but they're just as likely to hear a voicemail message. But this is a necessary step, considering two-thirds of every five (http://www.pewresearch.org/fact-tank/2013/07/08/two-of-every-five-us-households-have-only-wireless-phones/) households only have wireless phones, and reaching them under TCPA requires manual dialing.

(https://www.tcn.com/meat-and-potatoes-jesse-bird-cto-and-co-founder-of-tcn/)

## CATEGORIES

ACA (https://www.tcn.com/aca/)                    (7)

ACD (https://www.tcn.com/acd/)                    (5)

Adam Dummar                                       (17)
(https://www.tcn.com/adam-dummar/)

Agent Efficiency                                  (24)
(https://www.tcn.com/agent-efficiency/)

Australia                                         (4)
(https://www.tcn.com/australia/)

Auto Dialing                                      (5)
(https://www.tcn.com/auto-dialing/)

Auto Dialing                                      (1)
(https://www.tcn.com/autodialing/)

Automotive                                        (4)
(https://www.tcn.com/automotive/)

autopay                                           (1)
(https://www.tcn.com/autopay/)

Awards (https://www.tcn.com/awards/)  (24)

Blog (https://www.tcn.com/category-               (20)
blog/)

BPO (https://www.tcn.com/bpo/)        (2)

Bryce Payne                                       (6)
(https://www.tcn.com/bryce-payne/)

Business Intelligence                             (37)
(https://www.tcn.com/business-
intelligence/)

business performance                              (3)
(https://www.tcn.com/business-
performance/)

Buzz (https://www.tcn.com/buzz/)      (34)

call center kpi                                   (1)
(https://www.tcn.com/call-center-kpi/)
(1)

call center quality monitoring

💬 Want to chat about TCN's cloud contact center software? If you have a question, don't be shy.

(https://www.tcn.com/call-center-

# Blend Different Types of Dialing for Success

Under the TCPA, manual dialing seems to be the only way to stay in compliance. But the method is hugely inefficient, particularly when dealing with a large number of consumers or patients. Your call center agents don't have the time—or desire—to be on the phone all day in hopes of confirming something as simple as an appointment or stating that a repaired product is ready for pick-up.

Because of that, most contact centers blend their dialing to be more productive and effective. Automatic and predictive dialers provide the best contact numbers, which the agents then call. The challenge remains, however, in how to best combine the two dialing systems in order to stay within the TCPA's bounds.

# Stay in TCPA Compliance with Manually Approved Calling

The answer can be found with TCN's Manually Approved Calling (/call-center-solutions/manual-dialer/) (MAC) feature. It combines predictive and manual dialing so that agents call the right – and approved – people at the right time.

When third-party contact data appears on the reviewing agent's dashboard, the agent examines it, then decides whether to approve or reject the potential call. Approved calls go to the outbound-calling agent; rejected ones are segmented into appropriate lists, such as a scrubbed cell phone one.

TCN also provides the Compliance Suite (/compliance/), which comes with MAC and several other key features. With it, you can easily scrub cell phone lists, lock down IP addresses and implement manual-dial only. All the components help comply with TCPA, Consumer Financial Protection Bureau (CFPB) and other industry regulations, away from the courts and, perhaps more importantly, in your customers' good graces.

Staying in compliance can be tricky to navigate, but with the right technology in place, it can be much easier to manage than you think. Many organizations are fearful of reaching out to contacts because of the potential threat for litigation, but as the recent lawsuits have shown, there is less need for worry. So flex those dialing fingers and get to calling!

If you would like to learn more about how TCPA affects your inbound and outbound calling efforts, download (http://info.tcn.com/tcpa-compliance) our "Complete Guide to TCPA" eBook.

Tags: call center technology (https://www.tcn.com/tag/call-center-technology/), compliance (https://www.tcn.com/tag/compliance/), manual dialing (https://www.tcn.com/tag/manual-dialing/), predictive dialing (https://www.tcn.com/tag/predictive-dialing/), TCPA (https://www.tcn.com/tag/tcpa/)

**Political Seasons Provide Perfect Growth Opportunities for Cloud-Based Contact Center Technologies (https://www.tcn.com/political-seasons-growth-opportunities-for-contact-center-technologies/)**

**TCN Receives 2016 CUSTOMER Contact Center Technology Award (https://www.tcn.com/tcn-receives-2016-customer-contact-center-technology-award/)**

## About the Author: Adam Dummar

solutions/)

Call center technology                    (1)
(https://www.tcn.com/call-center-technology/)

Call Centers (https://www.tcn.com/call-     (175)
centers/)

call recording                            (3)
(https://www.tcn.com/call-recording/)

Cloud Technology                          (128)
(https://www.tcn.com/cloud-technology/)

cloud-based                               (10)
(https://www.tcn.com/cloud-based/)

Collections                               (21)
(https://www.tcn.com/collections/)

Competitive Analytics                     (6)
(https://www.tcn.com/competitive-analytics/)

Compliance                                (42)
(https://www.tcn.com/compliance/)

Conferences                               (2)
(https://www.tcn.com/conferences/)

Customer Service                          (45)
(https://www.tcn.com/customer-service/)

cyber security                            (1)
(https://www.tcn.com/cyber-security/)

data security                             (1)
(https://www.tcn.com/data-security/)

Dave Bethers                              (4)
(https://www.tcn.com/dave-bethers/)

Debt (https://www.tcn.com/debt/)          (5)

eBook (https://www.tcn.com/ebook/)        (3)

FCRA (https://www.tcn.com/fcra/)          (1)

FDCPA (https://www.tcn.com/fdcpa/)        (1)

GDPR (https://www.tcn.com/gdpr/)          (1)

Healthcare                                (3)
(https://www.tcn.com/healthcare/)

Inbound                                   (18)

Want to chat about TCN's cloud contact center software? If you have a question, don't be shy.

(https://www.tcn.com/infographic/)

5/23/2019             Is Manually Approved Calling the Key to TCPA Compliance? - TCN



Adam Dummar manages new client implementation, testing of system updates, ensuring client satisfaction, and oversees new employee orientation and training within the Customer Service & Support department. His background in legal services involved debt collections compliance and management of security processes for sensitive data collection. He routinely travels to client sites and assists with setup and training for new accounts as well as troubleshooting and presenting new features to existing clients.

IVM (https://www.tcn.com/ivm/) (4)

IVR (https://www.tcn.com/ivr/) (22)

Japan (https://www.tcn.com/japan/) (1)

Jesse Bird (https://www.tcn.com/jesse-bird/) (5)

L. Tiatia (https://www.tcn.com/l-tiatia/) (3)

Manually Approved Calling (https://www.tcn.com/manually-approved-calling/) (3)

Mckay Bird (https://www.tcn.com/mckay-bird/) (21)

NABD (https://www.tcn.com/nabd/) (1)

Natural Language Compliance (https://www.tcn.com/natural-language-compliance/) (1)

News (https://www.tcn.com/news/) (165)

Now Trending (https://www.tcn.com/now-trending/) (28)

Outbound (https://www.tcn.com/outbound/) (15)

Partners (https://www.tcn.com/category-partners/) (24)

patient payments (https://www.tcn.com/patient-payments/) (1)

Platform 3 (https://www.tcn.com/platform-3/) (8)

Political Calling (https://www.tcn.com/political-calling/) (2)

Political Surveys (https://www.tcn.com/political-surveys/) (2)

Predictive Dialing (https://www.tcn.com/predictive-dialing/) (6)

Press (https://www.tcn.com/press/) (106)

Retention (https://www.tcn.com/retention/) (1)

ROI (https://www.tcn.com/roi/) (1)

Want to chat about TCN's cloud contact center software? If you have a question, don't be shy. (https://www.tcn.com/salesforce/) (46)

5/23/2019                                    Is Manually Approved Calling the Key to TCPA Compliance? - TCN

Scalability                                      (4)
(https://www.tcn.com/scalability/)

SMS (https://www.tcn.com/sms/)         (1)

Speech Analytics                            (1)
(https://www.tcn.com/speech-
analytics/)

State of the Collection Industry          (1)
(https://www.tcn.com/state-of-the-
collection-industry/)

Switch to the Cloud                         (60)
(https://www.tcn.com/switch-to-the-
cloud/)

TCN Features                                  (38)
(https://www.tcn.com/tcn-features/)

TCPA (https://www.tcn.com/tcpa/)      (42)

tcpa compliant                               (2)
(https://www.tcn.com/tcpa-compliant/)

Terrel Bird (https://www.tcn.com/terrel-  (8)
bird/)

Trade Shows                                  (8)
(https://www.tcn.com/trade-shows/)

Uncategorized                              (2)
(https://www.tcn.com/uncategorized/)

Utah (https://www.tcn.com/utah/)        (4)

Utilities (https://www.tcn.com/utilities/) (2)

VocalDirect                                  (2)
(https://www.tcn.com/vocaldirect/)

VocalRx (https://www.tcn.com/vocalrx/) (9)

VocalVision                                  (1)
(https://www.tcn.com/vocalvision/)

VOIP (https://www.tcn.com/voip/)       (23)

Webinar                                       (16)
(https://www.tcn.com/webinar/)

WFO (https://www.tcn.com/wfo/)        (1)

# Call Center Solutions

Overview (https://www.tcn.com/call-center-solutions/overview/)

Inbound (https://www.tcn.com/call-center-solutions/inbound/)

Outbound (https://www.tcn.com/call-center-solutions/outbound/)

True Blended (https://www.tcn.com/call-center-solutions/true-blended/)

Mobile SMS (https://www.tcn.com/call-center-solutions/mobile-sms/)

Email (https://www.tcn.com/call-center-solutions/email/)

Enterprise (https://www.tcn.com/call-center-solutions/enterprise/)

Interactive Voice Response (IVR) (https://www.tcn.com/call-center-solutions/ivr/)

Interactive Voice Messaging (IVM) (https://www.tcn.com/call-center-solutions/ivm/)

Automatic Call Distribution (ACD) (https://www.tcn.com/call-center-solutions/acd/)

Call Recording Storage (https://www.tcn.com/call-center-solutions/call-recording-storage/)

Workforce Optimization and Engagement (https://www.tcn.com/call-center-solutions/workforce-optimization/)

Agent Gateway (https://www.tcn.com/call-center-solutions/agent-gateway/)

Predictive Dialer (https://www.tcn.com/call-center-solutions/predictive-dialer/)

Manual Dialer (https://www.tcn.com/call-center-solutions/manual-dialer/)

Auto Dialer (https://www.tcn.com/call-center-solutions/auto-dialer/)

Cell Phone Scrub (https://www.tcn.com/call-center-solutions/cell-phone-scrub/)

Voicemail Delivery (https://www.tcn.com/call-center-solutions/voicemail-delivery/)

Speech Analytics (https://www.tcn.com/call-center-solutions/speech-analytics/)

All Features (https://www.tcn.com/call-center-solutions/all-features/)

Business Process Outsourcing (BPO) (https://www.tcn.com/call-center-solutions/business-process-outsourcing-bpo/)

Collections / ARM (https://www.tcn.com/call-center-solutions/collections-arm/)

Contact Centers (https://www.tcn.com/call-center-solutions/contact-centers/)

Healthcare (https://www.tcn.com/call-center-solutions/healthcare/)

Newspapers (https://www.tcn.com/call-center-solutions/newspapers/)

Automotive (https://www.tcn.com/call-center-solutions/automotive/)

Reporting & Analytics (https://www.tcn.com/call-center-solutions/reporting-and-analytics/)

Notifications and Promotions (https://www.tcn.com/call-center-solutions/notifications-and-promotions/)

Surveys (https://www.tcn.com/call-center-solutions/surveys/)

Visually Impaired Agent Solutions (https://www.tcn.com/call-center-solutions/visually-impaired-agent-solutions/)

## About TCN

5/23/2019                          Is Manually Approved Calling the Key to TCPA Compliance? - TCN

About TCN (https://www.tcn.com/about-tcn/)

Overview (https://www.tcn.com/about-tcn/)

Careers (https://www.tcn.com/about-tcn/careers/)

Management Team (https://www.tcn.com/about-tcn/management-team/)

Media Room (https://www.tcn.com/about-tcn/media-room/)

Partners (https://www.tcn.com/partners/)

Privacy Policy (https://www.tcn.com/privacy-policy/)

Copyright © 2019. All Rights Reserved.